David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah  84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Mary S. Hobson
Erik F. Stidham
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant PacifiCorp



## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>      Plaintiff,<br><br>vs.<br><br>PACIFICORP,<br><br>      Defendant,<br><br>STATE OF IDAHO, by and through ALAN G. LANCE, Attorney General,<br><br>      Defendant-Intervenor. | Case No. CV 96-0308-E-BLW<br><br>**AFFIDAVIT OF DAVID B. CORY IN SUPPORT OF PACIFICORP'S  MOTION FOR SUMMARY JUDGMENT** |

| STATE OF OREGON | ) |
|---|---|
| | ) ss. |
| COUNTY OF MULTNOMAH | ) |

U.S. DISTRICT &
...

01 NOV 26  PM 5: 28

FILED
...    Clerk

David B. Cory, being duly sworn, deposes and states as follows:

1.    I am a Transmission Account Manager for PacifiCorp with responsibility over arranging for transmission services for requesting entitles.

2.    I have personal knowledge of the facts set forth below except where indicated and, as to those facts, I believe them to be true to the best of my information, knowledge and belief.

3.    Consistent with the statements made in Snake River's December 18, 1995, letter, PacifiCorp believed that Snake River wanted PacifiCorp to wheel power over PacifiCorp's distribution system down to the ultimate point of consumption for Snake River's members already served by PacifiCorp.  To my knowledge, Snake River has never presented a request to PacifiCorp for wheeling services, which would provide for delivery of electricity to customers already receiving electric service from PacifiCorp, that differs materially from its December 18, 1995 request.

4.    PacifiCorp does not wheel power over its transmission and distribution system down to the existing points at which a cooperatives' or municipal systems' customers receive service.  All of the cooperatives and municipalities served by PacifiCorp have their own distribution systems.  PacifiCorp delivers power to those systems from which points cooperatives and municipalities deliver electric service to their customers.  It is the owner of those systems, not PacifiCorp, that distributes the power to the ultimate end user.

5.    PacifiCorp is unaware of any distribution system owned by Snake River over which Snake River could distribute power to its members the way the cooperatives and municipalities to which PacifiCorp currently wheels power do. Snake River has never identified such facilities to PacifiCorp nor requested that PacifiCorp wheel power to those facilities.

6.    A true copy of *In the Matter of the Petition of PacifiCorp*, Case No. PAC-E-01-6 is attached hereto as Exhibit A.

7.    A true copy of the Affidavit of Del Ray Holm dated September 14, 2001, submitted in opposition to PacifiCorp's motion for summary judgment before the Idaho Pubic Utilities Commission is attached hereto as Exhibit B.

8.    A true copy of the Notice of Prehearing Conference and Order No. 28888 in *In the Matter of the Petition of PacifiCorp*, Case No. PAC-E-01-6 is attached hereto as Exhibit C.

9.    A true copy of the transcript of the September 28, 2001 hearing before the Idaho Public Utilities Commission in *In the Matter of the Petition of PacifiCorp*, Case No. PAC-E-01-6 is attached hereto as Exhibit D.

10.    A true copy of *In the Matter of the Commission's Investigation into Changes Occurring in the Electric Industry*, Case No. GNR-E-96-1, Order No. 26555 (August 16, 1996) is attached hereto as Exhibit E.

Dated this _____ day of November, 2001.

 

_____

David B. Cory

Subscribed and sworn to before me this _____ day of November, 2001.

 

_____

Notary Public

10.     A true copy of *In the Matter of the Commission=s Investigation into Changes*

*Occurring in the Electric Industry*, Case No. GNR-E-96-1, Order No. 26555 (August 16, 1996)

is attached hereto as Exhibit E.

Dated this _2/_ day of November, 2001.

_____
David B. Cory

Subscribed and sworn before me this _21st_ day of November, 2001.

OFFICIAL SEAL
MARYANNE WEED
NOTARY PUBLIC-OREGON
COMMISSION NO. 333565
MY COMMISSION EXPIRES JULY 7, 2004

_____
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that on the _26th_ day of November, 2001, I caused a true and correct

copy of the foregoing **AFFIDAVIT OF DAVID B. CORY IN SUPPORT OF**

**PACIFICORP=S MOTION FOR SUMMARY JUDGMENT** to be mailed, postage prepaid,

to the following:

Robert C. Huntley
Christopher F. Huntley
Huntley, Park, Thomas, Birkett,
 Olsen & Williams, L.L.P.
250 So. 5th Street, Suite 660
P.O. Box 2188
Boise, Idaho  83702

Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD  21401

Brett DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
700 W. Jefferson St., Rm. 210

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of November, 2001, I caused a true and correct

copy of the foregoing **AFFIDAVIT OF DAVID B. CORY IN SUPPORT OF**

**PACIFICORP'S MOTION FOR SUMMARY JUDGMENT** to be sent to the following as

instructed:

<table>
<tr><td>Robert C. Huntley<br>Christopher F. Huntley<br>Huntley, Park, Thomas, Birkett,<br> Olsen & Williams, L.L.P.<br>250 So. 5th Street, Suite 660<br>P.O. Box 2188<br>Boise, Idaho  83702</td><td>via Hand Delivery on 11/27/01</td></tr>
<tr><td>Charles F. Wheatley, Jr.<br>Wheatley & Ranquist<br>34 Defense Street<br>Annapolis, MD  21401</td><td>via U S Mail</td></tr>
<tr><td>Brett DeLange<br>Deputy Attorney General<br>Consumer Protection Unit<br>Office of the Attorney General<br>700 W. Jefferson St., Rm. 210<br>P.O. Box 83720<br>Boise, ID 83720-0010</td><td>via Hand Delivery on 11/27/01</td></tr>
</table>

*[signature]*

EXHIBIT

_A_

Mary S. Hobson, ISB#: 2142
STOEL RIVES LLP
101 South Capitol Blvd., Suite 1900
Boise, ID 83702-5958
Tel: (208) 387-4277
Fax: (208) 389-9040

John M. Eriksson
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 578-6937
Facsimile (801) 578-6999

Attorneys for PacifiCorp

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

| | |
|---|---|
| IN THE MATTER OF THE PETITION ) | |
| OF PACIFICORP dba UTAH POWER & ) | CASE NO. PAC-E-01-___ |
| LIGHT COMPANY FOR A DETERMINATION ) | |
| THAT IT IS NOT REQUIRED TO PROVIDE ) | PETITION OF |
| CERTAIN WHEELING SERVICE TO ) | PACIFICORP |
| SNAKE RIVER VALLEY ELECTRIC ) | |
| ASSOCIATION ) | |

Pursuant to I.C. § 61-332D and IPUCRP 053 and 101, PacifiCorp, dba Utah Power & Light Company ("PacifiCorp" or the "Company") petitions the Idaho Public Utilities Commission ("Commission") for a review of PacifiCorp's action in respect to a request by Snake River Valley Electric Association ("SRVEA") for certain wheeling service, and for an order determining that PacifiCorp shall not be required to provide such wheeling service. In support of this Petition, PacifiCorp states as follows:

1.    PacifiCorp is an electrical corporation and public utility in the state of Idaho and is subject to the jurisdiction of the Commission with regard to its public

utility operations.  PacifiCorp also provides retail electricity service in the states of California, Oregon, Utah, Washington and Wyoming.

2.   Communications regarding this Petition should be addressed to:

Douglas Larson
Vice President, Regulation
PacifiCorp
201 South Main Street, Suite 2300
Salt Lake City, Utah 84140
Telephone: (801) 220-2190
Facsimile: (801) 220-4804
E-mail: doug.larson@pacificorp.com

John M. Eriksson
STOEL RIVES LLP
One Utah Center
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111-4904
Telephone: (801) 578-6937
Facsimile (801) 578-6999
E-mail: jmeriksson@stoel.com

3.   SRVEA is a non-profit corporation organized under the laws of the State of Idaho for the purpose of buying electric power for resale to its members.  In July, 1996, SRVEA filed a lawsuit against PacifiCorp in the United States District Court for the District of Idaho.  In that litigation, SRVEA claims, among other things, that PacifiCorp's refusal to provide wheeling service for delivery of electric service to customers presently served by PacifiCorp constitutes a violation of various federal antitrust laws.  A copy of SRVEA's complaint in that action is attached hereto as Exhibit A.  Although the District Court granted summary judgment in favor of PacifiCorp based on the state action immunity doctrine, that decision was reversed by the 9th Circuit Court of Appeals, and the case has been remanded back to the District

Court. The District Court's finding of state action immunity was based on Idaho's

Electric Supplier Stabilization Act ("ESSA" or the "Act"), as it then existed. I.C. §§

61-332 et seq. ESSA has since been amended. (H.B. 142, 2001 Regular Session).

    4.    Presently, ESSA provides in part as follows:

> 61-332B. ELECTRIC SUPPLIER PROHIBITED FROM SERVING
> CONSUMERS OR FORMER CONSUMERS OF ANOTHER
> ELECTRIC SUPPLIER. No electric supplier shall supply or furnish
> electric service to any electric service entrance that is then or had at any
> time previously been lawfully connected for electric service to facilities
> of another electric supplier except as provided in this act.
> . . .
>
> 61-332D. WHEELING SERVICES. (1) An electric supplier shall not
> be required to provide wheeling service over its system if such service
> results in retail wheeling and/or a sham wholesale transaction.
>     (2) An electric supplier declining to furnish wheeling service
> pursuant to this section shall petition the commission for review of the
> electric supplier's action in respect to a request for such service. The
> commission shall, upon notice and opportunity for hearing, review the
> electric supplier's action for consistency with the purposes and
> provisions of this act, and issue an order in accordance with its finding,
> ordering either that the wheeling service shall, or shall not, be required.

    5.    SRVEA seeks wheeling service from PacifiCorp which would be

inconsistent with ESSA and which would constitute retail wheeling and/or a sham

wholesale transaction. Specifically, SRVEA seeks wheeling from certain substations all

the way to the existing points of delivery at which PacifiCorp presently delivers electric

service to its customers who are members of SRVEA. SRVEA's request, contained in

a letter dated December 18, 1995, identified the points of power receipt as including

specified substations, and further stated, "Delivery points for this request are the

*existing delivery points on Utah Power's system to each of the members of the SRVEA.*"

(Emphasis added.)   A copy of such letter is attached hereto as Exhibit B.   As represented by SRVEA's attorney to the District Court, SRVEA's request to PacifiCorp is that "We are requesting wheeling service over your facilities down to the association's members." Transcript of Hearing on Motion to Dismiss, November 25, 1996, p. 14, attached hereto as Exhibit C. The fact that SRVEA seeks wheeling all the way to PacifiCorp's existing points of delivery to its present customers is also reflected in SRVEA's responses to discovery:

> INTERROGATORY NO. 4:  Describe with particularity the wheeling services Snake River seeks from PacifiCorp, including receipt points, delivery points, voltages, and provisions for losses, scheduling, metering, and energy balancing, and identify any and all documents relating to the same.

> RESPONSE TO INTERROGATORY NO. 4:   ... SRVEA seeks transmission of electric energy purchased from Enron to PacifiCorp's Midpoint, Drummond, Borah, Jefferson, Kingsport [sic], Goshen and/or Amps substations (receipt points), from which PacifiCorp would wheel said electrical energy to individual members of SRVEA at their points of consumption, (delivery points).

> INTERROGATORY NO. 16:  Describe all assets owned, leased, operated or managed by Snake River that are used or useful for the transmission, transformation, distribution, or metering of electric power.

> RESPONSE TO INTERROGATORY NO. 16:  Power supply contract between SRVEA and Enron; engineering studies, and members' patronage. Upon PacifiCorp's agreement to wheel power to SRVEA and its members, SRVEA plans to acquire the metering facilities whereby it will bill and schedule the power to its members."

Responses 4 and 16 of Plaintiff's Answers to Defendant's First Set of Interrogatories and Request for Production of Documents, attached hereto as Exhibit D.

6.     To date, PacifiCorp has declined SRVEA's request to wheel power over PacifiCorp's facilities to SRVEA's members currently being served by PacifiCorp.

7.   The Energy Policy Act of 1992 amended the Federal Power Act in various respects and provided an express prohibition against mandatory retail wheeling and sham wholesale transactions.   That provision, contained in Section 212(h) of the Federal Power Act, states as follows:

> (h) PROHIBITION ON MANDATORY RETAIL WHEELING AND SHAM WHOLESALE TRANSACTIONS
> No order issued under this chapter shall be conditioned upon or require the transmission of electric energy:
> (1) directly to an ultimate consumer, or
> (2) to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer, unless:
> (A) such entity is a Federal power marketing agency; the Tennessee Valley Authority; a State or any political subdivision of a State (or an agency, authority, or instrumentality of a State or a political subdivision); a corporation or association that has ever received a loan for the purposes of providing electric service from the Administrator of the Rural Electrification Administration under the Rural Electrification Act of 1936 [7 U.S.C.A.§ 901 et seq.]; a person having an obligation arising under State or local law (exclusive of an obligation arising solely from a contract entered into by such person) to provide electric service to the public; or any corporation or association which is wholly owned, directly or indirectly, by any one or more of the foregoing; and
> (B) such entity was providing electric service to such ultimate consumer on October 24, 1992, or would utilize transmission or distribution facilities that it owns or controls to deliver all such electric energy to such electric consumer.
> Nothing in this subsection shall affect any authority of any State or local government under Sate law concerning the transmission of electric energy directly to an ultimate consumer.

16 U.S.C. § 824k(h).

8.   SRVEA has affirmatively acknowledged to the District Court that the wheeling which it requests PacifiCorp to provide falls within the retail wheeling/sham wholesale transaction prohibition set forth in the Energy Policy Act:

> In extending the FERC's power over wheeling, however, Congress in enacting the 1992 Energy Policy Act, expressly withheld from the FERC

any authority to order the wheeling which has been requested in the present case. Section 212(h)(2) of the FPA, as amended, does not provide the FERC with authority to order wheeling to the Plaintiff.

Plaintiff's Memorandum in Opposition to Motion to Dismiss or Stay, pp. 22-23, attached hereto as Exhibit E.

9.    The FERC has concluded that redundant meters do not constitute distribution facilities, and that wheeling to such a "system" would constitute a sham wholesale transaction. City of Palm Springs, 76 FERC ¶61,127 (July 31, 1996). Similarly, wheeling to meters installed or acquired by SRVEA for the purpose of "receiving" and then "reselling" power wheeled by PacifiCorp to those customer locations would constitute retail wheeling and/or a sham wholesale transaction under I.C. § 61-332D.

10.    The Act is designed to, among other things, "prohibit the 'pirating' of consumers of another electric supplier" and to "stabilize the territories and consumers served with electricity by such electric suppliers." I.C. . § 61-332. The Idaho Supreme Court has defined "pirating" for purposes of the Act as "providing electrical service to a customer who is receiving electricity from another electrical supplier or who had previously received electricity from that supplier." Kootenai Electric Co-op v. Washington Water Power Co., 901 P.2d 1333 (Idaho 1996).

11.    The foregoing demonstrates unequivocally that SRVEA is seeking retail wheeling and/or a sham wholesale transaction which would be inconsistent with the Act. Requiring PacifiCorp to provide the type of wheeling requested by SRVEA would

result in SRVEA pirating PacifiCorp's customers, and would also tend to destabilize, rather than stabilize, the territory served by PacifiCorp.

WHEREFORE, PacifiCorp respectfully requests that the Commission find that PacifiCorp's failure to provide the requested wheeling service described above is consistent with the purposes and provisions of the Act, and enter an Order that such wheeling service shall not be required.

DATED this  12th  day of April, 2001.

Respectfully submitted,

Mary S. Hobson
John M. Eriksson
Stoel Rives LLP

Of Attorneys for PacifiCorp

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Petition to be served upon

the following by United States mail, postage prepaid, at the addresses indicated on

April /2, 2001:

     Charles F. Wheatley, Jr.
     WHEATLEY & RANQUIST
     34 Defense Street
     Annapolis, MD  21401

     Robert C. Huntley
     HUNTLEY, PARK, THOMAS, BURKETT, OLSEN & WILLIAMS, LLP
     250 So. 5th Street, Suite 660
     P.O. Box 2188
     Boise, ID  83701

     Brett T. DeLange
     Deputy Attorney General
     Consumer Protection Unit
     Office of the Attorney General
     Len B. Jordan Building, Lower Level
     700 West Jefferson Street, Room 210
     P.O. Box 83720
     Boise, Idaho 83720-0010

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

1996 JUL 17 P 12: 28

SNAKE RIVER VALLEY )
  ELECTRIC ASSOCIATION )
13586 North 45th Street )
Idaho Falls, ID  83401 )
  )
        Plaintiff, )
  )
  )
     v. )  Civil Action No. CIV 96 - 3 0 8 - E - BLW
  )
  )  JURY TRIAL REQUESTED
  )
PACIFICORP (including UTAH )
  POWER & LIGHT, a division) )
%C. T. Corporation )
300 N. 6th St. )
Boise, Idaho  83701 )
        Defendant. )

## COMPLAINT

The Snake River Valley Electric Association, Idaho, a cooperative authorized to engage in the sale of electric power to its members in the State of Idaho, Plaintiff, by its attorneys, brings this action against the defendant named herein, and alleges as follows:

## I
### JURISDICTION AND VENUE

1.  This Complaint is filed and this action is instituted against defendant under Sections 4 and 16 of the Act of Congress of October 15, 1914, as amended, 15

U.S.C. §§ 15, 26, commonly known as the Clayton Act, in order to restrain and to provide compensation to the plaintiff for the past and continuing violation by the defendant, as hereinafter set forth of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Section 3 of the Clayton Act, 15 U.S.C. § 14.

2.    Violations of law hereinafter described are being carried out within the State of Idaho where the defendant transacts business and is found.

## II
## THE PARTIES

3.    The plaintiff is a cooperative organized and existing under the laws of the State of Idaho to acquire electric power at wholesale and to resell such electric power to its members and other users desiring service in an area surrounding Idaho Falls consisting of the unincorporated area served by the defendant through Utah Power and Light, bounded on the south by Idaho Power Company and the Northern boundary of Caribou County, on the North by Vigilante Electric and Idaho Power Company, on the East by Tall River Rural Electric Cooperative and Tower Valley Power and Light Cooperative, and on the West by Salomon River Electric Cooperative and Lost River Electric Cooperative.

4.    The plaintiff has been seeking, for over the past three (3) years, to supply the electric power requirements for the area, but has been thwarted in its efforts by the defendant, which has refused to deal with the plaintiff in its efforts to purchase wholesale power and certain electrical system facilities from defendant, and thereafter refusing to

wheel electric power to the plaintiff's over defendant's existing transmission facilities from alternate power suppliers from which the plaintiff has a right to purchase wholesale powers.

5.     The defendant. Pacificorp, through its division Utah Power and Light, organized under the laws of the State of Oregon, is doing business in the State of Idaho and has offices located in the State for the purpose of doing such business.  Defendant is a vertically-integrated power company which generates, and transmits and sells electric power at wholesale-for-resale and at retail.  Defendant presently owns and operates transmission lines in the area in which the plaintiff is authorized to purchase wholesale power and operate as an electric power cooperative, and while defendant makes sales at wholesale from those facilities to entities located near to that area, the company has consistently refused to deal with the plaintiff to allow the plaintiff to establish its own electric facilities within the area, and has also refused to wheel electric power over its transmission facilities in the area to the plaintiff, which would allow the plaintiff to use competitive wholesale power acquired from other suppliers, to resell to its customers to thereby compete with defendant.

### III
### TRADE AND COMMERCE

6.     The defendant. Pacificorp and its division Utah Power and Light. is a large integrated power company operating in Idaho and other states.  Defendant owns generation facilities or has obtained purchase rights to power located in the interstate

- 4 -

market, which brings power to the area presently being served by Utah Power and light in Idaho. PacifiCorp owns and operates an extensive system of transmission lines necessary to transport its own power supplies as well as any competing supplies of wholesale power necessary to serve the area of Utah, for which the plaintiff is seeking to serve its members. Transmission is the act of transporting electric power from generating plants to transmission facilities to points where it is sold to customers, either at wholesale or at retail. Wheeling is a sub-function of transmission. It refers to the transportation of bulk electrical energy produced or acquired by one party, using the facilities of another party, for the benefit of the first party or a third party.

7.     Defendant owns and controls the only electric transmission facilities by which the plaintiff can purchase power at wholesale from another supplier and sell to the members of its cooperative in competition with Utah Power and Light's sales to such area. It would be economically impractical to construct alternate electric transmission facilities to connect plaintiff with the transmission of generation facilities of any other utilities. Defendant has monopoly power in the transmission of electric power to the plaintiff.

8.     Plaintiff and defendant compete (a) for the sale of electricity at retail within plaintiff's service area; (b) to serve customers located in areas on or near the border between plaintiff's service areas and the service area of defendant; (c) to attract potential new customers; and (d) to retain existing customers.

9.      Defendant maintains interconnections with numerous utility systems (other than its municipal and rural electric cooperative customers) over which it interchanges power.  These utilities are located in Utah, Oregon, California and Montana.  Defendant is a member of an interstate power pool which consists of utilities located in Idaho, and which is interconnected with other utility companies in the Western United States.

10.      Defendant is engaged in, and its activities affect, interstate commerce. Defendant sells and buys wholesale electric power to and from electric utilities located in several states, and the power exchanged among them crosses state lines.  This power, in turn, is delivered at wholesale by defendant to various other municipal and cooperative customers.    The alleged violations of law hereinafter described have prevented, and are preventing, the flow of electric power in interstate commerce.

## IV
## VIOLATIONS ALLEGED

11.      Defendant, in continuing violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; have contracted, conspired, restrained, monopolized, and attempted to monopolize trade and commerce by:

(a)      refusing to deal, or refusing to deal except upon unreasonable and anticompetitive conditions, to block the plaintiff from acquiring wholesale supplies of power from defendant and facilities for the service of electric power to plaintiff's competitive distribution system;

(b)    refusing to wheel, or refusing to wheel except upon unreasonable or anticompetitive conditions, wholesale power to plaintiff from available, alternate suppliers;

(c)    preventing plaintiff from obtaining access to wholesale electric power from suppliers other than defendant, and preventing competing suppliers from gaining access to plaintiff;

(d)    by refusing to compete with the plaintiff, as a wholesale purchaser of power, to block the plaintiff from obtaining alternate, lower cost supplier of power at wholesale, and delivering those power supplies to its members;

(e)    refusing to deal or to wheel outside sources of power to plaintiff at wholesale, on the ground that plaintiff thereafter would compete with it for customers and the right to serve.

12.    Defendant, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, has acted to substantially lessen competition and tended to create a monopoly by:

(a)    refusing to wheel or transmit electric power at wholesale to the plaintiff;

(b)    restricting the sale of electricity to plaintiff on the condition that plaintiff not purchase or use the electricity and generation and transmission facilities of other utilities, where such other utilities are in competition with defendant; and

(c)     the allegations of ¶ 11 are incorporated herein.

## V
## EFFECTS

13.     The aforesaid Acts have had, and will have, the following effects, among

others:

(a)     defendant has been able to preserve its monopoly in the sale

of electric power at retail in the area in which plaintiff seeks

to establish a competing, lower-cost power supply;

(b)     competition in the sale of electric power at wholesale to

plaintiff has been eliminated;

(c)     plaintiff has been deprived of free and open competition in the

sale to it of electric power at wholesale;

(d)     trade and commerce in the generation, sale and transmission

of electric power has been restrained;

(e)     the plaintiff has been denied the benefits of lower-cost power

and an expanded revenue base which, but for the defendant's

activities, would have been available to it;

(f)     plaintiff is being denied revenues and potential profits from

the customers not served by reason of the acts of defendant;

(g)     as a result of defendants' continuing violations of Sections 1

and 2 of the Sherman Act and Section 3 of the Clayton Act,

- 8 -

plaintiff has been and will be damaged in an amount estimated at $10,000,000 before trebling;

(h)    plaintiff's competitive position in viability is threatened; and

(i)    potential competitors of defendant are discouraged from entering into or expanding into defendants' markets.

## VI
## PRAYER

14.    WHEREFORE, plaintiff prays:

(a)    that defendant's refusal to deal on the proposed acquisition by plaintiff of electric facilities, or its refusal to transmit electric power, to plaintiff be adjudged to be unreasonable and anticompetitive in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

(b)    that defendant be permanently enjoined from refusing to transmit electric power and from refusing to transmit electric power, except on reasonable anticompetitive conditions, over its transmission facilities from any electric power supplier to plaintiff;

(c)    that defendant be required to file with the Federal Energy Regulatory Commission, under §§ 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d and 824e, a tariff or tariffs

pursuant to which defendant will transmit electric power in accordance with the preceding sub-paragraphs;

(d)  that plaintiff recover treble damages of $30,000,000 as prescribed by Section 4 of the Clayton Act, 15 U.S.C. § 15, for defendants' violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act;

(e)  that plaintiff has such other and further relief as the Court may deem just and proper; and

(f)  that plaintiff recover the costs of this action, including attorney's fees.

## VII
## DEMAND FOR JURY TRIAL

16.  Plaintiff demands a trial by jury in this action.

Respectfully submitted,

Charles F. Wheatley, Jr.
Timothy P. Ingram
WHEATLEY & RANQUIST
34 Defense Street
Annapolis, MD  21401
(410) 266-7524, (301) 261-8699 (fax)

Peter J. Richardson
DAVIS WRIGHT TREMAINE
999 Main Street
Boise, ID  83702-9010
(208) 338-8216, (208) 338-8299 (fax)

July 17, 1996

**EXHIBIT B**

# Snake River Valley Electric Association
## "Our Own Power System Serving Us"

December 18, 1995

Mr. John Mooney, Executive Vice President
Utah Power and Light Company
201 South Main OUC 2300
Salt Lake City, Utah 84140

Dear Mr. Mooney:

The Snake River Valley Electric Cooperative ("SRVEA" or "Cooperative"), a non-profit corporation chartered under the laws of Idaho as an electric cooperative, hereby requests that Utah Power and Light Company provide firm transmission service over its electric system to the Cooperative for up to 150 MW from May 1 to September 15 and up to 21 MW from September 16 to April 30 each year, to supply the electric requirements of the Cooperative's members for the period May 1996 to April 2001.

The points of wholesale power receipt by SRVEA include Midpoint Substation, Drummond Substation, Borah Substation, Jefferson Substation, Kinport Substation, Goshen Substation and Amps Substation.

Delivery points for this request are the existing delivery points on Utah Power's system to each of the members of the SRVEA.

SRVEA requests that the Utah Power and Light Company provide it with a service agreement for the wheeling service requested herein within thirty (30) days.

For the Board of Directors,

Del Ray Holm, President
SNAKE RIVER VALLEY ELECTRIC ASSOCIATION

cc: Frederick W. Buckman

**13586 North 45th East      *      Idaho Falls, Idaho 83401**

EXHIBIT C

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

U.S. DISTRICT COURT
DISTRICT OF IDAHO
FILED AT_____M

MAR 1 5 1999

By_____Deputy

SNAKE RIVER VALLEY ELECTRIC
ASSOCIATION,

          Plaintiff,

vs.

PACIFICORP (including Utah
Power & Light Company, a
Division),

          Defendant.
_____

STATE OF IDAHO, by and through
ALAN G. LANCE, Attorney General,

          Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 96-0308-E-BLW

MOTION TO DISMISS

HELD BEFORE THE HONORABLE B. LYNN WINMILL

AT POCATELLO, IDAHO

NOVEMBER 25, 1996

Court Reporter:      JOSEPH P. RODEN, C.S.R.
                      Boise, Idaho

<u>A P P E A R A N C E S:</u>

For the Plaintiff:    Wheatley & Ranquist
                       BY:  CHARLES F. WHEATLEY, JR.,
                       34 Defense Street
                       Annapolis, Maryland  21401

     - and -

                       Davis, Wright, Tremaine, L.L.P.
                       BY:  PETER J. RICHARDSON, ESQ.
                       877 West Main Street, Suite 604
                       Boise, Idaho   83702

For the Defendant:   Stoel Rives LLP
                       BY:  DAVID J. JORDAN, ESQ. and
                             JOHN M. ERIKSSON, ESQ. and
                       One Utah Center
                       201 South Main Street, Suite 1100
                       Salt Lake City, Utah   84111

     - and -

                       Stoel Rives LLP
                       BY:  ERIK F. STIDHAM, ESQ.
                       101 South Capitol Boulevard, Suite 1900
                       Boise, Idaho  83702

2

P R O C E E D I N G S

NOVEMBER 25, 1996

1
2
3
4
5          THE CLERK:  Court will now hear Civil Case
6  No. 96-0308-E, Snake River Valley versus PacifiCorp, on
7  motion to dismiss.
8          THE COURT:  Good afternoon, Counsel.
9          MR. WHEATLEY:  Good afternoon, Your Honor.
10          MR. JORDAN:  Good afternoon, Your Honor.
11          THE COURT:  Counsel, before we begin, let me
12  indicate I only have an hour for this hearing.  I can delay
13  the next proceeding for a few minutes, but in courtesy to
14  them, I can't stay much more than an hour.  On the other
15  hand, I know this matter is very important to both sides
16  and I don't want you to think that I am going to give short
17  shrift in any respect to your arguments.
18          Let me indicate that I have reviewed all the
19  briefs and supporting documents which you have filed.  I
20  have not had a chance to go back, as I would like to of, to
21  review some of the cases which you have cited in your
22  briefs.  So, I am somewhat up to speed, but I am obviously
23  not in a position to rule from the bench today.  I intend
24  to take the matter under advisement.  However, because I
25  have reviewed the matter in some detail, I think we can get

1  their facilities, pay them a full return on that.  So, they

2  went back to the Defendant and asked for authority to --

3  for them to transmit power to them, to wheel it, that they

4  had acquired their outside source of power.

5       THE COURT:  But the transmission would be

6  completely upon PacifiCorp or Utah Power & Light's

7  facilities?

8       MR. WHEATLEY:  Yes, yes.  The outside source of

9  power would be delivered at so-call receipt points where

10 Utah Power and PacifiCorp are interconnected with other

11 outside systems and so the power will come in, it's all in

12 interstate commerce, our supply will come in at that point

13 and be delivered.  We were simply asking them to transmit

14 that power over their facilities.  We aren't asking them to

15 sell any of their facilities anymore, but to simply provide

16 wheeling to us for our supply of power.  And that was --

17 there was no mystery about our position.  In fact, in the

18 appendix to their original filing, they enclosed a letter

19 that was sent to them by Snake River which specifically

20 said, "We are requesting wheeling service over your

21 facilities down to the association's members."

22       So at that point, we were not asking that they

23 not use any of their existing facilities, there was nothing

24 that was going to be duplicated, nothing was going to be

25 left where they would not receive full compensation for

**EXHIBIT D**

Charles F. Wheatley, Jr.
Timothy P. Ingram
WHEATLEY & RANQUIST
34 Defense Street
Annapolis, MD 21401
Telephone: (410) 266-7524
Fax: (301) 261-8608

Peter J. Richardson
DAVIS WRIGHT TREMAINE
877 W. Main Street, Suite 604
Boise, Idaho 83702
Telephone: (208) 338-8200
Fax: (208) 338-8299
Attorneys for Plaintiff
  Snake River Valley Electric Association

Stoel Rives S.L.C.

AUG 1 2 1997

RECEIVED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION, <br><br> Plaintiff, <br><br> vs. <br><br> PACIFICORP (including UTAH POWER & LIGHT COMPANY, a division), <br><br> Defendant. | No. Case No. CV 96-0308-E-BLW <br><br> PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS |

COMES NOW Plaintiff, Snake River Valley Electric Association (SRVEA) and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and answers Defendant PacifiCorp's First Set of Interrogatories and Request for Production of Documents as follows:

## GENERAL OBJECTIONS

1.      SRVEA generally objects to all definitions, instructions, Interrogatories and Requests for Production to the extent they attempt or purport to impose obligations on SRVEA beyond those imposed or authorized by the Federal Rules of Civil Procedure.

INTERROGATORY NO. 4:  Describe with particularity the wheeling services Snake River seeks from PacifiCorp, including receipt points, delivery points, voltages, and provisions for losses, scheduling metering, and energy balancing, and identify any and all documents relating to the same.

RESPONSE TO INTERROGATORY NO. 4:  SRVEA seeks wheeling services from PacifiCorp to deliver electric energy from its wholesale provider, Enron, to points of delivery on Utah Power & Light's system in Eastern Idaho.  More particularly SRVEA seeks transmission of electric energy purchased from Enron to PacifiCorp's Midpoint, Drummond, Borah, Jefferson, Kingsport, Goshen and/or Amps substations (receipt points), from which PacifiCorp would wheel said electrical energy to individual members of SRVEA at their points of consumption, (delivery points), in the area described in response to Interrogatory No. 3.  The power will be delivered by Enron at the receipt points at the voltage levels of PacifiCorp's transmission facilities and delivered at the voltage currently in effect on that transmission system at the delivery points.  The losses will be provided by SRVEA through its power supplier, Enron.  The scheduling will be provided by Enron, based on information from SRVEA. The transmission provider will provide any necessary ancillary services for the transmission system, including energy balancing.

INTERROGATORY NO. 5:  Separately identify and quantify all costs, including costs for power, energy, transmission, distribution, metering, billing, general administration, and line extensions, that will be charged to Snake River members.  For each cost, describe in detail the calculation or other basis for establishing the cost.

RESPONSE TO INTERROGATORY NO. 5:  Power and energy: Power and energy costs are included in the Enron contract identified in response to Interrogatory No. 1.

Transmission and Distribution: Transmission costs to PacifiCorp's system are included in the Enron contract identified in response to Interrogatory No. 1.  Transmission and Distribution costs within PacifiCorp's system have not been provided by PacifiCorp to SRVEA.

Metering/Billing, General Administration: The costs for metering-billing and general administration will be assessed by SRVEA under standard practices used by electric cooperatives in

RESPONSE TO INTERROGATORY NO. 15: See Response to Interrogatory No. 9.

INTERROGATORY NO. 16: Describe all assets owned, leased, operated or managed by Snake River that are used or useful for the transmission, transformation, distribution, or metering of electric power.

RESPONSE TO INTERROGATORY NO. 16: Power supply contract between SRVEA and Enron; engineering studies, and members' patronage. Upon PacifiCorp's agreement to wheel power to SRVEA and its members, SRVEA plans to acquire the metering facilities whereby it will bill and schedule the power to its members.

INTERROGATORY NO. 17: State how Snake River will meter the electric usage of its members, and quantify all costs that will be incurred by Snake river for metering.

RESPONSE TO INTERROGATORY NO. 17: SRVEA proposes to own meters. The cost of this, to the extent it is not included in the SRVEA engineering report prepared by EGY Resources Development (see Response to Interrogatory No. 9), will be quantified by SRVEA's expert witness.

INTERROGATORY NO. 18: State all kWh, kW and other charges that will be made to Snake River members, by customer class, for the time over which Snake River claims damages.

RESPONSE TO INTERROGATORY NO. 18: This is the subject of an analysis by SRVEA's experts which is not yet complete, but which will be supplied to defendant when the expert study is completed.

INTERROGATORY NO. 19: State the factual basis for the allegation in paragraph 11(a) of the Complaint regarding PacifiCorp blocking "plaintiff from acquiring wholesale supplies of power from defendant."

RESPONSE TO INTERROGATORY NO. 19: Defendant has refused to meet with the Plaintiffs to provide wheeling services to SRVEA, or to provide wholesale power on a competitive bid basis to the Plaintiff.

INTERROGATORY NO. 20: State the factual basis for the allegation in paragraph 12(b) of the Complaint that PacifiCorp has restricted "the sale of electricity to plaintiff on the condition that plaintiff not purchase or use the electricity and generation and transmission facilities of other

REQUEST NO. 6: Produce any and all documents which constitute, discuss, refer to, or relate to any wholesale power supplies sought or contracted for by Snake River.

RESPONSE TO REQUEST NO. 6: To the extent said documents do not contain confidential, privileged or trade secret information see Response to Request for Production No. 1.

DATED this 11th day of August, 1997.

SNAKE RIVER VALLEY
ELECTRIC ASSOCIATION

By: _____
Carl Palmer

WHEATLEY & RANQUIST

By: _____
Charles F. Wheatley, Jr.

DAVIS WRIGHT TREMAINE LLP

By: _____
Peter J. Richardson

> section, the term "antitrust laws" has the meaning given in subsection (a) of the first sentence of section as of Title 15, except that such term includes section 45 of Title 15 to the extent that such section relates to unfair methods of competition.

16 U.S.C. Section 824k(e)(2) (1994).

In the House Report No. 102-474 (VII), by the Judiciary Committee, the Committee recommended certain amendments to the Energy Policy Act related to FERC's authority over wheeling. H. Rep. No. 102-474 (VII), 102 Congress, 2nd Session 1-8, *reprinted in* 1992 U.S. Code & Admin. News 2271-2276. In particular, the Judiciary Committee specifically requested inclusion of the "antitrust savings clause" quoted above. The Report summarized the purpose of the amendments regarding the antitrust laws:

> The purpose of the antitrust amendment is to protect the integrity of antitrust jurisprudence and enforcement, while fully preserving FERC's responsibility to weigh antitrust-related concerns in deciding whether to order the wheeling of power between utilities. This amendment deletes an explicit statutory reference to "the antitrust laws" in FERC's new responsibilities, while preserving statutory references to the antitrust-related goals of promoting competition and stopping discriminatory practices. The amendment also clarifies the antitrust savings clause to ensure that the antitrust laws remain fully available to public enforcement officials and private parties.

H. Rep. No. 102-474 (VII), 102 Congress, 2nd Sess. 4, *reprinted in* 1992 U.S. Code Cong. & Ad. News 2271 at p. 2272.

Later in the report, the Committee elaborated on its concern:

> the Committee's concern is that an *explicit* grant of statutory authority to provide relief based on the antitrust laws themselves could well result in a FERC-made body of antitrust "precedent" that would improperly influence, confuse, or segment the continuous development of antitrust jurisprudence in and by the courts.

In extending the FERC's power over wheeling, however, Congress in enacting the 1992 Energy Policy Act, expressly withheld from the FERC any authority to order the wheeling which

has been requested in the present case. Section 212(h)(2) of the FPA, as amended, does not

provide the FERC with authority to order wheeling to the Plaintiff[11]. Thus, FERC has no

jurisdiction to order wheeling to Plaintiff and the Court has exclusive jurisdiction on that key

issue under the Federal antitrust laws, as previously held by the Supreme Court in *Otter Trail*.

See also *Florida Municipal Power Agency v. Florida Power and Light Co,*. 64 F.3d 614 (11th

Cir. 1995); of *City of Kirkwood v. Union Electric Co,.* 671 F.2d 1173, 1177-79 (8th Cir. 1982),

*cert denied* 459 U.S. 1170 (1983); *City of Groton v. Connecticut Light and Power Co.,* 662 F.2d

921, 929-930 (2d Cir. 1981).

## CONCLUSION

For the foregoing reasons, Plaintiff submits that Defendant's Motion to Dismiss or Stay

should be denied.

DATED this 4/ᵗᴸ day of September, 1996.

DAVIS WRIGHT TREMAINE LLP

By: *Pet J. Richardson*

Peter J. Richardson

Attorneys for Plaintiff

---

[11] Section 212 (h)(2) of the Federal Power Act restricts the authority of the FERC to order wheeling for any entity having authority to provide electric service to the public under State law, if it was not providing electric service to such ultimate consumers on October 24, 1992. 16 U.S.C. Sec. 824k (h)(2) *City of Palm Springs*, Docket No TX 96-7-000 (Order by FERC issued July 31, 1996, Slip op. at 15). Defendant has included this restriction in filing its final open access transmission tariff at FERC which excludes plaintiff as an "eligible customer" from receiving any transmission service thereunder. See Affidavit of Del Ray Holm, attached.

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS OR STAY - Page 23
43636\1\Oppose.Mem

**EXHIBIT**

*B*

Robert C. Huntley, ISB No. 894
Christopher F. Huntley ISB No. 6056
Huntley, Park, Thomas Burkett,
 Olsen & Williams, L.L.P.
250 So. 5ᵗʰ Street, Suite 660
P.O. Box 2188
Boise, ID   83702
Telephone: (208) 388-1230
Fax : (208) 388-0234

Charles F. Wheatley, Jr.
Wheatley and Ranquist, P.A.
34 Defense Street
Annapolis, MD 21401
Telephone: (410) 266-7524
Fax: (301) 261-8699

Attorneys for Snake River Valley Electric Association

# BEFORE THE
# IDAHO PUBLIC UTILITIES COMMISSION

| | |
|---|---|
| IN THE MATTER OF THE PETITION OF PACIFICORP d.b.a. UTAH POWER & LIGHT COMPANY FOR A DETERMINATION THAT IT IS NOT REQUIRED TO PROVIDE CERTAIN WHEELING SERVICE TO SNAKE RIVER VALLEY ELECTRIC ASSOCIATION | Case No. PAC-E-01-6 <br><br> **AFFIDAVIT OF DEL RAY HOLM** |

STATE OF IDAHO                               :

COUNTY OF BONNEVILLE                    :

**Affidavit of Del Ray Holm on behalf of
Snake River Valley Electric Association-1**

DEL RAY HOLM, being duly sworn, deposes and states follows:

1.    I am President of the Snake River Valley Electric Association with responsibility over its operations in the State of Idaho.  I have personal knowledge of the facts herein.

2.    The Snake River Valley Electric Association (SRVEA) is a duly organized electric cooperative.  It was chartered, effective December 27, 1993, and a copy of the Articles of Incorporation are attached hereto as Exhibit No. 1.  The basic purpose of the Association was set forth in Article II specifying that its purpose was "to generate, manufacture, purchase, acquire and accumulate electric energy for its members only and to transmit, distribute, furnish, sell and dispose of such electric energy to its members only and to construct, erect, purchase, lease as lessee in any manner acquire, own, hold, maintain, operate, sell dispose of, lease as lessor, exchange and mortgage plants, buildings, works, machinery, supplies, apparatus, equipment and electrical transmission and distribution lines or systems necessary, convenient or useful for carrying out and accomplishing any of the foregoing purposes."    The non-profit Association was also authorized to borrow money, to make and issue bonds, notes and other evidence of indebtedness and to secure the payment of such bonds upon any or all of the property, rights, privileges or permits of the Corporation. These provisions of the Articles of Incorporation of the Snake River Valley Electric Association, are similar to those used by electric cooperatives throughout Idaho and many other states of the country, to my knowledge.

3.    Prior to incorporating the cooperative, the members of the Association, which included a number of the farmers engaged in the raising of potatoes, which were dependent upon irrigation facilities powered by electricity, put up substantial funds commencing in 1989 to hire an engineering firm to determine the feasibility of constructing any and all facilities needed to undertake

Affidavit of Del Ray Holm on behalf of
Snake River Valley Electric Association-2

the operation of the electric cooperative in the area. In 1989 and 1990, we raised substantial funds, initially over $111,000 for the undertaking of an engineering study.

    4.    In October, 1990, EGY Resource Development Corpl (EGY) was commissioned by the irrigation pumpers comprised of Snake River Valley Electric Cooperative to study the feasibility of developing an electric cooperative. Following the completion of the study which was very extensive, and took three years to complete, the engineering study concluded that it would be economically feasible for SRVEA to construct a distribution system which would include distributions lines, substations and transmission facilities. Subsequent to obtaining this final report in 1993, we formally established the Snake River Valley Electric Association which had been instrumental in all of he prior operations up to that time.

    5.    In 1994, SRVEA met with a number of finance companies, including the Cooperative Finance Corp., relating to the funding of the costs outlined in the feasibility study for our proposed distribution system. (and transmission system) We were advised that funding would be available to undertake the project.

    6.    SRVEA, in 1994, requested that PacifiCorp sell its electric facilities in the area to SRVEA not owned by SRVEA's members. At that point, a number of SRVEA's members had paid for the full capital cost of their distribution facilities to serve them to PacifiCorp. and these facilities would be transferred to SRVEA for its ownership, control and operation, as well as to acquire any other facilities, either by construction by SRVEA or purchase from PacifiCorp. SRVEA would also acquire and provide the wholesale power that would be used by the electric cooperative through these new facilities and, at that time, requested that PacifiCorp sell wholesale power to SRVEA for SRVEA to resell to its members. PacifiCorp refused to enter into negotiations with SRVEA at that

**Affidavit of Del Ray Holm on behalf of**
**Snake River Valley Electric Association-3**

time and refused to sell any wholesale power to SRVEA and expressly declined to sell its electric system to us.

7.    In early 1995, we learned that PacifiCorp had agreed to sell its northern Idaho electric properties to the Washington Water Power Company and also noted that PacifiCorp had entered into Nevada Power's territory as a competitor in that area.  As a result of this, the entire Board of Directors wrote to the President and CEO of PacifiCorp on May 3, 1995 and requested it consider selling to SRVEA all or part of PacifiCorp's non-economic rural electric properties in southeastern Idaho.  We noted that PacifiCorp's providing of power service had resulted in many losses to the farmers and that PacifiCorp provision of power only on an interruptible basis was a major problem. *See* Exhibit No. 2 hereto. We also sought to acquire wholesale power from PacifiCorp.

8.    On June 30, 1995, we received a very short letter from Verl R. Topham, Senior Vice President and General Counsel of PacifiCorp, refusing to meet with us or to consider our proposal. Exhibit No. 3 hereto.

9.    Subsequently, in 1995, we, through our engineering company, EGY Resource Development Corporation, sought to purchase wholesale power necessary for the cooperative from other suppliers.  By letter of November 22, 1995, we received a firm proposal from the Idaho Power Company to sell us wholesale power far below PacifiCorp's rates for a five-year contract from May 1, 1996 through April 1, 2001.

10.    On December 18, 1995, I again wrote to PacifiCorp requesting that it provide transmission service for our supply of wholesale power for SRVEA from Idaho Power which would deliver that power at receipt points on PacifiCorp's transmission system to be wheeled to SRVEA at facilities it would own at the delivery points and there resell it over the facilities owned by its

Affidavit of Del Ray Holm on behalf of
Snake River Valley Electric Association-4

members or to be constructed to SRVEA to its members. In reply, PacifiCorp again refused to provide any transmission service to SRVEA.

11. After our proposal for purchase of wholesale power from Idaho Power had expired, we undertook negotiations with another supplier, namely, Enron Power Marketing, Inc. We were able to negotiate and enter into a power purchase agreement from Enron for firm power which would be effective on May 1, 1997 for five years with an option to continue thereafter. Enron would sell the power at wholesale to be delivered to SRVEA at designated points of receipt on the borders of where PacifiCorp's transmission system was interconnected through substations with transmission systems of other utilities. SRVEA would take title to the power at those points of receipt, and after transmission service by PacifiCorp, SRVEA would itself take delivery of the power at delivery points where SRVEA would thereafter own or control facilities for service of the power to its members. Many of these facilities had already been paid by SRVEA's members in cash to PacifiCorp. Here again, PacifiCorp refused to wheel SRVEA's wholesale power across its transmission system to SRVEA at the delivery points, where SRVEA would undertake to resell it over facilities controlled by SRVEA to its members.

12. SRVEA has consistently from 1989 been dedicated to establishing an electric cooperative similar to the numerous other electric cooperatives in Idaho, as well as throughout the United States to acquire power at wholesale whether it is supplied by PacifiCorp, or other wholesale power suppliers and has sought to even purchase all transmission and distribution facilities required for that purpose for which SRVEA has been able to arrange financing. When PacifiCorp refused to sell its transmission system to us, we then have consistently sought to obtain wheeling by it to delivery points where SRVEA would be able to acquire the power and SRVEA would, thereafter own and

Affidavit of Del Ray Holm on behalf of
Snake River Valley Electric Association-5

construct any necessary distribution facilities that PacifiCorp might refuse to sell. Most of those distribution facilities have already been paid for by SRVEA's members as an up front capital contribution. PacifiCorp's refusal to wheel wholesale power for resale to our members is indistinguishable from PacifiCorp's furnishing such wholesale wheeling for resale service to a number of other cooperatives and municipal systems in its service territory.


DEL RAY HØLM


STATE OF IDAHO          )
COUNTY OF   ADA          )


Subscribed and sworn to before me this ___11th___ day of September, 2001.

7/30/05



Office of the Secretary
Service Date
October 30, 2001

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

STOEL RIVES S.L.C.

| | |
|---|---|
| IN THE MATTER OF THE PETITION BY PACIFICORP FOR AN ORDER DETER-MINING THAT PACIFICORP IS NOT REQUIRED TO PROVIDE WHEELING SERVICE TO SNAKE RIVER VALLEY ELECTRIC ASSOCIATION. | ) ) ) ) ) ) ) ) |

CASE NO. PAC-E-01-6     NOV - 2 2001

NOTICE OF     **RECEIVED**
PREHEARING CONFERENCE

**ORDER NO. 28888**

This case was initiated when PacifiCorp filed a petition pursuant to *Idaho Code* § 61-332D seeking review of PacifiCorp's refusal to provide electric wheeling service to Snake River Valley Electric Association (Snake River). Snake River filed a Motion to Dismiss PacifiCorp's petition, and PacifiCorp subsequently filed a Motion for Summary Judgment on its petition. The Idaho Attorney General filed a Petition to Intervene, but "only in the limited context of opposing Snake River's present motion [to dismiss]." Petition to Intervene, p. 2. The Commission issued Order No. 28807 granting the Attorney General's Petition to Intervene for the limited purpose stated in his petition.

The Commission heard oral argument on both the Motion to Dismiss and the Motion for Summary Judgment on September 28, 2001. By this Order the Commission denies Snake River's Motion to Dismiss and also denies PacifiCorp's Motion for Summary Judgment. The Motion to Dismiss must be denied because there is no legal basis for the Commission to disregard its statutory duty to review PacifiCorp's action "for consistency with the purposes and provisions of [the Electric Supplier Stabilization Act]." *Idaho Code* § 61-332D(2). The Motion for Summary Judgment is denied because the record does not demonstrate all material facts are undisputed. The Commission will convene a prehearing conference on November 20, 2001, to assist the parties in formulating the issues, obtain stipulations as to undisputed facts, schedule a hearing, and for any other purpose set forth in Commission Rule of Procedure 211, IDAPA 31.01.01.211.

### HISTORY

#### A. *The Antitrust Action*

The genesis of this case predates by several years the petition PacifiCorp filed with the Commission. Snake River in 1997 initiated an action in U.S. District Court after PacifiCorp

Court stated it is irrelevant that the ESSA did not *expressly* prohibit retail wheeling. *Snake River Valley Elec. Ass'n*, 238 F.3d at 1193.

The appellate court reversed the District Court, however, finding that the second prong of the *MidCal* test was not met, i.e., that the state did not "exercise ultimate control over the challenged anti-competitive conduct." *Snake River Valley Elec. Ass'n*, 238 F.3d at 1193. The Court concluded that "PacifiCorp can, consistent with ESSA, avoid competition for its customers simply by declining to consent [to wheel electricity]—an act undertaken without review by any state agency." *Snake River Valley Elec. Ass'n*, 238 F.3d at 1194. The Court found that such a decision is "wholly within the utility's control and without state supervision the state has, in effect, given the utility partial control over the no-competition policy." *Id.* The Court also stated "it should be clear that Idaho's situation, . . . could be addressed by legislative action providing for supervision." *Snake River Valley Elec. Ass'n*, 238 F.3d at 1195.

## B. Legislative Response

In response to the Circuit Court's decision, the Idaho Legislature amended the ESSA to address the deficiency identified by the Court. First, a section was added clearly stating that an electric supplier is not required to provide retail wheeling. Section 61-332D(1) now states that "an electric supplier shall not be required to provide wheeling service over a system if such service results in retail wheeling and/or a sham wholesale transaction." Second, the legislature provided for oversight by the Commission when a regulated utility denies a request for wheeling service. Paragraph 2 of Section 61-332D requires the Commission to, "upon notice and opportunity for hearing, review the electric supplier's action for consistency with the purposes and provisions of this act, and issue an order in accordance with its finding, ordering either that the wheeling service shall, or shall not, be required."

## C. The Removal Action

On April 13, 2001, PacifiCorp filed a Petition pursuant to Section 61-332D(2), asking the Commission to review PacifiCorp's action in denying Snake River's request for wheeling service, and an order determining that PacifiCorp is not required to provide the wheeling service. Rather than file an answer to PacifiCorp's Petition, Snake River on May 7, 2001 filed a Notice of Removal of State (IPUC) Case No. PAC-E-01-6 in the United States District Court, District of Idaho, which removed the case to the federal court. PacifiCorp filed a Motion to Remand the case back to the Commission, and following oral arguments on June 27, 2001, the U.S. District

Act enacted in 1992. Section 212(h) of the Federal Power Act, codified at 16 U.S.C. § 824K(h) prohibits the Federal Energy Regulatory Commission (FERC) from ordering retail wheeling or sham wholesale transactions. The provision provides that FERC cannot issue an order for wheeling which shall "be conditioned upon or require the transmission of electric energy: (1) directly to an ultimate consumer or (2) to, or for the benefit of, an entity if such an electric energy would be sold by such entity directly to an ultimate consumer, unless: . . ." certain conditions apply, none of which are applicable here.

PacifiCorp also cites a FERC decision to support its assertion that Snake River's transmission request amounts to retail wheeling or a sham wholesale transaction. According to PacifiCorp, FERC "has concluded that redundant meters do not constitute distribution facilities, and that wheeling to such a 'system' would constitute a sham wholesale transaction." PacifiCorp Petition, p. 6 citing *City of Palm Springs*, 76 FERC ¶ 61, 127 (July 31, 1996). Finally, PacifiCorp contends that "wheeling to meters installed or acquired by [Snake River] for the purpose of 'receiving' and then 'reselling' power wheeled by PacifiCorp to those customer locations would constitute retail wheeling and/or a sham wholesale transaction under *Idaho Code* § 61-332D." PacifiCorp Petition, p. 6.

Snake River filed a Motion to Dismiss PacifiCorp's petition on July 9, 2001.

## SNAKE RIVER'S MOTION TO DISMISS

As stated by its counsel during oral argument, Snake River filed its Motion to Dismiss on two separate grounds: "first, the question of the jurisdiction of the state Commission over wholesale transactions, and secondly, the issue that the actual matters that PacifiCorp is raising are *res judicata* based on the findings of fact made by the federal courts in the federal proceedings." Tr. p. 7. Snake River argues PacifiCorp's petition should be dismissed "because it raises federal issues as to the applicability of the federal antitrust laws to PacifiCorp, and seeks an improper end-run around long standing litigation between [Snake River] and PacifiCorp in the U.S. District Court for Idaho, and in the U.S. Court of Appeals for the Ninth Circuit on appeal therefrom, involving the application of the Federal Antitrust laws to PacifiCorp. . . ." Snake River also contends PacifiCorp's petition "improperly requests the Commission to consider wholesale wheeling issues over which it lacks jurisdiction under the commerce clause of the U.S. Constitution and the Federal Power Act." Snake River Motion and Brief, p. 2. Snake River characterizes PacifiCorp's petition as a "transparent attempt to have the State Commission

that would result in retail wheeling or sham wholesale transactions, 16 U.S.C. § 824k(h). PacifiCorp contends "it is disingenuous for [Snake River] to argue that FERC has exclusive jurisdiction over the question of whether that wheeling should be required." PacifiCorp Answer to Motion to Dismiss, p. 16.

The Office of the Idaho Attorney General also responded to Snake River's Motion to Dismiss. The Attorney General noted that *Idaho Code* § 61-332D was enacted in response to the decision of the Ninth Circuit Court, where the court "concluded that the State of Idaho did not adequately supervise the allegedly anti-competitive conduct prescribed by ESSA's provisions." Attorney General's Answer to Motion to Dismiss, p. 2. Quoting the court where it said "Idaho's situation . . . could be addressed by legislative action providing for supervision," the Attorney General contends the "Idaho Legislature promptly responded to the Ninth Circuit's invitation, enacting HB 142," amending the ESSA. Attorney General's Answer to Motion to Dismiss, p. 2. According to the Attorney General, "[t]his Section establishes one new way in which the State of Idaho, through the Commission, intends to adequately supervise the policies underlying ESSA." Attorney General's Answer to Motion to Dismiss, p. 3. If Snake River were to prevail on its Motion to Dismiss, argues the Attorney General, the Commission would avoid its responsibility to apply *Idaho Code* § 61-332D and analyze and apply the provisions of the ESSA. "Such a result would be to stymie the State of Idaho's interest in properly supervising the policies underlying ESSA. This consequence runs counter to the Legislature's goals and intent in amending ESSA. . . ." Attorney General's Answer to Motion to Dismiss, pp. 3-4.

### COMMISSION DECISION ON MOTION TO DISMISS

There can be little doubt regarding the authority of the Commission to hear a petition filed pursuant to Section 61-332D. That section *requires* an electric supplier that denies a wheeling request to file a petition with the Commission, and also *requires* the Commission to "review the electric supplier's actions for consistency with the purposes and provisions of this act." A grant of authority to the Commission by the legislature could hardly be more direct.

Snake River's first ground for dismissal purportedly raises "the question of the jurisdiction of the state commission over wholesale transactions." Tr. p. 7. Although the Federal Power Act enacted in 1992 authorizes FERC to regulate the terms for access to wholesale transmission services, the Act did not affect "any authority of any State or local government under State law concerning the transmission of electric energy directly to an ultimate consumer."

is prohibited from requiring retail wheeling; that is, the transmission of electric energy directly to an ultimate consumer. The Commission is also prohibited from requiring what can be called sham wholesale wheeling; that is, transmission of electric energy to an entity for resale to an ultimate consumer in instances in which the substance of the transaction amounts to retail wheeling because wholesale sales to the entity is in fact a subterfuge intended to circumvent the ban on retail wheeling.

*City of Palm Springs*, 76 FERC ¶ 61, 127 at p. 14.

When asked to review proposed transmission requests, FERC stated it "must ensure that, in a particular fact pattern in an individual case, it does not allow or approve transactions that clearly are nothing more than an indirect sale to an ultimate consumer formulated for the purposes of circumventing the statutory prohibition." FERC accordingly said it "should be sensitive to proposed transactions which in form meet the technical requirements of a sale for resale but which are, in economic substance, a retail sale to an end-user." It is in this context that FERC stated "Congress undoubtedly intended [FERC] to look at the substance of each transaction, not just the form, to detect subterfuges." Thus FERC was making clear its own responsibility to analyze proposed transactions brought to it to detect subterfuge. That is not the same as concluding as a matter of law that FERC exclusively has jurisdiction to analyze the character of proposed transmission transactions in each state.

In fact, the principal issue in Palm Springs is identical to the one presented by PacifiCorp's petition in this case: is the requested transmission service retail wheeling and thus one not permitted by law? Like FERC, this Commission is directed by applicable law to review the nature of the proposed service to make a determination. *Idaho* Code § 61-332D(2). The Commission's role cannot be defeated by a mere allegation that the service is a wholesale service and thus is outside the jurisdiction of the Commission. Instead, the Commission will look at the substance of each transaction, and will not accept without question one party's characterization of it, to determine whether it is consistent with the purposes and provisions of the ESSA.

The second ground for Snake River's Motion is related to the first. Snake River asserts "that the actual matters that PacifiCorp is raising . . . here are *res judicata* based on the findings of fact made by the federal court in the federal proceedings earlier." Tr. p. 7. Snake River claims PacifiCorp admitted, and the federal courts found, that Snake River is a wholesale supplier of electricity and therefore its request for wheeling service must be for wholesale

## PACIFICORP'S MOTION FOR SUMMARY JUDGMENT

The issues framed by the initial pleadings (PacifiCorp's Petition and Snake River's Answer and Motion to Dismiss) and the parties' arguments appear again in PacifiCorp's Motion for Summary Judgment and Snake River's answer. By its motion, PacifiCorp asks "for summary judgment in favor of PacifiCorp and an order declaring that PacifiCorp's actions in respect to a request by Snake River . . . for certain wheeling service is consistent with the purposes and provisions of ESSA and that PacifiCorp shall not be required to provide a wheeling service that [Snake River] seeks." PacifiCorp Motion, p. 1. PacifiCorp contends it is undisputed that wheeling power "to meters installed or acquired by Snake River for the purpose of 'receiving' and then 'reselling' power wheeled by PacifiCorp to those customer locations would constitute retail wheeling and/or a sham wholesale transaction." PacifiCorp contends it is entitled to judgment as a matter of law pursuant to *Idaho Code* § 61-332D.

PacifiCorp asserts there is no factual dispute regarding the nature of the wheeling service requested by Snake River. Included as attachments to PacifiCorp's Motion are representations by Snake River regarding the receipt and delivery points for the power PacifiCorp was asked to wheel. According to the provided attachments, Snake River represented the "outside source of power would be delivered at so-called receipt points where Utah Power and PacifiCorp are interconnected with other outside systems." Delivery points of the wheeled power for customers would be "the existing delivery points on [PacifiCorp's] system to each of the members of [Snake River]." If those facts are undisputed, and if such an arrangement constitutes retail wheeling or a sham wholesale transaction, PacifiCorp would be entitled to judgment as a matter of law under Section 61-332D.

In its response to Pacificorp's Motion, however, Snake River contends the material facts regarding the wheeling service it requests are in dispute. In an affidavit filed with its response, the president of Snake River avers that he "wrote to PacifiCorp requesting that it provide transmission service for our supply of wholesale power for [Snake River] from Idaho Power which would deliver that power at receipt points on Pacificorp's transmission system to be wheeled to [Snake River] at facilities it would own at the delivery points and there resell it over the facilities owned by its members or to be constructed by [Snake River] to its members." The affidavit also states that Snake River has "consistently sought to obtain wheeling by [PacifiCorp] to delivery points where [Snake River] would be able to acquire the power and

by PacifiCorp to Snake River's members would amount to such a transaction, PacifiCorp, according to Section 61-332D, "shall not be required to provide" it.

Although the ESSA does not define "retail wheeling" or "sham wholesale transaction," the parties and the Commission accept the definition provided by the Federal Power Act and FERC. Retail wheeling is "the transmission of electric energy directly to an ultimate consumer," and a sham wholesale transaction is the "transmission of electric energy to an entity for resale to an ultimate consumer in instances in which the substance of the transaction amounts to retail wheeling because wholesale sales to the entity is in fact a subterfuge intended to circumvent the ban on retail wheeling."        16 U.S.C. § 824k(h); *City of Palm Springs*, 76 FERC ¶ 61, 127 at p. 14.

Construing all disputed facts in the record liberally in favor of Snake River, and drawing all reasonable inferences therefrom in favor of Snake River, the Commission must deny the Motion for Summary Judgment. According to the affidavit provided by Snake River's president, Snake River seeks transmission of power to "facilities it would own at the delivery points and there resell it over the facilities owned by its members or to be constructed by [Snake River] to its members." Snake River's president also states in his sworn affidavit that its wheeling request "is indistinguishable from PacifiCorp's furnishing such wholesale wheeling for resale service to a number of other cooperatives and municipal systems in its service territory." Thus the factual record regarding the distribution facilities owned by Snake River, interpreted in favor of Snake River, is disputed. Because ownership by Snake River of distribution facilities involves a material fact for resolution by the Commission, and the record as currently constituted does not permit an undisputed finding that Snake River owns no facilities, Snake River is entitled to a hearing on PacifiCorp's petition. If Snake River owns distribution facilities with a point of delivery to which PacifiCorp can wheel power, then the wheeling service it requests may not constitute retail wheeling.

To guide the parties' preparation for hearing and to avoid delay, the Commission provides its understanding of the issues presented by ESSA and PacifiCorp's petition. First, to avoid the ban on retail wheeling, Snake River must own distribution facilities to which PacifiCorp can deliver power and over which Snake River can distribute power to the ultimate consumer. The Commission agrees with FERC's conclusion in *City of Palm Springs* that "[t]he interposition of unnecessary, duplicate meters does not . . . constitute ownership or control of

IDAHO PUBLIC UTILITIES COMMISSION
PO BOX 83720
BOISE, IDAHO 83720-0074
(208) 334-0338 (TELEPHONE)
(208) 334-3762 (FAX)

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho, this _30 th_
day of October 2001.

PAUL KJELLANDER, PRESIDENT

MARSHA H. SMITH, COMMISSIONER

DENNIS S. HANSEN, COMMISSIONER

ATTEST:

Jean D. Jewell
Commission Secretary

Vld/O:PACE016_ws4

NOTICE OF PREHEARING CONFERENCE
ORDER NO. 28888                                    15



BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

IN THE MATTER OF THE PETITION OF   )
PACIFICORP DBA UTAH POWER & LIGHT   )
COMPANY FOR A DETERMINATION THAT   ) CASE NO. PAC-E-01-6
IT IS NOT REQUIRED TO PROVIDE   )
CERTAIN WHEELING SERVICE TO SNAKE   )
RIVER VALLEY ELECTRIC ASSOCATION.   )
                                    )

BEFORE

COMMISSIONER DENNIS HANSEN (Presiding)
COMMISSIONER MARSHA SMITH
COMMISSIONER PAUL KJELLANDER

PLACE:     Commission Hearing Room
           472 West Washington
           Boise, Idaho

DATE:      September 28, 2001

VOLUME I - Pages 1 - 68



CSB REPORTING
Constance S. Bucy, CSR No. 187
17688 Allendale Road • Wilder, Idaho 83676
Boise (208) 890-5198 • Fax (208) 459-6645
Caldwell (208) 250-1212 • Email csb@rmci.net

1              A P P E A R A N C E S

2

3    For PacifiCorp:          Stoel Rives, LLP
                              by JOHN ERIKSSON, Esq.
4                             201 South Main
                              Suite 1100
5                             Salt Lake City, Utah  84111

6    For SRVEA:               WHEATLEY & RANQUIST
                              by CHARLES F. WHEATLEY, JR., Esq.
7                             34 Defense Street
                              Annapolis, Maryland  21401
8                                     -and-
                              Huntley, Park, Thomas
9                             by ROBERT HUNTLEY, Esq.
                              Post Office Box 2188
10                            Boise, Idaho  83701

11   For the Office           BRETT T. DeLANGE, Esq.
     of the Attorney          Deputy Attorney General
12   General:                 Post Office Box 83720
                              Boise, Idaho  83720-0010

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 1**

BOISE, IDAHO, FRIDAY, SEPTEMBER 28, 2001, 9:00 A. M.

COMMISSIONER HANSEN: Well, good morning, ladies and gentlemen. This is the time and place set for oral arguments in Case No. PAC-E-01-06, known as in the matter of the petition of PacifiCorp, Utah Power & Light Company for a determination that it is not required to provide certain wheeling services to Snake River Valley Electric Association.

Today we'll first hear the oral argument on a motion to dismiss filed by Snake River Valley Electric Association, then we'll hear the oral argument on the motion for summary judgment filed by PacifiCorp, Utah Power & Light.

I'm Commissioner Dennis Hansen. I'll be Chairman of today's hearing. At my left is Commissioner Marsha Smith and at my right is Commission President Paul Kjellander. The three of us make up the Commission. First, we'll take the appearances of the parties and we'll start with you, Mr. Eriksson.

MR. ERIKSSON: Thank you. John Eriksson with Stoel Rives for PacifiCorp.

COMMISSIONER HANSEN: Okay.

**Page 2**

MR. DeLANGE: Brett DeLange for the Office of the Attorney General.

MR. WHEATLEY: Charles Wheatley for the Snake River Valley Electric Association.

MR. HUNTLEY: And Robert Huntley for Snake River Valley.

COMMISSIONER HANSEN: Thank you. We'll begin our oral argument on a motion to dismiss filed by Snake River Valley Electric Association and before we get started, because of the time constraints with the Commission today, it will allow each party a maximum of 30 minutes to make their argument and so we will begin with Snake River Valley Electric Association on the motion and we'll start with you, Mr. Wheatley.

MR. WHEATLEY: Thank you, Your Honor. I'm going to present the argument here on behalf of Snake River Valley Electric Association. Sometimes I'll refer to it as Snake River or SRVEA which are the initials of it. When I was coming to this Commission this morning with Mr. Huntley, he told me something I hadn't known, that he had a period here years ago representing the Idaho Irrigation Association. I said how did you ever get me talked into doing this argument instead of yourself, so you'll have to just

**Page 3**

bear with me.

PacifiCorp -- I'd like to give a little background of the proceedings that led up to the filing of this complaint or petition by PacifiCorp. PacifiCorp filed this with the Commission on April 12th of 2001 and it's all based, the whole petition or complaint is all based, on Snake River's original complaint which was filed back on July 17, 1996, against PacifiCorp in the Federal District Court for PacifiCorp's refusal to deal or to sell or to wheel wholesale power to SRVEA in violation of the federal antitrust laws, and at that time after the complaint was filed, PacifiCorp filed later in 1996 a motion to dismiss that complaint on the grounds that there was -- it was immune from the federal antitrust laws under the state action exemption and that argument was heard before the -- on that motion to dismiss and the District Court issued a decision, its initial decision, on December 25th of 1997 and they denied PacifiCorp's motion.

The Attorney General through Mr. DeLange here later filed a petition to intervene in the case and subsequently as the case was approaching the final trial level, it filed a motion for summary judgment. In that second motion for summary judgment, the

**Page 4**

District Court reversed its prior decision and ruled that there was immunity. Subsequently, the case was appealed to the Ninth Circuit and that court set aside and reversed the District Court's second decision and remanded the case down so that the Ninth Circuit has held that PacifiCorp based on the law of the ESSA at that time has no immunity from the federal antitrust laws and both the -- in the federal proceedings, both the District Court ruled and the Ninth Circuit ruled and found that SRVEA was seeking wholesale power and was seeking wholesale wheeling of that power for delivery to SRVEA who would own the power, had bought it and was owning the power, at the delivery points for resale by SRVEA to its own members.

Prior to the Ninth Circuit's en banc decision on remand which was issued January 29th of this year, the ESSA was amended in what was originally HB NO. 1 on December 8th of 2000 and that added a new section, the Section 61-332D, which provides that "an electric system shall not be required to provide wheeling services over its system if such services result in retail wheeling and/or sham a wholesale transaction."

The language of this amendment to the ESSA was almost identical to language that was

rejected an explicit claim by the California Public
Utilities Commission that Edison, the same Edison we
hear a lot about today, that the facilities used by
Edison in California were for "local distribution"
holding that that is a question "to be decided by the
FPC as an original matter."

Now, subsequent to that case, there have
been a number of other decisions that have followed
that and pursued it and there's a case, for instance,
like the Arkansas Power and Light versus Federal Power
Commission where there were sales by the Arkansas
Power and Light Company to a cooperative in Arkansas
at low voltages at 108 different delivery points that
were not subject to state PUC jurisdiction and there
must be -- there are a lot of cases involved relating
to this issue; for instance, the two latest Supreme
Court cases where, Mississippi Power versus Moore,
487 354 and Nantahala Power and Light Company versus
Thornburg, 476 U.S. 953, they upheld the power in the
federal arena over wholesale sales of power in
interstate commerce which they say preempted the state
regulatory commissions.

Now, the FERC has ruled on the very
issue that is involved at PacifiCorp's complaint in
this case involving new Section 61-332D of the ESSA.
Page 9

namely, retail turned wholesale transactions. The
issue came up in the Order 888 proceedings before the
Commission and in Order 888-A, the Commission said we
will reject the request for rehearing of our decision
to be the primary forum for addressing the recovery of
stranded costs caused by retail-turned wholesale
customers.

That was appealed to the D.C. Circuit
which ruled that the Commission had adequately
distinguished between recovery of stranded costs from
retail customers and recovery from retail-turned
wholesale customers and in the former situation, the
court said the customers remain retail customers
subject to state jurisdiction. In the latter
situation, customers become wholesale customers
subject to FERC's exclusive jurisdiction. This very
different result justifies FERC's different treatment
of the two situations.

That's in the recent decision of
Transmission Access Policy Study Group versus FERC
which was the magnum opus appeal of Order 888 to the
federal courts. Cert. was granted by the Supreme
Court but not on that issue, so that issue is a final
decision. There have been other cases. There's a
very recent case that I was familiar with in PP&L,
Page 10

Inc. at 95 FERC, paragraph 61,160 and that involved a
case where the customers were identical to SRVEA in
this case. They were municipals, not co-ops, but they
were buying power in the wholesale market and they
were taking the power at delivery down at 12 kV. It
was definitely called distribution voltage, not
transmission voltage, and the company sought to file a
rate for that service for these customers based upon a
decision of the Pennsylvania Public Utilities
Commission as to the rates for retail customers and
the commission said that with respect to PP&L's
reliance on the rolled-in methodology that the
Pennsylvania Commission used, the Federal Commission
stated it does not defer to state commission rate
determinations for the purposes of setting wholesale
transmission rates, so that brings us down as a matter
of law, I think, to the situation where we have
PP&L -- I mean PacifiCorp in this case seeking a
determination that SRVEA's request for wholesale
wheeling for resale to its members is a sham should be
dismissed by this Commission.

Now, the issue as to SRVEA's request for
wholesale wheeling for resale is clearly within the
exclusive federal jurisdiction which preempts the
consideration of this question under state law.
Page 11

Now, the second -- before I go on,
though, I'd like to state some additional facts that
are, I think, germane to this matter. We filed an
affidavit by Dr. Wilson in the second docket coming
up, but Dr. Wilson was a former -- has had a long
record which he sets forth of experience in these
matters both at the state level and at the federal
level and in his affidavit, he refers to, at
paragraph 15 of his affidavit he refers to, the fact
that PacifiCorp has filed wholesales for resales in
its filings before -- in its Form 1 with the FERC for
263 separate companies, cooperatives, municipalities
and other public authorities and during the last year
of 2000 reported by them, those wholesales produced
revenues of $1,736,000,000 and that's PacifiCorp's
report filed at the FERC on June 29.

That report, incidentally, was attached
as Exhibit No. 1 to our brief in opposition to the
motion for summary judgment and of those 263
cooperatives and municipals and other wholesale
customers, many take their power at delivery points
and voltages that are indistinguishable from those
which are involved for Snake River.

Now, PacifiCorp admits in its answer
brief to our motion to dismiss that, and I'll quote
Page 12

1    prevailed at District Court and that was reversed.
2          Initially, the Ninth Circuit issued an
3    opinion in October of 2000 and at that time there was
4    concern by the state as to the impact of that decision
5    on the State of Idaho. The interim committee on
6    electric restructuring discussed it in their November
7    meeting of 2000 and based on that decision and the
8    concern, legislation was drafted which addressed that
9    concern. House Bill 1 was adopted in special session
10   in December of 2000 that had a sunset provision. It
11   was therefore readopted as HB142 in February of 2001.
12         It was then after that we filed a
13   petition in this case based on a section that was
14   added by HB142 and that was 61-332B. That provision,
15   as I said, was the basis of this petition in this case
16   and that brings me to the point of just what is this
17   case about. Our petition on the last page states what
18   we are asking this Commission to grant. The relief
19   that we request is that the Commission find that
20   PacifiCorp's failure to provide the requested wheeling
21   service described above, that is, just the wheeling
22   service described in the petition, is consistent with
23   the purposes and provisions of the act, that is ESSA,
24   and enter an order that such wheeling service, not any
25   other wheeling service, but the wheeling service that

Page 17

1    is described in the petition, shall not be required,
2    and I emphasize the scope of what we asked for because
3    there's a lot of discussion about wheeling service
4    that is other than what is described in the petition
5    and I'll get to that later on.
6          Before addressing Snake River's
7    arguments, I'd like to briefly address some factual
8    issues or factual assertions that they make that come
9    into play in their arguments and in doing so, I by no
10   means agree with any other factual assertions that
11   haven't been addressed.
12         First, they repeatedly refer to
13   PacifiCorp's "admission" that Snake River is organized
14   to acquire electric power and sell it to its members
15   and say that that is not consistent with the Company's
16   position in this case and that simply doesn't hold
17   water. An admission that Snake River was organized
18   for the purpose of selling wholesale power or doing
19   anything else is not an admission that that is what
20   they're actually doing, and what they are actually
21   doing, what they have actually requested is what is
22   described in our petition. Our admission about what
23   they were organized for has nothing to do with what
24   they have sought.
25         Secondly, they repeatedly refer to the

Page 18

1    Company's stipulation before Judge Winmill in the
2    antitrust case regarding the Enron contract and
3    describe it as the Company stipulated that it will
4    provide power at the same rates and terms as the Enron
5    contract and they even go so far as to say that this
6    Company stipulated that it would wheel power.
7          Well, the Company's stipulation in
8    Federal Court, as we've described, is a stipulation to
9    really step into the shoes of the Enron contract if
10   Enron terminated the contract and if Snake River
11   ultimately prevails in the antitrust case, which means
12   that they are -- that PacifiCorp is ordered to provide
13   the kind of wheeling service that they want.
14         Well, Snake River keeps failing to
15   mention that second condition; that is, that the
16   Company would actually be required to provide the
17   wheeling service. As I say, they even go so far as to
18   say that the stipulation was -- and looking at page 12
19   to 13 of their reply brief, it talks about
20   furthermore, PacifiCorp's stipulation in the Federal
21   Court proceedings that if the Enron contract was
22   canceled by Enron that PacifiCorp would agree to wheel
23   the power to SRVEA at the same rates, terms and
24   conditions set forth in the Enron contract at wheeling
25   rates determined by FERC.

Page 19

1          Well, the commitment to sell power at
2    the Enron contract rates, really to step into the
3    shoes of the Enron contract, was a stipulation that we
4    would sell power at specified substations that the
5    Enron contract states and then the wheeling
6    obligation, which was the other condition, would be
7    satisfied if the court ordered the Company to provide
8    the wheeling, then that wheeling would be provided
9    under rates set by FERC. We did not agree to wheel
10   service. The agreement was to sell power based on
11   certain conditions.
12         Another item just -- there's so many
13   factual assertions that they make that are false it's
14   difficult to address them all, but some of them I just
15   have to hit on. In their reply brief at pages 3 and
16   4, they state portions of their complaint, allegations
17   in their complaint and on page 4 they say, these basic
18   facts contained in PacifiCorp's petition to this
19   Commission and expressly admitted by PacifiCorp in its
20   answer to SRVEA's complaint provide the basis for so
21   and so. Well, we did not admit the facts that they
22   say we admitted. I mean, I have our answer. I can
23   provide copies of it if you'd like, but otherwise,
24   I'll just read the answer to you.
25         In paragraph 4 of their complaint, which

Page 20

1  special rules of interpretation, nothing in ESSA shall
2  be construed to preclude any electric supplier from
3  extending electric service to its own property or
4  facilities or to another electric supplier for
5  resale. As we've pointed out, this section deals with
6  the sale of the commodity, the electricity itself. It
7  doesn't deal with wheeling. It says this Commission
8  is not going to be precluded, nothing in the act is
9  going to preclude one supplier from making wholesale
10 sales to another. That's not within the Commission's
11 jurisdiction.
12       To say that that section effectively
13 deletes 332D I think is really ludicrous. I mean,
14 they're making an argument that this rule of
15 interpretation which was also amended at the same time
16 ESSA was amended in December and then also in 142 that
17 the legislature meant to take away the very authority
18 which they are so explicitly granting to the
19 Commission in 332D to address the very issue that the
20 legislature was concerned about.
21       Now, before I leave that, I'd like to
22 address several statements that they make in their
23 reply brief on page 14. First, they say that
24 PacifiCorp misstates the special rules of
25 interpretation. For the life of me, I cannot

                                                  Page 25

1  understand the basis for their claim that the Company
2  has misstated when we just quoted what it said. Then
3  they go on to say, they state that PacifiCorp's
4  contrary construction of this as not depriving the
5  Commission of its authority to review what has been
6  clearly confirmed to be a proposed wholesale
7  transaction in the federal proceedings because Section
8  61-332D somehow explicitly overrules the blanket
9  exemption of Section 61-334(3).
10       Then they refer to our answer at page
11 10. Well, turning to my answer at page 10, that quote
12 that they attribute to us doesn't exist. What is
13 stated starting on page 9, this provision, that is
14 334, however does not deprive the Commission of its
15 authority to review actions and issue orders regarding
16 retail wheeling and/or sham wholesale transactions as
17 explicitly provided in 332D, which is what I just
18 argued.
19       Then on the same page they make an
20 argument about what "electric service" covers. They
21 say that it clearly covers both the furnishing of
22 electricity, i.e., the wheeling of it, as well as the
23 sale of power. Well, ESSA defines what is electric
24 service and it is not wheeling. Electric service
25 under ESSA means electricity furnished to an ultimate

                                                  Page 26

1  consumer by an electric supplier.
2       Finally, on the same page, they
3  mischaracterize PacifiCorp's argument by saying that
4  PacifiCorp's construction of ESSA as exempting only
5  the wholesale for resale power while giving the states
6  jurisdiction over all transportation of wholesale
7  power, directly conflicts with then existing
8  Federal Power Act. We're not saying, we are not
9  claiming that ESSA gives this Commission jurisdiction
10 over all transmission of electric power.
11       The petition that we filed is very
12 specific. It deals with their request for the Company
13 to deliver electricity right down to the ultimate
14 consumer, right to the existing points of delivery.
15 They go on in the argument about lack of
16 jurisdiction. They continue on, but the argument is
17 based on a scenario where it would quote, and this is
18 at page 18 of their reply brief "own and/or control or
19 construct any and all facilities necessary to provide
20 the service to its members from the points of delivery
21 where the wholesale power will be delivered to
22 SRVEA." That's not the scenario we're dealing with.
23 We're dealing with the request to deliver the power
24 completely over PacifiCorp facilities right down to
25 the existing points of delivery.

                                                  Page 27

1       Now, perhaps as a reflection of how
2  strained their argument is on jurisdiction, I'd turn
3  to page 16 and quote, "The delivery of the power by
4  SRVEA to its members is therefore not a 'local retail
5  matter subject to state jurisdiction.'" I think that
6  would be a great surprise to the many states which
7  regulate the sale of power by co-ops to their
8  members. It's a retail sale and states have authority
9  to regulate that.
10       They say it's not a local retail matter
11 subject to state jurisdiction. In the State of Idaho,
12 it's not subject to jurisdiction of the Commission,
13 the retail sale by the co-op to its members, but this
14 statement is just way overstated, I'm sorry. Again, I
15 guess coming back, this case doesn't deal with Snake
16 River delivering electricity. This case deals with
17 PacifiCorp delivering electricity right down to the
18 point of delivery of existing customers, and finally,
19 they argue, Snake River argues, that the very issue
20 contained in Section 61-332D has been expressly ruled
21 by the FERC as in its jurisdiction. I think we
22 already dealt with this in the answer, but I would
23 just again point out that 332D provides for this
24 Commission to make a decision based on state law, not
25 the Federal Power Act. We're asking this Commission

                                                  Page 28

1  respond and then we will ask, see if the Commission
2  has any questions and that will wrap up this argument,
3  so we will now give you the 10 minutes to respond.
4       MR. WHEATLEY: I'd like to first address
5  comments by Mr. DeLange. He's referring to the
6  legislature having here passed a bill relating to the
7  ESSA and changing it which is true. The key point,
8  though, that he's not addressing and what he's
9  overlooking is that the legislature can allow this
10  Commission to do things within this Commission's
11  jurisdiction and function. The legislature can't
12  require this Commission to supervise wholesale for
13  resale transactions and I think the legislature knew
14  that when they passed the amended ESSA because they
15  kept that Section 334C in there which precludes
16  anything in the amended ESSA from applying to a resale
17  situation and the resale is the key word for a
18  wholesale transaction and they kept that word in there
19  and you cannot distinguish that language by saying,
20  well, when they said electric supplier, electric
21  service for resale is exempt from this act as they
22  did, you can't go back and say, well, electric service
23  is just electricity. Electric service is defined in
24  the ESSA as meaning electricity furnished to an
25  ultimate consumer by an electric supplier.
                                              Page 33

1       Under the definition of electric
2  supplier, SRVEA as an electric cooperative is an
3  electric supplier and if you're furnishing
4  electricity, you're not only providing for electric
5  service, you're not only supplying electricity, you're
6  supplying, you have to supply of necessity, the wires
7  and the wheeling to do that, so I think it's a fair
8  and clear interpretation of the ESSA that it did not
9  apply to wholesale service.
10       Now, that doesn't mean that the ESSA as
11  amended is out the window, not at all. If you have a
12  situation which is within your traditional
13  jurisdiction of a retail customer, say some large
14  retail customer comes in and wants wheeling and it
15  wants to provide service from another supplier, that's
16  clearly a retail situation which is within your
17  jurisdiction. SRVEA is not that kind of an animal.
18       It's been part of the long-established
19  tradition of a cooperative, electric cooperative,
20  which relies on buying its power at wholesale, it's
21  always subject to the federal arena and getting
22  wheeling of that wholesale service for resale and
23  that's entirely separate as recognized by a long line
24  of federal and state cases right up to recently that
25  these are all matters which fall within the federal
                                              Page 34

1  arena, so I think the ESSA makes sense for matters
2  that are within your jurisdiction. It doesn't make
3  sense for this case where SRVEA has been from the very
4  beginning and as confirmed by the final decisions, as
5  a matter of fact, by the District Court and the Ninth
6  Circuit, that it is a wholesale for resale customer.
7       Those findings by that court are binding
8  now upon PacifiCorp and the state which were parties
9  to that proceeding, so that's the fundamental
10  difference, and we get down to the situation where
11  really what PacifiCorp is saying, they're trying to
12  say that based on the facts of this case since the
13  wheeling is going to go down below our transmission
14  voltage down to a distribution level, it's therefore
15  automatically subject to this new state statute. It's
16  still wholesale wheeling down to the point where it is
17  delivered and the facts of this case are quite clear,
18  as I'll address in the next argument, that SRVEA from
19  the beginning was buying the power at wholesale, was
20  getting the wheeling of that at wholesale to be
21  delivered to it. It was then at the delivery point
22  going to resell it to its members and at that delivery
23  point there are transmission facilities that are going
24  to be owned or controlled by SRVEA to each of its
25  members, and I'll get into that in the next argument
                                              Page 35

1  relating to our affidavits and that's part of the
2  program, it's been that from the beginning.
3       When SRVEA first started, it wanted to
4  buy the whole system there and it had the money from
5  the Rural Electric Cooperative CFC to do that and it
6  still is interested and has said all along that it
7  intends from the point of delivery, wherever that is,
8  it's going to own it at that point and it's going to
9  deliver it to its customers by its own facilities
10  beyond that point, so I think what we have is a
11  situation where PacifiCorp is trying to make something
12  out of some bits and pieces of materials that it has
13  tried to hone out of the federal proceeding which have
14  never been tested, never resolved, but the clear
15  conclusion of those proceedings today is that SRVEA is
16  a wholesale customer and therefore, this Commission is
17  justified in ruling in dismissing their petition.
18  Thank you.
19       COMMISSIONER HANSEN: Thank you. Let's
20  see if we have any questions from the Commission.
21  Commissioners? Commissioner Smith.
22       COMMISSIONER SMITH: Yes, Mr. Chairman,
23  thank you. I have some questions for Mr. Wheatley.
24  First of all, Mr. Wheatley, in your argument, you
25  mention FERC order 888 and the decision on who gets to
                                              Page 36

1  federal arena.
2       COMMISSIONER SMITH: Okay, let's get
3  down to that with my next question. You gave an
4  example of where you think the Commission's
5  jurisdiction would come in and that you said, I think,
6  is if a large retail customer decided they wanted
7  wheeling, then that's for us. I don't see any
8  difference really from a small retail customer or a
9  collection of small retail customers already served by
10  a regulated utility who requests together the same
11  thing.
12      MR. WHEATLEY: I agree with you. I
13  don't see any problem with that.
14      COMMISSIONER SMITH: Thank you. Thank
15  you, Mr. Chairman.
16      MR. WHEATLEY: But that has nothing to
17  do with the question of a wholesale for retail
18  customer which has been recognized on the other side
19  of the clear bright line.
20      COMMISSIONER SMITH: I agree with that,
21  too, Mr. Wheatley, and as soon as we get to what I
22  hope will be the factual part of this proceeding,
23  which is where I think this has to go, I'm interested
24  to have evidence of your client's facilities that it
25  owns, because if and when it owns its own facilities

Page 41

1  and is capable of providing service over them to a
2  group of customers not already served by a regulated
3  utility, then I think you're right on point, but in my
4  mind we don't have that case.
5       MR. WHEATLEY: Well, I hope that in my
6  time on that I will be able to convince you that that
7  is not the case.
8       COMMISSIONER SMITH: Thank you.
9       COMMISSIONER HANSEN: Okay, that
10  completes the oral arguments on this matter. The
11  Commission will take about a seven-minute break.
12  We'll come back at 20 after and have the arguments on
13  the last issue.
14      (Recess.)
15      COMMISSIONER HANSEN: Okay, we'll be
16  back on the record. First of all, we need to excuse
17  Commissioner Kjellander. He had other commitments and
18  he will not be able to attend any further of this
19  proceeding and because of his commitment, the
20  Commission will reserve the right to make a decision
21  on the motion to dismiss and we'll proceed on with the
22  arguments on the summary judgment, so we will make
23  that decision later, but we reserve that right to
24  address that later, so we will begin, then, to hear
25  the oral argument on the motion of summary judgment

Page 42

1  filed by PacifiCorp and we will start with you,
2  Mr. Eriksson.
3       MR. ERIKSSON: Thank you,
4  Mr. Chairman. Do we need to shorten up the time or
5  are we okay still with --
6       COMMISSIONER HANSEN: We'll stay, we
7  still have that time commitment restraint, so 30
8  minutes.
9       MR. ERIKSSON: All right, I'll try to
10  move it along. Mr. Chairman, what we have is a motion
11  for summary judgment filed by PacifiCorp which seeks
12  the relief requested in our petition based on the
13  position that there is no genuine issue of material
14  fact and that we are entitled to the requested order
15  as a matter of law, and as I see our petition, looking
16  at what we requested, we really have three things for
17  the Commission to consider: One is the nature of the
18  wheeling request; second is PacifiCorp's failure to
19  provide the requested wheeling; and third is the
20  consistency with purposes and provisions of ESSA.
21      Now, regarding PacifiCorp's failure to
22  provide the requested wheeling service, that's not an
23  issue. Snake River affirmatively acknowledges that
24  that service has not been provided and the Company, as
25  they state, has refused to provide wheeling service

Page 43

1  that is requested.
2       Second, PacifiCorp's action being
3  consistent with the purposes and provisions of ESSA,
4  we established in our petition and motion why that is
5  the case, that it is consistent and Snake River in its
6  affidavits and argument does not dispute that, so I
7  don't see that as an issue.
8       What that leaves us with is the nature
9  of the wheeling request and we established in our
10  motion for summary judgment just what that request was
11  with supporting affidavits and we showed that the
12  wheeling sought by Snake River was for wheeling right
13  down to the existing delivery points of the Company's
14  customers that are also members of SRVEA.
15      I think Commissioner Smith recognized
16  and pointed out the matter that we're really dealing
17  with in this case and that is retail wheeling. This
18  request that we have before us is for wheeling
19  directly to the end user right down to the delivery
20  points. Now, is that denied by Snake River? No.
21  They have affidavits making a lot of statements about
22  what they want, but they do not deny that their
23  request was for delivery right down to the existing
24  delivery points of PacifiCorp's customers.
25      They talk about what they planned and

Page 44

1 Snake River with doing something or not doing
2 something. Also, they make a statement on page 6 of
3 their opposition about the right of -- well, let me
4 get it right -- the right to confront and
5 cross-examine witnesses is a fundamental aspect of the
6 due process rights. They would seem to be arguing
7 that no court in this country can grant a motion for
8 summary judgment based on affidavits instead of live
9 witness testimony subject to cross-examination. I
10 simply submit that that is false. There's no basis
11 for that position.
12        They also argue in their opposition
13 about the Commission's jurisdiction and refer to the
14 affidavit of Dr. Wilson and talk about that issue of
15 the Commission's jurisdiction being a material fact
16 that is disputed. The material fact or I should say
17 the Commission's jurisdiction, that issue is not a
18 fact, it's a legal issue and Dr. Wilson's affidavit
19 along those lines should just be -- it's
20 inadmissible. An affidavit purporting to state legal
21 opinion as to the Commission's authority is beyond the
22 scope of what is admissible for an affidavit.
23        A couple of other points and I'll wrap
24 it up quickly, I think, that they have in their
25 argument and there are just numerous assertions in

Page 49

1 all other similar wheeling services provided by
2 PacifiCorp to its numerous other wholesale customers
3 as well as to its affiliate, such as PacifiCorp Power
4 Marketing which are indistinguishable. Well, they're
5 not indistinguishable and the reason that SRVEA is not
6 before FERC requesting wheeling services is because
7 those wheeling services otherwise provided by
8 PacifiCorp are distinguishable. They are legitimate
9 wholesale transactions. They are not requests for
10 retail wheeling. FERC does not have the authority to
11 order the kind of wheeling that SRVEA wants.
12        In conclusion, I would again direct the
13 Commission or ask the Commission to focus on what is
14 being requested in this case and point to the request
15 and to the very specific wheeling request that we are
16 dealing with here, not any other wheeling request. As
17 Commissioner Smith pointed out, there is another kind
18 of wheeling that could be sought by SRVEA and which
19 has been sought and that is wheeling to facilities to
20 be owned by SRVEA that would provide service to
21 customers outside the bounds of ESSA. customers that
22 have a right to choose and on that point, the Company
23 obtained summary judgment in Federal Court that the
24 Company has not denied that kind of wheeling service,
25 but the wheeling service that we're dealing with here

Page 51

1 there. I didn't respond to them all and I still won't
2 respond to them all, but, again, some of them I just
3 can't pass up. On page 31, they state, yet, at the
4 same time, PacifiCorp's regulated public utility
5 before this Commission, dba Utah Power & Light
6 Company, is demanding a rate increase. I think the
7 Commission is aware the Company does not have a rate
8 increase request before the Commission, and then they
9 go on, obviously, the huge profits being made by
10 PacifiCorp through its subsidiary, PacifiCorp Power
11 Marketing, Inc., are being drained off of the public
12 utility entity subject to regulation by this
13 Commission.
14        Now, this is not even really relevant to
15 this case, but, again, I can't pass it up; first to
16 point out it's not relevant and has no place in here.
17 Secondly, if PacifiCorp's subsidiary is making
18 profits, it's nonsensical to argue that those are
19 being drained off of the regulated utility, but I
20 don't think we need to get further into that.
21        They make quite a point or they try to
22 about them being, SRVEA being, identical to other
23 co-ops throughout the country and doing what has
24 historically been allowed and talking about -- well,
25 on page 32, this Commission is required to consider

Page 50

1 is very specific, it has not been denied by SRVEA that
2 that is what they requested.
3        Given that, there's no genuine issues to
4 any material fact and PacifiCorp is entitled to the
5 order we've requested and would ask the Commission to
6 grant the same. Thank you.
7        COMMISSIONER HANSEN: Thank you.
8        Mr. Wheatley.
9        MR. WHEATLEY: Thank you. First, I'd
10 just like to answer a question that
11 Commissioner Smith asked earlier about a citation.
12 The case that I was referring to was City of Palm
13 Springs, California. It's 76 FERC. paragraph 61,127
14 and at page 61,702, the Commission ruled that the
15 issue as to what is retail wheeling and/or a sham
16 wholesale transaction, which is exactly what
17 PacifiCorp is asking for you to do, under Section
18 212(h) of the Energy Policy Act is subject to
19 determination in the federal arena. The Commission
20 said, "Congress undoubtedly intended this Commission,
21 FERC, to look at the substance of each transaction,
22 not just the form, to detect subterfuges," so that's
23 the basic question that we say, since SRVEA is a
24 wholesale for resale customer and it's been so
25 confirmed earlier that we are entitled to have that

Page 52

capital costs up front, these would be controlled and operated by PacifiCorp and at the point of delivery, SRVEA. SRVEA I'm saying, would own all of the facilities beyond that point and at the point of delivery, SRVEA would take delivery of the power in its own name. It would be responsible to pay the person that they're contracting with, either it would be whoever. At that point it was Enron, before that it was Idaho Power Company that had agreed to provide them wholesale power service and here again, SRVEA was unable to obtain any agreement from PacifiCorp to provide this service.

Now, Mr. Eriksson has referred to the letter of December 18, 1995. That came after SRVEA had received a firm proposal from the Idaho Power Company and this -- first off, they asked PacifiCorp to sell them power at wholesale and to sell them these facilities. PacifiCorp denied both things. After they denied that, they went back again in '95 and noted that PacifiCorp had entered into other agreements to sell part of its territory and they asked them to reconsider it and to agree to sell them these facilities. They denied that, but that was a very short letter in paragraph 8 of Mr. Del Ray Holm's affidavit.

Page 57

He says on June 30, 1995, we received a very short letter from Verle Topman, vice president and senior counsel, refusing to even meet with us or to consider our proposal and that's shown as Exhibit 3 to his affidavit, and so in '95 after that the cooperative, SRVEA, sought to purchase the wholesale power necessary from another source and they did get a firm proposal from Idaho Power Company for a five-year contract starting May 1, 1996 through April 1, 2001, and that was the predicate, that proposal came in on November 22 of '95, that was the predicate for the December 18, 1995 letter where he again wrote to PacifiCorp requesting that it provide transmission service for our supply of wholesale power which would deliver that power at receipt points on PacifiCorp and be wheeled to SRVEA at facilities it would own at the delivery point and there resell it over facilities owned by members or to be constructed by SRVEA to its members.

Those are the facts at that time and I think his reliance on -- as I say, have called the very bits and pieces out of the federal record, they haven't gotten the whole thing and there are conflicts of fact as to what this proposal was by SRVEA to them.

Page 58

Then paragraph 11 he refers to after he couldn't get any service relating to Idaho Power, they then entered into negotiations with another supplier, namely Enron Power Marketing and got another contract and SRVEA under that contract would be responsible to pay the total power bill and the bulk of that power was in the summer solely for irrigation for these potato farmers and SRVEA would take title to the power at the points of receipt where Enron would put it in miles away on PacifiCorp's transmission system and then it would be delivered. SRVEA itself would take delivery of the power at delivery points "where SRVEA would thereafter own or control facilities for service of the power to its members," and many of these facilities have already been paid by SRVEA's members in cash to PacifiCorp and here again, though, PacifiCorp refused to wheel SRVEA's wholesale power to SRVEA at the delivery points where SRVEA would undertake to resell it over facilities controlled by SRVEA to its members, so in conclusion, I think Mr. Del Ray's conclusion in paragraph 12 to summarize the situation is that when PacifiCorp refused to sell its transmission system, including its distribution system to them, then we have consistently sought to obtain the wheeling to it by delivery points where

Page 59

SRVEA would be able to acquire the power and SRVEA would thereafter own and construct any necessary distribution facilities that PacifiCorp might refuse to sell.

Most of these distribution facilities have already been paid for by SRVEA's members as an up-front capital contribution. PacifiCorp's refusal to wheel wholesale power for resale to our members is indistinguishable from PacifiCorp furnishing such wholesale wheeling for resale service to a number of other cooperatives and municipals in its service territory. That's Mr. Del Ray's affidavit.

Now, the facts in that affidavit are just at loggerheads with what PacifiCorp is arguing from the bits and pieces it has called from the federal record and so that brings us to a situation where the question is, is it proper now to grant summary judgment and deny SRVEA the opportunity to have a contested hearing wherein we believe we can show not only the accuracy of all the statements that I've just read to you, but we can also show you that there are a number of other cooperatives out there with delivery facilities that are indistinguishable from what ours are. They put in no affidavit contradicting Del Ray Holm.

Page 60

become a cooperative electric distributor and so on.
Well, right now what they're attempting to do
generally does not cut against what we have
established through our motion for summary judgment,
and for that matter, I'd note that in their argument
they failed to answer the question which I suggested
is the question to be answered and that is do they
deny that the request for wheeling which I described
in the petition was what they were after.

MR. WHEATLEY: We deny it.

MR. ERIKSSON: I would love to
cross-examine on that. They also discuss facilities
that have been paid for by the Company's customers,
presumably referring to line extension allowance
provided under the Company's tariff. Indeed,
customers do make contributions to facilities. They
do not own those facilities. Snake River also talks
about them taking PacifiCorp's facilities that have
been paid for or that that's their plan. Again, that
is not what we had before us. The request that we had
before us is well-established.

The refusal to sell facilities and
refusal to sell wholesale power that is claimed by
Snake River is subject to a motion for summary
judgment or partial summary judgment before the

Page 65

Federal Court, we dispute that claim and dispute that
the Company has any obligation to sell its system to
Snake River or anybody else.

As far as the argument about due
process, Snake River talks about the Company providing
bits and pieces out of the federal record. They had
every opportunity to provide other parts of the
federal record if they felt that what we provided was
inaccurate or incomplete or misrepresented what their
request was. They didn't do that. They didn't seek
discovery on that. They proceeded with an affidavit
and that is all they did.

As far as having a fair and open
hearing, we're here. This is a fair and open hearing
and due process is satisfied. Last point, they say
that under what we're seeking there could never be an
electric co-op ever again organized in the State of
Idaho. That's not true. If a co-op wanted to
organize itself and go out and build a system like
other co-ops have done, they could do that and that's
all I have. Thank you.

COMMISSIONER HANSEN: Thank you. Let's
see if we have any questions from the Commission.
Commissioner Smith?

COMMISSIONER SMITH: None from me.

Page 66

COMMISSIONER HANSEN: I have none
either. Well, this will close today's oral
arguments. The Commission recognizes the importance
of resolving this, so we will do our best to get a
ruling out as soon as possible and with that, our
hearing is adjourned.

(The oral argument adjourned at
11:05 a.m.)

Page 67

AUTHENTICATION

This is to certify that the foregoing
oral argument held in the matter of the petition of
PacifiCorp dba Utah Power & Light Company for a
determination that it is not required to provide
certain wheeling service to Snake River Valley
Electric Association, commencing at 9:00 a.m., on
Friday, September 28, 2001, at the Commission Hearing
Room, 472 West Washington, Boise, Idaho, is a true and
correct transcript of said oral argument and the
original thereof for the file of the Commission.

Constance J. Bucy

CONSTANCE S. BUCY
Certified Shorthand Reporter #18



Page 68



Office of the Sec
Service Dat
August 16, 19

# BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

IN THE MATTER OF THE COMMISSION'S )     CASE NO. GNR-E-96-1
INVESTIGATION INTO CHANGES )
OCCURRING IN THE ELECTRIC INDUSTRY. )     ORDER NO. 26555
)

## BACKGROUND

On January 30, 1996, this Commission issued a Notice of Inquiry and Order No. 26312 initiating an investigation into changes occurring in the electric industry. Subsequent to the issuance of the Notice/Order, a series of workshops was conducted by the Commission Staff involving numerous groups having a stake in the future of Idaho's electric industry, including this state's three investor-owned utilities as well as non-regulated electric suppliers such as municipal corporations, cooperatives, independent power producers and out of state, investor-owned utilities. Other participants included representatives from various customer classes, large industrial customers and a low income/conservation group.

The purpose of the workshops was to identify issues facing Idaho's electric utilities and their customers related to the nationwide transformation of the electric industry to a more competitive environment. The workshops were further intended to assist the Commission in defining its own role relative to the changing industry and to provide it with information critical in its continued effort to ensure that all of Idaho's electric consumers continue to receive quality service at reasonable rates.

Pursuant to the Commission's directive, a voluntary "working group" consisting of interested stakeholders was formed to draft a position paper outlining the issues facing the industry and providing a summary of the various stakeholders' perspectives on those issues with specific recommendations for the Commission regarding the future regulation of electric utilities in Idaho. That position paper, titled "Report on Changes Affecting the Electric Utility Industry," was filed with the Commission on May 28, 1996 and is attached to this Order as Appendix "A." The paper is a nonbinding document that reflects the perspectives and efforts of many different groups and

individuals. The Commission has reviewed the position paper and, after due consideration of the matter, issues the following findings.

## FINDINGS

We wish to commend the working group and all those who participated in this proceeding for the exemplary work performed. The position paper reflects considerable initiative and effort and has provided this Commission with valuable insight into the landmark evolution occurring within the industry. Because of the speed at which change is taking place, any attempt to summarize the state of the industry is, at best, a snapshot in time. Moreover, the forces that are creating that change are many and varied, from policy decisions made by the Federal Energy Regulatory Commission (FERC) to the choices of individual consumers. Suffice it to say that change within the industry is occurring and will continue to occur regardless of the will or desire of any individual or organization. Nonetheless, it is the duty of this Commission to exercise its statutory authority in an effort to shape the future of the industry so that all customers of Idaho's regulated electric utilities continue to receive high quality service at reasonable rates. In this regard, the efforts of the working group and the deliberation resulting from this proceeding will prove valuable in our decision making as the future unfolds.

In the meantime, we have made some general observations and conclusions regarding the state of the industry and the course this Commission must take in response to the changes occurring. First, we expect that the electric industry as a whole will continue to experience a transformation toward free market principles. Recent developments that helped to bring about this paradigm shift include improved thermal generation technologies, low natural gas prices and actions taken by the FERC. In addition, regulatory agencies in other states such as California have addressed problems related to high-cost utilities and the demands of large customers who believe they can obtain more favorable rates from suppliers other than their current utilities.

Although terms such as "competition" and "retail wheeling" are generally used to describe the evolution taking place in the industry, it is not always clear what they mean. For the purpose of our analysis, we presume that the deregulation or opening up of Idaho's distribution system is not feasible or desirable at this time. When we use the term "competition" or any of its mutations, therefore, we are referring to the possibility that customers of Idaho's regulated electric

utilities may, in some form or another, have the option of selecting an energy supplier other than their current utility, but not a new supplier of distribution lines.

As discussed below, we have concerns regarding the effect that "competition," regardless of how it is defined, will have on the majority of Idaho's ratepayers. Notwithstanding those concerns, this Commission has demonstrated time and again that it is not opposed to change so long as it is in the best interest of Idaho's citizens. For instance, in Case No. IPC-E-95-11, the Commission adopted a new regulatory regime for Idaho Power in which the Company would be allowed to accelerate the amortization of deferred income tax credits in years of poor financial performance but would share earnings with customers in highly profitable years. This constituted a departure from traditional ratemaking and is an example of our willingness to explore alternative forms of regulation that serve the needs of both utilities and their customers.

We are convinced that we should be cautious, however, with respect to an outright deregulation of Idaho's electric markets for several reasons. First, customers of Idaho's regulated electric utilities, on the average, currently pay some of the lowest electric rates in the nation. While some of Idaho's larger customers may be able to obtain lower rates through contract sales with other energy suppliers due to their size and buying power, we find that there is evidence suggesting that the majority of Idaho's ratepayers may experience an increase in rates over the long term. This is simply because, region-wide, and on the average, rates for comparable services outside Idaho are higher. Thus, in a completely free market, Idaho's regulated utilities could find customers in other states who are willing to pay rates that are considerably higher than those currently paid by Idaho consumers. Without adequate oversight, Idaho customers could be required to compete with others for low cost hydroelectricity produced now for the benefit of Idaho customers. Under such a scenario, smaller customers could see their electric rates increase as a result of competition.

Another matter of concern to this Commission is the possibility that a full or partial deregulation of the electric utility industry may result in the diminution of the quality of service Idaho's ratepayers currently enjoy. In addition, the recent power outages experienced throughout the western United States serve as a reminder of our dependence on electricity and the importance of maintaining reliability in the delivery of electric service to customers. As the industry transforms, we are keenly interested in exploring possible mechanisms that will ensure that reliability.

ORDER NO. 26555                                -3-

There is also the concern that deregulation may advantage a select few customers at the expense of the majority. That is, larger customers who make desirable targets for outside suppliers may be able to obtain advantageous rates. Smaller residential customers, however, clearly do not possess the buying power of a large industrial user and may ultimately pay relatively higher rates. This result may be exacerbated by the fact that once larger customers leave the host system for their source of supply, the fixed, generation-related costs of that host supplier may be required to be spread over fewer customers thereby increasing their rates.

In light of the foregoing, it is the conclusion of this Commission that the deregulation of Idaho's electric utilities, without some form of Commission oversight, is not in the best interests of the general body of Idaho's electric utility ratepayers. This declaration should not discourage our regulated utilities from making innovative proposals that are free-market based and in the best interests of all ratepayers. We believe, however, that it would be unwise at this time to simply let unrestrained market forces dictate price and terms.

It is neither the desire nor intent of this Commission to act as an impediment to the transformation to competitive ideals. Considering Idaho's unique position in the industry and taking into consideration the best interests of all Idaho ratepayers, we do not believe that it is our role to actively attempt to bring about the deregulation of the electric industry in this state. Rather, we believe that the interests of Idaho's ratepayers would best be served if this Commission serves as a facilitator and resource of information in the policy debates that industry transformation has or will engender at all levels including the legislature of this state. We do encourage utilities and other interested groups to continue making innovative proposals, however, as the industry continues to transform so that the needs of all of Idaho's ratepayers are addressed.

We note that there is currently pending before this Commission Case No. WWP-E-96-2, in which the Washington Water Power Company has proposed an experimental tariff that gives Water Power's Schedule 25 (larger) customers the option of obtaining service from a third party supplier to serve a small portion of their loads over a limited term. Regardless of how we ultimately rule on Water Power's application, this is an example of the case by case manner in which this Commission will be presented with and expects to resolve specific, restructuring related issues.

ORDER NO. 26555                                    -4-

The Position Paper presented by the working group in this proceeding contains eleven specific recommendations regarding action that could be taken by this Commission, its Staff or some combination of entities. We will now respond to each of those recommendations.

**Recommendation No. 1: Examine restructuring from a regional perspective.**

The Position Paper proposes that the Commission Staff review and report on restructuring activities in the region and that the Commission develop policies that will allow Idaho the opportunity to remain a full participant in the regional energy market.

We note that Staff has been monitoring restructuring developments in other states and this Commission has and will continue to be involved in the regional review process. While our jurisdiction lies solely within the boundaries of this state, the electric grids to which our utilities are connected go beyond state boundaries. A regional awareness and cooperation is ultimately in the best interests of Idaho's electric customers. Policies that allow this state's utilities to remain competitive and take advantage of opportunities within the region will, ultimately, inure to the benefit of citizens.

**Recommendation No. 2: Examine adoption of service quality standards.**

The Paper proposes that the Commission direct a study on current customer service standards and actual results and suggests state legislation clarifying the Commission's ability to monitor and enforce performance standards.

We note that Title 61 of the Idaho Code already vests this Commission with considerable latitude to establish and enforce service quality standards. We are concerned, however, that as the industry becomes more competitive, utilities may place less emphasis on service quality. The temptation to improve short-term financial results through personnel reductions, thereby reducing service quality, has been observed in other industries. Without regulatory oversight, this is a distinct possibility in the electric industry. While we do not believe it is necessary at this time to develop service quality standards or to seek legislation clarifying Commission authority, we want to make it clear that customer service is of the utmost importance and we are prepared to take action if utilities' performance in this area begins to deteriorate.

**Recommendation No. 3: Examine customer relations policies.**

The Paper suggests that current policies and rules be revised in light of the transition toward competition and that there be possible legislation strengthening customer protection.

We believe that issues relevant to customer relations are integrated with those related to service quality. The degree to which service quality and customer relations will be affected by competition depends, of course, on the extent and manner in which deregulation occurs within the industry. As the industry evolves, so too must this Commission's role in ensuring that customers receive the highest overall quality of service possible and that customers are treated fairly and without discrimination.

**Recommendation No. 4: Consider legislation for consumer protection in a deregulated environment.**

The Paper proposes that legislation could be introduced in the upcoming session emphasizing the Commission's role as mediator/arbitrator of consumer-utility disputes with the authority to impose sanctions where necessary and to establish standards for the public safety, convenience and necessity.

There is some degree of overlap between this recommendation and the several preceding it. The Commission is already vested with the authority to resolve disputes between public utilities and their customers. In fact, this is one of Staff's daily functions. Furthermore, the current statutory regime provides the Commission with the power to do all things necessary to ensure the public safety, convenience and necessity with respect to the operation of utilities. Whether any additional legislation or changes to the existing statutory structure are needed depends entirely upon how the industry evolves and whether legislation is proposed which would affect the Commission's jurisdiction or the manner in which it regulates public utilities. Regardless of what changes ultimately befall the industry, this Commission will staunchly advocate its continued role as a protector of the interests of public utility consumers.

As a further matter, we believe that even in the event that Idaho's electric customers are ultimately given the option of choosing between competing suppliers, this Commission should continue to be vested with the authority to ensure that those suppliers meet certain threshold criteria regarding their ability to provide safe and reliable electric service.

**Recommendation No. 5: Seek agreement on DSM, previous commitments to PURPA, etc.**

The Paper suggests that alternative funding mechanisms could be established for new DSM programs and the costs recovered through transition rates where appropriate.

As the industry moves toward open market principles, the manner in which conservation and PURPA related projects will be initiated and treated for cost recovery will need to change. This will require innovation on the part of utilities, this Commission and other interested parties. We believe that these issues can best be resolved on a case by case basis. The policy decision of funding for public purposes such as DSM, environmental protection, etc, is one that should be debated. The resolution of this issue may require legislative action.

## Recommendation No. 6: Examine stranded cost magnitude and treatment.

The Paper suggests that the Commission identify each utility's relative exposure with utility by utility filings including a proposal for recovering those assets that are stranded.

We do not intend, at this time, to initiate a generic examination of stranded costs. If and when this becomes of sufficient concern to each of the regulated utilities, they may seek specific action from this Commission.

## Recommendation No. 7: Consider expansion of service options to customers.

This is the very definition of the benefits that many believe competition will bring to the electric industry. Although we have previously expressed concern over some of the consequences also attendant to competition we fully expect Idaho's regulated electric utilities to remain innovative in offering their customers meaningful choices with regard to service and to bring proposals such as a "read your own meter' rate, as suggested by one utility, before the Commission to give customers better service and reduce costs.

## Recommendation No. 8: Pursue pricing flexibility.

To the extent this recommendation relates to the specific needs of individual customers or customer classes, our position is set forth in response to Recommendation No. 7. Regarding alternative ratemaking, we strongly encourage the utilities to offer proposals in lieu of general rate increases, such as the recent Idaho Power proposal to accelerate the amortization of deferred tax credits, and to look for opportunities to use reductions in other expenses to offset the write-down of regulatory assets.

In a somewhat related matter, we note that if Idaho's investor-owned utilities are to be deregulated, it will be necessary for them to itemize their billings, segregating the costs of their various functions such as generation, transmission, distribution, etc.

## Recommendation No. 9: Explore provision of competitive service.

The Paper proposes that the Commission continue to allow special contracts for larger customers and that it explore the use of alternative tariffs for others.

We can see no reason to discontinue our policy of allowing special contracts for larger customers due to their size and the unusual characteristics of their respective loads.  We are supportive of any type of pricing that is responsive to customer needs so long as the net revenues collected from those customers are fair and do not place an undue burden on other customers. Again, we encourage the utilities to be creative in this regard.

**Recommendation No. 10: Develop market-based mechanisms that will ensure all customers have the opportunity to participate in greater levels of competition if they so choose.**

The point of this recommendation seems to be that to the extent some aspect of the industry is deregulated, that all customers have the opportunity to compete for favorable rates and/or service.

We agree wholeheartedly.  Large customers must not be allowed opportunities that are not available to small customers, under the guise of competition.  Restructuring should be accomplished in a manner that allows the economic efficiencies of a competitive market to benefit all customers and not just a select few.

**Recommendation No. 11: Re-examine the Electric Supplier Stabilization Act.**

This Act consists of the operative statutes which provide public utilities with their monopoly status.  Thus, in all practicality, the Act must be re-examined before any form of deregulation can take place.  First, the Act should be clarified to provide exclusivity only in the provision of distribution lines, not the supply of energy.

It is also our opinion that the Act should be revised to vest this Commission with the explicit authority to determine if, when and how deregulation of investor owned electric utilities occurs.  Without such authority, it may be very difficult for us to respond to a rapidly changing industry requiring flexibility and innovation.  Further, we believe that the Act should be revised to outline a process for consideration of this issue with respect to the service territories of non-public utility suppliers, such as municipal corporations and cooperatives.

We know that disputes between regulated utilities and municipals or cooperatives involving the provision of distribution services to customers have been litigated under this Act.  As the industry is restructured, the method of resolving those disputes should be examined to determine

if the current process is optimal. Another alternative could be to revise the Act to vest this Commission with authority to establish geographical boundaries between the respective service territories of distribution providers. This would require the Commission issue certificates to municipals and cooperatives for the limited purpose of defining their exclusive distribution areas.

In proposing the foregoing changes to the Act we do not suggest that the existing authority of municipals to annex areas and acquire service territory or customers be altered. Furthermore, we are not suggesting that this Commission be given the authority to set rates for or regulate the operations of municipals or cooperatives.

## ORDER

IT IS HEREBY ORDERED THAT the Commission's investigation in this matter having been completed, this proceeding is hereby closed consistent with the terms and conditions set forth herein.

THIS IS A FINAL ORDER. Any person interested in this Order (or in issues finally decided by this Order) or in interlocutory Orders previously issued in this Case No. GNR-E-96-1 may petition for reconsideration within twenty-one (21) days of the service date of this Order with regard to any matter decided in this Order or in interlocutory Orders previously issued in this Case No. GNR-E-96-1 . Within seven (7) days after any person has petitioned for reconsideration, any other person may cross-petition for reconsideration. See *Idaho Code* § 61-626.

ORDER NO. 26555                           -9-

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho this ___
day of August 1996.

RALPH NELSON, PRESIDENT

MARSHA H. SMITH, COMMISSIONER

DENNIS S. HANSEN, COMMISSIONER

ATTEST:

Myrna J. Walters
Commission Secretary

vld/O:GNR-E-96-1.bp2

ORDER NO. 26555                    -10-

# REPORT ON CHANGES AFFECTING THE ELECTRIC UTILITY INDUSTRY

## I.  PROCEDURAL BACKGROUND

On January 30, 1996, the Idaho Public Utilities Commission (IPUC; Commission) issued Order No. 26312 and a Notice of Inquiry (NOI) in Case No. GNR-E-96-1.  On February 14, 1996 and March 19, 1996, the Commission conducted workshops to address several issues outlined by the Commission.  Over 50 individuals representing more than 20 organizations, attended each workshop.

Participants in these workshops have agreed that although consensus does not exist on all issues, a draft Report prepared by some of the participants, known as the "working group," would be an appropriate means to identify issues facing the industry and possible courses of action available to the Commission.  This Report is the product of that working group.

## II.  INTRODUCTION

For much of the last 80 years, public utility regulation has been based on the idea of a regulatory compact between utilities and regulators under which, in return for an exclusive franchise granted by the state, utilities agree to serve all those requesting service; and in return for agreeing to invest capital in plant and facilities, utilities' prices are set by regulators so that they are given a reasonable opportunity to earn a fair return on that capital.  Under the current regulatory regime, customers are grouped into fairly homogeneous classes and pay rates based on a variety of factors including the cost and value of the service to that class.  Rate setting considerations include simplicity, understandability, and public acceptability, the avoidance of sudden and unexpected changes, promotion of the efficient use of resources, and other social policies.

There are currently three major investor-owned electric utilities (IOUs) serving customers in Idaho.  They are Idaho Power Company, The Washington Water Power Company and PacifiCorp dba Utah Power & Light Company.  All three also serve customers in other states.  These utilities are regulated by the IPUC, other state commissions, and the Federal Energy Regulatory Commission (FERC).  Costs are allocated among the various retail and wholesale jurisdictions, with the IPUC

**ATTACHMENT A**

setting retail rates for Idaho customers and FERC regulating wholesale transactions whether inter-or intra-state. In addition to the IOUs, approximately 25 publicly-owned utilities provide service in Idaho. These utilities' retail rates are not regulated by the IPUC, but any wholesale transactions entered into by these utilities fall under the jurisdiction of FERC.

The IPUC regulates utilities under its authority found in Idaho Code. Titles 61 and 62. Electric utilities are also subject to the Idaho Electric Supplier Stabilization Act, or ESSA. (*Idaho Code § 61-332* through 61-334B) designed to promote harmony within the Idaho electric industry, prohibit the pirating of customers of another supplier, discourage duplication of facilities, and stabilize service territories.

The enactment by Congress of the Public Utility Regulatory Policies Act (PURPA) in 1978 and, more recently, the Energy Policy Act of 1992 (EPACT) have changed the regulatory compact by encouraging competition in what were monopoly markets. PURPA injected competition into the electric generation market by requiring utilities to buy the output of cogeneration and small power producers at the utilities' avoided costs. EPACT further opened bulk power markets to competition by encouraging new wholesale generators and giving FERC broader authority to order open wholesale transmission access. FERC responded by issuing a notice of proposed rulemaking, followed on April 24, 1996 by Final Order 888 designed to remove impediments to competition in wholesale bulk power markets. Order 888 requires all jurisdictional utilities transmitting electric energy in interstate commerce to file open access non-discriminatory transmission tariffs, to take transmission service for their own wholesale sales and purchases under these tariffs, to develop and maintain a "same-time" information system (Open Access Same-Time Information System, OASIS) that gives others the same access to transmission information that the public utility itself enjoys, and to separate the marketing of transmission and generation.

These events, in combination with changes in technology and low natural gas prices, have brought about a significant transformation of the electric industry. The changes taking place include increased third-party transmission access, the emergence of power marketers, and increased competitive pressures. A driving force in creating these changes is customer interest in having a choice among electric service providers. The business strategies of all of Idaho's electric suppliers, including the three IOUs regulated by the IPUC, are changing to meet their customers needs and the new market conditions they face.

Many states have opened inquiries in response to this movement toward a more competitive industry. Many of the restructuring proposals being considered by other states focus on increased access to power markets for retail customers. Many would permit retail wheeling. An end-use customer would be permitted to shop for power on the open market or contract with a power marketer or aggregator to secure power for the customer. The local utility would then be required to deliver, or "wheel," the independently secured power to the retail customer's premises over the utility's facilities. Because regulation of retail utility service is a matter of state law, individual state commission responses to emerging competition will necessarily differ. States must also consider actions taken in their neighboring states. Of major concern to western states has been the California PUC decision to allow customers to purchase power from a power pool called the "power exchange" with a limited group of customers allowed direct access.

The Commission, with the participation of a broad cross-section of stakeholders listed in Attachment A, have been meeting to discuss this changing electric industry environment. This Report, prepared by a working group consisting of some of those parties, attempts to outline the changes taking place in the industry and identify the decisions and options facing the Commission in the near future. It offers a perspective on the underlying structural changes occurring in the electric industry, sets out policy questions the Commission will face as it considers electric utilities' transition to a more competitive environment, and identifies potential actions that can be taken to accommodate and capitalize on the benefits presented by this transformation. A contemplated agenda is included in the Report.

The Report focuses on, and is unique to, customers of Idaho electric providers. While the Commission has monitored proceedings in other states, the situation facing Idaho customers is unique. Some Idaho customers pay the lowest rates in the country. However, this distinction is shared by the customers of a number of hydro-electric utilities in the Northwest. The challenge for the Idaho electric industry is to find advantages in a more competitive environment while maintaining the benefits that Idaho customers have historically enjoyed and expect to continue.

The changes occurring within the industry are, to varying degrees, already upon us. Utilities have been responding to these changes on a filing-by-filing basis. Examples include special contracts with large customers, rate freezes, demand-side management (DSM) tariff riders, and an experimental open access tariff. We are now at a critical point, however, at which the Commission

must reassess the practicality of the existing regulatory framework. As noted, changes are occurring in the industry independent of any action taken by the Commission. The primary focus of the Report, therefore, is to assist the Commission in identifying what obligations, authority, options, and role it has in the evolution toward a more market-based industry.

## III.   THRESHOLD ISSUES

Increased competition in the electric industry has been driven by changes in technology (e.g., more efficient and less costly turbines), economics (e.g., lower fuel costs for turbines), and public policy (e.g., recent changes implemented by FERC). One result of these changes has been an increase in the supply of available power in the western electricity markets. Market prices for firm power are now at or below utilities' average, or embedded, cost of production for the first time in many years.

As a result of the Commission's NOI and the workshops that have been conducted, it became apparent that there were several threshold issues that must be addressed by the Commission. Those issues are discussed below.

### 1)   Should the existing regulatory framework be altered?

In a competitive market, market power is distributed among a broad group of individual enterprises and operation of the market is driven by the independent decisions of many buyers and sellers. Because of the economies of scale inherent in many aspects of the public utility industry, it was once thought that utilities would operate most efficiently as monopolies. The assumption that utilities were natural monopolies, combined with the high degree of public interest attached to utility services are the primary reasons for the public utility regulation we have today.

There is no bright line that identifies at what point a market becomes competitive enough to allow market forces to work. It is now apparent, however, that competition is either present or inevitable in some functions of the electric industry. As a result of PURPA and EPACT, the generation of power is no longer a monopoly function performed only by regulated utilities, and open transmission access means that utilities cannot use their own transmission facilities to gain an advantage in the wholesale generation market. A robust wholesale power production market is now in place and a new category of participants has arisen with the advent of marketers such as Enron

and Louis Dreyfus who own no generation assets or transmission lines but buy and sell power at wholesale. Access to this market is now being demanded by some retail customers.

Initially, the Commission must determine whether the existing regulatory framework is adequate to accommodate the changing environment in which investor-owned utilities operate so that the needs of customers and utilities alike may be satisfied.

2)   **What actions could the Commission take to further the movement of the electric industry toward a market based environment?**

Until there are changes in the Idaho Code, the Commission is somewhat limited in what it can do with respect to the deregulation of its regulated electric utilities. If Idaho law were changed, the Commission could, conceivably, be faced with the choice of whether to deregulate the generation, transmission or distribution operations of Idaho's regulated utilities and how to change regulation of the remaining function(s). Under existing law, however, the Commission can still act in a number of ways to facilitate the transition to a competitive environment. For example, the Commission currently has authority to consider cost recovery for stranded investment, demand-side management programs (DSM), and renewable energy sources, to eliminate any unreasonable cross subsidies where some customers pay rates above cost and others, rates below cost, and to address concerns about consumer protection and service quality in light of expected changes in the industry. It can approve unbundled rates and give utilities more flexibility in dealing with customers. It can adopt performance standards and examine its customer relations policies to determine whether modifications are necessary. The potential actions that could be taken by the Commission are discussed in more detail under "Transaction Issues" below.

Some parties argue that the distribution ("wire") functions of Idaho's electric utilities are a natural monopoly and should remain regulated because of the social, environmental and economic shortcomings of redundant or competing distribution systems. They contend that only through a regulated monopoly can important public policies be pursued. Without sufficient Commission authority, the Commission could not avert bypass of the system and keep power affordable in the many rural communities of Idaho.

Other parties question the retention of protected service territories, saying that distribution service should not be assumed to be a natural monopoly. They argue that while the assumption may have been true in an industry dominated by large central generating stations, it is no longer the case.

POSITION PAPER                    -5-                    MAY 21, 1996

Furthermore, they believe the current design of the distribution system, typified by low-capacity factors, excess and idle circuit capacity, and a one-size-fits-all approach to power quality, makes it vulnerable to competition from hybrid systems designed to meet the power requirements of specific customers. They argue that the current averaging of distribution costs to provide postage stamp rates available to customers in rural and urban areas alike distorts the cost of distribution to individual customers and increases the potential for uneconomic bypass of the system by large customers. (Bypass is termed "uneconomic" when it occurs because the customer is charged more for service than the actual cost of that service.) They also argue that cross-subsidization of high-cost areas by low-cost areas restricts competition by discouraging distributed resources that would otherwise be cost effective. These parties would have the Commission stop the averaging of distribution costs and unbundle distribution rates.

Parties may disagree on whether transmission is a natural monopoly; however, this is not an issue to be decided by the IPUC. FERC has claimed jurisdiction over all transmission for third parties with no distinction between retail and wholesale transactions. Unless FERC is found to have overstated its jurisdiction, the IPUC's authority over transmission will be confined to the transmission necessary to move power from utility-owned generation to its own retail customers.

A competitive generation market has been evolving since the passage of PURPA in 1978. The Commission sets prices for mandatory purchases of power from facilities that qualify under PURPA (Qfs). The methodology by which the Commission will establish rates for QF projects larger than 1MW is the subject matter of Case No. IPC-E-95-9 currently pending before the Commission. All three investor-owned utilities regulated by this Commission have included an increasing reliance on market purchases in their integrated resources plans. Publicly-owned utilities traditionally relying predominantly on the Bonneville Power Administration (BPA) for their power, have indicated an interest in diversifying their supply portfolios.

The Commission could, with changes in the law, deregulate the generation function of regulated electric utilities, which would allow utilities to sell their power at market rates outside as well as inside their current service territory in Idaho to end-use and wholesale customers. Such a move would have to be preceded by legislation allowing customers to purchase power from their chosen provider and to wheel that power over the utility's distribution system. Issues associated

PacifiCorp is advocating federal legislation to ensure open access for all customers nationwide by 2001. That company proposes to work with states to establish the needed state legislative and regulatory environment.

## B.   Regional solutions and reciprocity.

The parties note that the Commission is monitoring, with interest, two developments affecting our region: the FERC actions to increase competition in the electric industry and the Comprehensive Review of the Northwest Energy System. The outcome of these proceedings may, if they haven't already, influence Idaho electric utility regulation. Idaho's utilities are concerned that they may lose customers to competitors without the opportunity to acquire new customers in other areas. This is primarily a timing issue, but at this juncture, it is unclear what Commission action may or could be taken. Certain Idaho customers desire to obtain immediate access to other, lower cost suppliers. Industrial customers are also concerned that they not be forced to pay electric rates that exceed those paid by their competitors in other states, jurisdictions or service territories.

## C.   Obligation to serve, obligation to transport, and eminent domain.

The obligation of Idaho's regulated utilities to serve all those requesting service will, of course, vary to the extent that the operations of those utilities have been deregulated. If retail wheeling is permitted and customers choose, for a period of time, to obtain power from other sources and then wish to return to the utility for service, a legitimate question is whether the utility who was serving that customer is obligated to serve them once again and if so, at what rates. New rate schedules specifying what rates or conditions would be applied in this event, might be considered. At a minimum each distribution company must continue to have the obligation to connect all customers in its service territory to the distribution system.

Competition for customers along shared service boundaries has become more common. Some believe that restrictions in choice for new customers may slow the evolution of competition and that utilities under the Commission's jurisdiction should have the flexibility to compete with other electric service providers in a manner which does not disadvantage the utility's existing customers. Others would argue that the ESSA currently governing which utility may serve new customers, was designed to minimize the economic costs of redundant and competing distribution systems, is still valid, and should, to that extent, not be changed.

D.   Stranded costs examination and potential recovery (e.g., deferred income taxes, DSM investments, above-market purchased power agreements, uneconomic generation costs, and other deferrals).

The possibility exists that if competition in power supply markets becomes widespread, some utilities may find it impossible to collect adequate revenues to recover all the costs incurred in a regulated environment. These potentially unrecoverable costs are referred to as "stranded costs" and include costs associated with existing generation facilities that may not be recovered through the competitive market price for generation, the amount by which existing purchased power contracts exceed the competitive market price for generation, and prudently incurred regulatory assets that were intended to be collected over time. The magnitude of any potential stranded cost liability will vary by utility.

Utilities argue that today's stranded costs were incurred to provide high quality electric service to customers at reasonable and fairly stable rates. If these costs met prudency tests when they were included in rate base, it is unreasonable to expect the utility to absorb them now. Others argue that the utility was never given more than the reasonable opportunity to recover these costs and that what utilities are now asking for is a guarantee that these costs will be recovered.

If a policy to allow recovery of stranded costs is adopted by the Commission, the amount to be recovered must still be quantified. The common definition would require that for generation assets and power purchase contracts the embedded cost be compared to the market price and the differential classified as stranded. Unfortunately, arriving at a market price with which to compare embedded cost will not be a simple task, and not everyone agrees that market price is the appropriate measure to use. Some would suggest that the marginal cost of new resources would be better. There will also be discussion as to whether stranded costs are determined on an asset-by-asset basis or whether a utility's assets will be considered as a whole to determine if stranded costs exist.

Assuming stranded costs are quantified, it must then be decided how to allocate them between shareholders and customers, then among customers, some of whom may be leaving the system; and finally, how and over what period they should be collected. One possibility put forward is to determine a reasonable sharing of stranded costs between shareholders and customers, and among customer groups, then on a transitional basis to recover them through a non-by-passable surcharge until the unamortized balance is reduced.

At least one utility has stated that many of its contracts with cogenerators or small power producers constitute stranded investments. Another participant urged that these contracts be protected from potential legislation or regulatory intervention by FERC.

**E.   The relationship between existing hydro resources and existing customers within the context of relicensing.**

Idaho customers, today, have low electricity rates due, in part, to an abundance of hydro-based generation. A distinctive cost characteristic of hydro-generation is that it is most expensive in the early years of a facility's operation and becomes relatively less expensive as the plant is depreciated. Utility customers often feel they have a stake in these resources because they have paid for them over the years through depreciation expense included in their rates. Some customers argue that it would be unfair to deregulate generation if it causes them to lose their perceived stake in these facilities. Others believe that, given potential costs of relicensing that may be incurred over the next decade, it is unclear whether hydro resources will remain a benefit or become a burden.

The Commission could entertain the option of somehow preserving the costs/revenues of hydro for its Idaho customers. Utilities argue, however, that if the Commission chooses to retain hydro-benefits or "negative stranded costs" for customers, it must also allow the utility full recovery of any stranded costs associated with other resources and purchase contracts. Finally, if these resources ultimately prove not to be cost effective and a portion of the cost of these resources becomes stranded, the Commission would be faced with the problem of how to make its investor-owned utilities whole.

**F.   Public purposes (e.g., DSM, renewable resources, social programs) and alternative funding mechanisms.**

The objective of meeting customer needs becomes increasingly important in competitive environments. The installation on customers' premises of demand-side management measures (DSM), such as insulation and other energy-efficiency products that allow customers to reduce their demand for electricity, may be such a customer service with dividends of cost-effectiveness for individual customers. Although DSM has, for a number of years, been paid for by the utility, the industry has seen a trend toward DSM being "customized" for specific customer groups with these customers paying a large part of the costs because it is cost effective for them to do so. Additionally, a utility response to a more competitive industry may include a focus on market transformation.

smaller scale direct funding (so that all customers will have some access to DSM services), and a continuation of limited income programs. (Limited income weatherization programs may continue to have merit for utility funding in a competitive environment because such programs can result in fewer delinquent accounts, disconnects. etc. and because electricity remains an essential service requiring distribution companies to provide universal access.)

Funding for these programs may be possible through a universal access charge on the distribution side which recognizes that cost-effective public interest goals may still be accomplished. Such a charge would allow the utility's generation to compete with third party producers without added costs not applicable to that competitor.

Renewable energy resources, such as wind and hydro generation whose common characteristic is that they rely on non-depletable or naturally-replenishable resources. may need to compete against lower cost generation. Even over a 20-year period with assumed inflation. natural gas projects remain low cost: however. some renewables (wind. methane from landfills) may be cost-effective and utilities need to explore these options and "funding alternatives" (if there are front-loaded impacts). Some advocate "green tariffs" which would allow customers to choose to purchase power from more expensive renewable resources that may be more costly in the short term but that they believe will be cheaper in the long run. Others argue that to expect customers to choose to pay rates above market prices today is impractical and. therefore, won't ensure that renewable resources are developed.

Prohibitions that limit utilities' ability to disconnect service to non-paying customers during the winter (commonly referred to as the moratorium) need to be examined. The recognized dangers to life and property of winter disconnection should be weighed against the economic impact of policy. While it is unlikely that all restrictions will be lifted. it may be possible to develop a more focused strategy for dealing with payment-troubled customers.

G.   **Utility flexibility in dealing with customers (including both price and service options).**

Under traditional regulation. customers have been grouped into classes with others of similar load characteristics. and average rates have been set for the class.  Using this method, some customers pay more than the cost of serving them; others less.  Because of this, some lower-than-average cost customers will have more competitive alternatives than others. Utilities desire to have pricing flexibility to meet these customers' competitive alternatives. Customers, without alternatives

may benefit if such flexibility means that the utility can continue to serve customers with alternatives and collect a contribution to cover fixed system costs that would otherwise be lost if they left the system entirely. Prices for core customers will continue to have a greater need for regulatory review and care will have to be taken to ensure that if utilities are allowed flexibility they do not misuse it to compete unfairly with other providers.

## H.    Price unbundling and cost assignment.

A primary reason for the current industry examination is to find ways to allow customers some choice in the source and types of electric services they buy. Customer responsiveness may require unbundling of some services in the future. "Unbundling" would require the identification of distinct products and services now "bundled" into electric rates. However, an unbundled rate structure could, conceivably, include any number of packages or an array of customer options. In the natural gas arena unbundling has been driven by customer needs and alternatives and has seen a slow evolution on a limited basis.

Full unbundling may not be to the benefit of all customers or utilities due to complexity and lack of benefits to many customers. However, expanded customer choice through a greater diversity of pricing options (e.g., "premium service", standard service, interruptible service, "read your own meter rate," etc.) may be beneficial to all concerned. To the extent that unbundling does occur, care will have to be taken to ensure that cost-shifting and/or cross-subsidization do not occur in the process. In Idaho, it appears that most customers are currently satisfied with existing services, but some are interested at this time in defining the various components of the services they now receive and establishing the costs to the utility of providing those services. Customers may seek options later as technology and economics change.

In general, tariffed exit/entry fees do not appear to be customer-responsive. Connection fees and disconnection costs may best be addressed on a contractual basis as appropriate.

## I.    The necessity for and use of an approved integrated resource plan (IRP) vis a vis competitive markets.

Currently, utilities submit IRPs on a biennial basis to the Commission. The plans present what utilities forecast their future loads to be and explain with what resources they plan to meet those loads. They have been developed with input from the public through meetings conducted by the utilities. Increasingly, around the country, utilities are asserting that the information about their

businesses that has traditionally been made available to participants in the IRP process will qualify as trade secrets in an unregulated environment and should no longer be required to be made available to others by the utility. It is also argued that in a competitive environment, utilities must be more flexible than they currently can be under the constraints of a formal public planning process. Others would contend that the integrated resource planning should be retained and key characteristics clarified (e.g, flexibility as an informational tool to provide a preview of coming issues). They also believe that all utilities have some form of long range planning, and IRP may bridge this planning with regulatory and public involvement concerns if exercised in a flexible manner. Most companies in a competitive environment place high value in meeting with stakeholders, the expert public, and customers; utilities would continue to convene public involvement sessions but may require flexibility for need and types of meetings.

**J.    Service quality**

Service quality as it relates primarily to distribution and customer service can be broken down into three components: reliability, provisioning (providing new service, including new construction), and accessibility and responsiveness to customers. Some participants believe that maintaining a level of service quality consistent with customer expectations should be the cornerstone of any enterprise, regulated or not. They cite cases showing that absent uniform industry standards and a system of accountability, service quality can deteriorate. They believe it is imperative, therefore, that the Commission, industry and consumers jointly develop performance standards and a mechanism for assuring adherence as soon as possible. Current levels of performance should be taken into consideration when benchmarks are established. Once standards are set, the Commission would assume the responsibility of monitoring performance and requiring compliance.

**V.    SUMMARY–REGULATORY AND LEGISLATIVE ACTION ITEMS**

Regardless of what action the Commission takes with respect to deregulation, there are two overriding concerns facing the Commission. First, the Commission should seek to assure that customers continue to receive a high level of service quality and reasonable rates. Second, availability of sound information will be vital to customers as customer choice enters the electric industry.

**Recommendation No. 1:  Examine restructuring from a regional perspective.**

Action contemplated—Review and report on restructuring activities in surrounding states. Develop policies that, to the extent possible, will allow Idaho the opportunity to remain a full participant in its regional energy market. At a minimum, policies will be reviewed from the viewpoint of not inadvertently or inappropriately interfering in the economics of this energy market that might harm the citizens of Idaho.

Primary effort—Participate in the ongoing discussions of Wyoming, Nevada, and Washington.

Completion date—A report will be available at each meeting of the Idaho Commission with a full report completed as part of the report to the legislative session for 1997.
Responsible party—IPUC Staff.

**Recommendation No. 2:  Examine adoption of service quality standards.**

Action contemplated—Development of existing service level benchmarks.  Any proposed change to existing regulation to be accompanied by customer service plan.

Primary effort—IPUC directed study on current customer service standards and actual results. State legislation to clarify Commission's ability to monitor and enforce performance standards.

**Recommendation No. 3:  Examine customer relations policies**

Action contemplated—Revisit current policies in light of the transition to competition.

Primary effort—Collaborative effort to examine existing rules and regulations. and identify need to make modifications and/or seek legislation to clarify or strengthen consumer protection.

**Recommendation No. 4:  Consider legislation for consumer protection in a deregulated environment.**

Action contemplated—Develop legislative language  emphasizing the Commission's role as mediator and arbitrator of consumer-utility disputes with attendant authority to impose sanctions if necessary.  Underscore authority to set policy with respect to public safety, convenience and necessity.

Primary effort—Activity in 1997 legislative session.

**Recommendation No. 5:  Seek agreement on DSM, previous commitments to PURPA, etc.**

Action contemplated—Consider alternative funding mechanisms such as system benefit charge for new programs and inclusion of costs in transition rates, as appropriate.

Primary effort— Utility by utility analysis per Commission investigation.

**Recommendation No. 6:  Examine stranded cost magnitude and treatment.**

Action contemplated—Identify each utilities' exposure as distinguished from cost of service and consider experimental tariffs.

Primary effort—Utility by utility analysis per Commission investigation.

**Recommendation No. 7:  Consider expansion of service options to customers.**

Action contemplated—Utility examination of existing tariffs, services, and costs. Consideration of new service and pricing options.

Primary effort—Utility by utility filings for optional tariffs.

**Recommendation No. 8:  Pursue pricing flexibility.**

Action contemplated—Continue to recognize the balancing of customer-responsive special contracts/optional tariffs.

Primary effort—During transition period, continued attention to means to offset price increases with other alternatives (e.g., accelerated deferred investment tax credits, wholesale revenue, etc.) on a utility by utility basis or through transition rates.

**Recommendation No. 9: Explore provision of competitive service.**

Action contemplated—Continue use of special contracts for large customers. and explore the use of alternative tariffs, experimental and otherwise for medium-to-small customers. Ongoing, supportive legislation.

Primary effort--Individual utility filings; development of supporting legislation.

**Recommendation No. 10: Develop market-based mechanisms that will ensure all customers have the opportunity to participate in greater levels of competition if they so choose.**

Action contemplated—Proposals will be formulated that will offer options for each customer class.

Primary effort—The residential and small-to-medium sized commercial class will have options presented to them such that they will not be denied the purported advantages of increased levels of competition.

Completion date--January 1, 1997.

Responsible party—IPUC Staff.

**Recommendation No. 11: Re-examine the Electric Supplier Stabilization Act**

Action contemplated—Collaborative effort prior to seeking legislation.

Primary effort--Activity in 1997 legislative session.

gnre961.noi/comments/umisc/May 21, 1996

POSITION PAPER

-17-

MAY 21, 1996

Mary S. Hobson, ISB#: 2142
STOEL RIVES LLP
101 South Capitol Blvd., Suite 1900
Boise, ID 83702-5958
Tel: (208) 387-4277
Fax: (208) 389-9040

John M. Eriksson
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 578-6937
Facsimile (801) 578-6999

Attorneys for PacifiCorp

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

IN THE MATTER OF THE PETITION          )
OF PACIFICORP dba UTAH POWER &         )        CASE NO. PAC-E-01-06
LIGHT COMPANY FOR A DETERMINATION      )
THAT IT IS NOT REQUIRED TO PROVIDE     )        AFFIDAVIT OF
CERTAIN WHEELING SERVICE TO            )        GLEN POND
SNAKE RIVER VALLEY ELECTRIC            )
ASSOCIATION                            )

STATE OF UTAH          )
                       : ss.
COUNTY OF SALT LAKE )

Glen Pond, being first duly sworn, deposes and says as follows:

1.      I am the Idaho Regional Community Manager of PacifiCorp, dba Utah

Power & Light Company ("PacifiCorp").

2.      PacifiCorp is an electrical corporation and public utility in the state of

Idaho.

3.      Attached as Exhibit A to the foregoing Motion for Summary Judgment is a

true and correct copy of a letter from Del Ray Holm, President of Snake River Valley

Electric Association ("SRVEA") dated December 18, 1995 requesting certain wheeling service.

    4.    To date, PacifiCorp has declined SRVEA's request to wheel power over PacifiCorp's facilities to SRVEA's members currently being served by PacifiCorp.

DATED this _13_ day of August 2001.

_____
Glen Pond

SUBSCRIBED AND SWORN to before me this _13_ day of August 2001.

_____
Notary Public

JoAnn Peters
NOTARY PUBLIC
STATE OF IDAHO

Mary S. Hobson, ISB#: 2142
STOEL RIVES LLP
101 South Capitol Blvd., Suite 1900
Boise, ID 83702-5958
Tel: (208) 387-4277
Fax: (208) 389-9040

John M. Eriksson
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 578-6937
Facsimile (801) 578-6999

Attorneys for PacifiCorp

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

| | | |
|---|---|---|
| IN THE MATTER OF THE PETITION | ) | |
| OF PACIFICORP dba UTAH POWER & | ) | CASE NO. PAC-E-01-06 |
| LIGHT COMPANY FOR A DETERMINATION | ) | |
| THAT IT IS NOT REQUIRED TO PROVIDE | ) | AFFIDAVIT OF |
| CERTAIN  WHEELING SERVICE TO | ) | JOHN M. ERIKSSON |
| SNAKE RIVER VALLEY ELECTRIC | ) | |
| ASSOCIATION | ) | |

STATE OF UTAH          )
                       : ss.
COUNTY OF SALT LAKE  )

John M. Eriksson, being first duly sworn, deposes and says as follows:

1.      I am an attorney with the law firm Stoel Rives, LLP, and am employed in

its office in Salt Lake City, Utah.  I am counsel in this action for PacifiCorp, dba Utah

Power & Light Company, and am also counsel for PacifiCorp in *Snake River Valley Elec.*

*Asso. v. PacifiCorp*, CIV96-308-E-BLW (D. Idaho filed July 17, 1996).

2.      Attached to the foregoing Motion for Summary Judgment as Exhibit B is a

true and correct copy of excerpts of the transcript of the November 25, 1996 hearing on

Affidavit of John M. Eriksson - 1

the motion to dismiss in *Snake River Valley Elec. Asso. v. PacifiCorp*, CIV96-308-E-BLW.

3.      Attached to the foregoing Motion for Summary Judgment as <u>Exhibit C</u> is a true and correct copy of excerpts from Plaintiff's Answers to Defendant's First Set of Interrogatories and Request for Production of Documents submitted by Snake River Valley Electric Association ("SRVEA") in *Snake River Valley Elec. Asso. v. PacifiCorp*, CIV96-308-E-BLW.

4.      Attached to the foregoing Motion for Summary Judgment as <u>Exhibit D</u> is a true and correct copy of excerpts from Plaintiff's Memorandum in Opposition to Motion to Dismiss or Stay submitted in *Snake River Valley Elec. Asso. v. PacifiCorp*, CIV96-308-E-BLW.

DATED this /4th day of August 2001.

_____
John M. Eriksson

SUBSCRIBED AND SWORN to before me this /4th day of August 2001.

NOTARY PUBLIC
STACY A. KAMAYA
201 S. Main St., Ste. 1100
Salt Lake City, Utah 84111
My Commission Expires
December 1, 2004
STATE OF UTAH

_____
Notary Public