Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD 21401
Telephone: (410) 266-7524
Fax: (301) 261-8699

Robert C. Huntley, ISB No. 894
Christopher F. Huntley ISB No. 6056
Huntley, Park, Thomas Burkett,
 Olsen & Williams, L.L.P.
250 So. 5th Street, Suite 660
P.O. Box 2188
Boise, ID 83702
Telephone: (208) 388-1230
Fax : (208) 388-0234

Attorneys for Snake River Valley Electric Association

U.S. COURTS
01 DEC 28 PM 1:09



ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| SNAKE RIVER VALLEY<br>ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFICORP (Including UTAH POWER & LIGHT<br> COMPANY, a division)<br><br>Defendant,<br><br>STATE OF IDAHO by and through Allen G. Lance,<br> Attorney General<br><br>Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. CV 96-308-E-BLW<br>)<br>)<br>) **SNAKE RIVER VALLEY**<br>) **ELECTRIC ASSOCIATION'S**<br>) **MEMORANDUM IN**<br>) **OPPOSITION TO**<br>) **PACIFICORP'S MOTION**<br>) **FOR SUMMARY**<br>) **JUDGMENT**<br>) |

To the extent that PacifiCorp requests partial summary judgment against any permanent

injunctive relief under the Federal Antitrust Laws subsequent to the amendment of the ESSA on December 8, 2000, Snake River incorporates herein its Opposition to the State of Idaho's ("State") similar motion recently filed, but includes in this memorandum, the enumeration of the genuine issues of disputed material facts, precluding summary judgment, referred to in I, of its opposition to the State's motion.

PacifiCorp's additional claims for summary judgment to avoid complying with the Federal Antitrust Laws enacted by Congress to protect American citizens from anticompetitive conduct, confirmed as applicable to it by the final decision of the U.S. Court of Appeals for the Ninth Circuit in *Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189 (9th Cir. 2001), are without merit and should be denied.

PacifiCorp improperly labels Snake River's long struggle to serve its members low-cost, wholesale power for resale through an electric cooperative similar to many already operating in the State and hundreds more across the nation, against PacifiCorp, the largest electric utility operating throughout all of the western states outside California as a "moving target." By refusing every conceivable alternative sought by Snake River, PacifiCorp, in violation of long-standing precedents under the Federal Antitrust Laws by the U.S. Supreme Court and the Federal Courts, is the true "moving target" in this litigation.

Snake River submits that PacifiCorp's motion for summary judgment should be denied on any of the following grounds:

(1)     PacifiCorp's motion, insofar as it seeks relief similar to that requested in the State's motion for partial judgment against any permanent injunctive relief after December 8, 2000, should be denied on any of the four grounds set forth in Snake River's

opposition to the State's second motion for partial summary judgment filed on this date, as supplemented by the enumeration of disputed facts contained herein.

(2)     PacifiCorp's separate motion for summary judgment that Snake River "has not presented a single, unambiguous request for wheeling service to PacifiCorp" should be denied based on disputed issues of fact. The allegations of the complaint supported by affidavits contained herein show that since 1993 PacifiCorp steadfastly refused to deal or sell wholesale power or any local facilities previously paid for by Snake River's members to Snake River, despite a number of different and alternative requests by SRVEA. Thereafter, PacifiCorp consistently refused to wheel wholesale power to Snake River for it to resell to its members under several different requests based on Snake River's rights to purchase power from Idaho Power, and then Enron. PacifiCorp was under no uncertainty as to the wheeling requested, because it stipulated to the Court, to preclude Snake River's request for a preliminary injunction seeking wheeling of its wholesale power from Enron, that PacifiCorp would provide wholesale power on the same terms and conditions as contained in Snake River's then-existing power contract with Enron Power Marketing, Inc. to Snake River, if required under the Antitrust Laws. Having agreed to provide similar service in the stipulation, PacifiCorp's contention is meritless.

(3)     PacifiCorp's claims for summary judgment on the ground that (a) it does not possess monopoly power in the relevant geographic or product market or wholesale market; (b) that it does not refuse to sell wholesale power to Snake River, and thus "cannot be required to sell its assets, nor can it be found liable for refusing to provide Snake

River with wholesale power" (Mem. at 2), should be denied as conflicting with disputed issues of genuine fact and with the controlling Federal Antitrust Laws.

(4)     PacifiCorp's claim that it cannot be held liable under the federal antitrust laws for refusing to wheel power to Snake River because of its claimed desire "to protect the public's interest" and "not to drive out competition" must be dismissed because it raises disputed fact issues. Also, the Ninth Circuit has rejected any claim by PacifiCorp that it can rely solely on any public policy in the ESSA as granting immunity from the Federal Antitrust Laws where the anticompetitive conduct is left to the discretion of individual parties.

## I.     STATEMENT OF FACTS

1.     The Snake River Valley Electric Association is a duly organized electric cooperative. It was chartered, effective December 27, 1993. The basic purpose of the Association was set forth in its Articles of Incorporation specifying that its purpose was to ". . . purchase, acquire and accumulate electric energy for its members only and to transmit, distribute, furnish, sell and dispose of such electric energy to its members only and to construct, erect, purchase, lease as lessee in any manner acquire, own, hold, maintain, operate, . . . equipment and electrical transmission and distribution lines or systems necessary, convenient or useful for carrying out and accomplishing any of the foregoing purposes." The non-profit Association was also authorized to borrow money, to make and issue bonds, , , , and to secure the payment of such bonds upon any or all of the property, . . . of the Corporation. These provisions . . . are similar to those used by electric cooperative throughout Idaho and many other states of the country. Affidavit of Del Ray Holm of September 14, 2001, App. A, ¶2.

2.      Prior to incorporating the cooperative, the members of the Association, which included a number of the farmers engaged in the raising of potatoes, which were dependent upon irrigation facilities powered by electricity, put up substantial funds commencing in 1989 to hire an engineering firm to determine the feasibility of constructing any and all facilities needed to undertake the operation of the electric cooperative in the area. In 1989 and 1990, substantial funds were raised for the undertaking of an engineering study. *Id.* at ¶3.

3.      In October, 1990, EGY Resource Development Corp. (EGY) was commissioned by the irrigation pumpers comprised of Snake River to study the feasibility of developing an electric cooperative. Following the completion of the study which was very extensive, and took three years to complete, the engineering study concluded that it would economically feasible for Snake River to construct a distribution system which would include distributions lines, substations, and transmission facilities. Subsequent to obtaining this final report in 1993, Snake River, which had been instrumental in all of the prior operations up to that time, was formally established. *Id.* at ¶4.

4.      In 1994, Snake River met with a number of finance companies, including the Cooperative Finance Corp., relating to the funding of the costs outlined in the feasibility study for its proposed electric system. Snake River was advised that funding would be available to undertake the project. *Id. at* ¶5.

5.      Snake River, in 1994, requested that PacifiCorp sell its electric facilities in the area to Snake River not owned by Snake River's members. At that point, a number of Snake River's members had paid for the full capital cost of their distribution facilities to serve them to PacifiCorp, and these facilities would be transferred to Snake River for its ownership, control and operation, as well as to acquire any other facilities, either by construction by Snake River or purchase from

PacifiCorp. Snake River would also acquire and provide the wholesale power that would be used by the electric cooperative through these new facilities and, at that time, requested that PacifiCorp sell wholesale power to Snake River for Snake River to resell to its members. PacifiCorp refused to enter into negotiations with Snake River at that time and refused to sell any wholesale power to Snake River and expressly declined to sell its electric system to Snake River. *Id.* at ¶6.

6.     In early 1995, Snake River learned that PacifiCorp had agreed to sell its northern Idaho electric properties to the Washington Water Power company and also noted that PacifiCorp had entered into Nevada Power's territory as a competitor in that area. As a result of this, the entire board of Directors wrote to the President and CEO of PacifiCorp on May 3, 1995 and requested it consider selling to Snake River all or part of PacifiCorp's non-economic rural electric properties in southeastern Idaho. Snake River advised PacifiCorp that its providing of power service had resulted in many losses to the farmers and that PacifiCorp's provision of power only on an interruptible basis was a major problem. Snake River also requested that PacifiCorp provide wholesale power to Snake River. *Id.* at ¶7.

7.     On June 30, 1995, Snake River received a very short letter from Verl R. Topham, Senior Vice President and General Counsel of PacifiCorp, refusing to meet with Snake River or to consider its proposal. *Id.* at ¶8.


8.     Subsequently, in 1995, Snake River, through its engineering company, EGY Resource Development Corporation, sought to purchase wholesale power necessary for the cooperative from other suppliers. By letter of November 22, 1995, Snake River received a firm proposal from the Idaho Power Company to sell Snake River firm wholesale power far below PacifiCorp's rates for

a five-year contract from May 1, 1996 through April 1, 2001. *Id.* at ¶9.

9.      On December 18, 1995, Snake River again wrote to PacifiCorp requesting that it provide transmission service for Snake River's supply of wholesale power for Snake River from Idaho Power which would deliver that power at receipt points on PacifiCorp's transmission system to be wheeled to Snake River at facilities it would own at the delivery point and there resell it over the facilities owned by its members or to be constructed by Snake River to its members. In reply, PacifiCorp again refused to provide any transmission service to Snake River. *Id.* at ¶10.

10.     After Snake River's proposal for purchase of wholesale power from Idaho Power had expired, Snake River undertook negotiations with another supplier, namely, Enron Power Marketing, Inc. Snake River was able to negotiate and enter into a power purchase agreement from Enron for firm power which would be effective on May 1, 1997 for five years with an option to continue thereafter. Enron would sell the power at wholesale to be delivered to Snake River at designated points of receipt on the borders of where PacifiCorp's transmission system was interconnected through substations with transmission systems of other utilities. Snake River would take title to the power at those points of receipt, and after transmission service by PacifiCorp, Snake River would itself take delivery of the power at delivery points where Snake River would thereafter own or control facilities for service of the power to its members. Many of these facilities had already been paid by Snake River's members in cash to PacifiCorp. Here again, PacifiCorp refused to wheel Snake River's wholesale power across its transmission system to Snake River at the delivery points, where Snake River would undertake to resell it over facilities controlled by Snake River to its members. *Id.* at ¶11.

11.     Snake River has consistently from 1989 been dedicated to establishing an electric

cooperative similar to the numerous other electric cooperative in Idaho, as well as throughout the United States to acquire power at wholesale whether it is supplied by PacifiCorp, or other wholesale power suppliers and has sought to even purchase all transmission and distribution facilities required for that purpose for which Snake River has been able to arrange financing. When PacifiCorp refused to sell its transmission system to Snake River, Snake River consistently sought to obtain wheeling by it to delivery points where Snake River would be able to acquire the power and Snake River would, thereafter own and construct any necessary distribution facilities that PacifiCorp might refuse to sell. Most of those distribution facilities have already been paid for by Snake River's members as an up front capital contribution. PacifiCorp's refusal to wheel wholesale power for resale to its members is indistinguishable from PacifiCorp's furnishing such

wholesale wheeling for resale service to a number of other cooperatives and municipal systems in its service territory. *Id.* at ¶12.

      12.     Snake River's complaint provided that:

> 4. The plaintiff has been seeking for over the past three (3) years, to supply the electric power requirements for the area, but has been thwarted in its efforts by the defendant; which has refused to deal with the plaintiff in its efforts to purchase wholesale power and certain electrical system facilities from defendant; and thereafter refusing to wheel electric power to the plaintiff's over defendant's existing transportation system from alternate power suppliers from which the plaintiff has a right to purchase wholesale powers.

PacifiCorp's answer provided as follows (App. B):

> 4. In response to paragraph 4 of the complaint, Defendant lacks information sufficient to form a belief as to the truth of the allegations about Plaintiff's business plans, admits that Defendant has not sold wholesale power to Plaintiff, admits that Defendant has declined to sell its electrical system facilities to Plaintiff, and denies every remaining allegation therein.

      13.     In its opposition to Snake River's motion for a preliminary injunction, PacifiCorp

admitted that PacifiCorp has no wheeling tariff on file at FERC (applicable for service to Snake River):

> ... to wheel power, PacifiCorp must have a wheeling tariff on file with FERC covering the type of wheeling source sold. The assets upon which PacifiCorp's wheeling tariffs are based do not include the distribution assets that would be used in providing the wheeling source sought by Snake River.

PacifiCorp's brief filed October 10, 1997 at 4. *See also,* Affidavit of Del Ray Holm dated September 4, 1996 (PacifiCorp's transmission tariff excludes Snake River as an eligible customer). App. C hereto.

14.     PacifiCorp's contention that it "does not possess monopoly power in the relevant geographic or product market" "or possess monopoly power in the power market" (Mem. at 2) conflicts with the facts contained in the affidavit of Dr. John W. Wilson, App D hereto, at 1-14. PacifiCorp has monopoly control of transmission facilities required to serve Snake River. *Id.* at 6-9.

15.     It would not be economically feasible for Snake River to duplicate the transmission system of PacifiCorp. Affidavit filed September 14, 1997 by Dr. John W. Wilson, App. D at 9.

16.     PacifiCorp's and the State's contention that Snake River's acquisition of wholesale power and request for wheeling at receipt points on PacifiCorp's system for wheeling to Snake River to its members is not a wholesale transaction in interstate commerce subject to exclusive federal jurisdiction, and is subject to the jurisdiction of the State Commission, conflicts with the facts contained in the Affidavit of Dr. John W. Wilson dated September 20, 2001, App. E, hereto at pp.3-9.

17.     Snake River, in its opposition filed September 14, 2001, has opposed numerous factual contentions in PacifiCorp's motion for Summary Judgment at the IPUC, App. F. at 7-27, and



in Snake River's list of undisputed facts filed at the IPUC.  App. G hereto.[1]

## II.    SUMMARY JUDGMENT STANDARD

The Supreme Court has set the standard for summary judgment in antitrust cases in *Poller*

*v. Columbia Broadcasting System*, 386 U.S. 464, 473 (1962):

> . . . We believe that summary procedures should be used sparingly in complex
> antitrust litigation where motive and intent play leading roles, the proof is largely in
> the hands of the alleged conspirators, and hostile witnesses thicken the plot. . . It is
> only when the witnesses are present and subject to cross-examination that their
> credibility and the weight to be given their testimony can be appraised.  Trial by
> affidavit is no substitute for trial by jury which so long has been the hallmark of
> "even handed justice."[2]

As shown herein, disputed issues of material fact require that the Court deny the motions for

summary judgment of PacifiCorp and the State.

---

[1]      This contains specific references to disputed material facts relating to PacifiCorp's claims
(1) that in this matter "it is subject to the jurisdiction of the [IPUC] as to wholesale wheeling sought by
Snake River; (2) that Snake River is not organized as a "wholesale electric cooperative"; (3) PacifiCorp
erroneously describes Snake River's lawsuit in "Federal District Court to explore the Federal Antitrust
Laws as involving retail not wholesale wheeling"; (5) PacifiCorp errs in stating that §61-332B of the ESSA
is part of a new amendment of ESSA; (6) PacifiCorp erroneously states that "SRVEA seeks wheeling from
certain substations all the way to the existing points of delivery of which PacifiCorp presently delivers
electric service to its customers who are members of Snake River"; (7) PacifiCorp erroneously construed
discovery documents and answers to interrogatories with this case; and (8) that PacifiCorp erroneously
states that the Energy Policy Act denies Federal Court jurisdiction over wholesale wheeling represented in
this case.

[2]      *See also, T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987)
("Thus, at this stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed
material fact. *Anderson*, 106 S. Ct. at 2513.  Nor does the judge make credibility determinations with respect to
statements made in affidavits, answers to interrogatories, admissions or deposition. *See id.*  These determinations

(Footnote 2 continued on page 11)

(Footnote 2 continued from page 10)

are within the province of the factfinder at trial.  Therefore, at summary judgment, the judge must view the evidence
in the light most favorable to the non-moving party; if direct evidence produced by the moving party conflicts with
direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the
nonmoving party with respect to that fact. . .)

SRVEA's Memorandum in Opposition to PacifiCorp's
Motion for Summary Judgment - 10

## III.   **ARGUMENT**

### A.   **PacifiCorp Is Not Immunized from Antitrust Liability for Conduct After December 8, 2000 Under the State Action Doctrine**

Snake River incorporates by reference here its memorandum in opposition to the State's motion for partial summary judgment, and supplements that memorandum by delineating herein the genuine issues of material fact that preclude PacifiCorp's and the State's motions for summary judgment.

#### 1.   **PacifiCorp's And The State's Motions For Summary Judgment Should Be Dismissed Because Disputed Facts Exist**

##### a.   **Conflict With Ninth Circuit Decisions**

The U.S. Court of Appeals for the Ninth Circuit in *Snake River Valley Electric Association v. PacifiCorp*, 238 F.3d 1189 (9th Cir. 2001) has ruled that:

> The State-action doctrine will shelter only the particular anticompetitive acts of private parties that in the judgment of the State, actually furthers State regulatory policies.

Emphasis added; *citing Patrick v. Burget*, 486 U.S. 94, 101 (1998) and *FTC v. Ticor Title Insurance Co.*, 504 U.S. 621, 634 at 634-35, (holding the "purpose of the state action immunity doctrine 'is to determine whether the State has exercised sufficient independent judgment and control so that the details of the [conduct] have been established as a product of deliberate state intervention, not simply by agreement among private parties.'") 238 F.3d at 1193-1194. The Ninth Circuit also rejected PacifiCorp's reliance upon *Municipal Utilities Bd. v. Alabama Power Co.* 934 F.2d 1193 (11th Cir. 1991) on the ground that the Eleventh Circuit, after remand, held that "the private agreements at issue in the case were actually approved by the Alabama Legislature and, further, under the provisions of the act in question, the Alabama Legislature had to give explicit approval to any

territorial exchanges private utilities agreed to."

The Ninth Circuit also denied the claims by PacifiCorp and Idaho that the four Idaho cases

applying and enforcing the ESSA, amount to active supervision under the Ninth Circuit's decision

in *Nuggett Hydroelec.,L.P. v. Pacific Gas & Electric Co.*, 981 F.2d 429 (9th Cir. 1992) ruling as

follows:

> . . . While *Nugett* does hold that an equivalent number of cases act as active
> supervision. . . those cases all involve reviews of the specific conduct at issue in
> Nugel... The mere presence of cases reviewing general violations of the ESSA does not amount to active supervision in this case when Idaho Courts lack
> all power to review the specific conduct at issue.

238 F.3d at 1195; emphasis added. The Ninth Circuit rejected both PacifiCorp's and the State's

arguments that the ESSA, as originally enacted, was "self-policing." 238 F.3d at 1194. This

decision is binding as the law of the case at this time on both the State and PacifiCorp, parties

therein.

The amendments to the ESSA do not purport to establish a "self-policing" system, but

authorize certain review and action by the IPUC. The only provision invoked by PacifiCorp is §61-

332D by its filing with the IPUC for an adjudication, claiming that Snake River is seeking "a sham

wholesale transaction." The IPUC, in an order issued October 30, 2001, denied

PacifiCorp's motion for summary judgment and has scheduled discovery, testimony, and a hearing

on the issue. *See* Order 2888 at 12-15, attached to the State's affidavit by Brett T. DeLange.

It is crystal clear that both the State's and PacifiCorp's motions for partial summary judgment

seeking to bar any antitrust injunctive or damages relief after December 8, 2000, must be denied

because, under the controlling Ninth Circuit decision, there has been no state action whereby the

state has "exercised sufficient, independent judgment and control so that the details of the [final

result] have been established as a product of deliberate state intervention", citing *Ticor*, 238 F.3d at

1194.[3]

Furthermore, §61-332D of the amended ESSA does not meet the Ninth Circuit's holding of the requirements to meet the second prong of the *Midcal* test because it clearly vests discretion in private parties as to whether they will or will not wheel electric power across its system by providing in §61-332D(2) that only an electric supplier "declining to furnish wheeling service pursuant to this section," shall petition the Commission. Thus, PacifiCorp is vested with sole discretion under the ESSA as to whether it will or will not grant wheeling service to a particular entity. Also, the Commission has no authority to adjudicate whether PacifiCorp is acting in an unduly discriminatory fashion.[4] This limitation on its regulatory power, in and of itself, precludes any conclusion that the amendment meets the *Midcal* state supervision test of the Ninth Circuit's decision. The Court was explicit in discussing *Municipal Utilities Bd. v. Alabama Power Co.*, that the Alabama Legislature "must explicitly approve any customer allocations the parties might wish to make" when it stated "it should be clear that Idaho's situation, like *Alabama*, could be addressed by legislative action providing for supervision." 238 F.3d at 1195. No such legislation has been enacted by the Idaho Legislature.

In addition, the Legislature in §61-334 exempted any wholesale-for-resale transactions from the Act:

---

[3] Further, the present motion for summary judgment before this Court by PacifiCorp and the State conflict with the plain language of the amended ESSA, §61-332D, which requires the IPUC after a hearing to "issue an order in accordance with its finding, ordering either that the wheeling service shall, or shall not, be required" (Emphasis added).

[4] The new ESSA amendment also discriminates against cooperatives in favor of investor-owned utilities. Section 61-334, "Special Rules of Interpretation," provides that "nothing in this Act shall be construed to . . . (2) apply to controversies between two (2) or more utilities." Thus, with respect to any dispute between two utilities, the Commission would not apply the ESSA.

Nothing contained in this Act shall be construed to:

> (3) preclude any electric supplier from extending
> electric service . . . to another electric supplier for
> resale . . . .

In this section, the legislature recognized the clear division between Federal and State jurisdiction

because wholesale-for-resale transactions are within the exclusive Federal jurisdiction not subject

to regulation by States. *See* Snake River's opposition to the State's motion for summary judgment,

IV, incorporated herein by reference. No summary judgment is possible under either PacifiCorp's

or the State's motions for summary judgment against injunctive or damages relief after December

8, 2000.

> **b.    Genuine Issues of Material Fact Also
> Bar Summary Judgment On The
> December 8, 2000 Claim**

The facts as stated in the affidavits of Del Ray Holm, App. A and B hereto and as stated in

the statement of facts, *supra*, Nos. 1-14 at pp. 4-10; and in the Affidavit of Dr. John W. Wilson,

*supra*, App. E, pp. 3-10, hereto, and in the pleadings and discovery undertaken in this case, as set

forth in Appendix F at 7-27, described at ¶17 of the "Statement of Facts", *supra*, preclude any

summary judgment on either PacifiCorp's or the State's motions for partial summary judgment

seeking immunity from antitrust liability for conduct after December 8, 2000 under the state action

doctrine.

> **B.    PacifiCorp Is Not Entitled To Summary Judgment
> On Its Claim That It Has Not "Refused To Deal"
> With Snake River**

> **1.    Legal Standard Applicable**

PacifiCorp's claim that it has "not refused to deal" should be denied because it conflicts with

long-standing Federal Antitrust Law under §2 of the Sherman Act and is based on disputed fact

issues.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), the Supreme Court upheld

a decree that enjoined Otter Tail Power Co.:

> . . . from refusing to sell electric power at wholesale to existing or proposed
> municipal electric systems in the area serviced by Otter Tail, from refusing to wheel
> electric power over the lines from the electric power suppliers to existing or proposed
> municipal systems in the area, from entering into or enforcing any contract which
> prohibits use of Otter Tail's lines to wheel power to municipal electric power
> systems, or from joining into or enforcing any contract which limits the customers
> to whom in areas in which Otter Tail or any other electric power companies may sell
> electric power.

410 U.S. at 368-69.

The Supreme Court noted the problem relating to proposed municipal systems as follows:

> . . . Proposed municipal systems have great obstacles; they must purchase the electric
> power at wholesale. To do so, they must have access to existing transmission lines.
> The only ones available belong to Otter Tail. While the Bureau of Reclamation has
> high voltage bulk-power supply lines in the area, it does not operate a
> subtransmission network, but relies on wheeling contracts with Otter

> Tail and other utilities to deliver power for its bulk supply lines to its wholesale
> customers. 410 U.S. at 370. [5]

The Court ruled that "Otter Tail Refused to sell the new systems' energy at wholesale and refused

---

[5]    As affirmed by the Supreme Court, the District Court found:

> "Here, Otter Tail refuses to sell power to municipalities which would
> thereby take retail power business from defendant and refused to wheel
> power for others willing to sell to these municipalities. Because of its
> dominant position, Otter Tail is able to deprive towns of the benefits of
> competition which would result from municipally-owned facilities."

*United States v. Otter Tail Power Co.*, 331 F. Supp. 54, 61 (1971).

to agree to wheel power from other suppliers of wholesale energy." The Supreme Court upheld the

decree, stating as follows:

> ... The record makes abundantly clear that Otter Tail used its monopoly power in the cities in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws. *See United States v. Griffith*, 334 U.S. 100, 107 . . . The District Court determined that Otter Tail has a "strategic dominance in the transmission of power in most of its service area" and that it used this dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply.

<p style="text-align:center">*   *   *</p>

> ... There were no engineering factors that prevented Otter Tail from selling power at wholesale to those towns that wanted municipal plants or of wheeling the power. The district court found - and its findings are supported - that Otter Tail's refusal to sell at wholesale or to wheel were solely to prevent municipal power systems from eroding its monopolistic position.

410 U.S. at 377, 378.

## 2.   Genuine Issues Of Fact Exist As To PacifiCorp's Claim That It Has Not "Refused To Deal"

PacifiCorp's contention that it has not "refused to deal" because Snake River has never

requested that PacifiCorp provide the wheeling services it seeks, presents a contested issue of

disputed fact which precludes summary judgment. In 1994, Snake River requested that PacifiCorp

sell its electric facilities in the area to Snake River not owned by Snake River's members. At that

time, a number of Snake River's members had paid for the full capital costs of their distribution

facilities to serve them to PacifiCorp and sought to have these facilities transferred to Snake River,

and Snake River proposed to acquire any other necessary facilities, either by construction by Snake

River or purchase from PacifiCorp. Snake River also requested that PacifiCorp provide wholesale

power to it for its cooperative for resale by it to its members. Affidavit of Del Ray Holm, App. A

at ¶5.

PacifiCorp refused to enter into negotiations at that time and refused to sell any wholesale power to Snake River or to sell its electric system. Again, on May 3, 1995, the entire Board of Directors wrote to PacifiCorp requesting that it sell to Snake River all or part of its electric properties and requested PacifiCorp provide wholesale power to Snake River. App. A, Affidavit of Del Ray Holm, ¶6. This request was rejected by PacifiCorp in a letter of June 30, 1995. *Id.* at ¶8. Subsequently, Snake River obtained a firm proposal from the Idaho Power Company to purchase wholesale power and, on December 18, 1995, requested that PacifiCorp provide wheeling service for Snake River's supply of wholesale power from designated receipt points on PacifiCorp's system to Snake River at facilities they would own at the delivery points. Again, PacifiCorp refused to provide any wheeling service to Snake River. *Id.* at ¶10.

In the complaint filed in this case by Snake River on July 17, 1996, Snake River specifically alleged:

> The Company has consistently refused to deal with the plaintiff to allow the plaintiff to establish its own electric facilities within the area, and has also refused to wheel power over its transmission facilities to plaintiff, which would allow the plaintiff to use competitive wholesale power acquired from other suppliers, to resell to its customers to thereby compete for the defendant. (*See* Exh. A to Cory Affidavit of December 7, 2001).

This Court in its Memorandum, Decision and Order of April 25, 1997, stated the "facts" as follows:

> Not only has PacifiCorp refused to sell its own electricity to Snake River, it has also refused to deliver any other generator's electricity to Snake River. And since PacifiCorp owns all those transmission facilities in Snake River's market, Snake River is effectively blocked from providing any electricity to its members.

Decision at 2.

Subsequently, Snake River filed a petition for a preliminary injunction to require PacifiCorp to wheel the wholesale power it had purchased in early 1997 from Enron under a firm contract. Here

again, PacifiCorp refused to wheel that power to Snake River. [6] PacifiCorp's statement that it does

not wheel power over its transmission and distribution system based on similar terms and conditions

to those requested by Snake River, presents a disputed issue of fact. *See* App. F, Exh. No. 1, which

includes references to 263 wholesale transactions by PacifiCorp, many of which are indistinguishable

from that sought by Snake River.[7] It also is inconsistent with PacifiCorp's filed transmission service

agreements at the FERC and other service agreements which expressly provide for delivery at retail

points.  App. F at Exh.2.

    **C.**    **PacifiCorp's Refusal To Sell Wholesale Power Or**
               **Electrical Facilities To Snake River Constitutes An**
               **Antitrust Violation Which Cannot Be Dismissed On**
               **Summary Judgment Because It Involves Disputed**
               **Issues Of Fact**

PacifiCorp's contention that its refusal to sell electric power or electrical facilities to Snake

River does not constitute an antitrust violation based on its motion for partial summary judgment

filed or about January 23, 1998 is not applicable to the facts of the present case.  The sole case cited

by PacifiCorp there, *i.e., Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 297 F.2d

370, 375-76 (7th Cir. 1986), *cert. denied,* 480 U.S. 934 (1987) involved facts completely different

from the facts of the present case.  The Seventh Circuit in *Olympia* affirmed the applicability of the

---

    [6]      PacifiCorp entered a stipulation on the record that if Snake River's contract with Enron
were terminated for failure of Snake River to obtain wheeling by PacifiCorp, that PacifiCorp would provide
wholesale power to Snake River on the same terms and conditions contained in the Enron contract to
SRVEA. The Court accepted this as a binding commitment. This demonstrated that PacifiCorp then was
committed to provide that explicit wheeling service then requested by Snake River. Exh. H hereto.

    [7]      An example of an agreement is the one entered by PacifiCorp with the Town of Eagle
Mountain, Utah which expressly recognized that "Eagle Mountain intends to construct additional facilities
to interconnect with PacifiCorp's transmission system in order to provide adequate service to its developing
community." App. G, ¶37, Exh. No. 11.

SRVEA's Memorandum in Opposition to PacifiCorp's
Motion for Summary Judgment - 18

antitrust laws to a firm that controls an essential facility, such as PacifiCorp stating as follows:

> Some cases hold, however, that a firm which controls a facility essential to its competitors may be guilty of monopolization if it refuses to allow them access to the facility. We accept the authority of those cases absolutely. They are well illustrated by *Otter Tail Power Company v. United States*, 410 U.S. 366. . . (1973) where a wholesale supplier of electricity refused to supply electric power to a power system that competed with it in the retail electrical power market and had no other source of supply. . . . The monopoly supplier who retaliates against customers who have the temerity to compete with him, by cutting such customers off, is severing a collateral relationship in order to discourage competition.

<div align="center">*    *    *</div>

> . . . The essential feature of the refusal to deal cases - a monopoly supplier's discriminating against a customer because the customer has decided to compete with it - is missing here . . .

*Id.* at 377.

The essential facilities doctrine, emanating from the *Otter Tail* case, upholds antitrust liability when a defendant refuses to deal or wheel, and it owns or controls "essential facilities" necessary for competition, it must make such facilities available to competitors. *Aspen Highland Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1518 n.11 (10th Cir. 1984), *aff'd*, 472 U.S. 585 (1985); *MCI Communication v. AT&T*, 708 F.2d 1081, 1107-08 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983); *Mid-Texas Communication v. AT&T* 615 F.2d 1372, 1388, n.12 (5th Cir.) *cert. denied*, 449 U.S. 912 (1980).

All of the elements of the essential facilities are met in this case: (1) the defendant, PacifiCorp, controls all of the essential transmission facilities over which it is a monopolist in the relevant geographic market; (2) the plaintiff is unable, reasonably or practically, to duplicate the essential facility; (3) the defendant has denied use of the facilities to plaintiff, a competitor; and (4)

providing the competitor access to the facility is feasible. [8]  Affidavit of Dr. John W. Wilson, App. D, pp. 1-14.

The Ninth Circuit has viewed the refusal to deal and essential facilities cases and concluded that "[a] facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to eliminate competition in the downstream market." *Alaska Airlines v. United Airlines, Inc.*, 948 F.2d 536, 544-45 (9th Cir. 1991). Exactly that situation exists in this case. PacifiCorp denied all Snake River's requests to purchase wholesale power or any of its essential facilities necessary to serve Snake River's members.  This eliminated any ability of Snake River to compete with PacifiCorp in the downstream geographic market in which Snake River and PacifiCorp compete for customers. There is no other means of access by Snake River other than by PacifiCorp's facilities to that market. [9]  PacifiCorp's subsequent refusal to wheel blocks all access by Snake River to alternate wholesale-for-resale power supplies.

Since "it would be economically impractical to construct alternate transmission facilities to connect Plaintiff with the transmission facilities of any other utilities", the duplication element of the essential facilities is met.  Affidavit of Dr. John W. Wilson, App. D at p. 9.  *City of Anaheim v. Southern Cal. Edison,*. 955 F.2d 1373, 1380 (9th Cir. 1992); *Fishman v. Estate of Wirth*, 807 F.2d 520, 540 (7th Cir, 1987); *Consol. Gas Co. v. City Gas Co.*, 665 F. Supp. 1493, 1534 (S. Fla. 1987), *aff'd*, 880 F.2d 297 (11th Cir. 1989), *reinstated on reh'g*, 912 F.2d 1262 (11th Cir. 1990); *vacated as*

---

[8]     The formulation was first set forth in *MCI Communication Corp. v. AT&T*, 708 F.2d 1081, 1107-08, ll32-33.  It has been followed by the Ninth Circuit, as well as many other circuits; *City of Anaheim v. Southern Cal. Edison* Co., 955 F.2d 1373, 1380 (9th Cir. 1992); *City of Malden v. Union Electric Co.*, 887 F.2d 157, 180 (8th Cir. 1989).

[9]     *Compare, City of Anaheim v. Southern Cal. Edison*, 955 F.2d 1373, 1381 (9th Cir. 1992). (Where the pacific intertie was not an essential facility because alternate power sources were available to the plaintiffs from others).

*moot*, 111 S. Ct. 1300 (1991).

Finally, it is feasible for PacifiCorp to provide access. SRVEA's members for whom it seeks to sell wholesale power at retail are presently receiving electric power from PacifiCorp, through the facilities in question. PacifiCorp cannot claim it lacks capacity in those facilities for the transmission requested by plaintiff. Denying access, having made the facility available, shows it was "feasible" to provide access. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *Del. Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174 (2d Cir. 1990). To the extent that PacifiCorp could establish that any part of the facilities over which Snake River requests wheeling are not essential facilities, which PacifiCorp has never done up to this time, Snake River would be willing to purchase those facilities, as it has consistently advised PacifiCorp since 1994.

Further, the law of the case by the Ninth Circuit now precludes any claim by PacifiCorp of antitrust immunity based on its refusal to sell facilities to Snake River:

> ... Further, as §61-328 provides the Idaho Public Utilities Commission jurisdiction over a decision to sell an exclusive service territory, it does not reach the present situation, where a utility has refused to sell an exclusive service territory.

238 F.3d at 1193, n.10.

Also, *Aspen Skiing Co. v Aspen Highlands Skiing*, 472 U.S. 585, 605 (1985), requires PacifiCorp to use all of its existing facilities to prevent a §2 Sherman Act violation. The Supreme Court upheld a judgment of a §2 Sherman Act violation where Ski Company, having monopoly power through its ownership of three of the four ski areas in Aspen, refused to deal with the fourth company, Highlands, to allow equal use of all of Ski Company's facilities by a joint pass available to all skiers. The Court held:

> ... If a firm has been "attempting to exclude rivals on some basis other than efficiency," it is fair to characterize its behavior as predatory. It is, accordingly,

appropriate to examine the effect of the challenged pattern of conduct on consumers, on Ski Co.'s smaller rival, and on Ski Co. itself.

472 U.S. at 605.

Similarly, PacifiCorp's refusal to allow the use of any of its facilities or to sell wholesale power or its electrical facilities, necessary to allow Snake River to serve its cooperative electric system consumer members, has impaired competition and is unlawful, predatory behavior.[10]

The Ninth Circuit's controlling decision holds that the IPUC's jurisdiction "does not reach the present situation where a utility has refused to sell an exclusive territory." 238 F.3d at 1193, n.10.

### D. PacifiCorp's Claim Of Good Faith Reliance On Idaho's Regulatory Policy Against Retail Wheeling Provides No Immunity For Its Antitrust Violations, And Also Is Based On Disputed Issues Of Fact

PacifiCorp's argument, Mem. at 16-19, should be rejected on a number of separate grounds. First, PacifiCorp could not rely on "Idaho's regulatory policy against retail wheeling" prior to the amendment of December 8, 2000 of the ESSA, because no such law existed. Therefore, no such

---

[10]     Inconsistent with its anticompetitive conduct in this case, PacifiCorp has agreed to sell similar facilities to those requested by Snake River to its wholly-owned affiliate, PPM-1 (both subsidiaries of its parent, Scottish Power), to enable PPM-1, a power marketer, to sell power at unregulated market-based rates. *PacifiCorp*, 93 FERC ¶62,121. PacifiCorp has also sold similar facilities used to serve existing retail customers: *PacifiCorp*, 90 FERC ¶62,059 (2000) ("facilities

(Footnote 10 continued on page 23)

(Footnote 10 continued from page 22)

used exclusively to deliver power to PacifiCorp retail customers in northern California"); *PacifiCorp*, EC99-900 (1999) (sale to Flathead Electric Cooperative in Montana); *PacifiCorp*, 87 FERC ¶62,116 (1999) (sale to Springfield Utility Board in Oregon). *See* App. G hereto.

     PacifiCorp's reference to the IPUC's preliminary decision "that an electric utility customer does not obtain ownership of a distribution line when it pays for a portion of a line extension" does not apply to Snake River's claim that many of its members have paid for the entire cost. *See* App. A, ¶6.

defense is available to PacifiCorp for its anticompetitive conduct prior to that date, which negates its motion for summary judgment.

Second, there can be no basis for any such reliance by PacifiCorp subsequent to December 8, 2000 because the new §61-332D expressly required final action by the IPUC, which has set the matter for hearing to determine "either that the wheeling service shall, or shall not, be required."

Third, PacifiCorp's claim is barred under the controlling law of the case on the Ninth Circuit's decision because under the Supreme Court's *Midcal* test, there is no basis for PacifiCorp to rely on any policy expressed in the ESSA as a basis for antitrust immunity, when the necessary second prong of *Midcal* requiring active state supervision, is absent. 238 F.3d at 1193-1195.

Fourth, PacifiCorp's claim poses disputed issues of material fact, precluding summary judgment. PacifiCorp knew at the outset, based on this Court's initial decision of April 25, 1997, that any reliance on the ESSA was improper. But PacifiCorp continued its refusal to deal or sell wholesale power, or to wheel Snake River's wholesale power acquired from Idaho Power and Enron, directly contrary to the Supreme Court's decision in *Otter Tail* case. The affidavits attached hereto show that its real intent was to:

> ... use its monopoly power in ... its service area to foreclose competition or gain a competitive advantage, all in violation of the antitrust laws.

*Otter Tail*, 410 U.S. at 377. *See* App. A, ¶¶ 6-12. [11]

---

[11]     The cases cited by PacifiCorp are not in point because they involve the relationship of the Federal Antitrust Laws in the communications field with the "public interest" standard of the Communications Act. *See Southern Pacific Communications v. AT&T*, 740 F.2d 980, 1009 (D.C. Cir. 1984), *cert. denied*, 410 U.S. 1005 (1995); *Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d 1332, 1579 (5th Cir. 1990), *cert. denied*, 499 U.S. 912. In contrast, the Supreme Court has ruled that nothing in the Federal Power Act provided utilities like PacifiCorp any grounds for immunity from the Federal Antitrust Laws. *Otter Tail Power Co. v. U.S.*, 410 U.S. 360, 372-377 (1973). Further- more, all of the cases relied on by PacifiCorp were tried on the merits of the factual issues involved; none involved granting of summary judgment as requested by PacifiCorp.

SRVEA's Memorandum in Opposition to PacifiCorp's
Motion for Summary Judgment - 23

## CONCLUSION

For the foregoing reasons, PacifiCorp's motion for summary judgment should be denied.

Respectfully submitted,

Robert C. Huntley
Huntley, Park, Thomas, Burkett,
  Olsen & Williams, L.L.P.
250 So. 5th Street, Suite 660
Boise, ID  83701
Telephone: (208) 388-1230
Facsimile: (208) 388-0234

Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD 21401
Telephone: (410) 266-7524
Facsimile:  (301) 261-8699

Counsel for SRVEA

December 21, 2001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of December, 2001, a true and correct copy of the foregoing document was served on the below listed individuals by the method indicated below:

Mary S. Hobson, ISB#2142
STOEL RIVES
101 South Capitol Blvd., Suite 1900
Boise, ID 83702
**Fax: 389-9040**

    ___ Hand Delivered
    _X_ U.S. Mail
    ___ Overnight Mail
    ___ Facsimile

John M. Eriksson, Esq.
STOEL RIVES
One Utah Center
201 S. Main St. Suite 1100
Salt Lake City, UT 84111
**Fax: 801-578-6999**

    ___ Hand Delivered
    _X_ U.S. Mail
    ___ Overnight Mail
    ___ Facsimile

Brett T. DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
Len B. Jordan Building, Lower Level
700 West Jefferson Street, Room 210
P. O. Box 83720
Boise, ID  83720-0010
**Fax: 334-2830**

    ___ Hand Delivered
    _X_ U.S. Mail
    ___ Overnight Mail
    ___ Facsimile

Robert C. Huntley