

David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah  84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Mary S. Hobson  (ISB# 2142)
Erik F. Stidham (ISB# 5483)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant PacifiCorp

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>       Plaintiff,<br><br>vs.<br><br>PACIFICORP,<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALLEN G. LANCE, Attorney General,<br><br>       Defendant-Intervenor. | Case No. CV 96-0308-E-BLW<br><br>**PACIFICORP'S TRIAL BRIEF** |

## I. INTRODUCTION

Over the course of this litigation, Snake River Valley Electric Association ("Snake River") has asserted a litany of antitrust claims against PacifiCorp, including PacifiCorp's alleged refusals to (1) sell its transmission facilities to Snake River, (2) sell wholesale power to Snake River, (3) wheel power to "new" customers, and (4) wheel power to PacifiCorp's existing members over nonexistent distribution facilities Snake River now claims it intended to build or acquire. After almost six years of litigation, three separate motions for summary judgment, an appeal to the Ninth Circuit, and the enactment of Idaho legislation aimed specifically at prohibiting the type of claims asserted by Snake River in this case, PacifiCorp has defeated all but one of Snake River's baseless antitrust claims.

While Snake River manufactured a disputed issue of fact regarding PacifiCorp's purported refusal to wheel power to current PacifiCorp customers over certain alleged "essential facilities", this claim too must fail at trial because: (1) Snake River never made a complete, unambiguous request for such wheeling services from PacifiCorp, thus precluding a finding that PacifiCorp refused to provide such services; (2) PacifiCorp's facilities are not "essential facilities" because Snake River itself has concluded that it would be economically feasible to construct its own distribution system, including distribution lines, substations and transmission facilities; and (3) PacifiCorp's position in this case is supported by PacifiCorp's reasonable attempts to comply with the State of Idaho's public policy as expressed in the Electric Supplier Stabilization Act.

Moreover, Snake River cannot prove that it has been damaged by any alleged refusal to wheel. Indeed, Snake River's own expert has concluded that, absent lost spot market sales,

Snake River's members saved money by purchasing their power through PacifiCorp. And Snake River is precluded from recovering damages for alleged lost sales because (1) Snake River's purported lost profits on the spot market are not an antitrust injury attributable to the allegedly anticompetitive conduct of PacifiCorp, (2) Snake River cannot show a genuine intent to enter the wholesale market or a preparedness to do so, (3) the termination of the Enron Contract resulted from Snake River's unilateral failure to procure necessary wheeling arrangements, (4) neither Snake River nor its members can generate or receive a profit through the resale of power, and (5) Snake River cannot recover the damages it seeks from PacifiCorp because those damages are based on subjective belief and unsupported speculation.

## II. STATEMENT OF FACTS

Snake River is a non-profit cooperative corporation organized under the laws of the State of Idaho whose articles of incorporation describe it as a corporation organized "[t]o generate, manufacture, purchase, acquire and accumulate electric energy for its members only and to transmit, distribute, furnish, sell and dispose of such electric energy to its members only . . . ."  Article II(a) (emphasis added).

Prior to 1993, Snake River commissioned EGY Development Corporation ("EGY") to study the feasibility of developing an electric cooperative.  EGY concluded that "it would be economically feasible for Snake River to construct a distribution system which would include distributions lines, substations, and transmission facilities."  In 1994, Snake River met with a number of finance companies, including the Cooperative Finance Corporation, to discuss possible funding for the costs outlined in the feasibility study conducted by EGY.  Snake River was advised that funding would be available to undertake the project.  Rather than construct its

own facilities, however, Snake River sought to buy facilities owned and operated by PacifiCorp. When PacifiCorp declined to pursue such a sale, Snake River decided to seek "retail wheeling." Snake River knew, however, that such services were not permitted under state law.

On December 18, 1995, Snake River sent a letter to PacifiCorp requesting, among other things, that PacifiCorp wheel "wholesale" power to "existing delivery points on Utah Power's system to each of the members of [Snake River]." The letter, however, was sent to John Mooney, who had no responsibility over wheeling requests, and failed to include essential information that PacifiCorp needed in order to evaluate its ability to provide the wheeling services requested.

Thus, on January 2, 1996, PacifiCorp directed Snake River's request to Dennis Steinberg, PacifiCorp's Senior Vice President for Transmission Services and Wholesale Sales, and began taking steps in anticipation of providing the service Snake River sought, including verifying that PacifiCorp had the transmission capacity to satisfy Snake River's request, and preparing a draft service agreement. PacifiCorp wrote to Snake River again on February 16, 1996, and included copies of its two FERC tariffs for wheeling and encouraged Snake River to file an application. Snake River, however, never submitted the necessary application. Instead, in July 1996, Snake River filed suit against PacifiCorp under sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act claiming that PacifiCorp had committed numerous antitrust violations dating back to 1994.

In February 1997, Snake River entered into a Power Purchase and Sale Agreement with Enron, ("the "Enron Contract") which was a wholesale supplier of electricity. The expressly

stated intent of the parties for entering into the Enron Contract was "to provide power to [Snake River] for resale to Snake River's Members. . . ." Enron Contract Art. 1.4. (emphasis added). Because Snake River did not want to be forced to purchase any power from Enron that could not be resold directly to its members, a condition precedent was inserted into the Enron Contract stating that Snake River would not be obligated to purchase any electric power from Enron unless it was first able to secure all wheeling agreements necessary for Snake River to "resell such power to Snake River's Members and transmit such power to Snake River's Members." *Id.* at Art. 1.3.

Snake River warranted in the Enron Contract that, as of February 27, 1997, it was "duly organized, validly existing and in good standing" in Idaho and that it had "the legal right, power and authority and is qualified to conduct its business." *Id.* at Art. 5.1(b). Contrary to that warranty, Snake River had forfeited its corporate powers and its right to do business in the State of Idaho as of December 1996, and did not have those rights reinstated until August 22, 1997.

"The first formal effort by Snake River to secure wheeling services after it had obtained the right to purchase power from Enron was made on June 9, 1997." Memorandum Decision and Order ("Memo Decision and Order"), January 21, 1999, at 5. On that date, Snake River sent a letter to PacifiCorp requesting wheeling arrangements that would allow Snake River to wheel power to "new" members that were not currently being served by PacifiCorp. *Id.* PacifiCorp acknowledged this request by stating that it expected to be able to provide the services requested by Snake River. *Id.* at 6. Nevertheless, "Snake River never submitted such an application or otherwise responded to the letter." *Id.* Instead, Snake River categorized

PacifiCorp's conduct as a refusal to wheel power in violation of antitrust law. PacifiCorp moved for summary judgment on the ground that it could not have refused to wheel power to Snake River because Snake River had never submitted the necessary application for such services. This Court agreed, holding that "PacifiCorp has demonstrated as a matter of law that it has not refused to provide wheeling [to "new" customers] and would consider Snake River's application when properly submitted." *Id.* at 8. Because Snake River failed to secure the necessary wheeling arrangements with PacifiCorp, Enron terminated its contract with Snake River.

On November 26, 2001, after remand from the Ninth Circuit, PacifiCorp again moved for summary judgment on the grounds that: (1) PacifiCorp was entitled to judgment as a matter of law on all claims for damages or injunctive relief for actions taken on or after December 8, 2000, which was the date Idaho's ESSA Amendments took effect; (2) antitrust laws do not require PacifiCorp to sell its assets to Snake River; (3) PacifiCorp does not possess monopoly power in the wholesale market for electricity and thus cannot be liable under antitrust law for refusing to sell wholesale power to Snake River; and (4) Snake River has never presented a single, unambiguous request for wheeling services to PacifiCorp. *See* PacifiCorp's Memo Supporting Summary Judgment. On February 7, 2002, this Court granted PacifiCorp's motion in part, dismissing all but one of Snake River's antitrust claims, and limiting the damages available under that claim.

The only claim as to which Snake River was able to create a genuine issue of material fact was PacifiCorp's alleged refusal to wheel power to alleged members of Snake River that are current PacifiCorp customers. Snake River manufactured this issue of fact with the sworn

affidavit of its President, Del Ray Holm, which stated that on December 18, 1995, he wrote to
PacifiCorp "requesting that it provide transmission service for our supply of wholesale power
for Snake River from Idaho Power which would deliver that power at receipt points on
PacifiCorp's transmission system to be wheeled to [Snake River] at facilities it would own at
the delivery points and there resell it over the facilities owned by its members or to be
constructed by [Snake River] to its members." *Id.* at 7. At best, this sworn statement by Mr.
Holm is misleading because the actual December 18, 1995 letter from Snake River contains no
such request. Indeed, the December 18 letter is purposefully vague and it contains absolutely
no mention of Snake River's purported intent to have PacifiCorp wheel power to facilities
owned by Snake River or Snake River's intent to resell the power over facilities Snake River
now claims it would have built.

Having had the bulk of its claims dismissed, and any potential damages stemming from
its one remaining claim limited to the timeframe preceding December 8, 2000, Snake River
attempted to advance a new theory of damages on March 8, 2002 that raised the claimed
damages to $270 million after trebling. This new theory suggests that if PacifiCorp had not
refused to wheel power to Snake River's members in 1997, Enron would not have cancelled its
power supply contract with Snake River and Snake River could have become a power
wholesaler realizing enormous profits by selling on the spot market.

## III. ANALYSIS

### A. PacifiCorp Has Not Committed An Antitrust Violation

Snake River relies on the essential facilities doctrine in alleging that PacifiCorp has
committed an antitrust violation. This reliance is misplaced. The "essential facilities" doctrine

imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis. *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1998). To prevail on such a claim, the plaintiff must establish: "(1) that the defendant is a monopolist in control of the essential facility, (2) that competitors of the monopolist are unable to duplicate the facility, (3) that the monopolist has refused to provide the competitors access to the facility, and (4) that it is feasible for the monopolist to do so." *Id.* Snake River cannot establish these elements.

### 1.   Snake River Has Never Formally or Clearly Requested the Wheeling Services It Now Claims PacifiCorp Refused to Provide

The viability of Snake River's antitrust claim hinges upon the issue of whether Snake River made an unambiguous and proper request to PacifiCorp for the type of wheeling services it now claims PacifiCorp refused to provide. It did not. Snake River never requested that PacifiCorp wheel power to distribution facilities Snake River owned or would own for subsequent distribution to Snake River's members over facilities Snake River would construct. It also never submitted the necessary applications that PacifiCorp expressly informed Snake River would need to be completed if Snake River desired wheeling services.

The only wheeling request PacifiCorp ever received from Snake River prior to the filing of this lawsuit came in a December 18, 1995 letter, to PacifiCorp in which Snake River stated that it wanted PacifiCorp to wheel "wholesale" power, down to the "existing delivery points on Utah Powers system" for Snake River's members. Then, in a September 2001 affidavit, more than four years after this lawsuit was filed, Del Ray Holm, claimed that Snake River actually intended for its December 18, 1995 letter to state that Snake River wanted

PacifiCorp to wheel power to Snake River's nonexistent distribution system, at which point Snake River would wheel the power down to the ultimate points of consumption for its members on distribution facilities that Snake River has never constructed.

No such request was ever made by Snake River. The best evidence of this fact, of course is the December 18, 1995 letter itself, which requests only that PacifiCorp wheel power down to the "existing delivery points" on Utah Power's system. It conspicuously did not identify (1) any so-called "delivery points" to which it now claims it had requested PacifiCorp to deliver power, or (2) any distribution system owned by Snake River over which Snake River could distribute power to its members the way the cooperatives and municipalities to which PacifiCorp currently wheels power do. Indeed, Snake River admits that it owns no such system and has not begun construction of one.

Even if the December 18, 1995 letter had contained the request Mr. Holm wrongly claims it did, Snake River cannot show that PacifiCorp refused to provide wheeling services requested. Rather, PacifiCorp responded on January 2, 1996 by indicating that Snake River should contact Dennis Steinberg, PacifiCorp's senior vice president for Transmission Services and Wholesale Sales, to discuss the requested service. Then, having not heard from Snake River, on February 16, 1996, PacifiCorp wrote to Snake River again, referring Snake River to PacifiCorp's two FERC tariffs for wheeling and encouraging Snake River to file an application with the appropriate PacifiCorp employee. Critically, rather than responding to PacifiCorp's letter or submitting the requisite application, Snake River filed a $10 million lawsuit against PacifiCorp alleging a wide-variety of antitrust claims. Consequently, the matter was turned over to PacifiCorp's lawyers and was taken out of the hands of the wheeling administrators at

PacifiCorp. And the request was transformed from a wheeling request to its true nature – a prohibited attempt to pirate PacifiCorp's customers.

> **2.    Snake River's Own Experts Have Concluded That Snake River Can Reasonably Duplicate the Transmission Facilities Owned By PacifiCorp**

Snake River also cannot prevail on its antitrust claim unless it can prove that it is unable to reasonably duplicate the transmission facilities owned by PacifiCorp. If such duplication is practicable, Snake River cannot prove that PacifiCorp owns an "essential facility," as is necessary to sustain its antitrust claim against PacifiCorp. *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992) ("[I]f the facility can be reasonably or practically duplicated it is highly unlikely, even impossible, that it will be found to be essential at all.").

Here the "essential facilities" to which Snake River claims it has been deprived access can be reasonably and practically duplicated. Most compellingly, studies conducted by Snake River's own consultants concluded that "it would be economically feasible for Snake River to construct a distribution system which would include distribution lines, substations, and transmission facilities." Snake River's board of director's agreed with that conclusion and even obtained commitments for financing the construction. These admissions preclude any antitrust liability based on PacifiCorp's purported refusal to wheel because, given these facts, such distribution facilities are not "essential facilities."

> **3.    PacifiCorp Cannot Be Held Liable For An Antitrust Violation Because It Acted In Accordance With Well-Defined Public Policy**

Finally, Snake River cannot establish that it was feasible for PacifiCorp to provide Snake River with access to its facilities. The U.S. Ninth Circuit Court of Appeals has

interpreted the feasibility requirement as encompassing "the familiar question of whether there

is a legitimate business justification for the refusal to provide the facility. . . ." *Anaheim*, 955

F.2d at 1380. Thus, "[a] company which has monopoly power over an essential facility may

refuse to make the facility available to others where there is a legitimate business reason for

the refusal." *Id.* at 1379; *Southern Pacific Comms. Co. v. AT&T*, 740 F.2d 980 (D.C. Cir.

1984). One type of "legitimate business reason" recognized in the context of public utility

companies is the need for the utility to protect the "public interest." *See, e.g., Southern*

*Pacific Communications Co. v. AT&T*, 740 F.2d 980 (D.C. Cir. 1984); *cert. denied*, 470 U.S.

1005, 105 S.Ct. 1359 (1985); *Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d

1372 (5th Cir. 1980) *cert. denied*, 499 U.S. 912, 101 S.Ct. 286 (1980).

   In the words of a controlling Ninth Circuit case on regulatory justification:

   "[If] at the time the various anticompetitive acts alleged here were taken,
   [PacifiCorp] had a reasonable basis to conclude that its actions were necessitated
   by concrete factual imperatives recognized as legitimate by the regulatory
   authority, then its actions did not violate the antitrust laws." *Phonetele, Inc. V.*
   *American Tel. & Tel. Co.*, 664 F.3d 716, 737-738 (9th Cir 1981) (Kennedy, J.)

   For example, in *Mid-Texas*, Mid-Texas filed antitrust claims against AT&T when

AT&T refused to interconnect Mid-Texas' phone lines with its own. 615 F.2d at 1389.

AT&T argued that it could not be held liable for refusing interconnection because such action

would be contrary to the public's interest. *Id.* The trial court refused to instruct the jury that it

could "consider the effect of regulation in ascertaining whether Bell willfully misused its

monopoly power" and AT&T appealed. *Id.* On appeal, the Fifth Circuit reversed. *Id.*

Relying on an FCC regulation requiring that interconnection be made when it is in the "public

interest," the Fifth Circuit concluded that good faith attempted compliance with regulatory concerns is a valid business justification. *Id.* at 1389-90.

Here, PacifiCorp had concrete and recognized concerns for the public interest when it took the position in this case that it need not provide wheeling service down to the ultimate point of consumption of Snake River's members. PacifiCorp reasonably believed it was not in the public interest as expressed in ESSA to provide the retail wheeling service requested. Accordingly, PacifiCorp should not be subject to antitrust liability.

**B.    Snake River Cannot Recover Alleged Lost Profits From Lost Sales on the Spot Market**

Even if Snake River is able to convince the jury that PacifiCorp committed an antitrust violation, Snake River will be unable to prove that it is entitled to recover lost profits from lost sales of electric power it allegedly would have made on the spot market but for PacifiCorp's alleged refusal to wheel power. First, Snake River's purported lost profits on the spot market are not an antitrust injury attributable to the allegedly anticompetitive conduct of PacifiCorp. Second, Snake River cannot recover for purported lost spot market sales because it cannot show a genuine intent to enter the wholesale market or a preparedness to do so. Third, the termination of the Enron Contract resulted from Snake River's unilateral failure to procure the necessary wheeling agreement. Fourth, neither Snake River nor its members can generate or receive a profit through the resale of power, and fifth, Snake River cannot recover the damages it seeks from PacifiCorp because those damages are based on subjective belief and unsupported speculation.

1.   **Snake River's Claimed Spot Market Loss is Not an Antitrust Injury Caused by a Purported Refusal to Wheel to Snake River's Members and Cannot be a Basis for Damages**

To recover damages under its claimed spot market loss theory, Snake River must prove that such loss is an *antitrust* injury,

> "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [PacifiCorp's] acts unlawful. The injury should reflect the anticompetitive effect either of the violation, or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violation . . . would be likely to cause.'"

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 95 S.Ct. 690, 697 (1977) (citation omitted).[1]

Snake River simply cannot make such a showing in this case. The anticompetitive conduct alleged in this case is the refusal to wheel power for delivery to Snake River's members – the retail market in which Snake River claims to compete with PacifiCorp. Yet, Snake River now asserts damages in a completely separate market – the wholesale market, which is a market over which PacifiCorp does not hold a monopoly and therefore cannot form the basis of an antitrust claim. Snake River's own expert admits Snake River could have made sales in the spot market without receiving <u>any</u> wheeling services from PacifiCorp—such services being necessary only for sales on the retail market. Because PacifiCorp's alleged refusal to provide wheeling services to Snake River is wholly unrelated to Snake River's ability to purchase and resell wholesale power on the spot market, any lost profits incurred by Snake



---

[1] Another way to view the lack of an antitrust injury is that Snake River lacks standing to bring such a damage claim, as it is speculative and not directly related to the alleged anticompetitive conduct. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907 (1983).

River on the wholesale market do not qualify as an antitrust injury caused by the alleged
refusal to wheel and therefore are not recoverable in this case.

Snake River has attempted to create a connection between the alleged anticompetitive
conduct—the refusal to provide wheeling services—and its alleged lost profits on the wholesale
market by pointing to the Enron Contract. Specifically, Snake River contends that because
PacifiCorp refused to wheel power, the condition precedent in the Enron Contract went
unfulfilled and Snake River was unable to purchase wholesale power that it could have resold
on the spot market. This analysis is conclusory and incorrect. If Snake River had wished to
purchase wholesale power from Enron for resale on the spot market to nonmembers it could
have done so. It did not. Snake River did not pursue this alternative, of course, because it had
no intention of making sales in the wholesale market to nonmembers. Instead, Snake River
agreed to the condition precedent in the Enron Contract relieving Snake River of the obligation
to purchase power from Enron if wheeling services from PacifiCorp could not be obtained.
The reason for this condition precedent was simple; the sole purpose for Snake River entering
into the Enron Contract, as expressly stated in the contract itself, was to purchase low-cost
wholesale electricity it could resell to its members in the retail market.

2.   **Snake River Cannot Recover for Purported Lost Spot Market Sales
Because it Cannot Show a Genuine Intent to Enter the Market or a
Preparedness To Do So**

In the Ninth Circuit, "a potential competitor has standing [to recover antitrust damages]
if he can show a genuine intent to enter the market and a preparedness to do so." *Bular v.
Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985). Snake River had no genuine intent to
enter the spot wholesale market. Snake River's Articles of Incorporation prohibit it from

selling electric power to any person or entity that is not a Snake River member.  Further, Snake River has taken absolutely no steps to prepare itself to enter that market.

The Federal Power Act, 16 U.S.C.§ 824d, and FERC Rules and Regulations, *e.g.*, 18 CFR § 35.12, set forth a regulatory process for obtaining necessary authorizations that an entity must have in order to enter the wholesale sales market.  Snake River not only failed to apply for such approvals, it failed to even investigate what the approval process was.  Snake River also never performed an analysis of the facilities or equipment it would need to enter the business, nor took steps to procure those facilities or equipment.  Indeed, as of the end of March, 2002, neither Mr. Palmer (Snake River's electric utility consultant and 30(b)(6) witness), nor Mr. Holm (Snake River's President, board member and 30(b)(6) witness) knew what the day-ahead market was.  Yet, the day-ahead market is the very foundation of Dr. Slaughter's market loss theory.  In short, PacifiCorp will prove at trial that because Snake River never intended to enter the wholesale sales market and never took a single step to prepare to enter that business.  Accordingly, Snake River lacks standing to recover any alleged damages based on speculative "lost profits" in such a market.

> **3.   The Termination of the Enron Contract Resulted From Snake River's Unilateral Failure To Procure the Necessary Wheeling Arrangements With PacifiCorp**

Snake River's entire spot market damages claim is based upon, and is inextricably intertwined with, the premise that PacifiCorp refused to wheel power to Snake River after the execution of the Enron Contract in 1997, thus preventing Snake River from selling excess electricity not used by its members on the spot market.  This premise is false.  Despite

PacifiCorp's responsiveness to Snake River's 1997 request for wheeling services, Snake River

voluntarily decided not to take the steps necessary to procure such services.

This Court has previously found that the "first formal effort by Snake River to secure

wheeling services after it had obtained the right to purchase power from Enron was made on

June 9, 1997." Memo Decision and Order at 5. On that date, Snake River sent a letter to

PacifiCorp requesting wheeling arrangements so that it could begin wheeling power to its

members having a right to choose their electric supplier. *Id.* In its response, PacifiCorp stated

that "subject to receipt of necessary information and resolution of certain issues we expect that

we will be able to reach agreement on an interconnection and wheeling arrangement for these

new service entrances." *Id.* at 6. Nevertheless, "Snake River never submitted such an

application or otherwise responded to the letter" and made no attempt to justify its failure to

provide that information. *Id.*

Based upon the above facts, this Court specifically concluded in its January 1999

Memorandum Decision and Order that Snake River cannot, as a matter of law, prove that

PacifiCorp is legally responsible for the absence of a wheeling agreement between PacifiCorp

and Snake River after June 1997:

> Snake River has produced absolutely no evidence that PacifiCorp has refused to
> provide the requested wheeling services. . . . <u>As such, PacifiCorp has
> demonstrated as a matter of law that it has not refused to provide wheeling and
> would consider Snake River's application when properly submitted</u>.

*Id.* at 8 (emphasis added).

Thus, it was Snake River, <u>not PacifiCorp</u>, that failed to take the necessary steps in 1997

to secure the wheeling arrangements required under the Enron Contact. Accordingly, the

termination of the Enron Contract, and consequently all spot market damages allegedly resulting therefrom, are attributable to Snake River's conduct not the conduct of PacifiCorp.

### 4. Neither Snake River Nor Its Members Can Generate Or Receive A Profit Through the Resale of Power

Neither Snake River nor its members could, under the Idaho Nonprofit Corporation Act, Snake River's articles of incorporation, or Snake River's bylaws, generate or receive a profit through the resale of power.

### a. Snake River Was Precluded From Making a Profit or Selling Power to Nonmembers

Snake River was organized on December 27, 1993 as a nonprofit corporation pursuant to the Idaho Nonprofit Corporation Act, I.C. §§ 30-3-1 through 30-3-145 (the "Act"). Among the various forms under which nonprofit corporations can operate, Snake River elected to be a cooperative corporation. Further, Snake River specifically denied itself the right to make a profit. *See* Articles of Incorporation, Art. II, ("The purpose for which the corporation is organized is the transaction without any purpose of pecuniary profit to itself, of any lawful activity . . . ." (emphasis added)).

In addition to denying itself the right to make a profit, Snake River specifically restricted its activities to the purchase and sale of electric energy for its members only. Art. II(a); Art. II(f). This limitation is consistent with the Enron Contract, which contemplates Plaintiff distributing power only to its members. Plaintiff thus has never had the ability to sell power to non-members. As such, Plaintiff cannot claim lost profits from such sales.

b.     **Plaintiff's Members, as Members of a Nonprofit Cooperative Corporation, Cannot Make a Profit**

Snake River also cannot claim lost profits because no part of the income of a nonprofit corporation is distributable to its members, directors or officers. A limited exception to this rule applies to nonprofit cooperative corporations. Nevertheless, while members of nonprofit cooperative corporations can receive distributions under certain circumstances, they cannot receive profits in the sense alleged by Plaintiff.

The Act strictly prescribes that "[e]xcept as authorized in section 30-3-109, Idaho Code, a corporation shall not make any distributions." I.C. § 30-3-108. Idaho Code section 30-3-109 allows two types of distributions. First, distributions upon dissolution to known and unknown creditors of the nonprofit corporation are authorized pursuant to Idaho Code sections 30-3-114 and 30-3-115. Second, a member of a nonprofit cooperative corporation may receive, upon dissolution or periodically upon approval of the board, a distribution of any actual or deemed paid-in capital by the member. I.C. § 30-3-109. Thus, distributions to members authorized by the Act are akin to a return of any overpayment for services, rather than a pecuniary profit. Snake River's Articles are consistent with Idaho Code section 30-3-109, providing that distributions upon dissolution or liquidation of Snake River are to be made in the following order: (1) toward outstanding indebtedness; (2) toward retiring capital credits without priority on a pro rata basis; and (3) any remaining assets are to be divided among the members and former members in the proportion which the aggregate patronage of each bears to the total patronage of members during a specified period.

Thus, if Snake River restricts its power sales to its members as it should, the members could not possibly make, nor would they be entitled to, a profit. Instead, the most the

members could receive is a return of their pro-rata share of any overpayment for services provided by Snake River.

> **5.     Snake River Cannot Recover the Damages It Seeks From PacifiCorp Because Those Damages Are Based On Subjective Belief and Unsupported Speculation.**

The Rules of Evidence require that the trial judge make a preliminary assessment of expert testimony to ensure that such testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Helpfulness to the trier of fact is the ultimate touchstone for admissibility of expert testimony. *Desrosiers v. Flight Intern. of Florida Inc.*, 156 F.3d 952, 961 (9th Cir. 1998). "Expert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict, and therefore is inadmissible as evidence under Rule 702." *Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (Idaho 1999) (emphasis added).

The aversion of courts to speculative expert testimony is particularly pronounced in the context of claims for lost profits. To recover lost profits, Snake River must prove its damages with "reasonable certainty." *Cuddy Mountain Concrete Inc. v. Citadel Const., Inc.*, 121 Idaho 220, 225, 824 P.2d 151, 156 (Idaho Ct. App. 1992). "The test for reasonable certainty has been held to be a requirement that damages be taken out of the realm of speculation." *Id.* This test is especially difficult for a plaintiff like Snake River to meet when "the alleged loss of profits occur out of collateral or subordinate agreements arising or entered into subsequent to the primary contract in question." 22 Am.Jur.2d Damages, Sec. 61-62, pg. 93-97. Moreover, where the collateral agreements relied upon by the plaintiff in proving lost profits

are not "firm contracts," any award of compensation for lost profits arising out of those
anticipated contracts would have to "be made solely upon speculation and conjecture, which is
improper." *Suitts v. First Sec. Bank of Idaho, N.A.*, 110 Idaho 15, 17-18, 713 P.2d 1374,
1376-77 (Idaho 1985). Thus, prospective profits hoped to be derived from a business which is
not yet established but merely in contemplation ordinarily are too speculative to be
recoverable. *Clark v. International Harvester Co.*, 99 Idaho 326, 346-47, 581 P.2d 784, 804-
05 (Idaho 1978).

The New Slaughter Report bases its roughly $270 million damages calculation on
speculation and unsupported assumptions. Specifically, the calculations in the New Slaughter
Report are based upon Dr. Slaughter's suppositions that (1) Snake River intended and was
prepared to enter the spot market sales business (which suppositions, as shown above, are
groundless); (2) Enron would have supplied electricity to Snake River for resale to non-
members despite Snake River's material breach of the warranty provisions in the Enron
Contract, and (3) Snake River, which has never before made, nor attempted to make, sales of
power to non-members, might have made substantial profits from uncertain and unidentified
sales on the spot market to nameless non-members under the most ideal market conditions
without significant risk or substantial cost. Thus, the report and any testimony relying or
based on it are too speculative to support a damages award.

## IV. Conclusion

The evidence will show that PacifiCorp has not committed any antitrust violation
because it never refused to provide the wheeling services now sought by Snake River, its
facilities are not "essential facilities" for purposes of antitrust law, and its conduct was in

accordance with public policy. Even if PacifiCorp is found to have committed an antitrust

violation, the purported lost profits sought by Snake River cannot be recovered because: (1)

they are based on a claimed injury which is not an antitrust injury; (2) Snake River cannot

show a genuine intent to enter the wholesale market or a preparedness to do so; (3) the

termination of the Enron Contract resulted from Snake River's unilateral failure to procure the

necessary wheeling agreement, (4) neither Snake River nor its members can generate or

receive a profit through the resale of power, and (5) Snake River cannot recover the damages it

seeks from PacifiCorp because those damages are based on subjective belief and unsupported

speculation.

DATED this 2nd day of April 2002.

STOEL RIVES LLP

Mary Hobson,
Attorneys for Defendant PacifiCorp
