

ORIGINAL

David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah 84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Mary S. Hobson  (ISB #2142)
G.Rey Reinhardt, IV (ISB #6209)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant PacifiCorp

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFICORP, (Including UTAH POWER & LIGHT COMPANY, a division),<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALLEN G. LANCE, Attorney General,<br><br>Defendant-Intervenor. | Case No. CV 96-0308-E-BLW<br><br>**MEMORANDUM IN SUPPORT OF PACIFICORP'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION** |

## I. INTRODUCTION

After almost six years of litigation, three separate motions for summary judgment, an

appeal to the Ninth Circuit, and the enactment of Idaho legislation aimed specifically at

prohibiting the type of claims asserted by Snake River in this case, Snake River's case has been

reduced to a single antitrust claim based on a purported refusal to wheel to existing customers before December 8, 2001. In an effort to offset this reduction in its claims, Snake River has attempted to inflate the damages under its remaining claim by seeking lost profits from sales it purportedly would have made on the spot market during the energy crisis of 2000-2001.

However, the damages Snake River is claiming- lost sales profits in the *wholesale* market - are not an antitrust injury attributable to PacifiCorp's purported anticompetitive conduct – a refusal to wheel in the *retail* market. Indeed, the parties are in complete agreement that Snake River could purchase and sell power on the spot market without receiving any wheeling services from PacifiCorp. Therefore, PacifiCorp's alleged refusal to provide wheeling services to Snake River for delivery to retail customers, cannot, as a matter of law, form the basis of Snake River's damages claim for lost sales in the wholesale market.

Further, Snake River cannot rely upon the Enron Contract to seek damages for lost spot market sales because (1) the termination of the Enron Contract resulted from Snake River's unilateral failure to procure necessary wheeling arrangements, and (2) Snake River had no right to sell wholesale power on the spot market.

Finally, PacifiCorp reasonably believed (and correctly so) that the anti-piracy provisions in ESSA necessitated its actions. Accordingly, any actions taken by PacifiCorp pursuant to its belief that Snake River was a wrongfully attempting to pirate PacifiCorp's customers cannot form the basis of an antitrust violation.

## II. STATEMENT OF FACTS

Snake River is a non-profit cooperative corporation organized under the laws of the State of Idaho whose articles of incorporation describe it as a corporation organized "[t]o generate, manufacture, purchase, acquire and accumulate electric energy for its members only and to transmit, distribute, furnish, sell and dispose of such electric energy to its members only . . . ."

Affidavit of Mary S. Hobson In Support of PacifiCorp's Motion to Strike Plaintiff's Expert Witness Disclosure of Richard Slaughter, Ph.D., filed March 25, 2002, ("Hobson Aff."), Ex. A (Articles of Incorporation) at Article II(a) (emphasis added). In addition to limiting its sales of electric power to Snake River members only, Snake River specifically denied itself the right to make a profit in its Articles of Incorporation, which state that "[t]he purpose for which the corporation is organized is the transaction without any purpose of pecuniary profit to itself. . . ." *See id.* (emphasis added). Snake River admits it formed itself as a non-profit cooperative to avoid regulation by the Idaho Public Utility Commission. Hobson Aff., Ex. N (March 21, 2001 Depo. Of Carl Palmer) at 51:1—51:14.

In 1995, Snake River began posturing itself for a lawsuit it intended to file against PacifiCorp. Among other things, Snake River commenced discussions with its present counsel, Mr. Charles Wheatley, regarding various litigation options available to Snake River, including the possibility of filing an antitrust claim against PacifiCorp for refusing to wheel power. Affidavit of G.Rey Reinhardt, IV In Support of PacifiCorp's Motion For Summary Judgment ("Reinhardt Aff."), Ex. D (December 12, 1995 Meeting Minutes). In discussing the benefits and drawbacks of filing a FERC action versus a federal antitrust action, Mr. Wheatley informed Snake River that if PacifiCorp were to lose an antitrust suit to Snake River, PacifiCorp "would lose big (treble damages, attorney's fees, and court costs); so there is incentive to come to the negotiating table." *Id.* Critically, these strategic discussions transpired before Snake River had even made a single request for wheeling services from PacifiCorp.

In pursuit of its litigation goals, Snake River sent a purposefully vague letter to PacifiCorp on December 18, 1995, requesting for the first time that PacifiCorp wheel "wholesale" power to "existing delivery points on Utah Power's system to each of the members of [Snake River]." See Affidavit of John E. Mooney, filed August 7, 1996 (Mooney Aff.), Ex. 1.

Snake River directed its letter to John Mooney, who had no responsibility over wheeling requests, and failed to include essential information in its letter that PacifiCorp needed to evaluate its ability to provide the wheeling services requested. *Id.*

Before it had even received a substantive response from PacifiCorp regarding the December 18, 1995 letter, Snake River entered into a formal retainer agreement with Mr. Wheatley to sue PacifiCorp. Reinhardt Aff., Ex. 4. Importantly, Snake River executed this retainer agreement before PacifiCorp committed a single act that Snake River relies upon in support of its antitrust claim.

No doubt to Snake River's surprise, PacifiCorp did not ignore or reject Snake River's obviously deficient December 18, 1995 letter. Instead, PacifiCorp responded on January 2, 1996 by directing Snake River's request to Dennis Steinberg, PacifiCorp's Senior Vice President for Transmission Services and Wholesale Sales. PacifiCorp also began taking steps in anticipation of providing the service Snake River sought, including verifying that PacifiCorp had the transmission capacity to satisfy Snake River's request, and preparing a draft service agreement. *See* Supplemental Affidavit of David B. Cory In Support of PacifiCorp's Motion For Summary Judgment ("Supp. Cory Aff."), ¶ 3, Ex. 1 (January 2, 1996 letter). On February 16, 1996, PacifiCorp again wrote to Snake River and included copies of its two FERC tariffs for wheeling and encouraged Snake River to file an application. *See* Mooney Aff., Ex. 2. Snake River never submitted an application.

Unwilling to allow PacifiCorp's good faith response to Snake River's insincere request for wheeling services to derail its plans, Snake River sued PacifiCorp in July 1996 under sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act claiming that PacifiCorp had committed numerous antitrust violations dating back to 1994.

In February 1997, almost a year after filing suit against PacifiCorp for allegedly refusing to wheel power, Snake River entered into a Power Purchase and Sale Agreement ("the "Enron Contract") with Enron, which was a wholesale supplier of electricity. *See* Hobson Aff., Ex. L. The Enron Contract was a requirements contract that obligated Snake River to purchase, and required Enron to sell, all of the electric energy necessary to meet the requirements of Snake River's members within specified minimum and maximum amounts. *See* Plaintiff's Supplemental Answers To Defendant's First Set Of Interrogatories And Request For Production Of Documents, at 2 ("SRVEA will determine the daily power requirements of its members and provide that information to Enron. Enron will provide the power to meet those requirements."); Hobson Aff., Ex. L at Art. 3.1. The expressly stated intent of the parties for entering into the Enron Contract was "to provide power to [Snake River] for resale to Snake River's Members. . . ." *Id.* at Art. 1.4. (emphasis added). Because Snake River did not want to be forced to purchase from Enron, and Enron did not want to be forced to sell, any power that could not be resold directly to its members, a condition precedent was inserted into section 1.3 of the Enron Contract stating that Snake River would not be obligated to purchase from Enron any electric power unless Snake River was first able to secure all wheeling agreements necessary for it to "resell such power to Snake River's Members and transmit such power to Snake River's Members." *Id.* at Art. 1.3.

"The first formal effort by Snake River to secure wheeling services after it had obtained the right to purchase power from Enron was made on June 9, 1997." Memorandum Decision and Order ("Memo Decision and Order"), January 21, 1999, at 5. On that date, Snake River sent a letter to PacifiCorp requesting wheeling arrangements that would allow Snake River to wheel power to "new" members that were not currently being served by PacifiCorp. *Id.* PacifiCorp acknowledged this request by stating that it expected to be able to provide the services requested

by Snake River, but that Snake River would first need to submit a proper application with additional information. *Id.* at 6. Nevertheless, "Snake River never submitted such an application or otherwise responded to the letter." *Id.* Instead, just at it had done in 1995, Snake River attempted to further embroil itself in litigation with PacifiCorp by categorizing PacifiCorp's conduct as a refusal to wheel power in violation of antitrust law. Frustrated with Snake River's repeated efforts to create litigation through the mischaracterization of PacifiCorp's conduct, PacifiCorp moved for summary judgment on the ground that it could not have refused to wheel power to Snake River because Snake River had never submitted the necessary application for such services. This Court agreed, holding that "PacifiCorp has demonstrated <u>as a matter of law</u> that it has not refused to provide wheeling and would consider Snake River's application when properly submitted." *Id.* at 8 (emphasis added).

Because Snake River failed to submit a proper application to secure the necessary wheeling arrangements with PacifiCorp, Enron terminated its contract with Snake River pursuant to section 1.3 on June 30, 1999. *See* Reinhardt Aff., Ex. F.

On February 7, 2002, after remand from the Ninth Circuit, this Court granted in part PacifiCorp's motion for summary judgment, dismissing all but one of Snake River's antitrust claims — the claim based on a purported refusal to wheel to existing PacifiCorp customers — and limiting the damages available under that claim.

Having had the bulk of its claims dismissed, and any potential damages stemming from its one remaining claim limited to the timeframe preceding December 8, 2000, Snake River advanced a new theory of damages on March 8, 2002 that raised the claimed damages to approximately $90 million. *See* Memorandum Decision and Order, filed April 8, 2002. This new theory suggests that if PacifiCorp had not refused to wheel power to Snake River's members after it entered into the Enron Contract in 1997 (which predicate was rejected as a matter of law

by this Court's January 21, 1999 Memorandum Decision and Order), Enron would not have

cancelled its power supply contract with Snake River and Snake River could have become a

power wholesaler realizing enormous profits by selling on the spot market.

Notably, the newfound damages claimed by Snake River came shortly after Carl Palmer

of Snake River read a newspaper article discussing the profits made by the City of Idaho Falls on

the spot market during the energy crisis in 2000. Mr. Palmer faxed this article to Snake River's

expert, Dr. Slaughter, who amended his damages report shortly thereafter to include the spot

market damages theory Snake River now claims formed an integral part of Snake River's claims

since the inception of this litigation. *See* Reinhardt Aff., Ex. E.

## III.   ANALYSIS

**A.    Snake River's Claimed Spot Market Loss Is Not An Antitrust Injury Caused by PacifiCorp's Alleged Anti-Competition Activity and Cannot Be A Basis For Damages**

In order to recover damages for purported lost spot market sales, Snake River must prove

that such losses are an *antitrust* injury,

> which is to say injury of the type the antitrust laws were intended to prevent and
> that flows from that which makes [the defendant's] acts unlawful. The injury
> should reflect the anticompetitive effect either of the violation, or of
> anticompetitive acts made possible by the violation. It should, in short, be 'the
> type of loss that the claimed violation . . . would be likely to cause.'

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 95 S.Ct. 690, 697 (1977) (citation omitted).[1]

Snake River cannot make such a showing in this case. The anticompetitive conduct alleged in

this case is PacifiCorp's purported refusal to wheel power for delivery to Snake River's

members—the retail market in which Snake River claims to compete with PacifiCorp. Yet,

---

[1] Another way to view the lack of an antitrust injury is that Snake River lacks standing to bring such a damage claim, as it is speculative and not directly related to the alleged anticompetitive conduct. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907 (1983).

Snake River now asserts damages in a completely separate market, the wholesale market, which is a market over which PacifiCorp does not hold a monopoly and therefore cannot form the basis of an antitrust claim. *See* Memorandum Decision and Order, filed February 7, 2002, at 6; Hobson Aff., Ex. F (March 19, 2002 Slaughter Depo.) at 106:24—107:12.

It cannot be overemphasized that the alleged anticompetitive conduct engaged in by PacifiCorp was its purported refusal to provide wheeling services to Snake River, which in turn precluded Snake River from reselling power to its members in the retail market. Snake River has itself claimed that the antitrust injury occurred in the retail market, not the wholesale market.[2] This fact is crucial because Snake River's own expert admits Snake River could have made sales in the wholesale spot market without receiving any wheeling services from PacifiCorp—such services being necessary only for sales on the retail market. *See* Hobson Aff., Ex. F (March 19, 2002 Slaughter Depo.) at 106:24 107:12. Indeed, Snake River's spot market damages theory assumes that Enron, not PacifiCorp, would have remarketed Snake River's electricity to buyers on the spot market. *See* Reinhardt Aff., Ex. B (August 6, 2002 Slaughter Depo.) at 39:3—41:21 ("The easiest thing to do and the most likely thing to do, because the energy source was external to the region and was through the Enron contract, the most likely avenue for SRVEA would be to remarket through Enron." (emphasis added)). Snake River's ability to secure retail wheeling services from PacifiCorp, therefore, is and always has been wholly unrelated to Snake River's ability to buy and sell electricity on the wholesale spot market.

---

[2] *See, e.g.,* SRVEA's Supplement to Answers to PacifiCorp's First, Second And Third Sets of Interrogatories and Request for Production of Documents, at 10-11, where Snake River responds to a request to identify the antitrust injury allegedly suffered ("PacifiCorp's refusal to wheel the alternate supplies of wholesale power purchased by Snake River adversely affects interstate commerce because SRVEA cannot obtain competitive supplies of wholesale power in interstate commerce and effectively use that supply of power for resale to its members to compete with PacifiCorp in the relevant geographic market." (emphasis added)).

If Snake River had wished to purchase wholesale power from Enron for resale on the spot market to nonmembers it could have done so. It did not. Instead, Snake River agreed to—and in fact insisted upon—the condition precedent in the Enron Contract relieving Snake River of the obligation to purchase power from Enron if wheeling services from PacifiCorp could not be obtained. Had Snake River actually desired to purchase wholesale power from Enron for resale on the wholesale market to nonmembers, it could have simply contracted with Enron to do so without conditioning its right to purchase (and Enron's obligation to provide) wholesale power on its ability to obtain retail wheeling services from PacifiCorp. Snake River did not pursue this alternative, of course, because it did not intend to make sales in the wholesale market to nonmembers. PacifiCorp therefore cannot be held accountable for Snake River's voluntary and unilateral decision to condition its entry into the wholesale market on its ability to obtain wheeling services in the unrelated retail market.

Accordingly, any lost profits incurred by Snake River on the wholesale spot market do not qualify as an <u>antitrust</u> injury resulting from PacifiCorp's alleged refusal to wheel power in the retail market (Snake River's only remaining claim), and therefore cannot, as a matter of law, be recovered in this case.

## B. Snake River is Precluded as a Matter of Law From Recovering the Purported Damages It Claims To Have Sustained as a Result of the Termination Of the Enron Contract

Snake River is precluded as a matter of law from recovering any profits it allegedly would have made on the wholesale market had the Enron Contract not been terminated because (1) this Court has already concluded that, with respect to the request for wheeling services made by Snake River after executing the Enron Contract, "PacifiCorp has demonstrated <u>as a matter of law</u> that it has not refused to provide wheeling and would consider SRVEA's application when

properly submitted," and (2) Snake River had no right to obtain or sell the wholesale power it now claims it would have received under the Enron Contract.

### 1. The Termination of the Enron Contract Resulted From Snake River's Unilateral Failure To Procure the Necessary Wheeling Arrangements With PacifiCorp

Snake River's entire spot market damages claim is based upon the premise that PacifiCorp refused to wheel power to Snake River after the execution of the Enron Contract in 1997, allegedly causing Enron to terminate the Enron Contract and preventing Snake River from selling excess electricity not used by its members on the spot market. This premise is false. Enron terminated the contract because of Snake River's actions, not PacifiCorp's.

Section 1.3 enables Enron to terminate the Enron Contract only if Snake River is unable to secure wheeling arrangements from PacifiCorp. Snake River, therefore, needed only to secure wheeling services for one customer after executing the Enron Contract to preclude Enron from terminating that contract pursuant to section 1.3. Snake River's own expert, John Wilson, admits as much in his September 12, 1997 affidavit, stating that once any power deliveries commence under the Enron Contract, the condition precedent is satisfied and Enron's option to terminate the contract "is no longer valid." Affidavit of Dr. John W. Wilson, filed September 12, 1997. Likewise in his sworn affidavit, Mr. Holm states that if Snake River could have secured wheeling from PacifiCorp for just three new loads (customers) Snake River would be "ensure[d] that [it] would not lose the extremely favorable contract with Enron." Affidavit of Del Ray Holm, filed August 30, 1997. Therefore, just one proper request by Snake River for wheeling services from PacifiCorp after the execution of the Enron Contract would have precluded Enron from invoking section 1.3.

Snake River made no such request. This Court has found previously that the "first formal effort by Snake River to secure wheeling services after it had obtained the right to purchase

power from Enron was made on June 9, 1997." Memorandum Decision and Order at 5. On that date, Snake River sent a letter to PacifiCorp requesting arrangements so that it could begin wheeling power to its members having a right to choose their electric supplier. *Id.* In its response, PacifiCorp stated that "subject to receipt of necessary information and resolution of certain issues <u>we expect that we will be able to reach agreement on an interconnection and wheeling arrangement</u> for these new service entrances." *Id.* at 6 (emphasis added). PacifiCorp went on to note that before such services could be provided, however, Snake River would need to first submit additional information and an application in accordance with PacifiCorp's tariffs. Nevertheless, "Snake River never submitted such an application or otherwise responded to the letter." *Id.* Just as it had done in 1995, Snake River attempted to justify its failure to submit the necessary application by claiming that the application process was a mere formality that would have resulted in a summary denial by PacifiCorp.

Rejecting that claim, this Court specifically concluded that Snake River cannot, as a matter of law, prove that PacifiCorp is legally responsible for the absence of a wheeling agreement between PacifiCorp and Snake River after June 1997:

> As such, PacifiCorp has demonstrated <u>as a matter of law</u> that it has <u>not</u> refused to provide wheeling and would consider Snake River's application when properly submitted.

January 1999 Memorandum Decision and Order at 8 (emphasis added).

Thus, it was Snake River, <u>not PacifiCorp</u>, that failed to take the necessary steps in 1997 to secure the wheeling arrangements required under the Enron Contact, thus causing the condition precedent in section 1.3 to remain unsatisfied.

Snake River has admitted that it took no action to prevent the termination of the Enron Contract under section 1.3 because of Snake River's erroneous belief that PacifiCorp is obligated to provide power to Snake River under the same terms and conditions present in the Enron

Contract. *See* Reinhardt Aff., Ex. A (July 18, 2002 Deposition of Carl Palmer), 106: 4-25; 107:

1-7. This mistaken belief by Snake River arises from its misinterpretation of the conditional

offer made by PacifiCorp in opposition to Snake River's motion for a preliminary injunction that

it would match the terms of the Enron Contract should Snake River prevail on the merits of its

claim for injunctive relief. *See* Dec. 8, 1997 Transcript at 43-44, attached as Ex. 4 to Affidavit of

Marc T. Rasich, filed with PacifiCorp's January 11, 2002 Reply Memorandum in Support of

Motion for Summary Judgment.[3] Wrongly believing PacifiCorp had unconditionally agreed to

provide power to Snake River under the terms of the Enron Contract, Snake River made the ill-

advised tactical decision to let the Enron Contract expire without any effort to meet the condition

precedent contained therein:

> Q: (By Mr. Jordan) Can you give us the substance of any other
> discussions that you had with Enron on the subject of possible termination?
>
> A: (By Mr. Palmer) No. I don't. But I know the board was aware.
> Everyone was aware of that commitment that you had made in court. And so,
> because of that commitment, there wasn't a big concern as to what happened to
> that Enron contract. Because if we lost it, PacifiCorp is obligated to step in and
> serve. . . .

*See* Reinhardt Aff., Ex. A (July 18, 2002 Palmer Depo.), 106: 4-12 (emphasis added).

PacifiCorp, therefore, cannot be held accountable for spot market losses purportedly

sustained by Snake River that are attributable solely to Snake River's own strategic decision,

---

[3] This Court has rejected Snake River's erroneous interpretation of PacifiCorp's conditional
promise in its April 19, 2002 Memorandum Decision and Order:

> SRVEA argues that PacifiCorp agreed to step into Enron's shoes and make
> SRVEA whole. Apparently, SRVEA interprets this agreement to constitute a wholesale
> waiver of all defenses. This Court rejects that interpretation. The agreement only applied
> if the Enron contract was terminated and PacifiCorp was required to wheel electricity to
> SRVEA. PacifiCorp never agreed to waive all defenses and pay whatever SRVEA
> demanded.

Memorandum Decision and Order, filed April 19, 2002 at 1.

albeit a misguided one, not to seek wheeling arrangements from PacifiCorp and to allow the
condition precedent in section 1.3 to remain unsatisfied.

### 2.    Snake River Has No Right To Obtain Power Under the Enron Contract For Resale On the Spot Market

Snake River's claim that it would have obtained wholesale power under the Enron

Contract for resell to nonmembers is fatally undermined by both (1) the language in the Enron

Contract restricting sales of power by Snake River to its members, and (2) Snake River's bylaws

and articles of incorporation, which prohibit Snake River from selling power to nonmembers for

a profit.

### a.    The Enron Contract Precludes Snake River From Reselling Power To Non-members

The Enron Contract does not permit Snake River to purchase wholesale power for resale

on the open market. The express language in the Enron Contract establishes that the intent of

Snake River and Enron in entering into that agreement was to provide Snake River with electric

power for resale by Snake River *to its members.* Article 1.4 of the Agreement states that "[i]t is

the intent of the Parties to enter into this Agreement in order to provide power to Buyer <u>for resale

to SRVEA's Members.</u> . . ." (emphasis added)); *see also* Hobson Aff., Ex. L, Article 1.3(a)(i)

(requiring SRVEA to acquire all approvals necessary to "purchase power from [Enron], <u>resell

such power to SRVEA's Members</u> and <u>transmit such power to SRVEA's Members</u> from the

Point of Receipt <u>to SRVEA's Members</u> as contemplated in this Agreement" (emphasis added)).

Snake River's claim that it would have sold electricity on the spot market to nonmembers,

therefore, cannot survive summary judgment.

Snake River's reliance on the isolated language in section 3.3—stating that Snake River

must either take delivery of, or resell, the Minimum Monthly Contract Quantity--as a basis for

claiming that it was entitled to resell electricity on the spot market is contrary to both the specific

language in that contract and fundamental principles of contract interpretation. Section 3.3 does not state that Snake River can resell power to non-members; rather, it states simply that Snake River can "resell" power. The Enron Contract, when read as a whole, clearly limits Snake River's ability to "resell" power *to its members only*. *See* Hobson Aff., Ex. L (Enron Contract) at Art. 1.4 ("It is the intent of the Parties to enter into this Agreement in order to provide power to Buyer for resale to SRVEA's Members. . . ." (emphasis added)). Even assuming *arguendo* there was a conflict between the expressly stated intent of the parties in Article 1.4 and the reference to Snake River's ability to "resell" in Article 3.3 (which there is not), the specific language in Article 1.4 defining the central purpose of the contract, which purpose is reiterated throughout the contract, would prevail as a matter of law. *See Bondy v. Levy*, 121 Idaho 993, 996-97 (Idaho 1992) ("The primary objective in construing a contract is to discover the intent of the parties, and in order to effectuate this objective, the contract must be viewed as a whole and considered in its entirety.").[4]

> ### b. Even If Snake River Could Resell Power On the Spot Market, Snake River Would Not Have Been Permitted To Resell Any Power On the Spot Market It Purchased In Excess Of the Contractual Minimum

The parties agree that the Enron Contract is a requirements contract. Plaintiff's Supplemental Answers To Defendant's First Set Of Interrogatories And Request For Production Of Documents, at 2 ("SRVEA will determine the daily power requirements of its members and provide that information to Enron. Enron will provide the power to meet those requirements."); Idaho Code § 28-2-306, cmt. 3 (2001). Under established contract law, the Enron Contract

---

[4] Moreover, the express language in section 3.3 disproves any argument by Snake River that the parties to the Enron Contract intended for Snake River to resell electricity on the spot market to reduce possible losses associated with unused power below the contractual minimum. Specifically, section 3.3 proves that the parties chose to balance the risk to Snake River regarding unused power below the contractual minimum by obligating Enron to resell such power in a commercially reasonable manner. Hobson Aff., Ex. L at Art. 3.3.

would <u>not</u> have permitted Snake River to resell energy it secured from Enron unless its members' requirements fell below the stated contractual minimum. Unless prohibited by the contract, a buyer under a requirements contract with a "take or pay" minimum quantity may sell any unused quantity *below* the contractual minimum. However, courts have universally held that <u>a buyer in a requirements contract may not resell any amount that is purchased in excess of the minimum.</u>

The rationale behind this rule is simple. A seller enters into a requirements contract on the assurance that the buyer has stated its estimated requirements in good faith, and that the buyer will not abuse the agreement by using the set long-term price for speculation or to enter competition with the seller. In *Northern Indiana Public Service Co. v. Colorado Westmoreland, Inc.*, 667 F. Supp. 613 (N.D. Ind. 1987), Judge Easterbrook of the Seventh Circuit, holding that a buyer in the electricity market may not resell amounts in excess of the contract minimum, explained:

> Otherwise a requirements contract at a price that becomes advantageous to the buyer would allow the buyer to become the middleman to the world, suddenly deciding to sell the product in bulk or building new plants and "requiring" vast quantities. <u>This has been a problem in the electricity business.</u> The whole idea of a requirements contract is that a buyer takes <u>no more</u> than it requires; if it determines these requirements in commercial good faith (the explicit statutory requirement [contained in UCC § 2-306(1)]), the fact that the requirements turn out to be unexpectedly small is of no moment.

*Id.* at 636 (emphasis added).

Judge Easterbrook specifically referenced the language of UCC § 2-306(1), which defines a requirements term as "such actual ... requirements as may occur in good faith," and said that buyers may therefore not enter into such contracts in order to get a discount price and engage in speculation. *Id. See also Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333 (7th Cir. 1988) (Posner, J.) (explaining that to allow a buyer to resell excess goods under a

requirements contract "would place [the buyer] in competition with the seller—a result the parties would not have wanted when they signed the contract").

These established contract law principles and the terms of Snake River's requirements contract with Enron preclude Snake River as a matter of law from claiming damages for purported lost sales of energy that exceed the expressly stated contractual minimum in the Enron Contract.[5] Any attempt by Snake River to resell energy purchased from Enron, other than unused amounts below the contractual minimum, would have in essence placed Snake River in competition with Enron, a result the parties did not intend and to which Enron would not have agreed. Such an attempt would have violated not only the express terms of Snake River's agreement with Enron, but also the good faith requirement imposed by Idaho Code section 28-2-306.

###### c. Neither Snake River Nor Its Members Can Generate Or Receive A Profit Through the Resale of Power

Even if the Enron Contract did permit Snake River to resell power on the spot market to nonmembers, (which it does not), Snake River is precluded as a matter of law from making such sales because neither Snake River nor its members could, under the Idaho Nonprofit Corporation Act, Snake River's articles of incorporation, or Snake River's bylaws, generate or receive a profit through the resale of power.

Snake River was organized on December 27, 1993 as a nonprofit corporation pursuant to the Idaho Nonprofit Corporation Act, I.C. §§ 30-3-1 through 30-3-145 (the "Act"). Among the various forms under which nonprofit corporations can operate, Snake River elected to be a cooperative corporation. *See* Hobson Aff., Ex. M (By-Laws) at Article IX, Section 1.

---

[5] As stated above in section III.B.2.a., PacifiCorp contents that the Enron Contract did not permit Snake River to sell any excess power, even amounts below the minimum. PacifiCorp's argument that, in any case, the contract did not contemplate sales of power above the minimum is made in the alternative.

A nonprofit corporation is a "[c]orporation organized for other than profit-making purposes." Black's Law Dictionary, 1056 (6th ed. 1990). In keeping with this basic definition, Snake River denied itself the right to make a profit. *See* Plaintiff's Articles, Article II, Hobson Aff., Ex. A ("The purpose for which the corporation is organized is the transaction without any purpose of pecuniary profit to itself, of any lawful activity...." (emphasis added)). Because Snake River cannot make a profit, any allegation that it lost profits is improper.[6]

In addition to denying itself the right to make a profit, Snake River specifically restricted its activities to the purchase and sale of electric energy for its members only. *See id.* at Article II(a) ("[t]o generate, manufacture, purchase, acquire and accumulate electric energy for its members only and to transmit, distribute, furnish, sell and dispose of such electric energy to its members only . . . ."); Article II(f) ("The corporation shall render no service to or for the public.") (emphasis added)). This limitation is consistent with the Enron Contract, which contemplates Snake River distributing power only to its members. *See* Hobson Aff., Ex. L (the Enron Contract) at Article 1.4. Thus, Snake River has never had the ability to sell power to non-members and cannot claim lost profits from such sales.[7]

In sum, Snake River decided voluntarily and knowingly to insert specific provisions into its by-laws and articles of incorporation that prohibit it from selling electric power to nonmembers and from selling products or services to the public for a profit. Snake River did so

---

[6] Dr. Slaughter's testimony that Snake River was not seeking to make profit in the spot market but rather "gains" to offset "losses" (Ex. B to Reinhardt Aff. (Aug. 6, 2002 Slaughter Depo. Trans. at 62:9—65-24) is specious in light of his $23 to $38 million "net damage" calculations that include such "gains."

[7] Under Idaho corporate law, Snake River's members also cannot derive a profit from Snake River's sales of electricity on the spot market. The Idaho Nonprofit Corporation Act strictly prescribes that members of a nonprofit corporation may receive distributions only of any actual or deemed paid-in capital by the member upon dissolution or periodically upon approval of the board. I.C. § 30-3-109. Thus, distributions to members authorized by the Act are limited to return of capital. Hobson Aff., Ex. A, (continued...)

to avoid regulation by the Idaho Public Utility Commission. Hobson Aff., Ex. N (March 21, 2001 Palmer Depo.) at 51:1—51:14. Snake River cannot now, with the benefit of hindsight and having received benefits from its status as a nonprofit cooperative, including circumventing PUC regulation, avoid the binding limitations that accompany this status by arguing that it actually intended to organize itself as (1) a cooperative capable of making sales to nonmembers and (2) a nonprofit corporation able to make profits.

## C. PacifiCorp Cannot Be Held Liable For An Antitrust Violation Because It Acted In Accordance With Well-Defined Public Policy

In its November 26, 2001 Motion for Summary Judgment, PacifiCorp argued that it cannot be held liable for violating antitrust laws because of its reliance on Idaho's regulatory policy prohibiting the "pirating" of customers. Because this Court did not reach that issue in its February 7, 2002 Memorandum Decision and Order, PacifiCorp renews its argument.

A public utility cannot face antitrust liability for refusing to deal if there are valid justifications for its acts. One such justification recognized in the context of public utility companies is the need for the utility to protect the "public interest." *See, e.g., Phonetele, Inc. V. Am. Tel. & Tel. Co.*, 664 F.3d 716, 737-738 (9th Cir 1981); *Southern Pacific Communications Co. v. AT&T*, 740 F.2d 980 (D.C. Cir. 1984); *Mid-Texas Communications Systems, Inc. v. AT&T*, 615 F.2d 1372 (5th Cir. 1980). The Ninth Circuit Court of Appeals has embraced this precept, holding that there can be no antitrust liability where the purpose of the allegedly anticompetitive conduct of the public utility was to vindicate the public interest:

> [If] at the time the various anticompetitive acts alleged here were taken, [the public utility] had a <u>reasonable</u> basis to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, <u>then its actions did not violate the antitrust laws.</u>

(...continued)

Article IX. Thus, if Snake River limits its power sales to its members as it should, the members could not make a profit. Instead, the most the members could receive is a return of their capital.

*Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.3d 716, 737-38 (9th Cir. 1981) (emph. added).[8]

At the time of Snake River's 1995 request for wheeling services, PacifiCorp reasonably believed and continues to believe—that its actions were necessitated by the anti-piracy provisions promulgated by the Idaho State Legislature in the Electric Supplier Stabilization Act ("ESSA"). The Ninth Circuit Court of Appeals confirmed both the existence and accuracy of this belief by PacifiCorp in its January 29, 2001 Opinion, finding that: (1) the purpose of ESSA was to, *inter alia*, "prohibit the 'pirating' of customers of another supplier . . . and stabilize the territories and customers served with electricity by such suppliers;" (2) PacifiCorp refused to wheel power to Snake River's members "believing the ESSA authorized such refusal;" and (3) ESSA did indeed "authorize[] PacifiCorp's behavior." *Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189, 1189-92 (9th Cir. 2001) (emphasis added). Snake River has never disputed—and cannot dispute—these key findings by the Ninth Circuit.

Moreover, PacifiCorp's reliance on the anti-piracy provisions in ESSA is confirmed by the first motion filed by PacifiCorp in this action over six years ago, which states that PacifiCorp's purported refusal to "wheel to Snake River cannot have injured Snake River because Snake River is precluded by Idaho's anti-piracy law from providing electric service to the customers it intends to serve with the requested power." Memorandum In Support Of Motion to Dismiss Or Stay, filed August 7, 1996 (citing ESSA). That motion was supported by the August 7, 1996 affidavit of John Mooney stating that PacifiCorp is presently connected and providing electric service to the customers Snake River sought to serve, that PacifiCorp is providing and remains willing and able to provide adequate electric service to those customers

---

[8] Although PacifiCorp did not locate the *Phonetele* case before it filed its first summary judgment motion, that case makes clear that the test in the Ninth Circuit is one of objective

(continued...)

and that PacifiCorp has not given consent to Snake River to supply or furnish electric service to any electric service customer that is now or has at any time previously been connected for electric service to facilities of PacifiCorp. Under ESSA, the existence of these factors renders Snake River's request an illegal attempt to pirate PacifiCorp's customers. Idaho Code § 61-332B. Mr. Mooney's testimony concerning these specific factors demonstrates his subjective intent to rely upon ESSA.

Thus, there is no dispute that at all relevant times PacifiCorp was relying on ESSA, which authorized PacifiCorp's refusal to consent to Snake River's pirating of its customers, and that harmony in the Idaho electric power supply business, furthered under ESSA by its restriction of customer pirating, is a "concrete factual imperative[] recognized as legitimate by the regulatory authority." *Phonetele*, 664 F.3d at 737-738. PacifiCorp's conduct in 1995, therefore, cannot, as a matter of law, constitute an antitrust violation.

### III.   CONCLUSION

For the foregoing reasons, PacifiCorp respectfully requests that this Court grant its motion for summary judgment, or alternatively, summary adjudication.

Dated this 21st day of August, 2002.

STOEL RIVES LLP

David J. Jordan
John M. Eriksson
Marc T. Rasich
G.Rey Reinhardt, IV

---

(...continued)

reasonableness and has no subjective good faith component. Nevertheless, the affidavit filed by John Mooney on August 7, 1996 presents unrebutted evidence of good faith reliance by PacifiCorp on ESSA.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of August, 2002, I caused to be served the

foregoing **MEMORANDUM IN SUPPORT OF PACIFICORP'S MOTION FOR**

**SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION**, via

U.S. Mail upon the following:

Robert C. Huntley
Christopher F. Huntley
HUNTLEY, PARK, THOMAS BURKETT,
   OLSEN & WILLIAMS, LLP
250 So. 5th Street, Suite 660
P.O. Box 2188
Boise, ID  83702

Brett DeLange
Deputy Attorney General
700 W. Jefferson St., Rm. 210
P.O. Box 83720
Boise, ID  83720-0010

Charles F. Wheatley, Jr.
Timothy P. Ingram
WHEATLEY & RANQUIST
34 Defense Street
Annapolis, MD 21401

By: _____
G.Rey Reinhardt