# ORIGINAL

David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah 84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Mary S. Hobson (ISB #2142)
G.Rey Reinhardt, IV (ISB #6209)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant PacifiCorp

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFICORP (Including UTAH POWER & LIGHT COMPANY, a division),<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALLEN G. LANCE, Attorney General,<br><br>Defendant-Intervenor. | Case No. CV 96-0308-E-BLW<br><br>**AFFIDAVIT OF G.REY REINHARDT, IV IN SUPPORT OF PACIFICORP'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION** |

I, G.Rey Reinhardt, IV, being first duly sworn, state as follows:

1.    I am one of the attorneys representing Defendant PacifiCorp in the above-captioned matter.  The facts presented in this affidavit are based upon my personal knowledge.

2.    Attached hereto as Exhibit "A" is a true and correct copy of relevant excerpts from the transcript of the Deposition of Carl Palmer, in his capacity as an individual and in his capacity as a designated witness under Federal Rule of Civil Procedure 30(b)(6), taken on July 18, 2002.

3.    Attached hereto as Exhibit "B" is a true and correct copy of relevant excerpts from the transcript of the Deposition of Richard A. Slaughter, taken on August 6, 2002.

4.    Attached hereto as Exhibit "C" is a true and correct copy of the retainer agreement, dated February 15, 1996, sent to Snake River Valley Electric Association ("Snake River") by Charles F. Wheatley, Jr., which was produced by Snake River to PacifiCorp.

5.    Attached hereto as Exhibit "D" is a true and correct copy of minutes from the December 12, 1995 meeting held by the board of directors of Snake River, which was produced by Snake River to PacifiCorp.

6.    Attached hereto as Exhibit "E" is a true and correct copy of the facsimile sent by Carl Palmer to Dr. Richard Slaughter on January 18, 2002, which was produced by Snake River to PacifiCorp.

7.    Attached hereto as Exhibit "F" is a true and correct copy of the June 30, 1999 letter sent by Enron to Snake River terminating the Enron Contract, which was produced by Snake River to PacifiCorp.

Further this affiant sayeth naught.

DATED THIS 21st day of August, 2002.

**AFFIDAVIT OF G.REY REINHARDT, IV IN SUPPORT OF PACIFICORP'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION – 2**
Boise-145447.1 0058802-00110

STOEL RIVES LLP

G. Rey Reinhardt, IV

SUBSCRIBED AND SWORN TO before me this 21st day of August, 2002.

Notary Public for Idaho
Residing at _Star, ID_
My commission expires: _6·23·2006_

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of August, 2002, I caused a true and correct copy of the foregoing **AFFIDAVIT OF G.REY REINHARDT, IV IN SUPPORT OF PACIFICORP'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION** to be sent via United States Mail to:

Robert C. Huntley
Christopher F. Huntley
Huntley, Park, Thomas, Burkett,
 Olsen & Williams, L.L.P.
250 S. 5th Street, Suite 660
P.O. Box 2188
Boise, Idaho  83702

Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD  21401

Brett DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
700 W. Jefferson St., Rm. 210
P.O. Box 83720
Boise, ID 83720-0010

G.Rey Reinhardt, IV

**EXHIBIT A**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

SNAKE RIVER VALLEY ELECTRIC
ASSOCIATION,                          )
                                      )
         Plaintiff,                   )   Case No. CV 96-0308-E-BLW
                                      )
vs.                                   )
                                      )
PACIFICORP, (including UTAH           )
POWER & LIGHT, a division),           )
                                      )
         Defendant,                   )
                                      )
STATE OF IDAHO, by and                )
through ALLEN G. LANCE,               )
Attorney General,                     )
                                      )
         Defendant-Intervenor.        )
_____)

### VIDEOTAPED DEPOSITION OF CARL PALMER

July 18, 2002

Boise, Idaho

Reported By:

Amy E. Menlove, CSR No. 685, RPR

**COPY**



200 N. Fourth Street ▾ Suite 204 ▾ Boise Idaho ▾ 83702-6002
1 800 588-3370 ▾ 208 343-4004 ▾ 208 343-4002 (Fax)



## VIDEOTAPED DEPOSITION OF CARL PALMER

BE IT REMEMBERED that the deposition of Carl Palmer was taken by the attorney for the Defendant, Pacificorp, at the law offices of Stoel Rives, LLP, located at 101 South Capitol Boulevard, Suite 1900, Boise, Idaho, before Amy E. Menlove, a Court Reporter (Idaho Certified Shorthand Reporter No. 685) and Notary Public in and for the County of Ada, State of Idaho, on Thursday, the 18th day of July, 2002, commencing at the hour of 10:10 a.m. in the above-entitled matter.

APPEARANCES OF COUNSEL:

For the Plaintiff:

> HUNTLEY, PARK, THOMAS,
> OLSON, BURKETT & WILLIAMS, LLP
> By: **Robert F. Huntley, Esq.**
> 250 S. Fifth Street, Suite 660
> P.O. Box 2188
> Boise, ID  83702
> (208) 345-7800
> FAX (208) 345-7894

For the Defendant:

> STOEL RIVES, LLP
> By: **David J. Jordan, Esq.**
>     **John M. Eriksson, Esq.**
> 201 S. Main Street, Suite 1100
> Salt Lake City, UT  84111
> (801) 578-6968
> FAX (801) 578-6999

> STOEL RIVES, LLP
> By: **G. Ray Reinhardt, Esq.**
> 101 S. Capitol Boulevard, Suite 1900
> Boise, ID  83702-5958
> (208) 389-9000
> FAX (208) 389-9040

Also Present:        John Glenn Hall, Videographer

1            P R O C E E D I N G S

2

3         THE VIDEOGRAPHER:  On the record.

4         MR. JORDAN:  My name is David Jordan of the law

5    firm of Stoel Rives.  I represent Pacificorp in the

6    matter of Snake River Valley Electric Association versus

7    Pacificorp.

8         This deposition is being made on behalf of the

9    defendant.  This deposition is being videotape recorded

10   by John G. Hall, who is the proprietor of John Glenn

11   Hall Company, whose business address is Post Office Box

12   2683, Boise, Idaho.

13        Today's date is July 18th, 2002.  The time is

14   approximately 10:10 a.m.

15        The location of this deposition is the offices of

16   Stoel Rives in Boise, Idaho.  The deponent's name is

17   Carl Palmer.

18        Now the other counsel will please identify himself.

19        MR. HUNTLEY:  Robert Huntley of the firm of

20   Huntley, Park, Thomas, Burkett, Williams & Olson on

21   behalf of the plaintiff.

22        MR. JORDAN:  Madam Reporter, would you please swear

23   in the witness?

24                    CARL PALMER,

25   a witness having been first duly sworn to tell the

1  truth, the whole truth, and nothing but the truth,

2  testified as follows:

3

4                          EXAMINATION

5  BY MR. JORDAN:

6      Q.    Mr. Palmer, this is your second deposition in

7  this case, correct?

8      A.    That is correct.

9      Q.    Let me --

10     MR. HUNTLEY:  Counsel, at this point, I want to put

11  something on the record.

12     His first deposition began at 9:16.  It went to

13  1603 in the afternoon.  After subtracting the lunch

14  recesses and the other recesses, it went five hours and

15  55 minutes, approximately.  The federal rules provide

16  for seven hours.  The deposition was not held open.

17     The rationale of this deposition supposedly is

18  because of the spot market question.  He was deposed on

19  the spot market issues from about page 168 of his

20  deposition to 180.  It's our position there is no

21  rationale for this second deposition, but we are

22  accommodating counsel.

23     But I would expect that you will limit the

24  deposition to new issues relative to the spot market

25  unless you have some other rationale.

1    to do with the right to sell power on the open market?

2        A.    I think we were advised -- well, no, that's a

3    legal question and I can't answer that.

4        Q.    Well, what is the basis for your

5    understanding that the eligible customer condition in

6    some way related to the right to resell power?

7        A.    I don't recall, Mr. Jordan, why that was

8    deleted.  But it was something to do with our ability to

9    sell, again, on the open market.

10       Q.    You just can't remember what the relationship

11   was?

12       A.    No, I don't.  It was something legally that

13   was involved in that.

14       Q.    Can you tell us, Mr. Palmer, whether you had

15   discussion within Snake River about whether Snake River

16   was an eligible customer within the meaning of FERC

17   Order 888 in this time period?

18       A.    We felt that we were an eligible customer.

19       Q.    Did you have any legal opinions on that

20   subject?

21       A.    Yes.

22       Q.    From whom?

23       A.    Mr. Wheatley.

24       Q.    Was Mr. Wheatley's opinion that you were an

25   eligible customer under FERC Order 888?

```
 1        A.    Yes.

 2        Q.    Look, if you would, please, at the force

 3   majeure provision, 10.1.

 4        MR. HUNTLEY:  Exhibit 39?

 5        MR. JORDAN:  Yes, same exhibit.

 6        Q.    (BY MR. JORDAN)  I'd like you to look at the

 7   portion of the paragraph that appears on page 8 of the

 8   draft contract.  You'll see a sentence, the last

 9   sentences of the paragraph that begins "Such causes"?

10        A.    Uh-huh.

11        Q.    Do you see that?

12        A.    Yes.

13        Q.    I'll read it for the record.  "Such causes

14   shall include the following and other causes of a

15   similar nature:  Acts of public enemies, earthquake,

16   flood, explosion, fire, lightning, severe storms,

17   interruption of transmission service relied on to make

18   deliveries hereunder, and government orders preventing

19   performance."

20              Did I read it correctly?

21        A.    Yes.

22        Q.    Do you recall any discussion about the

23   provision relating to, quotes, interruptions of

24   transmission service relied on to make deliveries

25   hereunder?
```

1     Q.    Okay.  What was the next discussion with

2  Enron on that subject?

3     A.    You know, I don't recall right now.

4     Q.    Can you give us the substance of any other

5  discussions that you had with Enron on the subject of

6  possible termination?

7     A.    No, I don't.  But I know the board was aware.

8  Everyone was aware of that commitment that you had made

9  in court.  And so, because of that commitment, there

10  wasn't a big concern as to what happened to that Enron

11  contract.  Because if we lost it, Pacificorp is

12  obligated to step in and serve.  And we are keeping that

13  very much in front of our members at all times, actual

14  court documents.

15     Q.    And that subject was actually discussed at a

16  board meeting?

17     A.    Oh, I'm sure it was.

18     Q.    I think the question that --

19     A.    And many times thereafter.

20     Q.    I think the question that maybe we didn't get

21  an answer to was, can you remember anything else that

22  was discussed in any of your conversations with Enron

23  about the possible termination of the contract?

24     A.    No.  I know that we were concerned about it

25  until you made your obligation to step in and serve with

1    the same terms and same conditions and same rates as
2    Enron.  And after that occurred -- and one day we got a
3    call from Enron and we were concerned that they were
4    going to cancel the contract.  But with your commitment,
5    that concern pretty much vanished because Pacificorp has
6    agreed to step in and serve at the same rates, same
7    terms.
8         Q.    So you went ahead and let the contract --
9         A.    No, it wasn't our --
10        Q.    -- terminate?
11        A.    It wasn't our decision.  It was Enron's.
12        Q.    Did you ever try to engage in a negotiation
13   with them for an extension or modification of the
14   contract?
15        A.    I don't recall.
16             (Deposition Exhibit No. 50 was marked for
17   identification.)
18        Q.    (BY MR. JORDAN)  Look, please, at what's been
19   marked as Exhibit 50 to your deposition.
20             Do you recognize this document as yet another
21   draft of the power purchase agreement?
22        A.    I do.
23        Q.    There is a handwritten note at the bottom.
24   Is that a note from Mr. Kevin Presto to you?
25        A.    Yes, it is.

REPORTER'S CERTIFICATE

STATE OF IDAHO      )
                    )      SS.
COUNTY OF ADA       )


I, Amy E. Menlove, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 18th day of July, 2002.

AMY E. MENLOVE
CSR, RPR and Notary
Public in and for the
State of Idaho.

My commission expires: 1-20-04

**EXHIBIT B**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION, | ) ) | |
| Plaintiff, | ) ) ) | Case No. CV 96-0308-E-BLW |
| vs. | ) ) ) | |
| PacifiCorp, (including UTAH POWER & LIGHT, a division), | ) ) ) | |
| Defendant, | ) ) ) | |
| STATE OF IDAHO, by and through ALAN G. LANCE, Attorney General, | ) ) ) ) | |
| Defendant-Intervenor. | ) ) | |

## VIDEOTAPED DEPOSITION OF RICHARD A. SLAUGHTER

August 6, 2002

Boise, Idaho

Reported By:

Amy E. Menlove, CSR No. 685, RPR

**COPY**



200 N. Fourth Street ▼ Suite 204 ▼ Boise Idaho ▼ 83702-6
1 800 588-3370 ▼ 208 343-4004 ▼ 208 343-4002 (Fax)

1              P R O C E E D I N G S

2

3       THE VIDEOGRAPHER:  On the record.

4       MR. RASICH:  All right.  My name is Marc Rasich.

5    I'm a member of the firm Stoel Rives.  I represent

6    PacifiCorp in this matter in caption Snake River Valley

7    Electric Association versus PacifiCorp and the State of

8    Idaho, pending in the United States District Court for

9    the District of Idaho.

10       This deposition is being videotaped by Rebecca

11   Ogawa, who is an associate of the John Glenn Hall

12   Company, whose business address is Post Office Box 2683,

13   Boise, Idaho.

14       Today's date is August 6th.  The time is

15   approximately 10:10.  The deponent's name is Dr. Richard

16   Slaughter.

17       Now the other counsel will identify himself.

18       MR. HUNTLEY:  Robert Huntley representing the

19   plaintiffs in this case.

20       MR. RASICH:  All right.  Please swear the witness.

21

22              RICHARD SLAUGHTER, Ph.D.,

23   a witness having been first duly sworn to tell the

24   truth, the whole truth, and nothing but the truth,

25   testified as follows:

1      A.     That is correct.

2      Q.     And then the second, that is, damages are

3  calculated assuming that sales would have been made of

4  any energy surplus to SRVEA needs and below the maximum

5  contract delivery.  That's Appendix D, Column 24?

6      A.     Yes, that's correct.

7      Q.     Okay.  The last sentence in that paragraph

8  reads, "Market sales assume a two percent transaction

9  cost."  I think we discussed earlier that that two

10  percent figure came from Mr. Gamarra at Whit Russell's

11  office; is that correct?

12      A.     Yes.

13      Q.     Do you know what transaction costs are

14  included in that two percent?

15      A.     Oh, we're talking about transmission -- costs

16  for retransmission or transmission or remarketing,

17  including staff, contract, however it's done.

18      Q.     And again, that two percent came from

19  Mr. Gamarra?

20      A.     Two percent came from Mr. Gamarra.  Also, I

21  had estimates from Tony Jones that it would be certainly

22  less than five percent.

23      Q.     When we discussed it earlier, I believe you

24  indicated that you didn't ask Mr. Gamarra for any

25  documentations to support the two percent figure.  Is my

1    memory correct?

2        A.    Yes.

3        Q.    And did you talk with or ask Mr. Jones for

4    documentations to support his estimate of that figure?

5        A.    I may have asked him if there were contracts.

6    And he said he didn't have any specific contracts, but

7    that was his judgment of costs, assuming that most of

8    them would be done through remarketing by Enron and that

9    Enron would take a fee for that.  Transmission costs

10   would be negotiated in the individual instance, if there

11   were retransmission costs.

12       Q.    So was it Mr. Jones, then, that indicated

13   that the two -- that a percentage certainly below five

14   percent would be assuming remarketing by Enron or did

15   that come from Mr. Gamarra?

16       A.    I believe they both mentioned that.  The

17   easiest thing to do and the most likely thing to do,

18   because the energy source was external to the region and

19   was through the Enron contract, the most likely avenue

20   for SRVEA would be to remarket through Enron.

21       Q.    Did either Mr. Gamarra or Mr. Jones indicate

22   that the two percent figure would increase if it was not

23   Enron that was doing the remarketing, that is, if some

24   other entity did the remarketing?

25       A.    No.  The assumption is that if the

1  remarketing was done by Enron, the costs would be

2  probably lower than that.

3      Q.    And that assumption that if it was remarketed

4  by Enron, the cost would be lower than the two percent,

5  is that something that Mr. Jones or Mr. Gamarra told

6  you?

7      A.    In the absence of specific notes on

8  conversations, they both would have confirmed that, as

9  would probably the conversations with Mr. Mooney and

10 Mr. Gendron.  And part of the thing here is that the

11 actual costs are going to depend upon how it's done and

12 what the volume is, what the size of the sale is.

13          So a variable -- I mean, what the model is,

14 Raft River and others maintain their own trading floor.

15 Their costs may be a little above that.  The UAMPS

16 members remarket through UAMPS, so that the volumes are

17 fairly high.  I mean, you have a person or people to do

18 it, the cost as a percentage in sales is going to depend

19 upon volume.  So for Enron, the cost personnelwise would

20 be a lot lower than it would be for a small trading

21 floor run by a couple of co-ops.

22     Q.    So does your calculations assume that Snake

23 River would have had an entity other than Enron doing

24 the remarketing?

25     A.    I think I've told you everything that I have

1    minimum monthly quantity.

2        Q.    All right.  Further down on page 10, there is

3    a sentence which reads or begins, "It specifically" --

4    and that is the report -- "does not and never has

5    assumed that SRVEA members would have constrained their

6    own consumption in such months, nor that they would have

7    traded energy in any market for the purpose of profiting

8    from such trades."

9            What would the Snake River members' purpose

10   be if not to profit from the trades?

11       A.    What would their purpose be from constraining

12   their consumption?

13       Q.    I'm referring to the part where it says "nor

14   that they would have traded energy in any market for the

15   purpose of profiting from such trade."  I'm wondering

16   what the purpose would have been if not to profit?

17       A.    The purpose would have been to avoid loss.

18   The word "profit" is a term that you introduced

19   beginning in my first deposition and that you

20   subsequently used in a number of court documents.  And I

21   never used that term.  And I never assumed at all that

22   SRVEA was in business to profit from energy trades.   I

23   do assume that SRVEA is authorized to sell energy into

24   the market.  And at the time that the -- at the time

25   that the contract was negotiated, there would have been

1    no thought of profiting from trades or engaging in

2    energy trading.  It would only have been thought of

3    reselling contracted power for which they didn't have

4    immediate use.

5         Q.    Okay.  And if they do that, is there some

6    dividing line at which point they would stop selling

7    into the market?  I'm just curious as to where we draw

8    the line from saving money to profiting from the trades.

9         A.    Well, Counsel, I've got to object to your use

10   of the term.

11        Q.    Okay.

12        A.    You're using the term "profit" in the sense

13   that there is a margin; a positive margin between the

14   cost of the energy and the price received for the

15   energy.  And then you have, in the past, moved from that

16   to saying that you think that SRVEA is -- or that I'm

17   saying that SRVEA is in business to profit from energy

18   trades.

19            That's like you purchasing a house for the

20   purpose of profiting from your house over the next 12

21   months as opposed to housing your family.  Now, some

22   people may do that, if they expect -- they may buy

23   instead of rent because they expect values to rise.  But

24   your purpose is to house your family.

25            SRVEA's purpose in entering into the contract

1    was to provide energy to their members at a lower cost

2    and higher reliability level than they were receiving

3    from PacifiCorp.  And contracts have minimum

4    requirements and maximum requirements.

5         And it would only make sense that a logical,

6    rational person, if I can buy a product for less than

7    the market price, that I will buy all that is available

8    to me and sell it at the market price.  It's called

9    arbitrage.  And there is absolutely no reason for SRVEA

10   not to do that.  But at the time they entered into the

11   contract, they wouldn't have been expecting that they

12   would have made any gains from that.  It's just

13   something you do to reduce your losses.

14        Your question assumes that there is some kind

15   of ethical criteria that should be applied to SRVEA's

16   members that -- in addition to that which is in the

17   contract, which doesn't get applied to anyone else.  And

18   I -- perhaps I'm delinquent here or deficient, but I

19   don't understand what the rationale would be for such a

20   constraint.

21        Q.   If SRVEA members sell power into the spot

22   market for a price that is greater than the price they

23   pay Enron for that same power, when you include all the

24   remarketing fees, et cetera, the difference between

25   those two prices, how would you characterize that?  Is

1      that not profit from the sale?

2            A.     I would characterize it as a gain.

3            Q.     As a gain?

4            A.     It may or may not be profit.

5            Q.     And what's the difference between the gain in

6      that scenario and profit?

7            A.     There may be no difference in that particular

8      scenario, but that doesn't speak to the purpose for

9      going into business.

10           Q.     And how do you determine whether the gain is

11     or is not a profit?

12           A.     Counselor, there is no reason I should

13     determine that, make such a determination.  They have

14     the right to buy and sell power.  You know, there is

15     nothing in the contract and there is nothing in anything

16     else that says that they can't make a gain from doing

17     so.

18                  Now, my analysis assumes that they will take

19     no extraordinary measures to increase their gain from

20     market sales of power, i.e., they will not constrain

21     their consumption.  Now, in actual fact, you've got to

22     expect they would have done that.  But I did not make

23     such an assumption.  And the findings and the analysis

24     do not assume that.

25           Q.     The next sentence reads, "Energy purchased

REPORTER'S CERTIFICATE

STATE OF IDAHO      )
                    )      SS.
COUNTY OF ADA       )


I, Amy E. Menlove, Certified Shorthand Reporter and

Notary Public in and for the State of Idaho, do hereby

certify:

That prior to being examined, the witness named in

the foregoing deposition was by me duly sworn to testify

to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in

shorthand at the time and place therein named and

thereafter reduced to typewriting under my direction,

and that the foregoing transcript contains a full, true

and verbatim record of said deposition.

I further certify that I have no interest in the

event of the action.

WITNESS my hand and seal this 7th day of August,

2002.

AMY E. MENLOVE
CSR, RPR and Notary
Public in and for the
State of Idaho.

My commission expires: 1-20-04

**EXHIBIT C**

LAW OFFICES
# WHEATLEY & RANQUIST
34 DEFENSE STREET
ANNAPOLIS, MARYLAND 21401

(410) 266-7524
(301) 261-8489 (Fax)

IN WASHINGTON, D.C.
(301) 261-8606

February 15, 1996

Mr. Carl L. Palmer
c/o Stardust Motor Inn
700 Lindsay Blvd.
Idaho Falls, ID 83401

Dear Carl:

Pursuant to our conversation, I am enclosing to you herewith two (2) executed originals of an "Agreement For Legal Services" relating to the undertaking of the antitrust suit on behalf of Snake River Valley Electric Association, Inc. If this meets with the approval of the Association, just send one executed copy back to me.

As we discussed by phone, I think that we ought to seek to file the suit as quickly as possible to get action for the enforcement of rights to transmission service.

If you have any questions, do not hesitate to call.

With best regards.

Sincerely,

Charles F. Wheatley, Jr.

CFW:fdd
Enclosures



SR00001462



# AGREEMENT FOR LEGAL SERVICES

AGREEMENT made and entered into this _____ day of February, 1996, by and between Snake River Valley Electric Association, Inc., residing at 13586 N. 45th E. Idaho Falls, ID 84301, hereinafter referred to as the "Client", and Charles F. Wheatley, Jr, of Wheatley & Ranquist, 34 Defense Street, Annapolis, Maryland 21401, attorneys at law, hereinafter referred to as the "Attorney."

WITNESSETH:

1.   The Client hereby retains and employs the Attorney to (1) represent, appear, and act for the Client in the prosecution of a certain claim which said Client has against Utah Power Company as follows:  a suit under the Federal antitrust laws to require Utah Power Company to transmit power purchased by the Client to serve its members from a third-party power supplier across the transmission (including distribution) lines of Utah Power and for treble damages for any refusal to transmit, including reasonable attorneys fees, and to commence and maintain any necessary action for that purpose in any court of competent jurisdiction.

2.   The Client hereby agrees to pay the Attorney for the services to be performed by him as herein set forth, at the special reduced hourly fee for his time and for services of others in his firm at the hourly rate for services, as per the Schedule attached hereto, plus any and all reasonable and necessary expenses, including any necessary travel or out-of-pocket expenses, but not office overhead, which may be paid

(1) ...draw up, negotiate, and defend before the appropriate jurisdiction(s) any applications or requests for power resource or power wheeling to Client members through Utah Power's transmission, transformation, and distribution systems.  And to...

SR00001463

- 2 -

or incurred by the Attorney on behalf of the Client in connection with the above-described litigation, to be billed monthly.

3.     It is agreed that the total amounts to be billed for fees and expenses will not exceed $120,000.00 per year, commencing with the date of this Agreement.

4.     Should the litigation result in a settlement or final court order, which includes a provision for an allowance or award of attorneys fees and expenses, that allowance or award shall be first applied to any amounts previously paid by the Client to the Attorney hereunder; second, to pay to the Attorney and his firm the amount by which the fees have been reduced (20%) and to reimburse the Attorney and his firm for any time and expenses incurred beyond the annual ceiling of $120,000; and third, any remaining balance would be divided 50/50 between the Client and the Attorney.

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals the day and year first above written.

Charles F. Wheatley (L.S.)
WHEATLEY & RANQUIST


Mr. Del Ray Holm, President (L.S.)
Snake River Valley Electric Association, Inc.

SR00001464

2/96

*SPECIAL REDUCED SCHEDULE OF FEES*
*FOR SNAKE RIVER VALLEY ELECTRIC COOPERATIVE, INC.*
*REGARDING ANTITRUST LITIGATION*

## WHEATLEY & RANQUIST

Charles F. Wheatley, Jr.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $120/hr.

Other Attorneys In Firm  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $76/hr.

Paralegals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $44/hr.

Clerks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  $32/hr.

SR00001465

**EXHIBIT D**

MINUTES

SRVEA Board of Directors; December 12, 1995
Cyringa Room, Stardust Motel, Idaho Falls, Idaho

Attendance:  SRVEA

Del Ray Holm, President
Doyle Beck, Vice President
Kevin Ward, Treasurer
Brent Stolworthy, Director
Clyde Cook, Director
Mark Tucker, Director
LaVerl Womack, Director

Carl Palmer, Consultant to SRVEA (Conducting)

Guests:  EGY Resource Development

Lynn Marsing, President
Anton Tonc, Professional Engineer

Mr. Palmer called the meeting to order at 1:03pm.  All directors were present, with
Mr. Holm Presiding.  There were no minutes from the last meeting due to recording
equipment not being set to record.  Mr. Palmer handed out a sheet from Jewel Electric
comparing the heat effeciencies of coal, gas, wood, and electricity.  Also the cost
to heat by each.  Also a "draft" Christmas letter was handed out for Board consideration
to be sent to all SRVEA supporters.

Mr. Palmer introduced the guests and recognized the Idaho Power offer and the part
Mr. Marsing and Mr. Tonc played as an organization. through which Idaho Power could
make a power offer to SRVEA.  He asked the guests to inform the Board in more detail
as to the Idaho Power offer, what it means to SRVEA members and projected costs.

Mr. Marsing discussed the value of the offer and how fortunate SRVEA was to receive it.
Also, that in the "world of power rates", 22 mills is an excellent rate, including
a five year term!  Final rates were projected to be around 30 mills (3.0¢/kwh).  Then
Mr. Marsing reviewed the origin of the offer as coming to SRVEA after Micron had opted
to go with UP&L rather than Idaho Power.  And thus, the Idaho Power offer is confidential
because UP&L learning of this offer could go to Idaho Power and offer them a share of
the Micron load in exchange for withdrawing the offer to the Idaho customer (SRVEA).
Idaho Power would - in all liklihood - go for UP&L's offer because Micron is a sure
load, whereas SRVEA is still without a distribution system at this reporting.

Mr. Tonc discussed bringing Idaho Power through UP&L's system via "Retail Wheeling"
and "Wholesale Wheeling".  He discussed the groundwork (politically) that has been
done by other states (specificly California), and the trend towards opening power lines
to competition.  He informed the group how SRVEA was being watched, as SRVEA is on
the forefront of this wheeling movement. and will be a model to be followed.  Mr. Tonc
also discussed different aspects of negotiations and how certain principals of "costing"
and "valuing" are recognized as standards in the electric utility business.  These
principals will be followed in UP&L-SRVEA negotiations.  He also stated that this
procedure will keep UP&L from "double charging" or claiming a position in negotiations
that is considered questionable or arbitrary.  Mr. Tonc also stated that when negotiations
begin definite boundries and membership of SRVEA will have to be provided, and the
maps and designation cards will be an excellent resource for that information.

SR00001213

Page 2:  Minutes

SRVEA meeting 12/12/95

Mr. Cook suggested a meeting(s) be held wherein attendees would be asked to be
"in or out" and sign a membership sheet including a pledge to support the initial
set up.

Mr. Tonc suggested that some type of a tier designation be established wherein the
largest power consumers/supporters be designated as Tier I customers; Tier II customers
would be the median power consumers/supporters; and Tier III customers would be
those who have not supported SRVEA.

Mr. Stolworthy had asked the question, "Can SRVEA sell excess or surplus power to
other Utilities"?  Mr. Tonc responded that a power contract will have a minimum
requirement that SRVEA will be required to pay for, whether used or not.  If it is
not used or needed by SRVEA at the time, it could be sold on the open market.

Mr. Palmer suggested that the prime concern at this time is to stay focused on
what SRVEA's relationship is going to be with UP&L, i.e. in court or in wheeling
negotiations.

Call to Charles Wheatley Jr.<br>
WHEATLEY AND RANQUIST, SRVEA legal counsel<br>
Washington, D.C.

Mr. Wheatley was asked what was needed in terms of defining SRVEA membership as
SRVEA requests UP&L to wheel Idaho Power.  Mr. Wheatley stated that the most
important information needed is the capacity and energy that SRVEA is asking to
be wheeled...and that SRVEA has been offered from Idaho Power.  He stated the work
done in maping and listing those who have designated SRVEA to represent their
electric interests is sufficient for now.

It was decided that Lynn Marsing and Charles Wheatley draw up a letter to be sent
to UP&L and copied to PacifiCorp requesting wheeling of the capacity and energy
of the Idaho Power offer, but not specifying the source as Idaho Power.  Mr. Wheatley
stated that if they reject this wheeling request SRVEA has two options:

> 1. File under Section 211 of the Federal Energy Act before FERC.
>    (This would put SRVEA in front of FERC).
>
> 2. File in Federal Court under the federal antitrust laws.

Mr. Wheatley stated that the Antitrust laws have more teeth than filing before
FERC.  Especially since SRVEA has the landmark Otter Tail Power case as a precedence
setting law case.  He stated this is especially powerful since SRVEA has been
denied audience with UP&L to negotiate the purchase of distribution; and also
rejection of wheeling a competitive power resource, namely SRVEA's Idaho Power
offer.  Another reason not to go to FERC, congress, in the Federal Power Act, put
in a special provision that allows FERC to scrutinize an applicant as to being a
"distribution" utility.  That is, a utility that currently has the ability to
distribute power to its customers.  This requirement is not in the antitrust laws,
therefore UP&L may try to tie SRVEA up on this issue even though Mr. Wheatley
states SRVEA may qualify under the power act.  Mr. Palmer asked how far past

Page 3:  Minutes

SRVEA meeting 12/12/95


transmission and down into distribution can SRVEA request power to be wheeled.
Mr. Wheatley stated that all the talk about retail wheeling is not going to be
worth anything if SRVEA can't obtain wheeling down to where the customer takes
power from the utility, because by definition retail wheeling is directly to the
customer.

Mr. Wheatley also stated that if UP&L were to lose the antitrust suit they would
lose big (treble damages, attorney's fees, and court costs); so there is incentive
to come to the negotiating table. Alternatively, proceedings before FERC can be
delayed and administrativly drawn out, and there are no cash refunds or damages.
Also, SRVEA can file an antitrust action relatively soon whereas it would take
approximately 4 months to prepare a filing at FERC.

Mr. Palmer asked, what SRVEA could get under the antitrust action, wheeling
through UP&L or a system purchase. Mr. Wheatley replied, "wheeling service down
to where the customer takes service".

The question came up as to a sign-up sheet for customers desiring to take power from
SRVEA. Mr. Palmer said he would contact other utilities as to their sign-up
procedures for new customers.

Mr. Wheatley agreed to draft a letter - to be reviewed by Lynn Marsing and Anton
Tonc - to be sent to Utah Power requesting wheeling of the Idaho Power offer,
without identifying Idaho Power as the resource. Mr. Wheatley agreed to draft the
letter immediately. The call terminated.

Mr. Tonc suggested UP&L's response to the request to wheel letter will be that some of
the delivery points and interconnections are loaded. Also; they will want more information
and try and draw SRVEA into a paper blizzard. SRVEA needs to be aware of this strategy.
UP&L will be testing SRVEA's metal to see just how committed they are Mr. Tonc stated.
Also he said, "The check-list we gave SRVEA years back for getting into the power business
has been completed and you have covered all the bases. You are ready to go".

Mr. Beck asked for clerification between what SRVEA gets with Antitrust vs the Idaho
Electric Stablization Act (going to the Idaho District Court). The answer was antitrust
gives SRVEA wheeling over UP&L's lines whereas the Idaho Law can order UP&L - upon proof
of unsatisfactory rates charged or service rendered - to "vacate" the electric system.
Mr. Beck suggested the Board may want to look at implementing both actions concurrently
to apply increased pressure on UP&L to get them to the negotiating table.

There was no further discussion. Mr. Palmer thanked the guests on behalf of the SRVEA
Board then called for a motion to dismiss. Mr. Stolworthy made the motion. Mr. Ward
seconded the motion.

Meeting adjourned at 3:01pm

**EXHIBIT E**

**Utilities Emphasizing
Customer Service
Above
Corporate Profits**

**Fax
Transmission**

DEPOSITION
EXHIBIT
44
SLAUGHT

☐ Please call to confirm receipt

☐ Please respond by return fax

☐ Call only if transmission is incomplete

Date: _____1/18/02_____

To: _Dr. Richard Slaughter_

Fax number: _(208) 345-9646_

From: _Carl T. Palmer_

From fax number:    (435) 628-2008

# of pages including cover page: _4_

Put any special message here.

Richard:
Per our telephone conversation.
You can reach me on my cell
(801) 209-3860

Regards,
Carl

CC: B. Huntley
    C. Wheatley



Received:  1/17/ 2;   4:42PM;      206 529 3930 => CARL FAUBER & ASSOC;   #2
81/17/2002  16:58    208-529-3938              FHC/FVS/MHE/JAFRA                 PAGE  82/83

# <u>CUSTOMER SERVICE PROPOSAL</u>

Inasmuch as Howell and Howell, Inc., hereinafter referred to as H&H, has
invested or contributed an amount in excess of $100,000 to Snake River Valley
Electric Association, Inc., hereinafter referred to as SRVEA, and inasmuch as it
appears SRVEA will soon be in a position to provide electrical service to a small
number of initial members, and in accordance with previous agreements and
understandings, H&H hereby submits the following proposal:

1. H&H will provide contract customer/member service services to SRVEA as
follows:

a. Meter Reading - H&H will read the electrical meters of SRVEA monthly in
preparation of monthly billings. H&H will not provide, own, operate, install, nor
maintain such meters. SRVEA service personnel will provide meter readings as
needed upon the replacement, removal, or installation of meters since such
readings need to be taken at the time of such activities rather than at the regular
monthly reading interval.

b. Billing and Receipting - H&H will prepare monthly bills for electrical charges
and, in a timely manner, mail or deliver the same to member/customers of
SRVEA. H&H will maintain, on its own computer equipment, the membership
database as needed for billing purposes. H&H will receive payments, provide
receipts as needed, record payments for billing purposes, and transmit payments
to SRVEA. H&H will provide telephone and walk-in service at its present location
of 2025 First Street, Idaho Falls, Idaho 83401 during H&H's normal business
hours.

c. Collections - H&H will diligently pursue collection of bills owed to SRVEA.
SRVEA will cooperate in such collection activity by providing personnel as
needed to physically disconnect and reconnect electricity from members upon
proper notice and under the policies developed and adopted by SRVEA. Any
lawsuits for collection and any collection agency fees and commissions will be at
the expense of SRVEA. The cost of uncollected accounts shall also be at the
expense of SRVEA.

2. This proposal in no way supercedes or replaces any prior agreements
between H&H and SRVEA. It is still understood that, in accordance with a prior
agreement, H&H will, beyond this proposal, have the opportunity to provide
customer services for at least two years starting with the date upon which
SRVEA has at least two hundred (200) customers taking electrical service.

<u>H&H PROPOSAL</u> TO SRVEA (Continued)

3. Compensation - H&H shall be compensated by SRVEA at rates which are lower than the costs identified by SRVEA for other electrical suppliers. The rates for compensation shall be $0.0014 <u>per KwH for agricultural and large commercial</u> users and $0.0034 per KwH <u>for residential and small commercial users.</u>

4. It is understood that the office and personnel of H&H used to provide the services included in this contract will not be exclusive to SRVEA. Other utilities and other businesses, including Falls Water Company, Inc. will be operated from the same office and by the same personnel. It is also understood that H&H would have the right to assign this contract to another legal entity or corporation which is owned or controlled by its principals.

5. H&H stands ready to begin operating under this proposal immediately upon acceptance by SRVEA.

This proposal is submitted by Howell and Howell, Inc. this <u>17th day of February,</u> 2000.

HOWELL AND HOWELL, INC.

By _____
      Kelly D. Howell, President

The above written agreement is hereby accepted by Snake River Valley Electric Association, Inc. on this _____ day of _____, 2000.

SNAKE RIVER VALLEY ELECTRIC ASSOCIATION, INC.

By_____
    Dell Ray Holm, President

*[handwritten: Need page that describes the Service]*

# In one deal, Idaho Falls Power recoups 18 months of losses

By MATTHEW EVANS
Post Register

Idaho Falls Power will rake in a whopping $11.5 million, thanks largely to city residents turning off their lights.

From May until the end of August, Idaho Falls Power customers cut their energy usage by about 2 percent compared with the same period last year, allowing the city to sell more power — at then-sky-high wholesale prices — to the Utah Associated Municipal Power Systems, a consortium of municipal utilities.

"Conservation made this city $11.5 million," said Idaho Falls Power Manager Mark Gendron.

The windfall has its roots in a 1996 deal, in which Idaho Falls Power agreed to buy 30 megawatts of extra energy from the Bonneville Power Administration, the federal hydropower system.

The city this year agreed to send that extra power to UAMPS instead of trading it or selling it to utilities around the West. The consortium, of which Idaho Falls is a member, bought more power than other utilities have in the past and paid about 15 times more for it because of the volatile power market.

In September, UAMPS returned the power to Idaho Falls Power, as the other utilities always have so the city has plenty of power to keep up with the high demand in winter. But by then, power prices had dropped, so the city-owned utility came out $11.5 million ahead.

"Some would call it good management; some good decisions and some good fortune," Gendron told City Council members on Monday. "Whatever it was ... we have been able to offset a great deal of the losses over the last 18 months."

Despite the profits, which "exceeded any expectations," ratepayers will not see their power bills shrink any time soon, Gendron said.

Gendron said Idaho Falls Power's rates won't go down until BPA's rates go down. BPA raised its wholesale rates by nearly 50 percent this year, forcing the City Council to raise electric rates by 25 percent in July.

The money will be deposited into the utility's reserve funds, which were depleted by last year's skyrocketing power costs.

The reserve funds topped out at $21 million in June. The reserves bottomed out at $10 million in October, as city officials used the money to insulate ratepayers from rising electricity costs before

See POWER, Page A19

**EXHIBIT F**




**Enron Capital & Trade Resources Corp.**
121 SW Salmon. 3WTC0306
Portland. OR 97204

June 30, 1999


PLAINTIFF'S EXHIBIT
1134

<u>**VIA FACSIMILE – (208) 529-8361**</u>

Snake River Valley Electric Association
Del Ray Holm, President
Snake River Valley Electric Authority
13586 North 45th East
Idaho Falls, Idaho 83401

      **Re:** **Power Purchase and Sale Agreement dated as of February 27, 1997**

Ladies and Gentlemen:

      This letter will serve as notice of termination of the Power and Purchase Sale Agreement ("Agreement") dated as of February 27, 1997 by and between Enron Power Marketing, Inc. ("EPMI") and Snake River Valley Electric Association ("SRVEA").

      Pursuant to Section 1.3 of the Agreement, EPMI has the option, effective upon notice to SRVEA, to terminate the Agreement at any time prior to the date on which SRVEA is legally and physically able to sell power to its members/owners. SRVEA does not currently have the legal and physical ability to sell power to its members/owners. EPMI accordingly hereby exercises its option to terminate the Agreement without further obligation or liability to either EPMI or SRVEA.

      Thank you for your interest in pursuing business opportunities with EPMI.

                Very truly yours,

                Bradley A. Richter
                Vice President

1205

**Natural gas. Electricity. Endless possibilities.**