

ORIGINAL

David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich  (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 328-3131

Mary S. Hobson (ISB #2142)
Erik F. Stidham (ISB #5483)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho  83702-5958
Telephone:  (208) 389-9000

Attorneys for Defendant
PacifiCorp

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>PACIFICORP (including UTAH POWER & LIGHT, a division),<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALAN G. LANCE, Attorney General,<br><br>Defendant-Intervenor. | Case No. 96-308-E-BLW<br><br>**MEMORANDUM IN SUPPORT OF PACIFICORP'S MOTION IN LIMINE TO STRIKE DR. RICHARD SLAUGHTER'S REPORT, TO PRECLUDE ANY TESTIMONY BASED THEREON AND REQUEST FOR HEARING** |

## I. INTRODUCTION

Dr. Richard Slaughter's damages analysis, first served on PacifiCorp on March 8, 2002, has been "revised" or "updated" numerous times. Despite his best efforts, however, Dr. Slaughter cannot hide the fact that he is not qualified to testify about hypothetical lost sales in the electric power spot market and his methodology for calculating Snake River's damages is unreliable because it is based upon numerous unsupported and unsupportable assumptions and fails to account properly for the costs associated with the alleged spot market sales. Finally, the prejudicial effect of the New Slaughter Report substantially outweighs any probative value it may add to this case.

For all these reasons, the Dr. Slaughter's damages analysis and any testimony or argument based thereon should be stricken in limine.

## II. STATEMENT OF FACTS

In February 1997, Snake River entered into a Power Purchase and Sale Agreement with Enron, ("the "Enron Contract") which was a wholesale supplier of electricity. The expressly stated intent of the parties for entering into the Enron Contract was "to provide power to [Snake River] for resale to Snake River's Members. . . ." Enron Contract Art. 1.4. (emphasis added). Because Snake River did not want to be forced to purchase and Enron did not want to sell any power that Snake River could not resell directly to its members, a condition precedent was inserted into the Enron Contract stating that Snake River would not be obligated to purchase (and Enron would not be obligated to sell) any electric power under the Contract unless it was first able to secure all wheeling agreements necessary for Snake River to "resell such power to Snake River's Members and transmit such power to Snake River's Members from the Point of Receipt to Snake River's Members as contemplated in this Agreement." *Id.* at Art. 1.3.

"The first formal effort by Snake River to secure wheeling services after it had obtained the right to purchase power from Enron was made on June 9, 1997." Memorandum Decision and Order ("Memo Decision and Order"), January 21, 1999, at 5. On that date, Snake River sent a letter to PacifiCorp requesting wheeling arrangements that would allow Snake River to wheel power to "new" members that were not currently being served by PacifiCorp. *Id.* PacifiCorp acknowledged this request by stating that it expected to be able to provide the services requested by Snake River. *Id.* at 6. Despite PacifiCorp's numerous subsequent reminders to Snake River that it had not yet submitted the necessary application for wheeling services, and even an offer by PacifiCorp to assist Snake River with the application process, "Snake River never submitted such an application or otherwise responded to the letter." *Id.* Instead, Snake River again categorized PacifiCorp's conduct as a refusal to wheel power in violation of antitrust law. PacifiCorp moved for summary judgment on the ground that it could not have refused to wheel power to Snake River because Snake River had never submitted the necessary application for such services. This Court agreed with PacifiCorp, holding that "PacifiCorp has demonstrated as a matter of law that it has not refused to provide wheeling [to "new" customers] and would consider Snake River's application when properly submitted." *Id.* at 8. Because Snake River failed to secure the necessary wheeling arrangements with PacifiCorp, Enron terminated its contract with Snake River.

On February 7, 2002, after remand from the Ninth Circuit, this Court again granted PacifiCorp partial summary judgment. In that order, the Court dismissed all but one of Snake River's antitrust claims, and limited the damages available under that claim. *See* Memorandum Decision and Order, filed Feb. 7, 2002.

Having had the bulk of its claims dismissed, and any potential damages stemming from its one remaining retail wheeling claim limited to the timeframe preceding December 8, 2000,

Snake River advanced a new theory of damages on March 8, 2002 that raised the claimed

damages to $270 million after trebling. Since then, Dr. Slaughter has revised and/or

supplemented his report four times. In essence, Dr. Slaughter's theory suggests that if

PacifiCorp had not refused to wheel power to Snake River's members in 1997, Enron would not

have cancelled its power supply contract with Snake River and Snake River could have become a

power wholesaler realizing enormous profits by selling on the spot market.

## III. ARGUMENT

## A.     The Court Acts as a "Gatekeeper" to Keep Unreliable Expert Testimony Out of the Courtroom.

Rule 702 places a "gatekeeping" responsibility on federal trial courts requiring them to

assess both the qualification of experts and the reliability of the experts' opinions. *See Daubert*

*v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 589-95 (1993); *see also Kumho Tireco Ltd. v.*

*Carmichael*, 526 U.S. 137, 152 (1999). In *Daubert* and its progeny, the courts have outlined

several key factors which trial courts should consider when assessing the reliability of the

methodology utilized by an expert. Those factors include:  (i) whether the expert's proposed

testimony grows naturally and directly out of the expert's non-litigation research; or whether the

expert developed his or her opinion expressly for the purpose of testifying; *see, e.g., Daubert v.*

*Merrill Dow Farm*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); (ii) whether the expert has

unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *see General*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); (iii) whether the expert has adequately accounted

for obvious alternative explanations, *see Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1999);

and (iv) whether the expert is exercising the same degree of care in testifying as he or she would

exercise in his or her professional work outside the context of paid litigation consulting. *See*

*Sheehan v. Daly Racing Forms, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997), *Kumho Tire*, 526 U.S. at 152; *see also* Fed. R. Evid. 702, Adv. Comm. Notes.

As discussed below, Dr. Slaughter is not qualified to testify about hypothetical lost sales in the spot market and his methodology for calculating damages is unreliable. Consequently, Dr. Slaughter's Report in its entirety should be stricken and any testimony related thereto should be precluded in limine.

**B.     Dr. Slaughter Is Not Qualified to Testify About Hypothetical Lost Sales in the Spot Market**

It is well settled that an expert witness may only testify within his particular field of expertise. *See, e.g., U.S. v. Ledesma*, 2000 U.S. App. LEXIS 2061; *10-11 (10th Cir. 2000), (chemists and toxicologists trained to determine the presence of toxic substances not qualified to testify as to the psychological or pharmacological effects of methanphetamines); *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (psychologists not qualified to testify as to the cause of plaintiff's alleged brain damage because she was not "an expert in the field of medicine or toxicology"). Thus, under Rule 702, the trial court must exclude testimony offered by an expert that falls outside their expertise.

Here, Dr. Slaughter may arguably be an expert economist, but he is not an expert in the calculation of damages associated with lost hypothetical sales in electricity power markets. Indeed, Dr. Slaughter clearly had little or no experience with electric power trading markets before this litigation. For Example:

- Dr. Slaughter asserts that the Mid-C market is a virtual market in which there can be delivery "anywhere on the BPA system." In reality, however, the Mid-C market is a physical market in which power is both purchased and sold at specific geographic locations. Affidavit of G.Rey Reinhardt, IV In Support of PacifiCorp's Motion In Limine To Strike Dr. Richard Slaughter's Report And To Preclude Any Testimony Based Thereon And Request For Hearing ("Reinhardt Aff."), Ex. D (Lauckhart Report) at 18.

- Dr. Slaughter asserts that Snake River would sell hourly day-ahead firm power. In reality, however, there is virtually no market for such a product and no published index upon which to price it. *Id.* at 21-22; *see also id.*, Ex. A (Hagen Report) at 3-4.

- Dr. Slaughter asserts that the Mid-C price index is an adequate proxy for the product he assumes Snake River would have sold. In reality, however, the Mid-C price index severely overestimates by the prices PacifiCorp could have obtained for the hourly, day-ahead firm power Dr. Slaughter assumes Snake River would have sold. Reinhardt Aff., Ex. A (Hagen Report) at 4.

- Dr. Slaughter assumes that there were no transmission limitations in getting power delivered from the Enron Contract points of receipt in southeastern Idaho to the Mid-C market. In reality, however, Snake River's ability to get transmission from those points of receipt to the Mid-C would have been spotty at best. *Id.*, Ex. D (Lauckhart Report) at 19.

- Alternatively, Dr. Slaughter assumes that Enron would have engaged in selective resales of excess power on behalf of Snake River in the Mid-C market for a minimum fee. In reality, however, without a separate agreement to that effect, Enron would not have engaged in selective sales on behalf of Snake River because those sales would bear market risk that — according to Dr. Slaughter's theory — would fall entirely on Enron. *Id.*, Ex. C (Jones Report) at 2-3.

- Dr. Slaughter asserts that by selling power in the hourly, day-ahead "market," Snake River would face no market risk. In reality, however, all sellers, regardless of the product being sold, face market risk unless they take precautions to mitigate that risk through risk-management techniques that Snake River does not employ. *Id.* at 3-4.

- Dr. Slaughter asserts that Enron would have sold power to Snake River for resale in the spot market up to the contract maximum based upon his interpretation of the buyer failure provision in the Enron Contract. In reality, however, buyer failure provisions in power sale agreements are not interpreted to obligate the seller to "take back" unused energy below the contract maximum and resell it on the buyer's behalf or to allow the seller to resell such unused power. Rather, such provisions exist to force parties to perform as stipulated in the contract. *Id.* at 3-4.

- Dr. Slaughter asserts that Snake River could have made spot market sales for transaction costs of only 2%. In reality, however, transaction costs for the type of sales Dr. Slaughter describes would have been significantly higher. *Id.*, Ex. D (Lauckhart Report) at 23-24.

In short, a fundamental understanding of the complexities of the power market is essential to a reliable opinion as to damages resulting from lost sales in those markets. As the

above examples illustrate, and as discussed in more detail below, Dr. Slaughter simply does not have the requisite expertise to form a reliable opinion in this area. His opinions regarding lost spot market sales and Snake River's damages related thereto should be excluded.

## C. The Methodology Dr. Slaughter's Used to Calculate Snake River's Alleged Losses is Not Reliable

Trial courts must insure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *Kumho Tire*, 526 U.S. at 141. The determination of whether proposed testimony is reliable "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The proponent of the expert testimony has the burden of proving that the methodology underlying such testimony is valid. *See id.* at 592, n. 10; *see also Boujaily v. United States*, 483 U.S. 171, 175-76 (1987). Snake River cannot meet this burden.

### 1. There is No Foundation for Dr. Slaughter's Assumed Growth Rate

One of the single largest departures from scientifically supportable methodology in Dr. Slaughter's damages analysis is his assumption that inexplicably, on 17 May 1998, Snake River's membership would grow by an incredible 243%, then flatten out and remain static for the remainder of Snake River's 5-year contract with Enron. In conclusory fashion, Dr. Slaughter explains the rationale for this assumed growth by stating, "The Enron contract presumed growth following the first year of operation, two to three times the first year load during peak months. . . . [F]irst year load is indicative of the load factor that would have been realized in had the contract become operational and the expected second year demand base thereby been realized." See Reinhardt Aff., Ex. G, (Slaughter Report, June 21, 2002 Revision ("June Report")) at

p. 6. Dr. Slaughter, however, does not attempt to explain: (1) what investigation he did not confirm that Snake River's dream membership growth rate could have been realized; (2) why the "load ratio" for the first year is indicative of the "load ratio" for years two through five; (2) what investigation he did to determine that the first year load is indicative of future loads; (3) why that "load ratio" is an appropriate basis for developing a "scale factor" to apply to actual energy hypothetically consumed in years two through five; and (4) why these hypothetical customers (or hypothetical additional loads) would have load characteristics large enough to cause energy consumption to jump 243% in year two and then flatten to 0% in years three, four and five.

He does not attempt to do so, of course, because (1) he has done no investigation to support his assumed growth rate and (2) there is no scientific basis for the rate he has chosen. Indeed, Dr. Slaughter acknowledges that any assumed growth rate would be based on pure speculation. *See* Reinhardt Aff., Ex. E (March 19, 2002 Slaughter Depo. ("March Depo.")) at 85:11-86:7. Thus, by his own admission, Dr. Slaughter has unjustifiably extrapolated from an accepted premise (some growth may have occurred) to an unfounded conclusion (a 243% growth rate). This Court should exclude any testimony based on this unwarranted leap of illogic. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## 2.   There is No Foundation for Calculating Snake River's Alleged Damages Using a Simulated "A" Rate

A second fundamental flaw in the methodology Dr. Slaughter used to calculate Snake River's alleged damages is his use of a "Simulated A Rate."[1]  Under generally accepted economic practices, a calculation of losses like that performed by Dr. Slaughter would compare

---

[1]   Under PacifiCorp tariffs, irrigation customers may choose from among three different rates reflecting three different levels of interruptability. Under Rate A, which is the most expensive rate, PacifiCorp provides uninterruptible service. Under Rate C, which is the least expensive, PacifiCorp provides interruptible service. The service and price under Rate B falls in between that of A and B.

what Snake River members actually paid to what they would have paid in a "but for" world in which the alleged anti-competitive actions did not take place. *See* Reinhardt Aff., Ex. B (Revised Supplement to the Expert Report of Adam Jaffe, dated August 15, 2002), at 10. Dr. Slaughter, however, does not follow this generally accepted practice. Instead, Dr. Slaughter compares what would have been paid in the "but for" world to an existing tariff rate that Snake River members did not elect to utilize. Dr. Slaughter justifies this assumption as necessary to make an "apples-to-apples" comparison stating: "it can be presumed that customers would prefer firm power to interruptible power, and that the difference between the A and C rates represents the opportunity cost to irrigators of power interruptions." *See* Reinhardt Aff., Ex. H (Slaughter Report, March 8, 2002 version ("March Report")) at 7. (Emphasis added.) Dr. Slaughter asserts that his approach is "consistent with standard economic practices for this purpose." *Id.*

Since the goal of any damage calculation is to estimate the harm incurred by customers, it may be economically appropriate to include some amount in the damages calculation to reflect the greater value to the customers of firm electric service. But Dr. Slaughter has performed no analysis to estimate the magnitude of this benefit. Indeed, he admits: "It can be argued that discount in the C rate was larger than was necessary to obtain . . . the required change in behavior, and I wouldn't dispute that." *See.* Reinhardt Aff., Ex. E (Slaughter's March Depo.) at 89:6-90:13. And there is certainly no evidence that the true opportunity cost associated with the firm electric service is the difference between Rate A and Rate C. Indeed, if that were true, a significant number of Snake River members would have chosen to use the supposedly superior firm service at the higher rate. But, as Dr. Slaughter concedes, that is not the case. *Id.* at 71:9-18; 73:1-5. Instead, nearly all of the irrigators chose Rate C. *Id.* This fact alone implies that, contrary to Dr. Slaughter's assumption, the value to the customers of firm service is not as great as the difference in the tariff rates that Dr. Slaughter has included in his damages. *See* Reinhardt

Aff., Ex. B (Jaffe Supp.) at 11.  Regardless, Dr. Slaughter has failed to perform any analysis to support use of a "Simulated A Rate" in his damage calculations.  *See* Reinhardt Aff., Ex. E (Slaughter March Depo.) at 89:6-90:4.  That failure precludes admission of any report or future testimony related to damages calculations made using that simulated rate.

## D.    Dr. Slaughter's Damages Analysis and Proposed Testimony related to Lost Spot Market Sales is based on Subjective Belief and Speculation

A third fundamental flaw in Dr. Slaughter's damages calculation is the inclusion of lost hypothetical sales in the spot market.  "Expert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict, and therefore is inadmissible as evidence under Rule 702."  *Bromley v. Garey*, 132 Idaho 807, 811, 979 P.2d 1165, 1169 (Idaho 1999) (emphasis added); *see also JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, *5 (E.D. Pa.) ("Expert testimony that is based on speculation or unrealistic assumptions is not helpful.").

The aversion of courts to speculative expert testimony is particularly pronounced in the context of claims for lost profits.  To recover lost profits, a Snake River must prove its damages with "reasonable certainty."  *Cuddy Mountain Concrete Inc. v. Citadel Const., Inc.*, 121 Idaho 220, 225, 824 P.2d 151, 156 (Idaho Ct. App. 1992).  "The test for reasonable certainty has been held to be a requirement that damages be taken out of the realm of speculation."  *Id.*  This test is especially difficult for a plaintiff like Snake River to meet when "the alleged loss of profits occur out of collateral or subordinate agreements arising or entered into subsequent to the primary contract in question."  22 Am.Jur.2d Damages, Sec. 61-62, p. 93- 97.  Thus, prospective profits hoped to be derived from a business that is not yet established but merely in contemplation ordinarily are too speculative to be recoverable.  *Clark v. International Harvester Co.*, 99 Idaho 326, 346-47, 581 P.2d 784, 804-05 (Idaho 1978).

Here, Dr. Slaughter's opinion regarding lost spot market sales is based entirely on speculation and unsupported assumptions. Specifically, to include hypothetical lost spot market sales in his calculations, Dr. Slaughter had to assume that:

- Enron would have supplied electricity to Snake River for resale to non-members;

- Enron would have arranged wheeling to other locations at Snake River's direction for little or no cost to Snake River (and at significant loss to Enron);

- Snake River intended and was prepared to enter the spot market sales business;

- Snake River could meet the creditworthiness requirements necessary to enter the business;

- There were no transmission limitations that would preclude sales into the Mid-C market; and

- Snake River, which had never before made, nor attempted to make, sales of power to non-members, would have made substantial profits from uncertain and unidentified sales on the spot market to nameless non-members under the most ideal market conditions without significant risk or substantial cost.

### 1. Snake River Can Only Speculate that Enron Would Have Provided It With Power For Resale

Dr. Slaughter has calculated Snake River's damages based upon the assumption that, but for PacifiCorp's alleged refusal to wheel power, Enron would have provided Snake River with the maximum amount of power contemplated by the Enron Contract. This conclusion is unreasonable and speculative given (1) Enron's historical contracting practices; (2) the parties stated agreement that the purpose of the Enron Contract was to provide Snake River with electricity for resale to Snake River's members; and (3) Snake River's material breach of the warranty provisions in the Enron Contract.

### a. Based on Enron's Historical Contracting Practices, Enron Would Not Have Provided Snake River With Power For Resale To Non-Members On the Spot Market

Under Dr. Slaughter's analysis, Snake River would not have taken power in excess of member needs if the cost of the power had been greater than spot market prices. That being the

case, Enron would have made no effort to acquire power for delivery to Snake River in excess of member needs. *See* Reinhardt Aff., Ex. D (Lauckhart Report) at 11. However, according to Dr. Slaughter's analysis, if on any hour or day, the spot price for power jumped above the price in the Contract, then Snake River would have jumped its power take to the maximum. *Id.* This would have left Enron in the undesirable position of having to purchase power to supply Snake River in that same wholesale spot market Snake River would turn around and resell the power into. *Id.* By definition, this would have created significant economic losses for Enron which history shows Enron would not have allowed to happen. *Id.*

According to Dr. Lauckhart, an expert with over 25 years experience, in other instances where Enron had contracted to sell power for delivery to end use customers and where the contract turned out to be uneconomic, Enron moved aggressively to unwind the arrangement. *Id.* For example, in November of 1998 Enron interpreted its contract to allow it to back out of an arrangement to sell power to Palm Springs Energy Services for resale to Palm Springs residents when the deal was perceived to be uneconomic. *Id.* Similarly Enron turned numerous customers back to their local utility provider in California when volatile wholesale spot markets made the arrangements uneconomic. Enron, for example, turned SBC (Pacific Bell) and 7-Eleven back to their utility providers during the period of dysfunctional energy markets. *Id.* In these cases, Enron went well beyond prohibiting spot market resale. Enron was no longer even providing the energy used for serving retail load. *Id.* Given this history, and the contractual provisions discussed above that Enron could have used to avoid doing so, it is simply implausible to assume that Enron would have provided power for Snake River to resell on the spot market and absorbed the huge attendant losses.

///

**b.      Enron Was Not Obligated To Provide Snake River With Power For Resale To Non-Members On the Spot Market**

The expressly stated intent of the parties when entering into the Enron Contract was to enable Snake River to purchase electric power from Enron "and resell such power to Snake River's individual members/owners ("Snake River Members")." Art. 1.4 (emphasis added). The Enron Contract does not obligate Enron to supply Snake River with any electric power that Snake River intended to resell in the wholesale market. Nevertheless, Dr. Slaughter simply speculates that Enron would have done so, even though this use of the power by Snake River falls outside the stated purpose of the Enron Contract. Dr. Slaughter has provided no basis for this assumption and, in fact, admits that he did not contact anyone at Enron concerning his report or the underlying assumptions in it. *See* Reinhardt Aff. Ex. F (August Slaughter Depo.) at 21:6-8.

**c.      Snake River Breached Material Warranties In the Enron Contract**

Article 5.1 of the Enron Contract contains Snake River's warranty to Enron that as of February 27, 1997, Snake River was "duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and it has the legal right, power and authority and is qualified to conduct its business . . . ." This representation by Snake River, labeled by the parties as being "a material inducement" to entering into the contract, was false. As of December 2, 1996, Snake River had "forfeited its corporate powers or its right to do business in the State of Idaho. . . ." It was not until August 1997, six months after executing the Enron Contract, that Snake River was reinstated. The assumption by Snake River, therefore, that Enron would have provided power to Snake River but for the alleged refusal of PacifiCorp to provide wheeling services is highly speculative. There is absolutely no basis or evidentiary support for the assumption that Enron would have provided Snake River with any power under the Enron

Contract for Snake River to sell into the spot market once it learned of Snake River's misrepresentation.

### 2.    Snake River Had No Genuine Intent to Enter the Market or a Preparedness To Do So

In the Ninth Circuit, "a potential competitor has standing [to recover antitrust damages] if he can show a genuine intent to enter the market and a preparedness to do so." *Bular v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985). Snake River cannot make this showing.

As a preliminary matter, Snake River's Articles of Incorporation, which permit it to sell power to its members only, disprove any genuine intent to enter the spot wholesale market. Further, Snake River took absolutely no steps to prepare itself to enter that market. Section 205 of the Federal Power Act, 16 U.S.C. § 824d, Rules 205 and 207 of FERC's Rules of Practice and Procedure, 18 CFR §§ 385.205 and 285.207, and Section 35.12 of FERC's Regulations, 18 CFR § 35.12, set forth a regulatory process for obtaining necessary authorizations, approvals, and certificates that an entity must have in order to enter the wholesale sales market. Snake River not only failed to apply for such approvals, it failed to even investigate what the approval process was. *See* Affidavit of Mary Hobson in Support of PacifiCorp's Motion to Strike Plaintiff's Expert Witness Disclosure of Richard A. Slaughter filed March 25, 2002 ("Hobson Aff."), Ex. N (Palmer Depo.) at 173:14-179:17. Further, Snake River did not perform any analysis of the facilities or equipment it would need to enter the business, let alone take steps to procure those facilities or equipment. *Id.* Indeed, just five months ago, neither Mr. Palmer, Snake River's electric utility consultant and 30(b)(6) witness, nor Mr. Holm (Snake River's President, board member and 30(b)(6) witness) knew what the day-ahead market was. *Id.* at p.171:8-174:1; Hobson Aff., Ex. O (Holm Depo.) at 50:5-53:23. Dr. Slaughter erred in ignoring these facts and

assuming Snake River intended to enter the spot market trading business and was prepared to do so.

### 3.    Snake River Could Not Meet the Creditworthiness Requirements Necessary to Enter the Market

Although Dr. Slaughter's damages analysis implicitly assumes otherwise, according to Dr. Laukhart, Snake River would have had significant difficulty meeting the creditworthiness requirements for trading in the spot market. *See* Reinhardt Aff., Ex. D (Lauckhart Report) at 14-17. The key participants in the energy trading business all have risk-management operations that include credit policies. *Id.* These participants do not conduct business with other entities except in accordance with these risk management policies. *Id.* Their evaluation of the creditworthiness of a potential customer is based upon its financial strength and ability to pay. *Id.* Further, the credit limit awarded to a customer is based upon the assessment of external credit rating(s) (if in existence) and an evaluation of financial statements.

In order to buy or sell power in power markets, Snake River would have had to meet this type of creditworthiness requirement. *Id.* at 16. Because Snake River owns virtually no assets, does not have a credit rating from one or more of the three rating agencies, and has no substantial financial statements, it would have been difficult for Snake River to demonstrate the requisite creditworthiness. *Id.* at 16-17. To do so, Snake River would have had to obtain a sizeable letter of credit. *Id.* That, in turn, would have required Snake River's members to post as collateral sufficient cash or first claims on assets to off-set the risk of Snake River's non-performance. *Id.* at 17. Snake River also would have had to pay a maintenance fee for the letter of credit. *Id.* Dr. Slaughter did not even investigate let alone adjust his damages analysis to account for these creditworthiness obstacles.

///

**4.    Transmission Limitations Would Have Prevented Snake River From Making the Kind of Sales Dr. Slaughter Assumes**

Another activity that Snake River would have needed to undertake in order to make market sales involves arranging for transmission (wheeling) services to move the power from the points of receipt in the contract (*e.g.,* southeast Idaho) to the Mid-C where Dr. Slaughter assumes the power would have been sold. Although Dr. Slaughter assumes otherwise, Snake River would have faced significant obstacles arranging for the necessary transmission service. *See* Reinhardt Aff., Ex. D (Lauckhart Report) at 17-19.

First, Snake River would have needed to understand and comply with the arrangements under which transmission owners make their transmission lines available. *Id.* at 18. As is the case with power traders, owners of transmission lines generally require, in accordance with their transmission tariffs, those potential users of their transmission lines subject themselves to credit review procedures in accordance with standard commercial practices. *Id.* In addition, transmission providers would likely have required Snake River to provide and maintain in effect during the term of the service, an unconditional and irrevocable letter of credit to meet its responsibilities and obligations under the transmission tariff. *Id.* Again, it would have been difficult and time consuming (at best) for Snake River to meet these credit requirements. *Id.* In addition, transmission providers typically require a requestor to make a request for transmission service in a manner specified in the transmission tariff. *Id.* Understanding and complying with that requirement would have necessitated Snake River becoming sophisticated in that process and living with the time line associated with the tariff process.

Second, in order for Snake River to move power from southeast Idaho to the Mid-C, Snake River would have needed to use some combination of transmission lines owned by Idaho Power Company, PacifiCorp, Avista, and the Bonneville Power Administration. *Id.* at 19.

Snake River would have needed to work with more than one of these entities to get power to the Mid-C. The power would have needed to cross over transmission-constrained cutplanes, meaning that it would have been difficult, if not impossible, to get firm transmission and Snake River would have been competing with others for any firm or non-firm transmission capacity that was available. *Id.*

Third, it is highly unlikely that Snake River would have been able to get firm transmission from points in southeast Idaho to the Mid-C. Transmission bottlenecks exist across southern Idaho, in western Montana, in eastern Washington, and from Idaho to the Northwest (e.g. the Mid-C). *Id.* Therefore, Snake River would have been relegated to using non-firm transmission access to the extent it existed and would have been competing with others for access to this non-firm transmission. *Id.* Accordingly, any market sales Snake River might make would have necessarily been non-firm sales and could not have been priced at firm rates. *Id.* Dr. Slaughter made no attempt to account for any transmission limitations on the power he assumes that Snake River would have sold. In all likelihood transmission availability would have been spotty at best. *Id.*

## 5.    Snake River Cannot Prove Lost Profits By Speculating About Hypothetical Sales To Nameless Individuals and Entities

It is undisputed that Snake River has no track record selling electric power in the spot market. Snake River's claim for lost profits allegedly resulting from its purported inability to make such sales, therefore, is based entirely upon its speculation about the types and amounts of sales it might have made on the wholesale market. This was unreasonable given Dr. Slaughter's failure to consider factors such as the demand for electric power on the spot market during the time in question, who potential buyers of the wholesale electricity might have been, the ability of Snake River to market its power to those potential buyers, possible competition, and the ability

of Snake River to purchase enough power from Enron to meet customer demand. Rather than accounting for the above factors, Dr. Slaughter conveniently premised his damages calculations on the ideal market for Snake River, presuming that Snake River could sell any amount of electricity, at any time, to any buyer, at the highest price and incur only a 2% transaction cost. As discussed below, these assumptions, too, are unsupported and unsupportable.

### a. There is No Foundation for Use of the Mid-C Price Index

Dr. Slaughter assumes that Snake River would "gain" by making sales in the day ahead market at firm Mid-C prices less the prices paid to Enron under the contract. Day ahead markets, however, deal primarily with standard products and Snake River could only have sold a non-standard product. *See* Reinhardt Aff., Ex. D (Lauckhart Report) at 21-22; *Id.*, Ex. A (Hagen Report) at 3-4. Non-standard products, like Snake River's hourly product, typically sell in real time markets or through a difficult process of seeking customized bilateral contracts. *Id.* Such contracts are disfavored because the amounts are too small and vary too much for purchasers to find attractive. *Id.*, Ex. D (Lauckhart Report) at 22. As such, real-time price data would likely be more reflective of the price that would have been obtained by Snake River for the product they proposed to sell. *Id.* at 22; *Id.*, Ex. A (Hagen Report) at 4. There was no index of hourly trades made at Mid-C during the 1998 through 2000 period. According to Mr. Hagen, however, the price for real-time purchases was significantly less than the Mid-C index upon which Dr. Slaughter relies, but Dr. Slaughter failed to appreciate or account for this difference in any way. *Id.*, Ex. A at 4.

### b. There is No Foundation for the 2% Transaction Charge

Dr. Slaughter also fails to adequately reflect transaction costs of selling into spot markets. Dr. Slaughter assumes a cost of 2% to reflect an assumption of "transaction" costs. *See* Reinhardt Aff., Ex. G (June Report) at 10. Presumably, this 2% figure is supposed to reflect (a)

all scheduling coordinator costs and/or charges by third parties for performing trading activity,
(b) dollar charges entailed in moving the power from points of receipt in southeastern Idaho to
the Mid-C market (e.g. Wenatchee Washington), and (c) reductions in power amounts caused by
transmission losses that Snake River power would have experienced in moving power from
points of receipt in southeastern Idaho to the Mid-C. This 2% figure is not reliable. *Id.*, Ex. D
(Lauckhart Report) at 23.

First, it is likely that Snake River would not have found anyone to perform the scheduling
coordinator/power trading function for them because Snake River was too small with too little
power to sell. *Id.* Second, because of the ownership of transmission lines between southeastern
Idaho and Mid-C, Snake River would need to utilize transmission of at least two different
utilities in order to make market sales. *Id.* Prices for using transmission facilities are published
by transmission owners. Assuming the use of Idaho Power and Bonneville Power
Administration facilities, the charge for transmission would have been $2.92/MWH (BPA) plus
approximately $2.03/MWH (Idaho Power). *Id.* Third, transmitting power over a distance results
in a loss of energy. *Id.* at 23-24. Again, assuming Snake River power would have been
transferred over transmission lines owned by BPA and Idaho Power, the reduction in amount of
sold energy would have been 1.9% (BPA) plus 3.6% (Idaho Power). *Id.* at 24. Fourth, Snake
River would have had to pay imbalance charges. *Id.* Dr. Slaughter failed to account properly for
each of these costs and, consequently, overstates Snake River's purported damages.

**E.      Dr. Slaughter's Testimony Should Be Dismissed Pursuant to Rule 403 of the Federal
         Rules of Evidence.**

Even if some shred of evidence relied upon by Dr. Slaughter is deemed sufficiently
reliable under *Daubert*, the testimony is based largely on conjecture and unsupported
speculation, such that the prejudicial effect of such testimony would outweigh any probative

value. Rule 403 applies even where an expert's testimony would otherwise be admissible under Rule 703. *See generally U.S. v. Scavo*, 593 F.2d 837 (8th Cir. 1979). Indeed, because "[e]xpert evidence can be both powerful and quite misleading" due to the difficulty in evaluating it, courts exercise greater control over experts than over lay witnesses in weighing possible prejudice against probative force under Rule 403. *Daubert*, 509 U.S. at 595. "Scrutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 145 (4th Cir. 1994) (citations omitted). For this additional reason, the Court should strike Dr. Slaughter's report and exclude any testimony thereon.

## IV. CONCLUSION

For all of the foregoing reasons, the court should exclude the testimony of Dr. Richard Slaughter.

DATED:  August 21, 2002                   Respectfully submitted,

STOEL RIVES LLP


David J. Jordan
John M. Eriksson
Marc T. Rasich
G.Rey Reinhardt

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of August, 2002, I caused to be served the

foregoing **MOTION TO STRIKE REPORT OF DR. RICHARD SLAUGHTER AND ALL**

**OPINIONS BASED THEREON**, via U.S. Mail upon the following:

> Robert C. Huntley
> Christopher F. Huntley
> HUNTLEY, PARK, THOMAS BURKETT,
>   OLSEN & WILLIAMS, LLP
> 250 So. 5th Street, Suite 660
> P.O. Box 2188
> Boise, ID  83702
>
> Brett DeLange
> Deputy Attorney General
> 700 W. Jefferson St., Rm. 210
> P.O. Box 83720
> Boise, ID  83720-0010
>
> Charles F. Wheatley, Jr.
> Timothy P. Ingram
> WHEATLEY & RANQUIST
> 34 Defense Street
> Annapolis, MD 21401

By: _____