Robert C. Huntley, ISB No. 894
Christopher F. Huntley ISB No. 6056
Huntley, Park, Thomas, Burkett,
    Olsen & Williams, L.L.P.
250 So. 5th Street, Suite 660
P.O. Box 2188
Boise, ID   83702
Telephone: (208) 388-1230
Fax : (208) 388-0234

Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD 21401
Telephone: (410) 266-7524
Fax:  (301) 261-8699

Attorneys for Snake River Valley Electric Association

U.S. COURTS

02 SEP 11 PM 12: 52

RECEIVED___FILED
CAMERON S. BURKE

CLERK, BOISE, IDAHO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| SNAKE RIVER VALLEY<br>ELECTRIC ASSOCIATION,<br><br>          Plaintiff,<br><br>vs.<br><br>PACIFICORP (Including UTAH POWER &<br>    LIGHT COMPANY, a division)<br><br>Defendant,<br><br>STATE OF IDAHO by and through<br>    Allen G. Lance, Attorney General<br><br>Defendant-Intervenor. | Case No. CV96-308-E-BLW<br><br><br><br><br><br>**AFFIDAVIT IN RESPONSE TO**<br>**PACIFICORP"S DAUBERT MOTION**<br>**REGARDING RICHARD SLAUGHTER**<br>**AND**<br>**SUPPLEMENTAL EXPERT REPORT**<br>**OF**<br>**WHITFIELD A. RUSSELL** |

311

# Affidavit in Response to
# PacifiCorp's Daubert Motion
# Regarding Richard Slaughter
# And
# Supplemental Expert Report
## of
# Whitfield A. Russell

I have been asked by the attorneys for Snake River Valley Electric Association ("SRVEA") to review and comment upon the expert reports prepared in behalf of PacifiCorp by Adam Jaffe, David E. Hagen, Scott T. Jones and J. Richard Lauckhart. The results of my review are contained in this Revised Supplement to my earlier Expert Report. Although Mr. Jaffe has previously prepared an expert report related to this proceeding, the other experts have not previously appeared and are at this time presenting new reports.

A common thread running through all of these reports is a critique of the assumptions used in Dr. Slaughter's damage study related to the claims for damages arising from the potential resale of power by SRVEA under the terms of the SRVEA/Enron contract. Dr. Jaffe raises issues related to the proper method of estimating damages and then purports to correct "errors" in the damage study of Dr. Slaughter. The reports of the remaining experts seek to call into question the ability of SRVEA to resell power under the contract and, failing to resolve the matter at that level, to raise a myriad of issues that they contend would lower the estimated value of the power and thereby reduce the damages claimed by Dr. Slaughter. I will address the issues that have been raised in light of my experience in preparing damage estimates as well as my experience in negotiating and litigating bulk power contracts in the electric utility industry for more than 30 years.

## I.    The Inclusion of Market Sales Up to the Maximum Monthly Contract Quantity is a Proper Element of the Damages

In light of the attack by PacifiCorp related to the resale of power under the SRVEA/Enron contract, I revisited that issue. After comparing the SRVEA/Enron contract to the new round of expert reports, I got the impression that the PacifiCorp witnesses are either not reading the same SRVEA/Enron contract that I am reading, or else they are reading something into the contract that I have not found there.

Let me begin with a few examples.

Much of the critique is said to be founded on Section 3.3 of the contract (which is not quoted by any of the PacifiCorp experts). Section 3.3 specifies:

> 3.3 **Buyer Failure.** In the event Buyer fails to take delivery or resell the Minimum Monthly Contract Quantity or amounts of Scheduled Power, where such failure was not caused by force majeure or by Seller, Buyer shall pay Seller . . . an amount for each MWH of such deficiency equal to the positive difference, if any, between (a) the Contract Price and (b) the price at which Seller is able to sell (if at all) or otherwise dispose of comparable supplies of power in a commercially reasonable manner (adjusted to reflect differences in transmission costs if any).

Note that this section assumes the Buyer can "take delivery or resell", not just consume the Enron power. Indeed, PacifiCorp's experts cite no provision of the SRVEA/Enron contract that requires SRVEA to confine its scheduling activity or its deliveries to the amount of power needed by SRVEA's loads. And I have found no such provision.

Because the contract specifies a maximum permissible schedule and delivery for each time period of the contract term, Enron is not obligated to serve any SRVEA power needs in excess of those maximums. Thus, the contract would not be regarded as a "requirements contract" despite what Mr. Lauckhart states at page 7 of his affidavit.

This section is not concerned solely with - nor is it triggered solely by Buyer's failure to take - the Minimum Monthly Contract Quantity (as Mr. Lauckhart implies at 9). It also encompasses Buyer's failure to take any amount of Scheduled Power – including a schedule of the contract maximum - that Buyer had arranged previously. Obviously, there would be no need to impose a charge for failure to take the full schedule if such a schedule were not permitted.

Section 3.2 calls for and governs "Scheduling"[1] by SRVEA. Section 3.2 allows SRVEA flexibility in the pre-scheduling of power. It states in pertinent part that "Buyer may only schedule deliveries in integral increments of one MW per hour, not to exceed a maximum hourly rate of delivery ("Maximum Hourly Rate of Delivery") set forth on Exhibit A for the applicable Delivery Term." Section 3.2 goes on to state: "Seller agrees that it will attempt to make changes to the prescheduled quantities submitted by the Buyer if Seller deems it commercially reasonable to do so."

These and other provisions allow SRVEA considerable flexibility and allow schedules to be made in each hour in amounts up to the monthly contract demand. Over time, the amounts could equal as much as the contract demand in every hour (100% load factor). SRVEA also has an obligation to take (or pay for) a minimum level of power each month. Finally, there is an obligation on the part of the Seller (Enron) to mitigate any claims against the Buyer for power scheduled and not taken or resold and for power that should have been scheduled in order for SRVEA to reach the minimum monthly contract quantity.

---

[1] This is a function that Mr. Lauckhart asserts that SRVEA could accomplish only at great expense and with great difficulty.

Under the literal terms of the contract, SRVEA has, by agreeing to the payment of a fixed monthly demand charge, reserved the right to the power associated with this capacity in the amount up to the maximum monthly contract quantity (i.e. at 100% load factor). Obtaining such reservation rights in return for a demand charge is not unusual. Indeed, it is the custom and practice in the electric utility industry to obtain a right to take the full contract demand in every hour by agreeing to pay for the right to take energy -- whether taken or not.

Under the terms of the Enron contract, SRVEA can schedule this power either for delivery to its own load or for resale to others. As noted earlier, this right is clearly in the contract. Whether or not SRVEA or Enron anticipated reselling power at the time the contract was executed does not negate the fact that SRVEA has that right under the contract.

The contract also specifies that the primary purpose of the contract is for SRVEA to make sales to its members and that a "condition precedent" is that SRVEA must have the legal and physical ability to conduct such transactions. This is important in that - even had SRVEA wanted to convert this contract from its primary purpose (i.e., to make sales to its members) - SRVEA could not have done so by creating a sham transaction and diverting the power for other purposes. Nor do I know of any evidence that has been adduced to the effect that SRVEA could or should have taken such a course of action. SRVEA was created for the purpose of providing reliable low-cost power to its members, not as a trader of bulk power.

Mr. Lauckhart contends (at 8) that the contract contains no specific option provision. I disagree. The SRVEA/Enron contract requires SRVEA to pay a demand charge for the monthly maximum power irrespective of the maximum amount of power scheduled in that month. The strike price for taking additional energy is the energy rate specified in Exhibit A. In my experience, this format for demand payments would be regarded as a reservation charge or kind of option payment.

SRVEA reserved the right to make sales to non-members in order to reduce the cost of power to its members in accordance with its purpose of providing its members with low-cost power. Such sales to third parties reflect a well-known and accepted custom and practice in the electric utility. This custom and practice is a reflection of the fixed costs associated with bulk power supplies. That is, there are fixed costs associated with power plants, and a bulk power customer often must obligate itself to pay fixed costs in the form of demand charges without regard to the percentage of time that it purchases power. And that customer typically seeks to minimize its cost of power by making the highest possible level of purchases, thereby spreading those fixed costs over the greatest possible volume of purchases (so long as the incremental outlay for each additional purchase is recovered through the incremental revenue of each additional sale). A customer maximizes purchases either by consuming the power itself or by reselling the power to third parties. Making sales for resale (wholesale sales) to third parties has long been a practice of retail customers who install their own self-generation under the Public Utility Regulatory Policies Act of 1978 ("PURPA"). More recently, it has become common for retail customers to buy power in bulk (in lieu of self-generation) and to engage in sales

for resale (wholesale sales) in order minimize their fixed costs. Once a customer makes a commitment to buy bulk power, it has an incentive and an economic imperative to make sales. That incentive and an economic imperative flows inextricably from the buyer's commitment. Dr. Jaffe disputes this link between wholesale and retail markets (discussed at page 5 et seq. of the Revised Supplement to Expert Report). As best I can determine, his dispute is based on theoretical distinctions. In my experience, the potential for making wholesale sales is often an important factor in the selection of a power supply intended primarily for use at retail. This nexus is very often present in real-life contracting situations and practices.

In their critiques of Dr. Slaughter, the experts for PacifiCorp have wandered far away from the language of the contract. For example, Dr. Jaffe argues that SRVEA could have made some de minimus amounts of purchases for a new customer and could have transformed itself into a power marketer and proceeded to enter the bulk power transactions. Whether SRVEA was empowered to make such a transformation under its charter is a question that Dr. Jaffe does not address. The fact is that SRVEA was looking primarily to its irrigators and other retail customers to provide a stable stream of revenues to secure its obligation to Enron, and Enron attached importance to this as well. That this primary purpose was important to Enron is indicated by Section 1.4 of the SRVEA/Enron contract:

> It is recognized that Seller is willing to enter into this Agreement in reliance upon the commitment of SRVEA's Members to secure their power requirements from Buyer, either directly or indirectly, in accordance with this Agreement. Accordingly, prior to the execution of this Agreement, Buyer shall have provided Seller with agreements from each of SRVEA's members in form and substance, in the sole opinion of EPMI [Enron], acceptable to EPMI.

The ability to make sales at wholesale was a secondary (but important) consideration that hedged the possibility that retail loads would not grow quickly enough and to provide margins of incremental revenue over incremental costs that would serve to reduce SRVEA's cost of serving SRVEA's Members.

Not to be outdone by Dr. Jaffe, Mr. Lauckhart also seeks to recast the contract in a different light. After first characterizing it as a requirements contract, Mr. Lauckhart terms the contract a hybrid contract.[2] He then correctly points out that contracts terms would prevent the type of sham situation posited by Dr. Jaffe. However, he goes too far. He asserts that the contract is something different from what it is because he believes that it fails to comport with his preconceived notion of what language should be in the contract or fails to comport with his notion of the purposes served by particular contract clauses. For example, he insists that the resale rights are limited to minimum take requirements based, not upon the language in the relevant contract, but upon other contracts with which he is familiar. But, as is clear from the contract itself, and has been previously discussed, this is not what the particular contract at issue states. Even Mr. Lauckhart must hedge his representations by use of the term 'in most respects' and by the

---

[2] "The Contract at issue here is a hybrid contract." (page 8)

rather awkward phrase "is similar to like provisions[3]." The fact remains that the contract at issue is not a template for industry use. It is a negotiated contract, and the specified terms exist as they were negotiated.

Mr. Lauckhart attempts to deliver the decisive rebuttal by appealing to the expectations of the parties at the time the contract was signed. However, as previously mentioned this is not the definitive answer. In fact, rather than proving his point, many of these circumstances actually support a contrary interpretation. For example, the purported belief that all parties to the contract "would have had little expectation that spot prices would ever be significantly above the contract price for power[4]" would tend to negate any argument that Enron would have felt at risk in allowing precisely the type of resale rights that Dr. Slaughter has modeled. The fact that there is no explicit contract language that limits resale rights to contract minimums indicates this lack of concern on the part of Enron. That this right later became valuable cannot be used as a justification for retroactively applying limits which are not contained within the contract itself. Furthermore, it is my understanding that, contrary to the assertions of Mr. Lauckhart, that SRVEA did view this right as important at the time that the contract was signed.

Having considered all of this, it is surprising to me that Dr. Jaffe would fail to see the nexus between the claims for damage and the issue of wholesale power sales that could have been made but for the frustration of this contract by PacifiCorp. The value that the resale right had, even if not fully known at the time of the signing, was a valuable asset that would have been in the possession of SRVEA. The loss of this asset was a damage sustained by SRVEA. The asset could not be readily replaced by either seeking to transform this contract into a supply contract under which SRVEA would not supply power to its own loads or by SRVEA seeking to gain status as a power marketer. Thus, the inclusion of a revenue credit for power resold under the contract as a damage claim by Dr. Slaughter is appropriate.

## II.   The Use of the Mid-C Index is a Reasonable Proxy for the Value of Power Sales

Dr. Slaughter has utilized the Mid-C index as the basis for a valuation of resale opportunities for SRVEA under the terms of the contract. When dealing with a but-for scenario that would have existed in the absence of the frustration of the contract, it is difficult to determine with absolute precision the level of damages that were incurred. Therefore, it is prudent to use a measure that will reflect a realistic and reasonable proxy for the potential that existed. The use of a recognized index for the value of power meets both of these criteria. The use of a regional index does not imply that sales will be made at the point at which the index is measured but that the index reflects a good indication of the value of power within the relevant region. In my experience the use of an index to

---

[3] It would be odd if like provisions were not similar. However, the fact is that the provisions in this contract and those cited by the expert are not alike but differ in the particular language employed.
[4] It is odd that Mr. Lauckhart supports this contention by citing testimony of Dr. Slaughter who was not a participant in the contract negotiations.

price power is a common industry practice. Therefore, the use of a Mid-C index should be accepted in this proceeding.

The experts arrayed by PacifiCorp have raised numerous objections to the use of the Mid-C index for the purposes of calculating damages. Mr. Hagen posits that the mid-C is for a "standard product" and that, at times, the amount of energy that might have been made available by SRVEA to the market would have been less than the standard block size and hence should be discounted. His analysis, while calling for some adjustment downward, does not present any alternative damage calculation. It is therefore impossible to determine what impact his "adjustment" should have upon the damages calculated by Dr. Slaughter. A similar infirmity exists for his only other adjustment, the potential charges and/or credits for imbalance energy. Furthermore, as Mr. Hagen is compelled to admit, in this instance the adjustment might result in greater or lesser damages, and there is no methodology advanced by which the adjustment might be made. For these reasons, the issues raised by Mr. Hagen are speculative, unquantified and unsupported.

Mr. Jones also contests the use of Mid-C prices. His first objection is that Dr. Slaughter's research was "inadequate." However, he presents no data indicating that further research would have indicated that the index used by Dr. Slaughter varies in any significant manner from other alternative indices. He does not show any evidence that the index used is less reliable or less representative of the value of power in the region than are other indices. He merely makes an unsupported assertion. Mr. Jones' remaining criticisms relate to issues that will be discussed in subsequent portions of my report.

Mr. J. Richard Lauckhart joins the bevy of experts that raise the standard product issue. However, his treatment of the subject is rather limited and deals with the inability of SRVEA to forecast surplus power that, in his opinion, would make scheduling difficult and prohibit SRVEA from selling a standard product . (page 21-22)

The question of a standard product is not so much a pricing issue as a packaging issue. There are several obvious solutions to the packaging problem. First, if the power were made available to a power marketer with multiple sources of power, the contribution of power from SRVEA could be integrated with that from other power supplies to create the standard product. Second, had the contract been in place and with power prices rising to such high levels as historically occurred, the consumption patterns of the members of SRVEA would have been altered to reflect the reality of its market opportunities. Given that the bulk of the summer sales are to loads that have large horse-power pumps, the opportunity to engage in load management thereby creating a standard product and simultaneously lowering direct power consumption costs, as well as offsetting power costs by power sales revenue, is very great. However, rather than capitalize upon this obvious opportunity, Dr. Slaughter has taken the conservative approach of assuming that historical consumption was maintained. Thus, the estimate produced is very conservative. The fact that Dr. Slaughter did not seek to create larger sales volumes by packaging the product in accord with a standard product really understates the damage claim, rather than overstating it, as argued by the experts on behalf of PacifiCorp. I understand that Dr. Slaughter has additional comments on this issue as well.

An additional issue is whether the use of Mid-C pricing implies that the energy provided, regardless of the volume, would of necessity be traded at the Mid-C hub. My experience is that sales agreements can and do reference an index price as a basis for the value of power, but, in those sales agreements, there is no expectation that the power will be sold at the hub or be subjected to the trading rules of the hub. Such sales could range from sales of energy from a power plant, remote from the hub to sales of energy to loads which are also remote from the hub neither of which is denominated in discrete blocks of power, to sales to retail loads which neither are at the hub nor are served by power sources that make delivery to the hub. These types of arrangements neither require nor are even assumed by either party to require physical delivery at the hub nor involve any power physically flowing into and out of the hub. The use of hub pricing is a means of pricing – of creating a price transparency which serves as a proxy for the price of delivered power. I believe that Dr. Slaughter employed the Mid-C price in just such a manner when he estimated the damage claim that he produced.

### III.    Enron Must be Assumed to Have Honored its Contract

Mr. Lauckhart raises a novel concept in his expert report in an attempt to mitigate the damage claim of Dr. Slaughter. On pages 10 – 14, Mr. Lauckhart speculates that Enron would have willfully violated the terms of the contract to prevent SRVEA from competing with Enron for power sales. The reason given for this speculation is that Enron would not have stood by while SRVEA resold the Enron supply at an immense profit and changed the balance of the benefits to Enron's disadvantage.

I am aware of no evidence indicating that – at the time the SRVEA/Enron contract was negotiated - either party expected that power prices would attain the stratospheric heights they achieved in 2000-2001. No such evidence has been cited by PacifiCorp. Assuming, *arguendo*, that maintaining the benefit of the bargain was a concern to Enron, the typical response is to provide in the contract for a "re-opener" or "hardship" clause. I have found no such clause in the contract.

To assume that Enron would act in bad faith and to use this as a defense to avoid SRVEA from making claims against PacifiCorp is going far beyond the realm of reason. I am aware of Enron honoring a number of contracts that resulted in net losses both before and after it declared bankruptcy.

I feel that this testimony is filled with unsupported speculation. I will take the opportunity to demonstrate the errors in the argument advanced. Enron is a rational market participant. When deals go bad, it does try, as any party would, to mitigate its losses. However, it is limited by its contractual obligations. In his account of the situation in California, Mr. Lauckhart misstates what happens, apparently in order to bolster his weak case.

In California, retail customers were granted access to alternative energy suppliers under a program known as Direct Access. This program is unique to California and contains many elements which have no bearing upon the issues involved in this proceeding. For Mr. Lauckhart to consider the California Direct Access contracts to be the same as the SRVEA/Enron contract is not appropriate. I also believe that his characterization is inadequate in that "contractual escape clauses" in the California Direct Access contracts are not in play in this proceeding. Beyond that, although Mr. Lauckhart has selectively cited testimony made by Enron in a related proceeding, he has ignored other testimony that portrays Enron in a far different light. In the proceedings before the California Public Utilities Commission, Enron's witness indicated that the contracts were in fact not abrogated but rather Enron has merely "out-sourced" the power supply to the host utilities. And Enron took back those customers after prices fell and continued to serve them for months after filing for bankruptcy – including customers whose contracts were "below water". That is to say, Enron believed that it was continuing to honor the contracts and continued to assume responsibility for power costs necessary to serve their contracted loads – even if it meant selling the power at a loss under the terms of the contracts.

In a proceeding before the Public Utilities Commission of the State of California denominated Investigation 01-12-008; testimony and briefs were entered in behalf of Enron Energy Services, Inc and Enron Energy Marketing Corporation. In these documents, Enron lays out a case far different from that described by witnesses on behalf of PacifiCorp.

> As has been documented in other Commission proceedings, the return of direct access customers to bundled service in the winter of 2000-2001, was the result of the collapse of the PX [Power Exchange] and the UDCs' [Utility Distribution Company] failure to continue payment of the PX credit which was owing on the accounts of most direct access customers. Enron attempted to effect the return of its customers to utility commodity service while ensuring that these customers did not suffer economic harm as a result. Accordingly, during the time period which Enron's customers were receiving their commodity from the UDC, they were not paying the UDC's commodity rate. Rather they were paying the rate contracted for under their direct access contract, with Enron making up the differential. In addition, to the extent called for in the contract, Enron continued to provide other services such as energy management and efficiency. To say, as PG&E has (Opening Brief at 8) that these customers were no longer customers of Enron is incorrect. These customers were still being served by Enron. The confusion, to the extent it occurred, was, therefore, not the result of Enron attempting to mislead customers as to the source of their commodity service, but rather from the fact that customers continued to receive uninterrupted service at the same rate.[5]

The remainder of Mr. Lauckhart's characterizations of Enron do not warrant rebuttal. How Enron might have reacted and how SRVEA would have protected its contractual

---

[5] Reply Brief of Enron Energy Services, Inc. and Enron Energy Marketing Corporation, March 5, 2002.

rights are not at issue. What is at issue is the value of the contract that was frustrated by the actions of PacifiCorp.

## IV.    Points of Receipt in the Contract are not a Limiting Factor in SRVEA's resale damage claim

PacifiCorp's expert reports indicate that under the terms of the SRVEA/Enron contract, it would be necessary for all power to have been physically delivered to the specified points of receipt in the contract. That would not necessarily be the case. I recognize that in a high-priced market, Enron would have an incentive to resist any change in the point of receipt as a way to gain leverage against SRVEA in sharing some of the margins earned by SRVEA. But Enron would not necessarily exercise that leverage because it seems likely that - when SRVEA diverted power to some third parties for resale  - Enron's costs would go down if it changed SRVEA's point of receipt and that Enron would welcome such a change in the point of receipt.

In any event, this PacifiCorp interpretation of the contract is flawed in several respects. First, it is only if SRVEA had taken delivery for consumption by its Members that the contract points of delivery would be applicable. That is, the contract specified at what points of receipt SRVEA could take delivery of its power in order to serve its members' load. It is obvious that in order to take advantage of resale opportunities, SRVEA would have been required to specify alternative points of delivery. The fact that such points of delivery are not specified is used by the experts for PacifiCorp to create the impression that - in the case in which power is resold, the power would be physically delivered at the contract points of delivery and then be rerouted to an alternative point of sale. This is contrary both to the logic and to the physical operation of bulk power systems.

An additional argument is raised to the effect that historically such rerouting would not have been possible because there existed limited transmission capability to accommodate the redirected flow of power. However, this line of reasoning fails to account for the fact that the flows to SRVEA never occurred. Had such flows been scheduled in that direction, the opportunity would have been created to counter-schedule in the opposite direction. In such a case, there would be no need for additional capacity on the line since the net flow would have been zero. Moreover, if resale rights existed, no such schedules would ever have been submitted in the first place. Rather, the schedule of power from the source to the final sink would have been submitted. SRVEA would not have incurred the costs of transmission from its points of receipt to its points of delivery stated in the contract but would rather have incurred costs necessary to transmit power to the newly designated sink (loads) less the costs that SRVEA would avoid in not delivering the power to the SRVEA loads.[6] So long as Enron did not incur transmission costs greater than it would have incurred in delivering power to the specified points of receipt, Enron would impose no further costs for making resales.

---

[6] If SRVEA were taking network transmission service, its network service charges would decline in proportion to any reduction in its coincident peak demands.

## V.    SRVEA Could Have Participated in Reselling Power

The PacifiCorp witnesses offer numerous, and at times contradictory, reasons that supposedly support the notion that SRVEA could not market any power, or, in the alternative, if it did that it would incur costs that would made such attempts uneconomic. At times, the arguments assume that SRVEA would have to function as an independent power marketer, an assumption lacking support or logic. SRVEA, to my knowledge, never would have sought status as a standalone power trader. However, possessing a valuable asset in the form of its right to schedule power under the contract, SRVEA would have been able to market this right to other parties in exchange for a large share of the value of the power. Dr. Slaughter has presented a conservative claim as to the potential revenues that might have been obtained under such an arrangement.

Rather than disproving the claim that resale rights should be considered as a damage claim, this discussion merely alters the argument to one over how to value the damages. My initial expert report stated that a power marketer or other market participant might have been obtained for a fee. I presented a fee that I thought represented a reasonable estimate. I should say that this fee together with the conservative estimate of the value of the power leaves ample room for additional revenues to have been obtained by the power marketer if a more aggressive and well-managed marketing program were undertaken. The experts for PacifiCorp have mistakenly assumed that Dr. Slaughter's estimate was the ceiling for revenue recovery. However, as I have discussed in this expert report, that is not the case.

Having said that, I will address several of the points raised by the PacifiCorp experts in their reports.

A.    PacifiCorp's contention that the volume of power from SRVEA may be too small to be of any interest to a power marketer is not a valid criticism. Power marketers and other parties that can aggregate power sources in order to serve loads are often very interested in obtaining power even in very small increments. I would note that Utah Power and Light Company (UP&L) (an operating company of PacifiCorp) did exactly this in May of 2001 and actually sought the power that was being supplied in very small increments from irrigators on its system. This was attempted by use of the Irrigation Curtailment Program Rider – Electric Service Schedule No. 72. Under this tariffed rate, UP&L offered to purchase power from sources with as little as 16 kW (0.016 MW) and to pay a rate of $150 per MWH for power. See Attachment _____. I would also note that the price offered by PacifiCorp proved to be far in excess of the Mid-C price used by Dr. Slaughter is his damage study. This is yet another indicator that the use of the historical Mid-C price is a realistic and reasonable measure of the historical value of power in the region.

In addition, during periods of high demand the output from even very small units becomes increasingly important. The role played by small

QF's in California was quite important, and it is doubtful that any power marketer would have refused to deal with such a supplier, if it had the opportunity, merely because the supply was either small or varied hour-by-hour.

B.   Risk would have played a very small role during the periods in which Dr. Slaughter estimates the greatest damages for his resale damage claim. While it is true that the precise price level may have been subject to fluctuation, the prevailing prices were significantly in excess of the contract price under the contract. Thus, the risk of losses was very slight. Therefore, SRVEA would have imposed little or no risk upon its members, and a prudent power marketer could have avoided risk at little cost to either itself or SRVEA.

C.   Additional transmission costs incurred to engage in power resales are highly speculative. Dr. Slaughter has assumed that SRVEA would pay for network transmission service based upon its contract demand rather than upon its actual deliveries. Had resales occurred to another network customer within SRVEA's local area, no additional transmission costs would have been incurred. Had SRVEA engaged in sales outside its local area, it would have avoided a commensurate amount of network transmission charges and would have had funds available to pay for additional transmission costs incurred in making resales of its power. And even outside SRVEA's local area, many potential buyers of SRVEA's resold power would have in place transmission service agreements to cover part or all of the needed transmission service. Thus, Dr. Slaughter has already set aside funds for the costs of transmission that might have been incremental to making these sales.

D.   The issue of energy imbalance payments is a red herring that should be eliminated. Mr. Hagen raises the point in his expert report but fails to provide any quantification of the offset he asserts is appropriate. Until such a quantification is presented, it is difficult to determine how this issue would affect the estimates presented by Dr. Slaughter. It may be that the impact would be *de minimus* or in fact result in even greater damages since (as Mr. Hagen admits) deviations could occur in either direction resulting in payments to SRVEA as well as payments by SRVEA. Because no such analysis was performed by any party, I believe that this issue is at best an interesting theoretical question that cannot be resolved and is best left ignored as was done by Dr. Slaughter. I would only mention in passing that for a large utility with a myriad of residential and commercial customers the difficulty of making accurate load forecasts may prove difficult, as mentioned by Mr. Hagen. However, in the case of SRVEA, the large pumping loads present a more controlled load that would make load forecasting a less difficult endeavor, particularly if carried out under a prudent load management program.

E.  Mr. Lauckhart discusses principles for firms that were seeking to establish an "energy trading business." This was certainly neither the intent of SRVEA nor the purport of the SRVEA/Enron contract. It is important to note that SRVEA was not created for the purpose of becoming a power marketer but rather for the purpose of lowering the cost of reliable power to its members. If SRVEA had been foolhardy enough to have lined up one "new" retail customer and to have initiated purchases for resale under the SRVEA/Enron contract (assuming Enron would have permitted such an action), both Enron and any opposite party in a resale arrangement would have had reason to question the creditworthiness of SRVEA. Therefore, SRVEA sought to structure the contract with the primary emphasis being to serve the anticipated loads of its members and to obtain a stable revenue stream for paying Enron. However, SRVEA was aware that an important element in keeping costs to its members low was its ability to resell excess power. Therefore, this entire discussion is far removed from the issues involved in this proceeding as was previously discussed. Mr. Lauckhart also discusses "APX" standards that even he admits have no bearing on this case.[7] Moreover, once again, the discussion assumes that SRVEA was seeking to become an independent energy trader – an assumption without any basis in the record.

_____
WHITFIELD A. RUSSELL

Subscribed and sworn to before me on this 10th day of September 2002.

_____
NOTARY PUBLIC
My Commission Expires: 12/14/04

**THOMAS J. LEET**
Notary Public District of Columbia
My Commission Expires December 14, 2004

_____
[7] APX is only involved in transactions into the CA ISO, a market that no party to this proceeding has asserted would be the relevant market.

# ATTACHMENT 1

# BEFORE THE PUBLIC UTILITIES COMMISSION

## OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Investigation into the Operations and Practices of Companies Affiliated with Enron Corporation, Relating to the filing for Chapter 11 Bankruptcy of Enron Corp. and its Affiliated Entities. | Investigation 01-12-008 |

# REPLY BRIEF OF
# ENRON ENERGY SERVICES, INC.
# AND ENRON ENERGY MARKETING CORP.

GOODIN, MACBRIDE, SQUERI,
RITCHIE & DAY, LLP
Michael B. Day
Jeanne M. Bennett
505 Sansome Street, Suite 900
San Francisco, CA 94111
Telephone:    (415) 392-7900
Facsimile:    (415) 398-4321

Attorneys for Enron Energy Services, Inc. and
Enron Energy Marketing Corp.

Date:  March 5, 2002

## BEFORE THE PUBLIC UTILITIES COMMISSION
## OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Investigation into the Operations and Practices of Companies Affiliated with Enron Corporation, Relating to the filing for Chapter 11 Bankruptcy of Enron Corp. and its Affiliated Entities. | Investigation 01-12-008 |

### REPLY BRIEF OF
### ENRON ENERGY SERVICES, INC. AND
### ENRON ENERGY MARKETING CORP.

Pursuant to Rule 75 of the Commission's Rules of Practice and Procedure and the schedule established by Presiding Administrative Law Judge Wong, Enron Energy Services, Inc. ("EES") and Enron Energy Marketing Corp. ("EEMC") (collectively, "Enron") submit their Reply Brief in the above captioned investigation proceeding.[1]

## I.    INTRODUCTION

In its Opening Brief, Enron summarized the record evidence which demonstrated that Enron's bankruptcy has not had a negative impact on the continued service of electric and / or gas customers in the state, nor has it had an adverse impact on California's energy markets. Given this result, Enron suggested that it was not necessary for the Commission to take any affirmative action at this time. Rather, the Commission should postpone taking formal action until circumstances arise which warrant taking steps to protect consumers' interests.

---

[1]    Enron received opening briefs from the following parties: (1) Applied Materials, Inc.; (2) California Manufacturers and Technology Association; (3) Commission Counsel; (4) Los Angeles Unified School District; (5) Pacific Gas and Electric Company; (6) Southern California Edison Company; (7) Southern California Gas Company and San Diego Gas & Electric Company; (8) Sutter Health; and (9) University of California, California State University and Community College League of California.

Nothing in the Opening Briefs of the other parties to this investigation proceeding suggest that any other course of action is necessary. As stated by Southern California Edison Company ("SCE"), "[i]t appears that at the moment Enron is providing the ESP services required of it under the CPUC's rules and tariffs."[2]   Similarly, the California Manufacturers and Technology Association ("CMTA") expressed the view that "the testimony submitted in this proceeding, as well as experience to date, establishes that the Enron bankruptcy has not had a significant adverse consequence on retail customers, the utilities, or on energy markets in general."[3]

The most parties to this proceeding appear to be seeking by way of action by the Commission at this time is information. For example, San Diego Gas & Electric Company suggested in its testimony that the Commission require Enron to "file frequent reports with the Commission and serve those reports promptly on utilities that would indicate operational changes, contact information, organizational and structural changes, information about the relevant petition in bankruptcy, and Bankruptcy Court developments that affect the business of the Commission and its regulated entities."[4]   The University of California, *et al*, echoed this request in its brief,[5] as did Commission Counsel.[6]   Enron has committed to providing the

---

[2]   "Opening Brief of Southern California Edison Company Regarding I. 01-12-008," (February 19, 2002), at p. 2.

[3]   "Opening Brief of the California Manufacturers and Technology Association," (February 19, 2002), at p. 1.

[4]   Exh. 8 (SDG&E-Fong), p. 14; *see also*, "Opening Brief of Southern California Gas Company and San Diego Gas & Electric Company in the Commission's Investigation into the Operations and Practices of Enron" (February 19, 2002), at p. 9.

[5]   "Joint Opening Brief of the University of California and California State University and the Community College League of California," (February 19, 2002), at p. 10.

[6]   "Post Hearing Brief of Commission Counsel," (February 19, 2002), at p. 2.

Commission periodic updates on the status of its operations and bankruptcy proceedings.[7] Enron would suggest that, should the Commission impose a specific reporting obligation, that such obligation be limited to filing updates as necessary to inform the Commission as to changes in Enron's operations or organizational structure which would alter the manner in which Enron services energy customers in California.

## II.    POINTS OF CLARIFICATION

While the Opening Briefs in this proceeding do not evidence any real points of controversy between Enron and the other parties to this proceeding, Enron would use this Reply Brief to clarify a few matters for the record.

### A.    PG&E Core Gas Aggregation Service

As discussed in the Opening Briefs of Enron and Pacific Gas and Electric Company ("PG&E"), on December 7, 2001, PG&E terminated its Core Gas Aggregation Service Agreement with EES, due to EES failure to post adequate security.[8]  As a result of the termination, all EES core gas procurement customers defaulted to PG&E's bundled gas service. On cross-examination of this issue, Enron witness Blachman indicated that he believed Enron was working with PG&E to resolve the matter and that it planned to resume core aggregation services in February, 2002.[9]  Enron would like to clarify for the record that this has not occurred. The former EES core aggregation customers continue to receive bundled service from PG&E. At this juncture, Enron cannot state with certainty whether it will resume service to those customers.  Enron is, however, continuing to evaluate the situation.

---

[7]    Exh. 1 (Enron-Blachman), at p. 12.

[8]    "Opening Brief of Enron Energy Services Inc. and Enron Energy Marketing Corp.," (February 19, 2002), at pp. 5-6; "Concurrent Opening Brief of Pacific Gas and Electric Company," (February 19, 2002), at pp. 6-7.

[9]    Tr. Vol. 1 (Enron-Blachman), p. 61.

## B.    Dual Billing

Enron acknowledged that the transition from consolidated to dual billing engendered some confusion with customers, but indicated that it was in fact working with the UDCs and its customers to resolve the situation.[10]  In its Opening Brief ( at p. 3),  SCE implies that Enron may be continuing to send consolidated bills to all or some of its customers (instead of billing solely for the commodity as indicated under dual billing), and thereby continuing the customer confusion with respect to their payment obligations.  There is no intent on Enron's part to confuse its customers or to lead them to believe that Enron is still the consolidated biller of all utility charges. Rather, the type of bill which an Enron customer currently receives is dictated by the type of energy product it receives from Enron.

About thirty percent of Enron's customers receive service from Enron at a stated discount off of the utility's AB 1890 frozen bundled tariff rate (which included transmission and distribution charges).  Accordingly, for Enron's billing of the customer, the metered usage is multiplied by the frozen bundled tariff rate and the discount is then applied.[11] Given that this is the nature of the product sold, the switch to dual billing, wherein the utility bills the customer separately for transmission and distribution, has resulted in certain customers being charged for transmission and distribution twice – once from the UDC and again as incorporated within the energy product received from Enron.  In order to ensure that such customers do not actually pay transmission and distribution charges twice, Enron notified these customers that they would be receiving from the UDC charges for transmission and distribution which may also be included within the bill received from Enron. In such circumstances, Enron instructed the customer to proceed and pay the UDC for the transmission and distribution charges, deduct that amount from

---

[10]    Exh. 1 (Enron-Blachman), pp. 8-9.

4

the amount owed Enron, and provide documentation of the payment of the UDC charges with the remittance of the remainder to Enron.[12]  While such a billing method may appear confusing, it is, given the nature of the service product offered these customers, the only manner which Enron can bill these customers while continuing to provide them with what they contracted – a discount off of a bundled tariff rate.

For the remaining approximately seventy percent of Enron's customers, the switch to dual billing has eliminated transmission and distribution charges from the bill sent by Enron.  Enron has stopped receiving charges from the UDCs for transmission and distribution service on behalf of its direct access customers.  Therefore Enron does not have the data to present its direct access customers with consolidated bills.  It should be noted, however, that Enron continued to receive as late as the end of December, transmission and distribution charges from PG&E for certain direct access accounts. These charges were passed through on the Enron consolidated bill. So it is possible that certain of Enron customers received bills in January that reflected UDC transmission and distribution charges

### C.    Status as Direct Access Customers

Both SCE and PG&E assert that a certain amount of current customer confusion has resulted from actions taken by Enron last winter when it temporarily returned a vast majority of its customers in PG&E's and SCE's service territories to the UDCs for provision of commodity service.  Specifically SCE argues that "some of the customer confusion over Enron's roles and responsibilities stems from the Enron ESPs' misuse of the term 'bundled service' with customers and Enron's evident desire to lead customers to believe that, even after they returned to bundled

---

[11]    Enron would then remit the transmission and distribution charges owing to the UDC.

[12]    Tr. Vol. 1 (Enron-Blachman), p. 22, lines 20-25.  Enron will supply a copy of that notice to the Commission for the record if it so requests.

service under the UDC tariffs and are receiving commodity as well as T&D, metering and billing services from the UDC, they are still direct access customers served by Enron."

There was no intentional deceit on Enron's part. As has been documented in other Commission proceedings, the return of direct access customers to bundled service in the winter of 2000-2001, was the result of the collapse of the PX and the UDCs' failure to continue payment of the PX credit which was owing on the accounts of most direct access customers. Enron attempted to effect the return of its customers to utility commodity service while ensuring that these customers did not suffer economic harm as a result. Accordingly, during the time period which Enron's customers were receiving their commodity from the UDC, they were not paying the UDC's commodity rate. Rather they were still paying the rate contracted for under their direct access contract, with Enron making up the differential. In other words, Enron continued to honor the financial terms of the contract with the customer. In addition, to the extent called for by the contract, Enron continued to provide other services such as energy management and efficiency. To say, as PG&E has (Opening Brief at 8) that these customers were no longer customers of Enron is incorrect. These customers were still being served by Enron. The confusion, to the extent it occurred, was, therefore, not the result of Enron attempting to mislead customers as to the source of their commodity service, but rather from the fact that customers continued to receive uninterrupted service at the same rate.

Enron would also note that, contrary to assertions made by certain parties to this proceeding,[13] *all* of Enron's customers were notified as to the change in the source of their electric commodity. By letter dated early February 2001,[14] Enron informed each of its customers

---

[13]     *See* "Initial Brief of Applied Materials," (February 19, 2002), at p. 4.

[14]     *See, e.g.*, Attachment A to this Brief (letter dated February 2, 2001 to Richard Chessen of Applied Materials from Marty Gleason of Enron Energy Services informing Applied Materials that it would begin receiving its electricity supply directly from the utility).

that changes in the California energy market had made it impractical for Enron to directly supply electricity to the customer's facilities and that it had directed PG&E and /or SCE to begin supplying such electricity. In this correspondence, Enron informed the customer that the terms of the customer's contract with Enron remained in tact. Contact names and phone numbers of Enron service representatives were provided and customers were encouraged to contact these representatives if they had questions. Such correspondence was either preceded by, or followed up with, a phone call from a customer service representative.

## III.   CONCLUSION

The parties to this investigation proceeding are in agreement that the impact of Enron's bankruptcy on customers, the utilities and the energy markets in California has been minimal. Customer confusion which was generated by the bankruptcy is being dissipated as Enron continues to perform under its contracts. Enron would emphasize its continued performance under its contracts and its continued purchases in the bilateral markets to service those contracts has been critical to the lack of market disruption. If this status quo were to be disrupted through regulatory interference it could cause the type of disruption in the market which initially engendered Commission concern.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of September, 2002, a true and correct copy of the foregoing document was served on the below listed individuals by the method indicated below:

Mary S. Hobson, ISB#2142
STOEL RIVES
101 South Capitol Blvd., Suite 1900
Boise, ID 83702
**Fax: 389-9040**

___ Hand Delivered
___ U.S. Mail
_X_ Overnight Mail
___ Facsimile

John M. Eriksson, Esq.
STOEL RIVES
One Utah Center
201 S. Main St. Suite 1100
Salt Lake City, UT 84111
**Fax: 801-578-6999**

___ Hand Delivered
___ U.S. Mail
_X_ Overnight Mail
___ Facsimile

Brett T. DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
Len B. Jordan Building, Lower Level
700 West Jefferson Street, Room 210
P. O. Box 83720
Boise, ID  83720-0010
**Fax: 334-2830**

___ Hand Delivered
_X_ U.S. Mail
___ Overnight Mail
___ Facsimile

Charles F. Wheatley, Jr.
Robert C. Huntley