David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah 84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Mary S. Hobson (ISB #2142)
G.Rey Reinhardt, IV (ISB #6209)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000
Facsimile: (208) 389-9040

Attorneys for Defendant PacifiCorp

**ORIGINAL**

U.S. COURTS

02 SEP 18  PM 12: 15

CAMERON S. BURKE
CLERK       IDAHO

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFICORP (Including UTAH POWER & LIGHT COMPANY, a division),<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALLEN G. LANCE, Attorney General,<br><br>Defendant-Intervenor. | Case No. CV 96-0308-E-BLW<br><br>**AFFIDAVIT OF ADAM JAFFEE IN RESPONSE TO THE SUPPLEMENTAL AND REBUTTAL REPORT OF DR. SLAUGHTER** |

316

**AFFIDAVIT OF ADAM JAFFE IN RESPONSE
TO THE SUPPLEMENTAL AND REBUTTAL
REPORT OF DR. SLAUGHTER**

September 18, 2002

Submitted to:

STOEL RIVES LLP
201 South Main Street, #1100
Salt Lake City, Utah  84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

I       **QUALIFICATIONS**

I am a Professor of Economics and Chair of the Department of Economics at Brandeis University in Waltham, Massachusetts. Prior to joining the Brandeis faculty in 1994, I was on the faculty of Harvard University. During academic year 1990-91, I took leave from Harvard to serve as Senior Staff Economist at the President's Council of Economic Advisers in Washington, D.C. At the Council, I had primary staff responsibility for science and technology policy, regulatory policy, and antitrust policy issues and was a member of the interagency committee that drafted recommendations for reform of electricity regulation, which formed part of the basis of what eventually became the 1992 National Energy Policy Act. I have served as a member of the Board of Editors of the *American Economic Review*, the leading American academic economics journal. I am currently an Associate Editor of the *Rand Journal of Economics* and a member of the Board of Editors of the *Journal of Industrial Economics*. I also serve as Co-organizer of the Innovation Policy and the Economy Group of the National Bureau of Economic Research.

I have served as a consultant to a variety of businesses and government agencies on economic matters, including antitrust and competition issues and electricity regulation and regulatory reform. I have filed expert testimony and been qualified as an economic expert in a variety of regulatory, judicial, and arbitration proceedings, including filings before the Federal Energy Regulatory Commission ("FERC") and public utility commissions in a number of states. At Brandeis and Harvard, I have taught graduate and undergraduate courses in microeconomics, industrial organization, and the economics of antitrust and regulation. A true and accurate copy of my *curriculum vitae* is attached as Attachment A. I am being compensated for my work in this case at a rate of $600 per hour.

2

## II    BACKGROUND AND OVERVIEW

I have been asked by attorneys for PacifiCorp to prepare a response to certain aspects of the Supplemental and Rebuttal Report of Dr. Richard Slaughter.[1]   In this response, I focus only on certain aspects of this report that misrepresent or distort my earlier reports in this case.

In my judgment, each permutation of Dr. Slaughter's damage calculation method in this case has violated important principles of economics and logic.  Once these errors are corrected, it is clear that there can be no damages awarded in this case.  In Dr. Slaughter's most recent report, rather than reconfiguring his calculation method one more time to skirt the numerical and methodological corrections presented by me and other witnesses of the Defendant, Dr. Slaughter introduces a litany of irrelevant and/or incorrect factors.  Apparently Dr. Slaughter believes that even if his calculations are in error, the Court should accept them based on the fact that he *could have* inflated damage estimates even further.

I again must reiterate, as I have done in each of my previous reports, that (1) I do not believe there is any antitrust injury in this case, and (2) to the contrary, the actions of PacifiCorp that are alleged by the Plaintiff to be anticompetitive were fully consistent with federal and state regulatory policy, and were economically reasonable within PacifiCorp's market and regulatory context.  Nonetheless, PacifiCorp has asked me to continue to review Dr. Slaughter's method and calculations for the Court's review in the event that it finds antitrust injury in this case.  In order to evaluate Dr. Slaughter's methods and assumptions, I relied on my training and expertise as an economist and expert on public utility regulation and on the operation of electricity markets, and my personal knowledge and experience in the field of federal antitrust policy and precedent.  In this report I reiterate the appropriate economic basis for a damage estimate, and compare this against the "new" information presented in Dr. Slaughter's most recent report.

---

[1] *Case No. CIV 96-0308-E-BLW, Dr. Richard Slaughter, Ph.D.: (1) Supplemental Expert Report; & (2) Rebuttal Expert Report; & (3) Affidavit in Opposition to Motion to Exclude testimony [sic] of Richard Slaughter,* dated September 20, 2002 (hereafter "Slaughter").

### III   THE CALCULATION OF ECONOMIC DAMAGES

The Plaintiff has estimated damages based on its allegation that the Plaintiff requested (and the Defendant refused) to wheel power to Snake River "...at facilities [Snake River] would own at the delivery points and there resell it...to its members."[2] Assuming for the sake of discussion that the Plaintiff prevails in this claim, Dr. Slaughter's damage calculation therefore should compare payments by Snake River members to PacifiCorp over the relevant period with an estimate of the payments these members otherwise would have made. As a basis for such an estimate, Dr. Slaughter postulates a scenario in which Snake River members had ratified the power purchase contract between Snake River and Enron, and had been able to take service under that contract.[3]

As I have demonstrated in my two previous reports, if the Plaintiff had calculated damages in this way, the result would be negative. If the estimated damages are negative, this means that Snake River's members were actually better off purchasing power from the Defendant than if they had in fact purchased their power under the terms of the Enron contract. Consequently, even if the Court were to find in favor of the Plaintiff on the wheeling claim, no damages can be awarded in this case.

Rather than accept this outcome, the Plaintiff has taken pains through several iterations of damage estimates to manufacture positive damages through improper assumptions, faulty economic reasoning and projections unsupported by evidence. Notably, the Plaintiff has not substantively challenged the recalculation of damages I presented in either of my previous two reports, which corrected only the most egregious errors in Dr. Slaughter's method. Instead, Dr. Slaughter resorts to characterizing my analysis as "...high school rhetoric and sarcasm." (Slaughter at 6.)

---

[2] Affidavit of Del Ray Holm, at 4-5. This claim related to the Defendant's alleged refusal to wheel is the only remaining claim in this case (see February 7, 2002 *Memorandum Decision and Order*, at 7).

[3] Richard Slaughter Associates, *Calculation of Economic Damages*, Revision 21 June 2002, Submitted to Mr. Robert C. Huntley, Esq., June 21, 2002, at 5.

My corrections to Dr. Slaughter's damage estimates were limited to three critical areas: his inclusion of hypothetical "market sales"; his inflation of estimated damages based on an assumed growth in Snake River members' consumption to 243% of actual; and his substitution of hypothetical payments for the payments required under the tariff that the Plaintiff's members actually used. I have made no attempt to correct Dr. Slaughter's damage estimates for any other errors of judgment or calculation, several of which have been raised by other witnesses for the Defendant.[4] Yet correcting only these three important mistakes – using Dr. Slaughter's own numbers and calculations – leads to negative damages. In the sections that follow, I will review the validity of Dr. Slaughter's responses to my earlier reports with respect to his assumed growth rate and the application of an alternative tariff.[5]

## III.A   ESTIMATE OF GROWTH

In his May 31, 2002, and June 21, 2002, revisions, Dr. Slaughter dramatically changed the basis for and nature of his damage estimates by altering the level of electricity assumed to have been consumed by Snake River's members. Specifically, in these revisions Dr. Slaughter does not estimate damages using estimates of the actual electrical consumption of Snake River members over the relevant time period, but instead assumes (without justification) a much higher level of Snake River consumption. Since the estimated non-market sales damages are proportional to the amount of electricity purchased, Dr. Slaughter's arbitrarily increased electrical energy estimate grossly inflates his damage estimates.

Dr. Slaughter's defense of his growth assumptions can be characterized as a scramble, at best. If I understand it correctly, Dr. Slaughter does not suggest that the Court accept his "scalar increase" of 2.43 because he can provide evidence supporting his assertion that SRVEA membership (or sources of additional load at existing member locations) would have caused the

---

[4] While I do not present testimony related to the appropriate distribution charge in this case, I have presented recalculations of damage estimates assuming the distribution charges used by Dr. Slaughter as well as those put forth by the Defendant in this case.

[5] While not revisited in this response, in my earlier reports I review Dr. Slaughter's inclusion of hypothetical market sales in his damage calculations, and conclude that by including these market sales Dr. Slaughter ignores the need for a causal relationship between antitrust injury and damages, violates simple principles of economics and logic, and specifically ignores the practical realities of market engagement.

Cooperative's electrical consumption to reach 243% of members' actual consumption; nor does he put forth a sensible reason for granting the current Plaintiffs (SRVEA members) alleged damages associated with energy consumption of hypothetical customers that are not parties to this case. Instead, Dr. Slaughter would have the Court accept his "scalar increase" of 2.43 simply because he is able to calculate numeric ratios that exceed this number by dividing his estimate of SRVEA member accounts (511) into the following disparate and largely irrelevant sources of data:

(1)     a *1993* engineering study, and a *1980* budget forecast of the average number of irrigation customers, which "…show some 1300 customers."[6]

(2)     a *2001* irrigation rate application in which PacifiCorp states that it has "at least 2000 Schedule 10 customers" in its service territory in Idaho.

(3)     PacifiCorp's FERC Form 1 Report for *2000*, which "lists 4,458 schedule 10 customers."

Thus, in an attempt to support his growth assumption, Dr. Slaughter was able to find several numbers from different sources and years that contain data related to the number of irrigation loads, customers, accounts, or meters across the full service territory of PacifiCorp in Idaho.[7] What Dr. Slaughter fails to do is provide an explanation of how these numbers support his assumed level of growth, other than to *imply* that since there are a large number of irrigation customers or meters in PacifiCorp's service territory, it is acceptable to *presume* that many or most of these are in the right geographical area, are not already part of SRVEA's membership, would have chosen to become members of the Snake River Valley Electric Cooperative, and would have chosen to ratify the contract with Enron. These "implied scalars" are nothing more

---

[6] Slaughter at 9.  It is not clear from a review of Dr. Slaughter's attachment related to the 1980 case U-1009-107 how he arrives at a number of 1300.

[7] In his response Dr. Slaughter does not attempt to reconcile the disparities in this data, but does recognize that there is not a clear relationship among these numbers, and suggests that a "likely explanation" would distinguish among contracting entities, members, customers, meters, and billing locations (see Slaughter at 10, note 1).

than simple numeric ratios of data whose accuracy, consistency, and relevance are at best highly suspect.

In my judgment, it is inappropriate for Dr. Slaughter to apply an arbitrary scalar to increase his damage estimates – to 243% of the *actual historical* level of electricity consumption by Snake River members over the relevant period.[8] Even assuming for the sake of argument that it is appropriate to allow a damage claim for the current members of Snake River to include calculations based on an unrealized growth in the Cooperative's membership, Dr. Slaughter has not provided a plausible and defensible link between his presumed growth rate and the data in this case, and he fails to provide evidence supporting the foundational assumption that Snake River membership would have grown at all. Dr. Slaughter is correct in one respect – he points out that "...what is important is not the estimated growth itself, but its effect on the loss calculation." (Slaughter at 10.) In this case, Dr. Slaughter's presumed growth arbitrarily increases the Plaintiff's estimate of non-market sales damages by, according to him, $27.3 million.[9]

There are standard economic and statistical techniques that can be used to construct reliable estimates of the growth in demand for a product, or in the growth in market share of a given competitor in a market. These techniques rely upon historical and current data, and typically incorporate parameters to capture the magnitude of influences such as the price advantage that one competitor has over another.

Dr. Slaughter has not, to my knowledge, attempted to apply such techniques in support of his presumed growth in SRVEA's market share. Instead, he based his non-market sales damages on an estimate of what the SRVEA load *might* conceivably have grown to, and has presented no

---

[8] While Dr. Slaughter disputes my characterization as "actual" the SRVEA historical consumption he includes *in his database* (see Slaughter at 8), citing concerns with data provided by the Defendant, he does not suggest an alternative number more representative of actual consumption.

[9] In his most recent response, Dr. Slaughter frequently suggests with disdain that I did not review his report because my conclusions are inconsistent with the impact of his assumptions on *total* estimated damages. To the contrary, it is very clear and explicit in my report that in such calculations I am referencing Dr. Slaughter's estimation of *non-market sales* damages only. I separately and explicitly discuss the fundamental problems associated with Dr.

evidence that such growth would have been likely. And when pushed, he defends this approach by pointing out that under his assumptions, SRVEA makes more money by not growing than by growing, since it hypothetically could have sold the "surplus" Enron power for large profits. Hence, in this through-the-looking-glass world, an unsupported assumption of enormous growth by SRVEA is conservative, because without it the damages inclusive of those deriving from resale profits would have been even greater.

## III.B    RATE A

In his earlier reports, Dr. Slaughter ignores in his damage estimates the actual payments made by many Snake River members under their applicable electrical service tariffs, and instead estimates what these members' payments *would have been* if they had chosen service under a different tariff for electric service that was available to them, but which they explicitly chose not to take ("Irrigation Rate A"). In my earlier reports, I point out that:

(1)    since the goal of the damage calculation is to estimate the harm incurred by customers due to the alleged actions of the Defendant, considering the difference in tariff rate cost is only appropriate if and to the extent that the difference is equal to the difference in *value* to the customers of firm service over interruptible service;

(2)    based on the evidence in this proceeding, we know that this is not true; otherwise a significant number of Snake River's members would have chosen the allegedly superior firm service; and

(3)    based on the regulatory context for and historical experience with interruptible rate programs, it is economically and logically possible that the value is essentially zero.[10]

---

Slaughter's inclusion of <u>any</u> estimate of *market sales* damages, regardless of whether any of his other methodological changes serve to increase or decrease those estimates.

[10] *Revised Supplement to the Expert Report of Adam Jaffe* (hereafter "Jaffe"), at 11.

However, in my recalculation of the alleged damages, I neither suggest it is possible to estimate the value, nor treat the value as zero as suggested by Dr. Slaughter.[11]  Instead, I point out that in the absence of any clear indication of value, and given that there is at least anecdotal evidence that the value is small, assuming a value at the mid-point between the non-interruptible and interruptible rates is a conservative approach – that is, one likely to overstate the magnitude of alleged damages.

In his response, Dr. Slaughter agrees, stating "…while I would generally agree with Dr. Jaffe that the mid-point is the best estimate in the absence of other evidence, in this case other evidence is available:  Mr. Hogstrom's testimony on the value of interruption for Utah Power and Light…"[12]  However, the value *to the customer* (if any) of the difference between interruptible and non-interruptible service is fundamentally different from the value of interruptibility *to the utility*.  There is simply no logical or economic link between the two, other than the decisional relationship I noted in my earlier reports – namely, that the value to customers on the interruptible rate of firm service is *not as great* as the value to the utility, otherwise the customers would have chosen the firm service tariff.  Indeed, Dr. Slaughter concedes this point, stating that this value to the company "may or may not accurately reflect the opportunity cost of the irrigators…"[13]

Finally, Dr. Slaughter appears to suggest that my position related to his misapplication of the firm tariff rate in the non-market sales damage calculation is somehow inconsistent with my position on Dr. Slaughter's inclusion of hypothetical market sales in the damage estimates.[14]  If I understand this line of reasoning correctly, Dr. Slaughter would have the Court conclude that his application of the firm tariff rate is appropriate because otherwise he *could have* arrived at a much higher damage estimate by inflating the market sales portion of his calculations with assumptions about load management that he admits "…would have taken me into the area of speculation."[15]  As Dr. Slaughter must realize by now, I consider it fundamentally inappropriate to include any estimate of hypothetical market sales in the damage estimates.  Dr. Slaughter's

---

[11] Slaughter at 5.
[12] Slaughter at 6.
[13] Slaughter at 5.
[14] Slaughter at 7.

attempt to link that conclusion to my position on the appropriateness of basing damages on a tariff rate rejected by SRVEA's customers over the period in question is nothing more than an attempt to introduce additional confusion on the relevant issues in the case. My comments related to the inclusion of market sales damages can be found in my previous reports in this case.

## IV  CONCLUSION

I have reviewed Dr. Slaughter's numerous attempts at developing an estimate of damages in this case, and have previously identified several fundamental flaws in his analysis. Correcting his calculations for only these flaws leads to negative damages, meaning that Snake River's members were actually better off purchasing power from the Defendant than if they had in fact purchased power under the terms of the Enron contract. In his response, Dr. Slaughter attempts in part to provide additional evidence to support his analysis in two areas on which I previously commented: the assumption of 243% growth in SRVEA consumption, and the development of damage estimates based not on members' actual electricity service tariffs, but on alternative tariffs they chose not to take. In this response, I conclude that Dr. Slaughter's attempt to provide additional support in these areas fails to rectify these fundamental flaws in his damage calculation method.

---

[15] Slaughter at 7.

DATED this 18th day of September, 2002.

_____
Adam Jaffe

Subscribed and sworn to before me this _/9th_ day of September, 2002.

_____
NOTARY PUBLIC

Residing at _Cambridge, MA_

My Commission expires:

_12/5/08_

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of September, 2002, I caused a true and correct copy of to **AFFIDAVIT OF ADAM JAFFEE IN RESPONSE TO THE SUPPLEMENTAL AND REBUTTAL REPORT OF DR. SLAUGHTER** be served via fax and U.S. Mail, postage prepaid, to the following:

Robert C. Huntley
Christopher F. Huntley
Huntley, Park, Thomas, Burkett,
 Olsen & Williams, L.L.P.
250 S. 5th Street, Suite 660
P.O. Box 2188
Boise, Idaho  83702

Charles F. Wheatley, Jr.
Wheatley & Ranquist
34 Defense Street
Annapolis, MD  21401

Brett DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
700 W. Jefferson St., Rm. 210
P.O. Box 83720
Boise, ID 83720-0010

G.Rey Reinhardt, IV

# ATTACHMENT A

# ADAM B. JAFFE

One Mifflin Place
Cambridge, MA  02138
(617) 520-0200

## PROFESSIONAL EXPERIENCE

Brandeis University, Faculty of Arts and Sciences and Graduate School of International Economics and Finance, Waltham, MA
*Chair, Department of Economics*, 2000 - present
*Professor of Economics*, 1999 - present
*Associate Professor of Economics*, 1994 - 1999
*Chair, Brandeis Intellectual Property Policy Committee*, 2001 - present
*Member, University Advisory Council*, 2001 - present

> Teaching industrial organization, environmental economics, and regulatory economics. Current research examines the use of patent citation data to trace knowledge flows; evaluation of public science and technology programs; and the role of energy prices and public policy in energy-related technological change.

Harvard University, Faculty of Arts and Sciences, Cambridge, MA
*Associate Professor of Economics,* 1989 - 1994
*Assistant Professor of Economics,* 1985 - 1989

> Taught graduate and undergraduate courses in Applied Microeconomics, Industrial Organization, Economics of Innovation, and Government Regulation and Antitrust Policy. (On leave, Academic Year 1990-91; visiting the Kennedy School of Government, 1992-94)

President's Council of Economic Advisers, Washington, DC
*Senior Staff Economist,* 1990 - 1991

> Primary staff responsibility for antitrust issues, science and technology policy, energy policy, and regulatory issues related to telecommunications.

## EDUCATION

Harvard University, Cambridge, MA
> Ph.D. in Economics, 1985
> Dissertation: "Quantifying the Effects of Technological Opportunity and Research Spillovers in Industrial Innovation"

Massachusetts Institute of Technology, Cambridge, MA
> S.M. in Technology and Policy, 1978

Thesis: "Regulating Chemicals: Product and Process Technology as a Determinant of the Compliance Response"
S.B. in Chemistry, 1976


## TESTIMONY AND CONSULTING EXPERIENCE

Television Music License Committee (Weil, Gotshal & Manges, New York)
*Before the American Arbitration Association, SESAC, Inc., against Television Music License Committee.* Economic analysis of a reasonable license fee for public performance of SESAC music. Expert Report, January 11, 2002.

Phillips Transportation Alaska, Inc. (Birch, Horton, Bittner and Cherot, Anchorage)
*State of Alaska, The Regulatory Commission of Alaska, In the Matter of the Application of BP Pipelines (Alaska), Inc. and Phillips Transportation Alaska, Inc., for the Transfer of 3.0845% Interest in the TAPS System.* Affidavit (with Lisa J. Cameron) evaluating the competitive impact of a proposed sale of capacity on the Trans Alaska Pipeline System from BP Pipelines (Alaska), Inc., to Phillips Transportation Alaska, Inc., May 25, 2001; Supplemental Affidavit (with Lisa J. Cameron), July 10, 2001.

SFPP, L.P. (Vinson & Elkins, Houston)
*United States of America before the Federal Energy Regulatory Commission, In the Matter of ARCO Products Company, et al., v. SFPP, L.P.* Prepared Answering Testimony evaluating whether there has been a substantial change in the economic circumstances that were the basis for interstate rates, May 15, 2001; Reply Testimony, July 31, 2001; Oral Testimony, October 25-26, 2001; Supplemental Testimony, February 20, 2002.

A group of internet broadcasters (Weil, Gotshal & Manges, New York; Wiley, Rein & Fielding, Washington, DC)
*Before the United States Copyright Office, Library of Congress, in the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings.* Direct Testimony in an arbitration proceeding involving the valuation of the right of public performance of digital sound recordings and ephemeral recordings, April 11, 2001; Oral Testimony, August 27-28, 2001; Written Rebuttal Testimony, October 4, 2001; Oral Rebuttal Testimony, October 19-20, 2001.

The Burlington Northern and Santa Fe Railway Company (Steptoe & Johnson, Washington, DC)
*Before the American Arbitration Association, Tucson Electric Power Company, Claimant, v. Burlington Northern and Santa Fe Railway Company, Respondent.* Direct testimony in an arbitration proceeding concerning a coal transportation contract, January 26, 2001; Deposition, February 9, 2001.

Cheminova A/S (Beveridge & Diamond, Washington, DC)
*Before the American Arbitration Association, In The Matter of Arbitration Between Cheminova A/S, Claimant and Griffin LLC, Respondent, Docket No. 23 171 00020 99.* Direct Oral Testimony in a data compensation case concerning a pesticide, December 7, 2000; Oral Rebuttal Testimony, December 9, 2000.

Music Choice (Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Washington, DC)
  *In the United States District Court, Southern District of New York, United States of America against Broadcast Music, Inc., et ano., In the Matter of the Application of Music Choice, et al., Applicants, for the Determination of Reasonable License Fees.* Affidavit, July 28, 2000; Expert Report, January 26, 2001; Supplemental Expert Report, March 9, 2001; Deposition, March 28, 2001; Affidavit, April 9, 2001; Oral Testimony, May 29, 2001.

Wilson-Cook Medical Incorporated (Brinks Hofer Gilson & Lione, Chicago)
  *In the United States District Court for the District of Massachusetts, Boston Scientific Corporation and SCIMED Life Systems, Inc., v. Wilson-Cook Medical Incorporated.* Expert Report analyzing irreparable harm related to preliminary injunction in a patent infringement case, July 26, 2000; Deposition, July 27, 2000; Supplemental Expert Report, September 15, 2000.

Owens-Corning (Forman, Perry, Watkins, Krutz & Tardy, Jackson, MS)
  *In the Circuit Court of Jefferson County, Mississippi, Ezell Thomas, et al. (as to all defendants) and Owens-Corning (as to tobacco defendants only) versus R.J. Reynolds Tobacco Company, et al., and Amchem Products, Inc., et al.* Expert Report prepared on behalf of Owens Corning in tobacco litigation, June 14, 2000; Deposition, September 13, 2000.

Castano Tobacco Litigation Plaintiff's Legal Committee (Murray Law Firm, New Orleans)
  *In the Civil District Court for the Parish of Orleans, State of Louisiana, Gloria Scott and Deania M. Jackson, et al., vs. The American Tobacco Company, Inc., et al.* Expert Report prepared on behalf of the Castano Tobacco Litigation Plaintiff's Legal Committee, June 6, 2000; Deposition, October 18, 2000.

Ellis Simon, *et al.* (Brown, Rudnick, Freed & Gesmer, Boston)
  *In the United States District Court, Eastern District of New York, Ellis Simon, et al., v. Philip Morris Incorporated, et al., CV-99-1988, First Amended Class Action Complaint.* Testimony on behalf of the plaintiffs in tobacco litigation; Expert Disclosure Statement, December 20, 1999; Deposition, February 28, 2000; Affidavit, April 13, 2000.

Vastar Resources, Inc.
  *Before the United States of America, Department of the Interior, Minerals Management Service, Further Supplementary Proposed Rule for Establishing Oil Value for Royalty Due on Federal Leases,* Affidavit, January 31, 2000.  *Before the United States of America, Department of the Interior, Minerals Management Service, Vastar Resources, Inc.'s Request for a Binding Value Determination on Transportation Allowances,* Affidavit April 4, 2000. Testimony on behalf of Vastar Resources, Inc., on issues related to the appropriateness and reasonableness of various methodologies that may be employed for the purpose of determining transportation allowances to be used for royalty payments from federal leases.

Pharmaceutical Research and Manufacturers of America
  Prepared research report entitled "Consequences of Pharmaceutical Price Controls on Innovation" (with Catherine Moore), May 1999.

Adam B. Jaffe

PacifiCorp (Stoel Rives, Portland, OR)

*Before the Public Utility Commission of Oregon, UE 102, In the Matter of the Application of Portland General Electric Company for Approval of the Customer Choice Plan.* Testimony on behalf of PacifiCorp regarding the company's eligibility to participate in an auction of generation assets, April 26, 1999.

Turner Broadcasting System, Inc., et al. (Weil, Gotshal & Manges, New York)

*In the United States District Court, Southern District of New York, United States of America against American Society of Composers, Authors, and Publishers, In the Matter of the Application of Turner Broadcasting System, Inc., et al., Applicants, For the Determination of Reasonable License Fees, CIV. NO. 13-95 (WCC),* Expert Report prepared on behalf of the applicants in litigation about music licensing fees, April 16, 1999; Deposition, July 26-27, 1999; Rebuttal Expert Report, December 16, 1999; Deposition, March 3, 2000.

The American Chemical Society

Developed and evaluated a number of approaches to pricing the web editions of ACS's publications. Modeled the performance of the various pricing plans to assess their ability to protect ACS's publications revenue as web editions replace paper. (1999)

Copyright Clearance Center, Inc. (Weil, Gotshal & Manges, New York, NY)

Primary consultant on statistical and economic matters since 1985; designed and implemented CCC's initial statistical methodology for pricing corporate photocopy licenses; recently assisted the Rightsholders Committee of the Board of Directors in designing a new market-based approach to valuation of copyright licenses and distribution of the resulting royalties. (ongoing)

Procter & Gamble, Inc. (Torys, Toronto)

*In the Matter Between Unilever PLC. and Lever Brothers Limited, Plaintiffs, and Procter & Gamble, Inc., and the Procter & Gamble Company, Defendants, Court File No. T-2534-85,* Expert Report prepared on behalf of the defendants in patent dispute, January 11, 1999; Reply Report, January 29, 1999; Oral Testimony, December 6-7, 1999.

Ironworkers Local Union No. 17 Insurance Fund and its Trustees (Milberg, Weiss, Bershad, Hynes & Lerach, San Diego)

*Ironworkers Local Union No. 17 Insurance Fund and its Trustees, et al., vs. Philip Morris, Inc., et al.* (Ohio), Expert Report prepared on behalf of the plaintiffs in tobacco litigation, November 6, 1998; Supplemental Report, December 17, 1998; Deposition, January 11 and 21, 1999; Oral testimony, February 23, 1999.

State of Wisconsin (Habush, Habush, Davis & Rottier, Milwaukee)

*The State of Wisconsin v. Philip Morris, et al.* Prepared Expert Witness Report on behalf of the plaintiffs in tobacco litigation, November 1, 1998.

Trans-Alaska Pipeline (Steptoe & Johnson, Washington, DC)

*In the Matter of the Correct Calculation and Use of Acceptable Input Data to Calculate the 1997, 1998, 1999, 2000 and 2001 Tariff Rates for the Intrastate Transportation of Petroleum over the Trans Alaska Pipeline System Filed by Amerada Hess Pipeline Corporation; Arco*

*Transportation Alaska, Inc.; BP Pipelines (Alaska) Inc.; Exxon Pipeline Company; Mobil Alaska Pipeline Company; Phillips Alaska Pipeline Corporation; Unocal Pipeline Company; Phillips Transportation Alaska, Inc.; and Williams Alaska Pipeline Company, LLC, and the Protest by Tesoro Alaska Petroleum Company of the 1997 and 1999 Tariff Rates, Before the Regulatory Commission of Alaska, Docket No. P-97-4.* Prepared Direct Testimony evaluating whether the TAPS Intrastate Settlement and the ratemaking methodology it established produce tariff rates that are just and reasonable, October 8, 1998; Second Prepared Direct Testimony, July 12, 2000; Prepared Rebuttal Testimony, February 26, 2001; Oral Testimony, April 10-13, 2001.

Commonwealth of Massachusetts (Brown, Rudnick, Freed & Gesmer, Boston)
*The Commonwealth of Massachusetts vs. Philip Morris Incorporated, et al., Civil Action Number 95-7378.* Prepared Expert Disclosure Report on behalf of the plaintiffs in tobacco litigation, June 16, 1998; Affidavit in Opposition to Defendants' Motions for Summary Judgement, October 30, 1998.

CBS (Weil, Gotshal & Manges, New York)
*CBS Inc. v. American Society of Composers, Authors & Publishers, New York State Supreme Court, New York County.* Prepared Expert Report regarding timing of payments under ASCAP agreements, August 11, 1997; Deposition, June 12, 1998; Addendum to Prepared Expert Report, December 1, 1998; Supplemental Deposition, January 28, 1999.

Public Broadcasting System, National Public Radio, and the Corporation for Public Broadcasting (Weil, Gotshal & Manges, New York)
Prepared testimony regarding royalties for copyrighted musical compositions, *In the Matter of the Rates for Noncommercial Educational Broadcasting Compulsory License, Before the Copyright Arbitration Royalty Panels, Docket No. 96-6, CARP NCBRA,* 1997. Written Testimony, April 1, 1998; Oral Testimony, April 1-2, 1998; Rebuttal Testimony, April 15, 1998; Oral Rebuttal Testimony, May 7, 1998.

State of Minnesota (Robins, Kaplan, Miller & Ciresi, Minneapolis)
*The State of Minnesota and Blue Cross and Blue Shield of Minnesota vs. Philip Morris Incorporated, et al., Court File No. C1-94-8565.* Prepared Expert Witness Report on behalf of the plaintiffs in antitrust litigation involving allegations of collusive conspiracy, May 29, 1997; Deposition, June 26-27, 1997; Oral Trial Testimony, March 18-23, 1998.

PacifiCorp (Stoel Rives, Portland, OR)
*PacifiCorp, Electric Restructuring Transition Plan, Before the Montana Public Service Commission, Docket No. D97.7.91.* Prepared Prefiled Rebuttal Testimony evaluating testimony regarding market power in the generation of electricity in Montana, February 24, 1998; Prefiled Surrebuttal Testimony, July 21, 1998.

PacifiCorp (Stoel Rives, Salt Lake City)
*United States District Court for the District of Idaho, Snake River Valley Electric Association v. PacifiCorp, Case No. CV 96-0308-E-BLW.* Testimony analyzing allegations of anticompetitive behavior and evaluating market power. Expert Witness Statement, October

17, 1997; Affidavit, February 27, 1998; Expert Report, January 22, 2002; Supplement to the
Expert Report, April 8, 2002; Revised Supplement to the Expert Report, August 15, 2002.

Trans-Alaska Pipeline (Steptoe & Johnson, Washington, DC)
Prepared Affidavit and Rebuttal Affidavit evaluating the competitive impact of the Amended
and Restated Capacity Settlement Agreement, *Exxon Pipeline Co., et al., Application of
TAPS Carriers for Approval of Amended and Restated Capacity Settlement Agreement,
Before the Federal Energy Regulatory Commission, Docket No. OR96-1-000, et al.* (1997)

The Burlington Northern and Santa Fe Railway Company (Steptoe & Johnson, Washington, DC)
Prepared Verified Statement regarding market power in transporting coal, *In the Matter of
Western Fuels Service Corporation v. The Burlington Northern and Santa Fe Railway
Company, Before the Surface Transportation Board, STB Docket No. 41987.* (1997)

PacifiCorp (Stoel Rives, Portland, OR)
Assisted in FTC pre-merger Hart-Scott-Rodino review; prepared *Economic Analysis of
Alleged Vertical Market Power Consequences of Merger of PacifiCorp and Peabody Coal.*
(1997)

Subaru of New England, Inc. (Todd & Weld, Boston)
*Subaru of New England, Inc., vs. Subaru of Wakefield, Inc., Civil Action No. 96-01475-A,
Commonwealth of Massachusetts, Norfolk County, Superior Court Department.* Prepared
Affidavit regarding appropriate methodology for assessing competitive impact of dealer
relocation, November 20, 1996.

Public Service Company of New Hampshire
*Direct testimony before the State of New Hampshire Public Utilities Commission, Docket No.
DR 96-150, Electric Industry Restructuring,* with Joseph P. Kalt, October 18, 1996.

*Pro Se* Testimony
*United States of America before the Federal Energy Regulatory Commission "Alternatives to
Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines, Regulation of Negotiated
Transportation Services of Natural Gas Pipelines," Docket No. RM-96-7-000.* Comments of
Adam B. Jaffe and Joseph P. Kalt, May 30, 1996.

Massachusetts Technology Collaborative
Prepared a study assessing the effects of reductions in federally funded R&D on the
Massachusetts economy. (1995-96)

Federal Trade Commission
Asked by Commission staff to prepare testimony for Hart-Scott-Rodino preliminary
injunction hearing regarding anticompetitive impact of a proposed acquisition. (1995)

GAF Corporation, *et al.* (Hannoch Weisman, Roseland, NJ)
*Joseph Rossi, et al., vs. Standard Roofing, et al., Civil Action No. 92-5377, United States
District Court, District of New Jersey.* Prepared Expert Witness Report on behalf of six
defendants in antitrust litigation involving conspiracy and monopolization claims. (1995)

Connecticut Light and Power Company

*Before the Connecticut Department of Public Utility Control, Investigation into Restructuring of the Electric Industry, Docket No. 94-12-13.* Submitted Written and Oral Hearing Testimony. (1995)

New England X-Ray & Electronics Inc. (Kushner & Sanders, Wellesley, MA)

*New England X-Ray & Electronics Inc. vs. Robert T. Kennedy, Inc., et al., Commonwealth of Massachusetts, Number 88-5532.* Presented damages study and jury trial testimony regarding breach of contract. (1990-95)

Florida Gas Transmission Company

*Before the Federal Energy Regulatory Commission, Docket No. RP95-103-000,* Written Testimony supporting FGT's proposed flexible service offerings, inflation-indexed rate, and removal of regulatory constraints on the secondary market for pipeline capacity. (1995)

Burlington Northern Railroad Company (Steptoe & Johnson, Washington, DC)

*Southwestern Electric Power Company, Plaintiff, vs. Burlington Northern Railroad Company, Defendant, in the 102nd Judicial District Court of Bowie County, Texas, No. D-102-CV-91-720.* Presented Oral Trial Testimony before a state court jury regarding the pricing provisions in two long-term coal transportation agreements, in defense against a claim by the shipper of overcharges resulting from the contract rates failing to reflect the railroads' productivity improvements. (1994)

Houston Lighting & Power Company

*Before the Texas Public Utilities Commission, Docket No. 12065,* Written Testimony regarding appropriate regulatory policy changes dictated by emerging competition in electricity markets. (1994)

Boston Ventures Management (Boston)

Prepared a report for a venture capital firm on the adverse consequences on investment of the re-regulation of cable TV. (1994)

Kern River Gas Transmission Company (Salt Lake City)

*Before the Public Service Commission of Utah, Application of Mountain Fuel Supply Company for Approval of Modifications to its Tariff to Implement a Firm Transportation Rate, Docket No. 94-057-02.* Prepared Prefiled Direct and Rebuttal Testimony, as well as Oral Testimony, before the Public Service Commission of Utah regarding the appropriateness of a firm gas distribution tariff including within it costs of upstream pipeline transportation. (1994)

Burlington Northern Railroad Company (Steptoe & Johnson, Washington, DC)

*In the Matter of the Arbitration between Public Service Company of Oklahoma and Burlington Northern Railroad Company.* Delivered Written and Oral Testimony concerning the interpretation of the pricing and renegotiation provisions of a long-term coal transportation agreement. (1994)

Adam B. Jaffe

Arco Pipe Line Company (Steptoe & Johnson, Washington, DC)
  Prepared written *Comments in Response to Notice of Inquiry, Market-Based Ratemaking for Oil Pipelines, U.S. Federal Energy Regulatory Commission, Docket No. RM94-1-000.* (1994)

Kern River Gas Transmission Company (Wright and Talisman, Washington, DC)
  *Before the Federal Energy Regulatory Commission In the Matter of Kern River Gas Transmission Company, Docket No. RP92-226-000.* Delivered Written and Oral Testimony regarding rate design for pipelines built under optional certificates. (1993)

ISK Biotech Corp. (Beveridge and Diamond, Washington, DC)
  *In the Matter of the Arbitration between ISK Biotech Corporation and Veterans Chemicals,* Prepared Testimony regarding allocation rules and competitive impacts in an arbitration proceeding regarding data compensation under the Federal Insecticide, Fungicide and Rodenticide Act. (1993)

Geneva Steel Corp., *et al.* (Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City)
  *Before the Utah Public Service Commission Docket No. 93-057-01,* Written Testimony regarding antitrust implications of LDC treatment of pipeline charges under FERC *Order 636,* on behalf of a coalition of interruptible shippers. (1993)

Enron Gas Services Corp.
  Co-authored study analyzing appropriate Public Utility Commission policy towards utility procurement of natural gas and emissions allowances in developing competitive markets. (1993)

New York Power Authority
  Prepared analysis and delivered Public Hearing Testimony before the Board of Trustees regarding the economic consequences of below-market pricing for electricity. (1993)

Coalition of Non-Utility Generators
  Co-authored study analyzing the effect of power from non-utility generators on electricity prices in New England. (1993)

U.S. Department of Commerce, Economics and Statistics Administration
  Co-authored study analyzing the effect of U.S. environmental regulations on U.S. competitiveness. (1993)

International Energy Group
  *Before the Federal Energy Regulatory Commission, Docket No. PL91-1-000,* Prepared Written Testimony regarding electricity transmission access policy. (June 1991)

El Paso Natural Gas Co. (Andrews & Kurth, Washington, DC)
  *Before the Federal Energy Regulatory Commission, Docket No. CP88-434-000,* Prepared Written Testimony analyzing the extent of competition faced by El Paso as a seller of natural gas. (1989)

## PUBLICATIONS AND RESEARCH

"Technological Change and the Environment," in K.-G. Mäler and J. Vincent, eds., *Handbook of Environmental Economics*, North-Holland (forthcoming).

*Patents, Citations and Innovations:   A Window on the Knowledge Economy* (with M. Trajtenberg), MIT Press, 2002.

*Innovation Policy and the Economy* (edited with J. Lerner and S. Stern), MIT Press, Volume 1 (2001) and Volume 2 (2002).

"Reinventing Public R&D:   Patent Policy and the Commercialization of National Laboratory Technologies" (with J. Lerner), *Rand Journal of Economics*, Spring 2001.

"International Taxation and the Location of Incentive Activity" (with J.R. Hines, Jr.), in J.R. Hines, Jr., ed., *International Taxation and Multinational Activity*, University of Chicago Press, 2001.

"Knowledge Spillovers and Patent Citations: Evidence from a Survey of Inventors" (with M. Trajtenberg and M. Fogarty), *American Economic Review Papers and Proceedings*, May 2000.

"The Cigarette Industry," in W. Adams and J. Brock, eds., *The Structure of American Industry*, 10th edition, Prentice Hall, 2000.

"The U.S. Patent System in Transition: Policy Innovation and the Innovation Process," *Research Policy*, April 2000.

"Energy-Efficient Technologies and Climate Change Policies:   Issues and Evidence" (with R. Newell and R. Stavins), Resources for the Future Climate Issue Brief No. 19, December 1999.

"The Regional Economic Impact of Public Research Funding:   A Case Study of Massachusetts" (with A.B. Candell), in L.M. Branscomb, F. Kodama, and R. Florida, eds., *Industrializing Knowledge: University-Industry Linkages in Japan and the United States*, MIT Press, 1999.

"The Induced Innovation Hypothesis and Energy-Saving Technological Change" (with R. Newell and R. Stavins), *Quarterly Journal of Economics*, August 1999.

"The Pipeline's View:   FERC's Proposed Rule Misses" (with J. Lukens), *Public Utilities Fortnightly*, July 1, 1999.

"Special Issue on Geography and Innovation" (with R. Henderson), introduction to *Economics of Innovation and New Technology*, Vol. 8, 1999.

"International Knowledge Flows:   Evidence from Patent Citations" (with M. Trajtenberg), *Economics of Innovation and New Technology*, Vol. 8, 1999.

Comment on "Inventors, Firms and the Market for Technology in the Late Nineteenth and Early Twentieth Centuries," in D. Raff, N. Lamoreaux and P. Temin, eds., *Learning by Doing in Markets, Firms, and Nations*, The University of Chicago Press, 1999.

"The Importance of 'Spillovers' in the Policy Mission of the Advanced Technology Program," *Journal of Technology Transfer*, Summer 1998.

"Inside the Pin-Factory: Empirical Studies Augmented by Manager Interviews: Introduction" (with Severin Borenstein and Joseph Farrell), *Journal of Industrial Economics*, June 1998.

"Evidence from Patents and Patent Citations on the Impact of NASA and Other Federal Labs on Commercial Innovation" (with Bruce A. Banks and Michael S. Fogarty), *Journal of Industrial Economics*, June 1998.

Comment on "What Do Technology Shocks Do?" in Bernanke, Ben S., and Julio Rotemberg, eds., *NBER Macroeconomics Annual, 1998.*

"Universities as a Source of Commercial Technology: A Detailed Analysis of University Patenting, 1965-1988" (with Rebecca Henderson and M. Trajtenberg), *Review of Economics and Statistics*, February 1998; also published in a slightly different form as "University Patenting Amid Changing Incentives for Commercialization" in G.B. Navaretti, P. Dasgtupta, K.-G. Maler and D. Siniscalco, eds., *Creation and Transfer of Knowledge*, Springer, 1998.

"Measurement Issues," in L.M. Branscomb & J. Keller, eds., *Investing in Innovation*, MIT Press, 1998.

"University Versus Corporate Patents: A Window on the Basicness of Invention" (with M. Trajtenberg and R. Henderson), *Economics of Innovation and New Technology,* 1997.

"Environmental Regulation and Innovation: A Panel Data Study" (with K. Palmer), *Review of Economics and Statistics*, November 1997.

Review of *Green, Inc.*, by Frances Cairncross, *Journal of Economics Literature*, March 1997.

"Bounding the Effects of R&D: An Investigation Using Linked Establishment and Firm Data" (with J. Adams), *Rand Journal of Economics,* winter 1996

"Economic Analysis of Research Spillovers: Implications for the Advanced Technology Program," Economic Assessment Office, The Advanced Technology Program, National Institutes of Standards and Technology, U.S. Department of Commerce, November 1996.

"Flows of Knowledge from Universities and Federal Labs: Modelling the Flow of Patent Citations over Time and across Institutional and Geographic Boundaries" (with M. Trajtenberg), *Proceedings of the National Academy of Sciences*, Vol. 93, pp. 12671-12677, November 1996.

"Trends and Patterns in U.S. Research and Development Expenditures," *Proceedings of the National Academy of Sciences*, Vol. 93, pp. 12658-12663, November 1996.

"Should Electricity Markets Have A Capacity Requirement: If So, How Should It Be Priced?" (with F. Felder), *The Electricity Journal*, December 1996.

"Regional Localization of Technological Accumulation: Application to the Tri-State Region," *The Annals of the New York Academy of Sciences*, 1996.

Comment on "Cross-Country Variations in National Economic Growth Rates" by J. Bradford Delong, in *Technology and Growth*, J.C. Fuhrer and J. Sneddon Little, eds., Federal Reserve Bank of Boston Conference Series No. 40, June 1996.

"Regulatory Reform and the Economics of Contract Confidentiality: The Example of Natural Gas Pipelines" (with J. P. Kalt, S. T. Jones, and F. A. Felder), *Regulation*, 1996, No 1.

"Planning for Change, Preparing for Growth: Implications for Massachusetts of Reductions in Federal Research Spending" (with Amy B. Candell, Kenneth W. Grant, Michael Laznik, and Kelly T. Northrop), The Economics Resource Group, Inc., funded by the Massachusetts Technology Collaborative, February 1996.

"Incentive Regulation for Natural Gas Pipelines" (with J. Kalt), in Ellig, J. and J. P. Kalt, eds., *New Horizons in Natural Gas Deregulation*, Praeger, 1996.

"The Emerging Coexistence of Competition and Regulation in Natural Gas Transportation" (with S. Makowka), *Hume Papers on Public Policy*, 1995.

"On the Microeconomics of R&D Spillovers" (with J. Adams), in Louis Lefebvre, ed., *Technology Management*, Paul Chapman Publishing, Ltd., 1995.

"An Economic Analysis of Electricity Industry Restructuring in New England" (with J. P. Kalt), The Economics Resource Group, Inc., funded by Northeast Utilities System Companies, April 1995.

"Dynamic Incentives of Environmental Regulations: The Effects of Alternative Policy Instruments on Technology Diffusion" (with R. Stavins), *Journal of Environmental Economics and Management*, 1995.

"Environmental Regulation and the Competitiveness of U.S. Manufacturing: What Does the Evidence Tell Us?" (with S. Peterson, P. Portney and R. Stavins), *The Journal of Economic Literature*, 1995; reprinted in Alan M. Rugman and John J. Kirton, eds., *Trade and the Environment: Economic, Legal and Policy Perspectives*, Cheltenham, UK: Edward Elgar Publishing Limited, 1998.

Comment on "Taxes, Technology Transfer, and the R&D Activities of Multinational Firms" by James R. Hines, Jr., in Martin Feldstein, James R. Hines, Jr., and R. Glenn Hubbard, eds., *The Effects of Taxation on Multinational Corporations*, University of Chicago Press, 1995.

"The Energy-Efficiency Gap" (with R. Stavins), *Energy Policy*, 1994.

"The Investment Consequences of the Re-Regulation of Cable Television" (with W. Emmons and J. Taylor), The Economics Resource Group, Inc., Cambridge MA, 1994.

"Insight on Oversight" (with J. Kalt), *Public Utilities Fortnightly*, April 15, 1994.

"The Energy Paradox and the Diffusion of Conservation Technology" (with R. Stavins), *Resource and Energy Economics*, 1994.

"Energy-Efficiency Investments and Public Policy" (with R. Stavins), *The Energy Journal*, 1994.

"Prices, Regulation and Energy Conservation: An Econometric Analysis" (with R. Stavins), delivered at the Conference on Market Approaches to Environmental Regulation, Stanford University, December 1993.

Comment on "R&D and Market Value in the 1980s" by Bronwyn Hall, *Brookings Papers on Economic Activity, Microeconomics*, 1993.

"The Effect of Liquidity on Firms' R&D Spending" (with K. Hao), *Economics of Innovation and New Technology*, 1993.

"Geographic Localization of Knowledge Spillovers as Evidenced by Patent Citations" (with M. Trajtenberg and R. Henderson), *Quarterly Journal of Economics*, August 1993.

"Environmental Regulations and the Competitiveness of U.S. Industry" (with S. Peterson, P. Portney, and R. Stavins), U.S. Department of Commerce, Economics and Statistics Administration, Washington, DC, NTIS No. PB-93-193514, July 1993.

"Oversight of Regulated Utilities' Fuel Supply Contracts:  Achieving Maximum Benefit from Competitive Natural Gas and Emission Allowance Markets" (with J. P. Kalt), The Economics Resource Group, funded by Enron Gas Services Corporation, April 1993.

"Achieving Maximum Benefit from Competitive Natural Gas and Emission Allowance Markets" (with J. Kalt), *Proceedings of the U.S. Department of Energy/National Association of Regulatory Utility Commissioners Conference on Natural Gas Use, State Regulation and Market Dynamics in the Post 636/Energy Policy Act Era*, March 1993.

"The Diffusion of Energy-Conserving Windows:  The Effect of Economic Incentives and Building Codes" (with R. Stavins), presented at the American Economic Association annual meeting, Anaheim CA, January 1993.

"How High are the Giants' Shoulders:  An Empirical Assessment of Knowledge Spillovers and Creative Destruction in a Model of Economic Growth" (with R. Caballero), in O. Blanchard and S. Fischer, eds., *National Bureau of Economic Research Macroeconomics Annual, Vol. 8*, MIT Press, 1993; reprinted in Gene M. Grossman, ed., *Economic Growth:  Theory and Evidence*, Vol. II, Cheltenham, UK:  Edward Elgar Publishing Limited, 1996.

Review of *Investing in the Future*, by John Irvine, *et al.*, *Journal of Economic Literature*, June, 1992.

Review of *Productivity and U.S. Economic Growth* by D. Jorgenson, *et al.*, *Business History Review*, 1991.

"Evaluating the Relative Effectiveness of Economic Incentives and Direct Regulation for Environmental Protection:  Impacts on the Diffusion of Technology" (with R. Stavins), *CSIA Discussion Paper No. 91-1*, Center for Science and International Affairs, Environment and Natural Resources Program, John F. Kennedy School of Government, Harvard University, February 1991.

"Economic Evaluation of Policy Options for Global Climate Change:  Some Methodological Reflections," Center for Energy and Environmental Policy, John F. Kennedy School of Government, Harvard University, August 1990.

"Market Power of Local Cable Television Franchises:  Evidence from the Effects of Deregulation" (with D. Kanter), *Rand Journal of Economics*, summer 1990.

"Unintended Impacts of Public Investments on Private Decisions:  The Depletion of Forested Wetlands" (with R. Stavins), *American Economic Review*, June 1990.

"Universities and Regional Patterns of Commercial Innovation," *REI Review*, Center For Regional Economic Issues, Case-Western Reserve University, 1989.

"Real Effects of Academic Research," *American Economic Review*, December 1989; reprinted in Paula E. Stephan and David B. Audretsch, eds., *The Economics of Science and Innovation*, Cheltenham, UK:  Edward Elgar Publishing Limited, 2000.

"Characterizing the 'Technological Position' of Firms, with Application to Quantifying Technological Opportunity and Research Spillovers," *Research Policy*, 1987.

"Demand and Supply Influences in R&D Intensity and Productivity Growth," *Review of Economics and Statistics*, August 1988.

"Technological Opportunity and Spillovers of R&D: Evidence from Firms' Patents, Profits and Market Value," *American Economic Review*, December 1986; reprinted in Edward N. Wolff, ed., *The Economics of Productivity*, Cheltenham, UK:  Edward Elgar Publishing Limited, 1997.

"Who Does R&D and Who Patents" (with J. Bound, *et al.*), in Z. Griliches, ed., *R&D, Patents and Productivity*, University of Chicago Press, 1984.

"Benefit-Cost Analysis and Multi-Objective Evaluation of Federal Water Projects," *Harvard Environmental Law Review*, 1980.

"Preventing Groundwater Pollution:  Towards a Coordinated Strategy to Protect Critical Recharge Zones (with J.T.B. Tripp), *Harvard Environmental Law Review*, 1979.

## WORKING PAPERS

"Patent Citations and International Knowledge Flow: The Cases of Korea and Taiwan" (with A. Hu), NBER Working Paper No. W8528, October 2001.

"The NBER Patent Citation Data File: Lessons, Insights and Methodological Tools"(with B. Hall and M. Trajtenberg), NBER Working Paper No. W8498, October 2001.

"Technological Change and the Environment" (with Richard G. Newell and Robert N. Stavins), NBER Working Paper 7970, October 2000.

"Market Value and Patent Citations: A First Look" (with B. Hall and M. Trajtenberg), presented at the NBER Conference Celebrating Zvi Griliches' 20 Years as Director of the Productivity Program, March 1999; NBER Working Paper 7741, June 2000 (submitted to the *Rand Journal of Economics*).

"The Meaning of Patent Citations:  Report on the NBER/Case-Western Reserve Survey of Patentees," NBER Working Paper No. 7631, April 2000.

## OTHER PROFESSIONAL ACTIVITIES

Guest Associate Editor, Management Science Special Issue:  "Managing Knowledge in Organization," 2001

Co-organizer, National Bureau of Economic Research Innovation Policy and the Economy Group, 1999-present

Member, National Academy of Engineering Committee on the Impact of Academic Research on Industrial Performance, 1998-2001

Lead author, Third Assessment Report, Intergovernmental Panel on Climate Change, 1998-2001

Associate Editor, *Rand Journal of Economics*, 1997-present

Member, Board of Editors, *Journal of Industrial Economics*, 1995-present

Member, Economics Roundtable, Advanced Technology Program, U.S. National Institute of Standards and Technology, 1995-present

Co-organizer of the National Bureau of Economic Research Science and Technology Policy Research Workshop, 1995-1998

Member, Board of Editors, *American Economic Review*, 1995-2000

Project Coordinator, National Bureau of Economic Research Project on Industrial Technology and Productivity, 1994-1999

Member, Stanford Energy Modeling Forum, Working Group on Competitive Electricity Markets (EMF 15)

Member, Economic Impact Committee, Association of University Technology Managers, 1994-1995

Contributing Author, Working Group III (socioeconomics) of the Intergovernmental Panel on Climate Change (IPCC), 1993-1994

Member, Stanford Energy Modeling Forum, Working Group on Energy Conservation (EMF 13), 1992-94

Referee for *American Economic Review, Econometrica, Economic Inquiry, Economic Journal, Economics of Innovation and New Technology, Journal of Applied Econometrics, Journal of Economics Organization and Management, Journal of Environmental Economics and Management, Journal of Health Economics, Journal of Industrial Economics, Journal of Law and Economics, Journal of Political Economy, Quarterly Journal of Economics, Rand Journal of Economics, Research Policy, Review of Economics and Statistics, Science,* and MIT Press.

## TEACHING EXPERIENCE

Introductory Economics (undergraduate), Microeconomic Theory (Ph.D.), Law and Economics (undergraduate), Environmental and Natural Resource Economics (undergraduate), Industrial Organization (Ph.D. and undergraduate), Government Regulation and Antitrust Policy (Ph.D. and undergraduate), R&D, Innovation and Productivity Growth (undergraduate), Applied Welfare Economics (John F. Kennedy School of Government)

Foundation for American Communications, economics education for journalists, "The Role of Government in the Economy" (1996)

Designed and implemented a two-year Policy Analysis Lecture Series for the U.S. Army Corps of Engineers, New England Division, Regulatory Branch (1988-89)

## HONORS AND AWARDS

Research Associate, 1994-present, and Faculty Research Fellow, 1985-1994, National Bureau of Economic Research

Principal Investigator, National Science Foundation Grant, "A Protocol for Empirical Measurement of the Impact of Public Research Funding," 2000-2001.

Adam B. Jaffe

Co-Principal Investigator, U.S. Department of Energy Grant, "The Effects of Government Policies on the Invention, Innovation, and Diffusion of Energy-Efficient Technologies," 1998-2001.

Co-Principal Investigator, U.S. Department of Energy Research Grant, "Energy-Efficiency Innovation and the Economic and Regulatory Environment," 1995-1998

Project Director, National Science Foundation Research Grant, "Using Patent Citation Data to Trace Knowledge Flows," 1994-97

Project Director, National Science Foundation Research Grant, "The Sources and Effects of Knowledge Spillovers," 1994-97

Invited Speaker, National Academy of Sciences Symposium: *Science and the Economy*, April 1994

Co-Principal Investigator, National Science Foundation Research Grant, "Getting Down to Basics: Using University and Corporate Patents to Identify Basic Inventions and Trace Their Diffusion," 1991-92

Co-Principal Investigator, Environmental Protection Agency Exploratory Research Grant, "Evaluating the Relative Effectiveness of Economic Incentives and Direct Regulation for Environmental Protection: Impacts on the Diffusion of Technology," 1991-93

Alfred P. Sloan Dissertation Fellowship, Harvard, 1984-85

Alfred P. Sloan Research Fellowship, MIT, 1976-77

Phi Beta Kappa, 1976

September 2002