David J. Jordan (Utah Bar #1751)
John M. Eriksson (Utah Bar #4827)
Marc T. Rasich (Utah Bar #9279)
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 328-3131

Mary S. Hobson (ISB #2142)
G.Rey Reinhardt, IV (ISB #6902)
STOEL RIVES LLP
101 S. Capitol Blvd., Suite 1900
Boise, Idaho 83702-5958
Telephone: (208) 389-9000

Attorneys for Defendant
PacifiCorp

US COURTS
DISTRICT OF IDAHO

OCT 1 6 2002

RECD_____FILED____
CAMERON S. BURKE
CLERK IDAHO

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| SNAKE RIVER VALLEY ELECTRIC ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>PACIFICORP (including UTAH POWER & LIGHT, a division),<br><br>Defendant,<br><br>STATE OF IDAHO, by and through ALAN G. LANCE, Attorney General,<br><br>Defendant-Intervenor. | Case No. 96-308-E-BLW<br><br>**PACIFICORP'S OPPOSITION TO SNAKE RIVER'S MOTION TO STRIKE PACIFICORP'S NINTH AFFIRMATIVE DEFENSE ON THE MERITS** |

### I.   INTRODUCTION

Snake River contends that PacifiCorp cannot assert a regulatory justification defense because ESSA, as it existed before December 8, 2000, permitted rather than compelled

PACIFICORP'S OPPOSITION TO SNAKE RIVER'S MOTION TO STRIKE PACIFICORP'S NINTH
AFFIRMATIVE DEFENSE ON THE MERITS -- Page 1
Boise-148314.1 0058802-00110

341

PacifiCorp's denial of Snake River's request to pirate PacifiCorp's customers. Snake River is mistaken. There is no rule in the Ninth Circuit, or any other circuit, that a regulatory justification defense can be asserted only when the public utility's conduct is compelled, as opposed to authorized, by a regulatory agency. Instead, a regulatory justification defense is available when a public utility can establish that, at the time it engaged in allegedly anticompetitive conduct, it *reasonably believed* that its actions were taken in furtherance of regulatory policy.

## II.   ANALYSIS

### A.   Ninth Circuit Law Regarding the Regulatory Justification Defense

The leading cases in the Ninth Circuit addressing the regulatory justification defense are (1) *Phonetele, Inc. v. Am. Telephone and Telegraph Co.*, 664 F.2d 716 (9th Cir. 1981) ("*Phonetele I*"), (2) *Phonetele, Inc. v. Am. Telephone and Telegraph Co.*, 889 F.2d 224 (9th Cir. 1989) ("*Phonetele II*"), and (3) *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427 (9th Cir. 1997). Each case, as discussed in detail below, refutes Snake River's flawed interpretation of the regulatory justification defense.

#### 1.   *Phonetele I*

The seminal case in the Ninth Circuit addressing the regulatory justification defense is *Phonetele I*. *Phonetele I* involved an antitrust suit brought by Phonetele, Inc., which manufactured and sold devices used in conjunction with telephone networks, against AT&T and other phone companies (collectively, "AT&T") for filing tariffs in an alleged attempt to monopolize and restrain trade in the distribution and sale of telephone terminal equipment. *Phonetele I*, 664 F.2d at 721. AT&T argued, *inter alia*, that the Federal Communications Act conferred implied antitrust immunity for its actions.

The Ninth Circuit found in *Phonetele I* that AT&T enjoyed no absolute antitrust immunity or exemption by virtue of federal or state law. Critically, however, the court concluded that the absence of state action immunity did not foreclose AT&T from showing that its alleged monopolization and restraint of trade in the distribution and sale of telephone terminal equipment was justified by the regulatory scheme in which it operated. Specifically, the court explained that while a given regulatory scheme might not amount to the degree of necessity required to confer implied immunity on all activities of a regulated entity, justification might be established as a matter of fact in individual cases, emphasizing that when a regulated entity assertedly attempted to respond to its duties as a common carrier by filing and implementing an anticompetitive tariff, the antitrust laws did not apply to the tariff without regard to the technical and legal constraints flowing from the regulatory structure. As stated by the Court, "if a defendant can establish that, at the time the various anticompetitive acts alleged . . . were taken, it had a <u>reasonable basis</u> to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, then its actions did not violate the antitrust laws." *Id.* at 737-38 (emphasis added). The court added that the regulatory justification defense must be established in the context of the specific claims made out in the pleadings. *Id.* at 738.

2. ***Phonetele II***

Upon remand of the case after *Phonetele I*, the district court concluded that "in enacting its tariffs, AT&T was acting on the basis of its reasonable belief as to how best to provide effective telephone service to the public, based on technical imperatives known to it and <u>recognized as legitimate</u> by the regulating authorities." *Phonetele II*, 889 F.2d at 229 (emphasis added). In *Phonetele II*, the Ninth Circuit affirmed the district court's conclusion

notwithstanding the absence of any directive from a regulatory agency compelling AT&T to engage in the allegedly anticompetitive conduct at issue. In fact, the court in *Phonetele II* specifically acknowledged that numerous conflicting rulings had been issued by the Federal Communications Commission ("FCC"), the California Public Utility Commission ("CPUC") and the California Supreme Court during the relevant time frame regarding the validity of AT&T's allegedly anti-competitive conduct. Despite this uncertainty, however, the Ninth Circuit noted that the agencies had authorized (not compelled) AT&T to continue its allegedly anticompetitive conduct during the period when those agencies were attempting to resolve their disputes regarding the validity of AT&T's conduct. "Until the issue was actually decided against [AT&T's conduct]", the Ninth Circuit concluded, "AT&T acted reasonably in [continuing its conduct]." The court supported its conclusion by reemphasizing that "the test . . . articulated in *Phonetele I* only requires the defendant to establish that its conclusion 'that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority' was reasonable at the time its conclusion was reached." *Id.* at 230 (former emphasis added, latter emphasis in original) (quoting *Phonetele I*, 664 F.2d at 737-38).

Thus, the holdings in *Phonetele I* and *Phonetele II* clarify that the relevant inquiry in the context of a regulatory justification defense is whether the defendant had a "reasonable belief" that its actions were recognized as legitimate by the regulatory authority recognized; the relevant inquiry is not whether its actions actually were necessitated or compelled by concrete factual imperatives. This question is factual and therefore within the province of the jury. *Id.*; *see also Mid-Texas Communications Systems v. Am. Telephone and Telegraph Co.*, 615 F.2d 1372, 1390 (5th Cir. 1980) ("We do not determine here that Bell's refusal was, in fact, reasonable, but we hold that factual issues concerning the reasonableness of Bell's actions are presented which

require resolution by a jury properly instructed by the trial judge as to the relevant regulatory framework.").

Here, the facts present an even more compelling case for the regulatory justification defense than did the facts in *Phonetele*. Unlike the confusion between the regulatory agencies in *Phonetele*, there is no dispute that the conduct of PacifiCorp in response to Snake River's wheeling request was the <u>precise</u> conduct contemplated by the Idaho legislature when it enacted ESSA. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189, 1192-93 (9th Cir. 2001) ("There is no question that Idaho Code § 61-332B contemplates the suppression of competition at issue. The code section forbids furnish[ing] electric service to the electric service entrance of another electric supplier's customer without the written consent of such other electric supplier." (internal quotations omitted)). Moreover, there is no dispute that Snake River reasonably relied on ESSA in refusing to allow Snake River to pirate its customers. *Id.* at 1191 ("PacifiCorp refused to grant [Snake River's request to pirate PacifiCorp's customers], however, <u>believing the ESSA authorized such refusal</u>." (emphasis added)).

### 3. *Columbia Steel*

Contrary to the representations made by Snake River, the above analysis under *Phonetele I & II* is entirely consistent with the Ninth Circuit's decision in *Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*, 111 F.3d 1427 (9th Cir. 1997). Reaching this conclusion requires discussion of the facts giving rise to the *Columbia Steel* decision.[1] For many years, Portland General Electric ("PGE") and Pacific Power & Light ("PP&L") competed for customers in Portland, and for many years, they had attempted to gain approval from the Oregon Public Utilities Commission ("OPUC") for a division of the Portland market into exclusive service

---

[1] The following recitation of the facts is quoted largely from *Columbia River People's Utility District v. Portland General Electric Company*, 40 F.Supp.2d 1152.

territories. These efforts were unsuccessful, in part because of opposition from the City of Portland. In 1972, PGE and PP&L jointly submitted to the City a plan to eliminate competition between them by dividing the City into exclusive service territories. The City disapproved the plan, but agreed that the duplication of facilities should be eliminated for aesthetic, safety, and economic reasons. The City then passed an ordinance that only "approved 'the sale, transfer and exchange of plant and property between PGE and PP&L.'" *Id.* at 1433. The ordinance did not sanction the creation of exclusive service territories.

After obtaining the City's limited approval for the "sale, transfer and exchange of plant and property," PGE and PP&L entered into an agreement (the "1972 Agreement"), which was then submitted to the OPUC for approval. In contrast to the plan they had submitted to the City, the 1972 Agreement submitted to OPUC said nothing about exclusive territories in Portland. *Id.* at 1433. It did say, however, that one of the purposes of the 1972 Agreement was "to comply with the terms of the Portland ordinance," which, as stated, disapproved of exclusive territories but approved an exchange of plants and property. *Id.* at 1434.

The OPUC approved the 1972 Agreement. Notably, however, the OPUC did not cite any of the statutory provisions that give OPUC authority to approve contracts between utility companies allocating exclusive service territories. Indeed, the OPUC order said nothing about exclusive service territories in Portland. *Id.* at 1434-35.

The division of territory went unchallenged until 1987, when Columbia Steel, a major customer of PGE, decided that it preferred PP&L's rates. Columbia Steel asked PP&L to provide service, but PP&L declined so as not to encroach upon PGE's exclusive territory. When Columbia Steel repeated its request in 1989, PP&L agreed. PGE objected, arguing that the 1972 Agreement gave it the exclusive right to service Columbia Steel. *Id.* at 1435.

In 1990, Columbia Steel filed an antitrust action in federal district court against PGE, PP&L, and the OPUC. PGE and PP&L raised a regulatory justification defense, claiming that the 1972 Order authorized exclusive service territories. *Id.* at 1436. The district court rejected the defense, concluding that the OPUC's "1972 Order did not approve the allocation of exclusive service territories." *Id.* at 1436-37 (emphasis added). The court did state, however, that "[h]ad the 1972 Order [approved the allocation of exclusive service territories], a justification defense would arguably have been available to PGE ...." *Id.* at 1445.

Thus, *Columbia Steel* turned on the district court's, and on appeal, the Ninth Circuit's finding that the "1972 Order did not approve" (which is to be distinguished from a finding that the 1972 Order did not compel) the anticompetitive conduct engaged in by PGE and PP&L—that is, the division of Portland into exclusive service territories. *Id.* at 1437.

    a.    ***Columbia Steel* does not, as claimed by Snake River, limit the regulatory justification defense to instances in which a public utility's allegedly anticompetitive conduct is compelled, as opposed to authorized, by a regulatory agency**

Snake River misrepresents the holding in *Columbia Steel* as requiring that a party's actions be compelled (rather than approved) by a regulatory agency. Snake River bases this interpretation on the statement in *Columbia Steel* that "the 1972 Order used permissive language .... Because the language of the 1972 Order was permissive, it did not require PGE and PP&L to perform the 1972 agreement ...." Snake River improperly extrapolates from this language in concluding that the Ninth Circuit allows a regulatory justification defense to be presented only "where the earlier order involved did not compel anticompetitive conduct by defendants." [CITE Huntley's brief.] However, a complete reading of the language quoted by Snake River in *Columbia Steel* unveils the misconceptions giving rise to Snake River's argument.

PACIFICORP'S OPPOSITION TO SNAKE RIVER'S MOTION TO STRIKE PACIFICORP'S NINTH AFFIRMATIVE DEFENSE ON THE MERITS – Page 7
Boise-148314.1 0058802-00110

As noted above, PGE attempted to support its regulatory justification defense in *Columbia Steel* by arguing that the 1972 Order authorized exclusive service territories that precluded PGE from competing with PP&L in the Portland area. The Ninth Circuit rejected this argument by PGE, citing (1) the history of the 1972 Order proving that the City of Portland and the OPUC rejected the concept of exclusive service territories; and (2) the disconnect between Oregon's statutory framework for public utility service areas and the permissive language in the 1972 Order regarding the transfer and exchange of property between PGE and PP&L. It is the latter of the two arguments that gave rise to the language relied upon by Snake River in opposition to PacifiCorp's regulatory justification defense. Accordingly, the second of the two arguments requires additional clarification.

In proving that the 1972 Order was not intended to create exclusive service territories, the court noted that "the Oregon statues provide that only the utility that has been allocated a territory may serve that territory." *Id.* at 1445, citing Or. Rev. Stat. § 758.450(2). In light of this provision, the court found it to be "significant that in approving an exchange of facilities, the 1972 Order used *permissive* language." *Id.* The court's reasoning was that, given the statutory prohibition against serving a territory allocated to another utility, if the 1972 Order had been intended to create *exclusive* service territories as claimed by PGE, the 1972 Order would have used *compulsory* language regarding the exchange of facilities. Stated alternatively, had the 1972 Order actually intended to establish exclusive service territories, PGE and PP&L would have been *required*, not permitted, by Oregon law to transfer to one another all property held in each other's exclusive service area. As stated by the court, "[g]iven the statutory prohibition against serving a territory allocated to another utility, the permissive language in the 1972 Order would have been incongruous if the 1972 Order had approved an allocation of exclusive service

territories." *Id.* at 1445. Because the transfer of property in the 1972 Order was permissive rather than compulsory, the court in *Columbia Steel* concluded that the 1972 Order was not intended to create exclusive service territories and, consequently, could not be relied upon by PGE in support of its regulatory justification defense.

It is the above analysis that Snake River has misconstrued to mean that no regulatory justification defense can survive absent language compelling (as opposed to approving) the allegedly anticompetitive conduct of the public utility. Although it is true that in the specific factual context of the *Columbia Steel* case the permissive language in the 1972 Order was fatal to PGE's regulatory justification defense, Snake River clearly misreads that opinion to the extent it suggests that all regulatory justification defenses must be based upon compulsory rather than permissive language.

Moreover, it cannot be overlooked that the specific regulatory justification defense made by PGE was that the 1972 Order actually "required," or compelled, PGE to cease competition with PP&L. PGE did not argue that it had a reasonable belief that its actions were justified by the 1972 Order. The opinion in *Columbia Steel* regarding the regulatory justification defense, therefore, focuses largely on whether the 1972 Order actually "required" or compelled PGE to operate within an exclusive service territory.

Finally, reading *Columbia Steel* as mandating that all regulatory justification defenses be based upon compulsory statements by a regulatory agency would eviscerate the distinction between state action immunity and regulatory justification. For example, had PacifiCorp been compelled rather than authorized by ESSA to deny Snake River's request for wheeling services to PacifiCorp's existing customers, PacifiCorp's conduct would have fallen squarely within the state action immunity doctrine. Thus, under Snake River's interpretation of *Columbia Steel*,

there would be no instance in which a public utility could claim a regulatory justification defense the allegedly anticompetitive conduct either would be compelled by the state (in which case the conduct would be protected by the state action immunity doctrine) or would be authorized by the state (in which case the conduct would be permissive and ineligible for the regulatory justification defense). This result is contrary to the clear intent of the Ninth Circuit to allow public utilities to rely upon a regulatory justification defense.

### b. PacifiCorp's actions under ESSA are easily distinguishable from PGE's conduct under the 1972 Order in *Columbia Steel*

In stark contrast to the 1972 Order at issue in *Columbia Steel*, ESSA not only "approves" the allegedly anticompetitive conduct of PacifiCorp in this case, it affirmatively promotes such conduct. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 238 F.3d 1189, 1192-93 (9th Cir. 2001) ("There is no question that Idaho Code § 61-332B contemplates the suppression of competition at issue."). Thus, the sole basis for the *Columbia Steel* court's rejection of PGE's regulatory justification defense—that is, that the 1972 Order "did not approve" the conduct of PGE—has no bearing on the facts in this case.

### c. *Columbia Steel* concluded that a public utility's actions did not have to be compelled by the state to qualify for state action immunity

Further proof that the court in *Columbia Steel* had no intention of imposing a requirement that a public utility's actions be compelled by the state is found in the court's discussion of *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985). The issue addressed by the U.S. Supreme Court in *Hallie* was whether a city's anticompetitive conduct qualified for state action immunity when its actions are authorized, but not compelled, by the state. The U.S. Supreme Court concluded that mere authorization is sufficient when the anticompetitive conduct is a foreseeable result of such authorization. The court in *Columbia Steel* never moved beyond this analysis,

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of October 2002, I caused the foregoing **PACIFICORP'S OPPOSITION TO SNAKE RIVER'S MOTION TO STRIKE PACIFICORP'S NINTH AFFIRMATIVE DEFENSE ON THE MERITS** to be served via hand delivery to the following:

       Robert C. Huntley
       Christopher F. Huntley
       HUNTLEY, PARK, THOMAS, BURKETT,
       OLSEN & WILLIAMS, L.L.P.
       250 So. 5th Street, Suite 660
       P.O. Box 2188
       Boise, Idaho 83702

By: _____
     David J. Jordan
     John M. Eriksson
     Marc T. Rasich
     G. Rey Reinhardt, IV

however, because it concluded that the 1972 Order did not authorize PGE to maintain an exclusive service territory.

Here, ESSA did authorize the allegedly anticompetitive conduct of PacifiCorp. Moreover, as held by the Ninth Circuit in this case, the "restraint of trade at issue--PacifiCorp's refusal to allow Snake River to supply PacifiCorp customers with electricity--is clearly a foreseeable result of the Idaho Code." Snake River Valley Elec. Ass'n v. PacifiCorp, 238 F.3d 1189, 1193 (9th Cir. 2001). There can be no question, therefore, that PacifiCorp is entitled to claim a regulatory justification defense given that its actions were both expressly authorized by and a foreseeable result of ESSA.

DATED: October 16, 2002.

STOEL RIVES LLP

_____
David J. Jordan
John M. Eriksson
Marc T. Rasich
G. Rey Reinhardt, IV
Attorneys for Defendant PacifiCorp